## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

| | | |
|---|---|---|
| NORMAN GRAHAM, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| V. | ) | CIVIL CASE NO.:  1:20-cv-210-GNS |
| | ) | |
| TODD COUNTY, The Estate of Todd | ) | |
| County Sheriff LAURIN MORRIS, | ) | JURY TRIAL DEMANDED |
| *in his individual capacity;* | ) | |
| Kentucky State Police Officers, *in* | ) | |
| *their individual capacities,* the Estate | ) | |
| of VERNON ALBRO, ROBERT | ) | |
| MILLER, the Estate of LARRY | ) | |
| BOLLIGNER, A. BELL, SCOTT | ) | |
| SMITH, the Estate of STEVEN | ) | |
| SILFIES; and other unknown | ) | |
| Kentucky State Police supervisors. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

NOW COMES Plaintiff, NORMAN GRAHAM, by his attorneys LOEVY & LOEVY, and complaining of Defendants TODD COUNTY, the Estate of Todd County Sheriff LAURIN MORRIS, in his individual capacity; Kentucky State Police Officers, in their individual capacities, the Estate of VERNON ALBRO, ROBERT MILLER, the Estate of LARRY BOLLINGER, A. BELL, SCOTT SMITH, and the Estate of STEVEN SIFLIES; and other unknown Kentucky State Police supervisors, and states as follows:

1

## INTRODUCTION

1.   On June 30, 1980, Plaintiff Norman Graham suffered the unimaginable – discovering the body of his naked, deceased girlfriend, Janice Kaye Williams, whom had been brutally raped and murdered.

2.   Mr. Graham had absolutely nothing to do with Williams' rape or murder and yet faced the penalty of death for crimes he did not commit.

3.   Robbed of the opportunity to grieve, Mr. Graham devoted the next 39 years fighting to clear his name after the Defendants herein conspired to frame him by fabricating false evidence, withholding exculpatory evidence, and initiating charges against him for a rape and capital murder that was lacking probable cause.

4.   Mr. Graham spent over nine years wrongfully incarcerated before he was finally exonerated on December 26, 2019 when the Todd County Circuit Court entered an Order granting the Commonwealth's motion to dismiss.

5.   This manifest injustice was not the result of mere flaws in the judicial system.

6.   Rather, the Defendants named herein conspired to take Mr. Graham's liberty by knowingly initiating charges based on evidence the Defendants fabricated and by withholding evidence directly implicating other potential perpetrators.

7.   The Defendants sought the prosecution of Mr. Graham not just once, but twice, without any legitimate basis for probable cause.

8.   Mr. Graham now brings this lawsuit seeking justice for the harm caused to him for decades by the Defendants' misconduct.

2

**Jurisdiction and Venue**

9.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

10.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

11.    Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all Defendants reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

**THE PARTIES**

12.    Plaintiff Norman Graham is a 74-year-old resident of Clarksville, Tennessee. At all relevant times to this Complaint, Mr. Graham resided in the Commonwealth of Kentucky and lived within the Western District of Kentucky.

13.    At all relevant times, Defendant Laurin Morris was Sheriff of the Todd County Sheriff's Department. Defendant Morris is sued in his individual capacity. He acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

14.    Defendant Todd County is a local governmental entity organized under Kentucky law. Defendant Todd County is responsible for the policies, practices, and customs of the Todd County Sheriff's Department.

15.    At all relevant times, Defendants Vernon Albro, Larry Bollinger, A. Bell, Robert Miller, Scott Smith, and Steven T. Silfies were Kentucky State Police

("KSP") officers. Each of these Defendant Officers is sued in his individual capacity, and each acted under color of law and within the scope of his employment in engaging in the actions alleged in this complaint.

16.     Defendants Albro, Bollinger, Bell, Miller, Smith, and Silfies are collectively referred to as the "KSP Defendants."

17.     The individual Defendants are referred to collectively as the "Defendant Officers."

## FACTUAL ALLEGATIONS

### The Murder of Janice Kaye Williams

18.     At approximately 4:30 a.m. on June 30, 1980, Norman Graham arrived home in the Tiny Town Trailer Park in Guthrie, Kentucky, to discover Janice Kaye Williams' nude body lying across the bed with her hands tied behind her back and her legs spread in a sexually explicit position.

19.     A red jumpsuit was found on the floor at the foot of the bed.

20.     According to the post-mortem examination, Ms. Williams was raped and stabbed 27 times.

21.     Ms. Williams' wrists and ankles had been bound with bootlaces like those found in military boots.

22.     Members of the Todd County Sheriff's Office and the Kentucky State Police jointly investigated the crime.

**Mr. Graham Assists the Defendants' Investigation
Before Being Framed for Murder**

23.     Mr. Graham, who had absolutely nothing to do with the rape and murder of Ms. Williams, assisted the Defendant Officers with the investigation in every way he could.

24.     Mr. Graham voluntarily gave a statement to Defendants Albro and Morris at the scene, explaining the last time he had seen the victim alive and detailing his whereabouts for the time in question.

25.     Mr. Graham's alibi was confirmed to Defendant Albro the following day by a third-party witness.

26.     Additionally, Mr. Graham voluntarily provided Defendant Albro with the clothing and cowboy boots he was wearing that night and with a small pocketknife that he was carrying.

27.     Subsequent testing revealed there was no physical evidence on those items tying Mr. Graham to Ms. Williams' murder.

28.     In fact, no blood found at the scene matched that of Mr. Graham.

29.     Indeed, the physical evidence in this case demonstrated that Mr. Graham was innocent.

30.     Despite his innocence and with no probable cause to do so, the Defendant Officers initiated charges against Mr. Graham in 1981 and 2007.

## The Framing of Norman Graham Prior to 1981 Trial

*The Defendant Officers Withheld Exculpatory Information Relating to
Alternate Suspects Discovered Prior to Mr. Graham's First Trial*

31.    Early in the investigation, the Defendant Officers learned of viable alternate suspects.

32.    The Defendant Officers developed one such suspect, a soldier named Rick. Multiple witnesses revealed that Ms. Williams gave Rick her contact information and address hours before her death.

33.    Likewise, Rick wrote down his name and contact information on an envelope that Ms. Williams placed in her purse. Ms. Williams' purse was found at the scene, but the Defendants withheld that letter from Mr. Graham, his counsel, and the Commonwealth.

34.    Defendant Albro also came to suspect Daniel Drzenzski, another Fort Campbell soldier Williams was dating at the time of her death. Defendant Albro discovered that Drezenzki's car was seen on June 29 and June 30 in the Tiny Town Trailer Park where Williams' body was discovered.

35.    The Defendant Officers conducted an investigation into these alternate suspects but buried and withheld the exculpatory information from Plaintiff, his counsel, and the prosecutors.

36.    Indeed, the Defendant Officers have withheld all investigation into these alternate suspects for over 39 years.

### The Defendant Officers Withhold Exculpatory Evidence Relating to
### Threats Ms. Williams Received

37.     In November of 1980, Ms. Williams' mother informed Defendant Albro that the victim received an anonymous letter prior to her death in which "obscene threats" were made toward Ms. Williams and her child.

38.     Although this letter was provided to Defendant Albro, he did not disclose that letter or its contents to Plaintiff, his counsel, or the prosecutor.

38.     Likewise, on that same date, Defendants Albro, Bollinger, Miller and Bell learned from Graham's neighbor, Rita Kelly, that she had been receiving threatening phone calls since Ms. Williams' murder. According to Ms. Kelly, the caller referred to Ms. Williams' body and said, "that was nothing compared to what he would do to her." The Defendant Officers learned that the caller admitted to killing Ms. Williams.

39.     The Defendant Officers investigated such threats throughout their investigation and learned that Mr. Graham was not the person that wrote the letter nor made the threats over the phone.

40.     The Defendants further developed investigative leads into the source of these threats and the letter and withheld such evidence from the Commonwealth and the Plaintiff for decades on end.

### Defendant Morris Withholds Exculpatory "Interrogation"

41.     While the Defendant Officers were unearthing evidence implicating a host of viable alternate suspects, Mr. Graham continued to cooperate with the

Defendants' investigation, even going so far as agreeing to Defendant Morris' request that he go to a hypnotist "to determine" what he knew.

42.     Indicative of the widespread withholding of evidence, Defendant Morris failed to document the hypnosis "interrogation" session in any report.

*The Defendant Officers Manufacture False Forensic Evidence*

43.     In July of 1980, Defendant Albro submitted multiple items of evidence, including Plaintiff's clothing and shoes, the pocketknife he was carrying, and the jumpsuit Ms. Williams had been wearing on the night of her death, to the Kentucky State Laboratory for serological analysis.

44.     By September of 1980, the Defendant Officers learned that no blood was found on Mr. Graham's shirt, boots, and knife and that no blood or semen was found on the jumpsuit Ms. Williams had been wearing on the night of her death.

45.     The Defendant Officers subsequently learned in a January 1981 report that the blood found at the scene did not match Mr. Graham.

46.     In an effort to obtain forensic samples from Plaintiff, Defendants Morris and Miller interrogated him at the Todd County Sheriff's Office on December 16, 1980.

47.     As he had done throughout the investigation, Mr. Graham cooperated, reporting his whereabouts on June 29 and June 30, 1980, and informing the Defendant Officers that he and Ms. Williams last had sexual intercourse on the morning of June 29.

48.    Mr. Graham continued to maintain his innocence throughout the interrogation.

49.    At the conclusion of the interrogation, Mr. Graham voluntarily provided samples to the Defendants, including a semen sample.

50.    In their quest to frame him for a crime he did not commit, the Defendant Officers thereafter manufactured false evidence, by planting Mr. Graham's semen on the jumpsuit that had previously tested negative for semen.

51.    Thereafter, Defendant Albro resubmitted many of the items found at the crime scene to the Kentucky State Police laboratory for further testing, including the red jumpsuit.

52.    Subsequent testing then revealed the presence of semen on the jumpsuit.

53.    Additionally, the Defendant Officers fabricated statements and "evidence" that falsely implicated Graham.

54.    The Defendant Officers concealed the fact the manufactured evidence and statements were false from Plaintiff, his counsel, and the Commonwealth. In fact, the Defendants have withheld information relating to this misconduct to this day.

### The Wrongful Prosecution of Norman Graham in 1981

55.    Armed with their false theory that Mr. Graham was guilty, the Defendant Officers endeavored to stretch, manipulate, manufacture, and fabricate the facts and evidence to fit their false hypothesis.

56.     In so doing, the Defendant Officers manufactured "evidence" that falsely implicated Mr. Graham.  The Defendant Officers likewise withheld evidence that was both exculpatory and material from Plaintiff, his counsel, and the Commonwealth.

57.     Ultimately, Defendant Morris issued an arrest warrant on March 7, 1981 for Plaintiff charging him with rape and murder.

58.     At the time of his arrest, Defendant Albro interrogated Mr. Graham, who continued to maintain his innocence.

59.     Two days later, Defendants Morris and Albro presented false and fabricated evidence to the Grand Jury seeking indictments for rape and murder.

60.     At the time of Mr. Graham's arrest and their subsequent presentation to the Grand Jury, the Defendant Officers knew no probable cause existed to initiate charges against Mr. Graham. Nonetheless, the Defendant Officers continued to set Plaintiff's prosecution in motion.

61.     In their conspiracy to frame Mr. Graham, sometimes acting alone and sometimes acting in concert, the Defendant Officers manipulated and manufactured inculpatory evidence and withheld exculpatory evidence.

62.     Prior to Plaintiff's trial, the Defendant Officers actively concealed the falsity of the inculpatory evidence they fabricated, the methods by which they fabricated, and the scope of their fabrication from Graham, his defense counsel, and the prosecutor.

63.     Ultimately, Mr. Graham's case proceeded to trial in September of 1981. On the day of trial, the Commonwealth's Attorney dismissed the rape charge against Mr. Graham, conceding he had no evidence that Mr. Graham raped Ms. Williams.

64.     The 1981 trial ended in a hung jury on the murder charge.

### The Defendants Continued in Their Quest to Frame Mr. Graham After The 1981 Trial

*Defendant Miller Withholds Exculpatory Evidence that Led to the Dismissal of Charges*

65.     The nightmare for Mr. Graham did not cease after the hung jury. Instead, the Defendant Officers continued their quest to frame him for crimes he did not commit.

66.     Between December 31, 1981 and January 18, 1982, Defendant Miller continued investigating Ms. Williams' death.

67.     During this period of time, Defendant Miller obtained exculpatory information that has yet to be disclosed to Mr. Graham to this day.

68.     Due to the absence of probable cause, the Commonwealth dismissed the charges against Mr. Graham without prejudice on February 28, 1982.

69.     The Defendant Officers' investigation into Mr. Graham and their quest to frame him for crimes he did not commit continued.

*Roy Wayne Dean Confessed to Killing "Something" in the Trailer Park*

70.    Early in the investigation, the Defendants were informed that Roy Wayne Dean, a serial killer, lived with his family in a trailer behind Mr. Graham's in June of 1980.

71.    Ms. Williams caught Dean peering through the window of Mr. Graham's trailer at her. Dean subsequently threatened her.

72.    Around 11:00 pm on June 29, 1980, 13-year-old Regina "Renee" Dean and her cousin, Barbara Keaton, were playing hide-and-go-seek in the Tiny Town Trailer Park. As they were playing, Renee heard what sounded like a woman screaming and then everything got quiet.

73.    A short time later, Renee saw her 18-year-old brother Roy Wayne Dean quickly exit the back door of Mr. Graham's trailer. Renee could see her brother clearly as he passed under a lit pole light and observed that he was covered in blood. He motioned for her to be quiet as she called out to him.

74.    Ms. Keaton too heard a loud, piercing scream as she and Renee played. Within five to ten minutes, Dean came running around a trailer, almost bumping into Ms. Keaton. Dean was carrying a black combat boot in his hand that he threw into a dumpster before going into his uncle's home across the road.

75.    About 45 minutes later, Renee observed Dean in the kitchen with a bloody cut on his hand. When she asked her brother what happened, Dean told her to shut her "damn mouth" and get back in her room.

76.     Dean later threatened to do to Renee what he "had done to that girl in the trailer park."

77.     Dean subsequently confessed to his wife that he had killed "something" in Tiny Town.

78.     Additionally, the Defendant Officers learned that just days before Williams' death, Graham's neighbors, the Kellys, discovered Dean in their trailer in the middle of the night. When confronted, Dean quickly ran out.

79.     The Defendants learned of this information that implicated Dean in the murder of Ms. Williams. Even still, they buried exculpatory evidence implicating Dean in the rape and murder as part of their quest to frame Plaintiff for crimes he did not commit.

80.     As is discussed below, Defendants' misdeeds not only had tragic consequences for Plaintiff, who fought tirelessly for decades to clear his name, but for other victims as well. If Defendants had conducted a legitimate investigation in 1980, they would have rightly apprehended Dean for this rape and murder before he went on to kill again – multiple times.

*The Defendant Officers Withheld Exculpatory Information Relating*
*to Convicted Serial Killer Roy Wayne Dean*

81.     Because of Defendants' conspiracy to frame Plaintiff, Dean went on to rape and murder other women in and around Todd County, Kentucky.

82.     In 1982, the Defendant Officers learned of the murder of a young woman who had been stripped of her clothing, was bound at her arms, and was stabbed multiple times in Fort Campbell, Kentucky.

13

83.    No later than October of 1984, the Defendants also learned of two other murders, similar to the murder of Ms. Williams', of young women in Todd County.

84.    The Defendant Officers took steps to determine whether the murders were linked and whether a serial killer may have been responsible for all four murders.

85.    In fact, by 1994, Roy Wayne Dean had been convicted of two of the murders.

86.    Through their investigation, the Defendant Officers developed evidence demonstrating that the Williams' homicide was linked to these other crimes committed by Dean.

87.    The Defendant Officers withheld this exculpatory information, including information related to and derived from the investigation for the three other murders, from Mr. Graham, his counsel, and the Commonwealth.

*DNA Testing Confirms Graham's Innocence*

88.    The Williams' murder investigation laid dormant for the next sixteen years until 2001 when Kentucky State Police Detective Brad Stevenson took over the investigation.

89.    Detective Stevenson presented evidence from Ms. Williams' case to the Kentucky State Police Laboratory for DNA testing. It was thereafter that he learned that there were two different sources of DNA and semen found within Williams' vaginal swabs.

14

*With No Probable Cause, Defendant Silfies Initiates*
*New Charges Against Mr. Graham*

90.     For the next three years, Detective Stevenson reviewed the case, finding no new leads.

91.     Defendant Steven Silfies took over the case in October of 2006, with the assistance of Defendant Scott Smith.

92.     Because no probable cause existed against Plaintiff, Defendant Silfies conspired with other Defendant Officers to fabricate statements.

93.     Within less than 3 months of inheriting a 26-year-old cold case and with no true new evidence, Defendant Silfies presented false and fabricated evidence to the Grand Jury successfully obtaining indictments for rape and murder.

94.     On that same date, Defendant Silfies obtained an arrest warrant for Mr. Graham.

95.     At the time of the presentation to the Grand Jury and Mr. Graham's subsequent arrest, the Defendant Officers knew no probable cause existed to initiate charges against Plaintiff. Nonetheless, the Defendant Officers continued to set Mr. Graham's prosecution in motion.

**The Wrongful Prosecution of Norman Graham in 2008**

96.     In their conspiracy to frame Mr. Graham, sometimes acting alone and sometimes acting in concert, the Defendant Officers manipulated and manufactured inculpatory evidence and withheld exculpatory evidence.

97.     Prior to Mr. Graham's 2008 trial, the Defendant Officers actively concealed the falsity of the inculpatory evidence they fabricated, the methods by

which they fabricated, and the scope of their fabrication from Mr. Graham, his defense counsel, and the Commonwealth.

98.    Ultimately, Mr. Graham's case proceeded to trial in October of 2008. Though the Commonwealth had dismissed the rape charge against him in 1981, Mr. Graham was tried for both rape and murder. Mr. Graham was found guilty of both charges and was sentenced to 40 years' imprisonment.

### Mr. Graham's Vindication

99.    For over 39 years, the Defendant Officers contrived to frame Norman Graham for the murder and rape of Janice Kaye Williams. Mr. Graham spent over nine years incarcerated before the Todd Circuit Court granted him a new trial. Ultimately, the Commonwealth's Attorney agreed that the charges against Mr. Graham should be dismissed.

100.    On December 26, 2019, the Todd Circuit Court entered an Order granting the Commonwealth's motion to dismiss the charges against him, in a manner indicative of his innocence.

### Mr. Graham's Damages

101.    Norman Graham was a hard-working, carefree, thirty-five-year-old man when his girlfriend was murdered, and he was first arrested and wrongfully prosecuted for a crime he did not commit.

102.    Although not found guilty during the first trial, Mr. Graham was forced to spend the next 25 years looking over his shoulder as the Defendant

Officers herein continued in their quest to frame and prosecute him despite his innocence.

103.    In 2007, at age sixty, Mr. Graham's nightmares once again came true, when he was arrested and wrongfully charged a second time.

104.    Mr. Graham spent the next nine years incarcerated in the Kentucky Department of Corrections, where he was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free individuals enjoy as a matter of right. Mr. Graham missed out on the ability to share holidays, births, funerals, and other life events with loved ones, as well as the fundamental freedom to live one's life as an autonomous human being. As a result, the emotional pain and suffering caused by losing those years has been substantial.

105.    Because of the foregoing, Mr. Graham has suffered tremendous damage, including but not limited to, physical harm, mental suffering, and the loss of a normal life – all proximately caused by Defendants' misconduct.

## NORMAN GRAHAM'S CLAIMS

### Count I – 42 U.S.C. § 1983
### Malicious Prosecution

106.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

107.    As described more fully above, all the Defendant Officers, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Graham of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

108.   In the manner described more fully above, the Defendant Officers made, influenced and/or participated in the decision to prosecute Plaintiff, not just once – but twice – for rape and murder, for which prosecution there was no probable cause and which caused Mr. Graham to suffer a deprivation of liberty. The Defendant Officers' misconduct included falsifying and manipulating evidence and withholding exculpatory and impeachment evidence.

109.   As described more fully above, the prosecution was resolved in Mr. Graham's favor.

110.   The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Mr. Graham's liberty in violation of his constitutional rights.

111.   As a result of this violation of his constitutional rights, Mr. Graham suffered injuries, including but not limited to emotional distress and bodily harm, as is more fully alleged above.

112.   The Defendant Officers' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Graham's constitutional rights.

113.   The misconduct described in this Count was undertaken pursuant to a routine practice of the Todd County Sheriff's Department to pursue wrongful prosecutions and wrongful convictions through reckless and flawed investigations and coerced and fabricated evidence. In this way, Defendant Todd County violated

Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

114.   These widespread practices, so well-settled so as to constitute *de facto* policy in the Todd County Sheriff's Department, were able to exist and thrive because municipal policymakers with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

115.   The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

### Count II – 42 U.S.C. § 1983 –Fourteenth Amendment Due Process

116.   Each paragraph of this Complaint is incorporated as if restated fully herein.

117.   In the manner described more fully above, the Defendant Officers, while acting individually, jointly and in conspiracy with each other, conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, false forensic evidence, and other evidence from the prosecution, Mr. Graham, and Mr. Graham's counsel. Absent this misconduct, the prosecution of Mr. Graham would not been pursued.

118.   Furthermore, in the manner described more fully above, one or more of the Defendant Officers continued to withhold and/or suppress exculpatory evidence from Mr. Graham even after his first criminal trial.

119.   The Defendants' misconduct directly resulted in the unjust criminal conviction of Mr. Graham, denying him the constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

120.   The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

121.   As a direct and proximate result of the Defendant Officers' actions, Mr. Graham's constitutional rights to a fair trial were violated. He suffered from injuries and damages, including but not limited to the loss of liberty, bodily harm, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

122.   The misconduct in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Graham's constitutional rights.

123.   The misconduct described in this Count was undertaken pursuant to a routine practice of the Todd County Sheriff's Department to pursue wrongful prosecutions and wrongful convictions through reckless and flawed investigations and coerced and fabricated evidence. In this way, Defendant Todd County violated Mr. Graham's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

124.     The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

125.     In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of Defendant Todd County and the Todd County Sheriff's Department in that the violation of Mr. Graham's rights described herein was caused by the actions of policymakers for these Defendants.

### Count III – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments Fabrication of False Evidence

126.     Each paragraph of this Complaint is incorporated as if restated fully herein.

127.     In the manner described more fully above, the Defendant Officers, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed to witnesses, fabricated false forensic evidence, and fabricated evidence offered at the grand jury and other pretrial proceedings. The Defendant Officers knowingly fabricated this evidence. A reasonable likelihood exists that the false evidence affected the decision of the grand jurors that considered this false evidence when determining whether probable cause existed.

128.     The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

129.     The Defendant Officers' misconduct directly resulted in the unjust continued incarceration of Mr. Graham, thereby denying him from his

constitutional right to due process as guaranteed by the United States Constitution. Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecutions of Plaintiff could not and would not have been pursued.

130.    As a direct and proximate result of the Defendant Officers' actions, Mr. Graham's constitutional rights were violated, and he suffered from injuries and damages, including but not limited to the loss of liberty, bodily harm, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count IV – 42 U.S.C. § 1983**
**Supervisory Liability**

131.    Each paragraph of this Complaint is incorporated as if restated fully herein.

132.    The continued wrongful detention of Plaintiff was caused by the deliberate indifference and recklessness of unknown supervisory defendants when they failed to adequately train and supervise the individual Defendant Officers.

133.    Specifically, these supervisory defendants knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

134.    Furthermore, these supervisory defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned the production of exculpatory evidence and the prohibition of falsifying statements and evidence, thereby encouraging and/or

permitting these employees and other defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Graham.

135.   These failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Graham's constitutional rights.

136.   The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Graham, including the above-mentioned injuries and damages.

137.   The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Graham's clearly established constitutional rights.

### Count V - 42 U.S.C. § 1983
### Failure to Intervene

138.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

139.   In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

140.   As a result of the Defendant Officers' failure to intervene to prevent the violation of Mr. Graham's constitutional rights, he suffered pain and injuries, as well as emotional distress.

141.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Graham's rights.

142.   The misconduct described in this Count was undertaken pursuant to the policy and practice of Defendant Todd County in the manner described more fully in preceding paragraphs and was tacitly ratified by policymakers for the city defendants with final policymaking authority.

### Count VI - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

143.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

144.   After Janice Kaye Williams was murdered, the Defendant Officers reached an agreement amongst themselves to frame Plaintiff for the crime and to thereby deprive him of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various paragraphs of this Complaint.

145.   In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

146.   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

147.   As a direct and proximate result of the illicit prior agreement referenced above, Mr. Graham's rights were violated, and he suffered financial damages, as well as emotional distress and anguish, as is more fully alleged above.

148.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

149.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the Todd County Sheriff's Department in the manner described more fully in preceding paragraphs and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

### Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Todd County

150.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

151.   The actions of the Todd County officers in withholding material exculpatory information from Mr. Graham and his counsel were undertaken pursuant to the policies and practices of the Todd County Sheriff's Department, described above, which were ratified by policymakers for the Todd County Government with final policymaking authority. These policies and practices

included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

152.   The policies and practices described in this Count were maintained and implemented by the Todd County Government with deliberate indifference to Plaintiff's constitutional rights.

153.   As a direct and proximate result of the Todd County Government's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

154.   The Knox County Government is therefore liable for the misconduct committed by its officers.

## Count VIII – State Law Claim
## Malicious Prosecution

155.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

156.   Through their actions as described above, the Defendant Officers caused Graham to be improperly subjected to a prosecution for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Mr. Graham's favor and in a manner indicative of his innocence.

157.   The Defendant Officers accused Mr. Graham of criminal activities knowing those accusations to be without genuine probable cause, fabricated evidence and withheld the manner in which that evidence was fabricated, and made

statements and reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

158.  The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment and/or official responsibilities.

159.  As a result of this misconduct, Plaintiff suffered injuries, including the threat of bodily harm, and emotional pain and suffering as more fully alleged above.

### Count IX – State Law Claim
### Negligent Supervision

160.  Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

161.  The municipal defendants, as well as the supervisory defendants, including Defendant Morris and other unknown KSP supervisory defendants, had a duty to properly train and supervise officers, detectives, and supervisor employees of the Todd County Sheriff's Department and the Kentucky State Police, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

162.  The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant Officers, resulting in Graham being deprived of his right to due process, and his right to be free from false imprisonment and wrongful conviction.

163.   As a result of this misconduct, Graham suffered injuries, including bodily harm and emotional pain and suffering, as more fully alleged above.

### Count IX – State Law Claim
### Intelligent Infliction of Emotional Distress

164.   Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

165.   As described more fully in the preceding paragraphs, by framing Mr. Graham for a crime he did not commit and pursuing his prosecution, the Defendant Officers intended to cause Mr. Graham emotional distress or should have known that their actions would result in serious emotional distress.

166.   In so doing, the Defendant Officers' conduct was extreme and outrageous, going beyond all possible bounds of decency, such that it can be considered completely intolerable in a civilized society. This conduct caused Mr. Graham to suffer serious emotional distress of the nature no reasonable person could be expected to endure.

167.   The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment.

168.   As a result of this misconduct, Mr. Graham suffered injuries, including emotional pain and suffering, as is more fully alleged above.

## Count XI
## Respondeat Superior

169.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

170.    In committing the acts alleged in the preceding paragraphs, Defendant Morris was a member and agent of the Todd County Sheriff's Department, acting at all relevant times within the scope of his employment.

171.    Defendant Todd County is liable as principal for all state law torts committed by its agents.

**WHEREFORE**, Plaintiff, NORMAN GRAHAM, respectfully requests that this Court enter judgment in his favor and against Defendants TODD COUNTY, Todd County Sheriff LAURIN MORRIS, Kentucky State Police Officers VERNON ALBRO, ROBERT MILLER, LARRY BOLLINGER, A. BELL, SCOTT SMITH, and STEVEN SILFIES, and other unknown officers and supervisory defendants from the Kentucky State Police, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, NORMAN GRAHAM, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/  Amy Robinson Staples
*One of Plaintiff's Attorneys*

Michael Kanovitz
Elliot Slosar*
Amy Robinson Staples
Margaret E. Campbell*
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902

*Pro Hac Vice Motion Forthcoming