**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | | |
|---|---|---|
| BRENDA GRAHAM , | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| V. | ) | CASE NO.    1:20-CV-210-GNS |
| | ) | |
| | ) | Judge Greg N. Stivers |
| TODD COUNTY, et al; | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT TODD COUNTY,**
**KENTUCKY'S MOTION FOR SUMMARY JUDGMENT (DKT. 117)**

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

STATEMENT OF FACTS ............................................................................................1

ARGUMENT ...............................................................................................................17

I.   The Summary Judgment Standard Mandates the Case Proceed to Trial Against Defendant Todd County ..........................................................................................................17

II.   The Record Presents a Triable *Monell* Claim (Count VII) .................................17

    A.  The Record Establishes Todd County Sheriff Morris Violated Plaintiff's Constitutional Rights ..........................................................................................18

       1.  The Record Establishes that Morris Maliciously Prosecuted Plaintiff .................20

       a.  A Reasonable Jury Could Conclude Morris Made, Influenced, or Participated in the Decision to Prosecute Plaintiff and/or Contributed to His Continued Detention ..........................................................................................20

       b.  A Reasonable Jury Could Conclude the Grand Jury Indictment was Tainted, Rebutting Probable Cause ..........................................................................23

       2.  The Record Establishes that Morris Withheld Exculpatory Evidence .................25

       3.  The Record Establishes that Morris Fabricated Evidence .....................................25

       4.  The Record Establishes that Morris Failed to Intervene and Conspired with the KSP Defendants to Violate Plaintiff's Rights .....................................................27

    B.  The County's Conscious Choice Not to Have Policies on *Brady,* Fabrication, and Other Crucial Issues Amounts to Deliberate Indifference and Was The Moving Force Behind Plaintiff's Injury ..........................................................................................29

CONCLUSION ............................................................................................................32

# TABLE OF AUTHORITIES

*Adams v. Metiva,* 31 F.3d 375 (6th Cir. 1994)....................................................................19

*Alexander v. CareSource*, 576 F.3d 551 (6th Cir. 2009) ...................................................28

*Alman v. Reed,* 703 F.3d 887 (6th Cir. 2013) ....................................................................24

*Armstrong v. Sqaudrito,* 152 F.3d 564 (7th Cir. 1998)......................................................29

*B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587 (6th Cir. 2001)..............................18

*Bakos v. City of Olmstead Falls,* 73 Fed. Appx. 152, 158 (2003) ...................................23

*Bard v. Brown Ctnty., Ohio,* 970 F.3d 738 (6th Cir. 2020) ........................................18, 19

*Bazzi v. City of Dearborn,* 658 F.3d 598 (6th Cir. 2011) ..................................................27

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .................................................................28

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).........................................................18

*Clark v. Louisville-Jefferson Cnty. Metro Gov.,* No. 3:17-CV-00419-GNS-CHL,
    2024 WL 56938 (W.D.Ky. Jan. 4, 2024)..............................................24, 25, 27, 29

*Clay v. Emmi,* 797 F.3d 364 (6th Cir. 2015).....................................................17, 27, 31

*Ferris v. City of Cadillac,* 726 F.App'x 473 (6th Cir. 2018)..............................................26

*Fox v. DeSoto,* 489 F.3d 227 (6th Cir. 2007).....................................................................21

*Gambrel v. Knox Cnty.,* 25 F.4th 391 (6th Cir. 2022) ..............................................17, 26

*Higgason v. Stephens,* 288 F.3d 868 (6th Cir. 2002) .......................................................23

*Hoskins v. Knox Cnty, Kentucky,* 2018 WL 1352163 (E.D.Ky. Mar. 15, 2018) ...............23

*Jackson v. City of Cleveland,* 925 F.3d 793 (6th Cir. 2019)....................................*passim*

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 2002) ...................................................28

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017)................................................................21

*Leath v. Webb*, 323 F. Supp.3d 882 (E.D. Ky. 2018) ........................................................23

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ...............................................................23

*Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 106 S.Ct. 1348 (1986) ........................18

*McPherson v. Kelsey,* 125 F.3d 989 (6th Cir. 1997)..................................................23, 25

*Miller v. Calhoun Cnty.*, 408 F.3d 803 (6th Cir. 2005) ...............................................30

*Miller v. Maddox,* 866 F.3d 386 (6th Cir. 2017)..................................................................21

*Mills v. Barnard,* 869 F.3d 473 (6th Cir. 2017)........................................21, 22, 23, 26

*Moldowan v. City of Warren,* 578 F.3d 351 (6th Cir.2009) ...................................25

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ....................................................18

*Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845
    (6th Cir.2002)..................................................................................................28

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010)..................................................................18

*Palma v. Johns,* 27 F.4th 419 (6th Cir. 2022) .......................................................17, 26

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)...................................... 18, 29

*Pyles v. Raisor,* 60 F.3d 1211 (6th Cir.1995) ...................................................................24

*Reed v. City of Chicago*, 77 F.3d 1049 (7th Cir. 1996) ...............................................21

*Ricks v. Pauch,* No. 17-12784, 2020 WL 1640166 (E.D.Mich. Apr. 2, 2020)...........................23

*Sanders v. Jones,* 845 F.3d 721 (6th Cir. 2017).................................................................21

*Sheffey v. City of Covington,* 564 F.App'x 783 (6th Cir. 2014) .................................27

*Sykes v. Anderson,* 625 F.3d 294 (6th Cir. 2010) ..............................................20, 21, 22

*Tlapnaco v. Elges,* 969 F.3d 638 (6th Cir. 2020)...........................................................23

*United States v. White,* 492 F.3d 380 (6th Cir. 2007)...................................................25

*Webb v. United States,* 789 F.3d 647 (6th Cir. 2015) .......................................21, 24, 27

*Weberg v. Franks,* 229 F.3d 514 (6th Cir. 2000)......................................................27, 29

## STATUTES

Fed.R.Civ P. 56(c) ..................................................................................................17

Fed.R.Civ.P. 56(c)(1)(A) ........................................................................................28

## INTRODUCTION

Todd County Sheriff Laurin Morris conducted a joint investigation with the Kentucky State Police into the 1980 brutal murder of Janice Kaye Williams. Plaintiff Norman Graham spent over nine years wrongfully imprisoned after being charged and convicted of the murder: a crime he did not commit. But, it took 39 years, 5 months, and 18 days of Norman steadfastly maintaining his innocence before he was finally exonerated. During that time, Defendants ignored and withheld exculpatory evidence, fabricated inculpatory evidence, and conspired to prosecute Norman not just once – but twice – allowing the true killer to remain free and kill again (and again). These constitutional violations were due, in part, to Defendant Todd County's failure to provide guidance to its employees on constitutional obligations during investigations. The ample evidence described below merits a trial. Defendant's Motion should be denied.

## STATEMENT OF FACTS

1.  In 1980, Norman Graham[1] was a hard-working, laid-back veteran, in love with his girlfriend Janice "Kaye" Williams. Ex. 1, Susan Graham Dep., 8:16-23; 11:20-25; 14:6-7. Norman lived in the Tiny Town Trailer Park in Todd County, Ky; Kaye stayed with him. Doc. 122-3, KSP File, Page ID#1996.

2.  At approximately 4:30 am on Monday, June 30, 1980, Norman arrived home and found Kaye's deceased body. *Id.* at Page ID#1995. An autopsy revealed she had been raped and stabbed 27 times. *Id.* When the pathologist began his autopsy at 9:10 am, he determined that Kaye had been dead "nine to twelve hours" - or that she had died somewhere between 9:00 pm and 12:00 am on June 29, 1980. Ex. 2, '81 Trial Tr., Vol. I, 116:11; 124:14-15.

---

[1] Tragically, Norman passed away on July 9, 2023. Doc. 62. His wife and administrator of his estate, Brenda Graham, was substituted as personal representative in this action.  Doc. 69.

**Convicted Serial Killer Roy Wayne Dean was Seen Running from the Scene and Admitted to Kaye's Murder**

3.    On the night of Kaye's murder, teenagers Regina "Renee" Dean and her cousins, Barbara and Connie, were playing hide-and- go-seek in the trailer park. Ex, 3, R.Dean Dep., 11:2-3; 39:3-5. Renee and Barbara heard a lady scream; it was "loud and piercing, and then it just stopped." *Id.* at 11:5-6; Ex 4, Keaton Dep., 35:11-19. It scared the girls. Ex. 3, R.Dean Dep., 11:5-6; Ex. 4, Keaton Dep., 35:1. To Barbara, it sounded like the scream came from the area "close to where Kaye lived." Ex. 4, Keaton Dep., 34:19-20. Renee looked up and saw her brother, Roy Wayne Dean, running from the back door of Norman's trailer. Ex. 3, R.Dean Dep., 11:6-11; Ex. 5, 6/12/17 Hearing Trans., 23:13-16. Once he got close enough, Renee asked Dean what he was doing, and he told her to be quiet; he had "red stuff all over his shirt," which she believed was blood. Ex. 3, R.Dean Dep., 11:12-16; Ex. 5, 06/12/17 Hearing Trans., 24:19-20. Barbara also saw Roy; he was running from the area of Norman's trailer and had a black boot in his hand, missing its shoe lace. Ex. 4, Keaton Dep., 37:6-16; 39:16-21. He ran to a dumpster, raised the lid, and threw something away. *Id.* at 37:23-38:6. He then ran towards the home he shared with his family on the outskirts of the trailer park. *Id.* at 38:6-8; 15:1-16:3. Later that night Renee saw a cut on Dean's hand; when she asked him what happened, he told her "to shut [her] damn mouth and get back in her room." Ex. 5, 06/12/17 Hearing Trans., 28:1-2; 67:1-9. The following day, Dean's parents took him to the home of some relatives to stay. Ex. 4, Keaton Dep., 43:3-7.

4.    Dean had harassed Kaye prior to her death and threatened to cut her "like a pig." Ex. 4, Keaton Dep, 26:8-9. He would peek into the trailer window or around the side of the trailer when she and Barbara were sunbathing, calling them "whores" and "sluts." *Id.* at 26:1-27:4. Prior to her murder, Kaye had told Barbara she was afraid of Dean. *Id.* at 27:14-18.

2

5.  Dean physically and sexually abused his sister, Renee, and threatened to slit her throat. Ex. 4, Keaton Dep., 18:17-18:4. Renee testified about Dean, "There's a lot of times he did things to me and swear to God and Heaven he didn't do them." Ex. 5, 6/12/17 Hearing Trans., 67:10-12.  He also sexually abused Barbara, raping her when she was just ten years-old. Ex. 4, Keaton Dep., 18:7-9; 20:5-8. He left a recorded tape under Barbara's bed, threatening to slaughter her and her family "like a pig." *Id.* at 19:1-20:2. Barbara witnessed Dean kill a stray dog with a knife. *Id.* at 22:18-19.

6.  A couple weeks after Kaye's murder, Dean threatened to throw Renee, who could not swim, into a creek. Ex. 5, 6/12/17 Hearing Trans., 14:10-16. When Renee resisted and threatened to tell their parents, Dean said, "If you do, I'm going to do you like I did that damn woman in that trailer." *Id.* at 17-19.

7.  Later, Danny Moles, Dean's cousin, spoke with Roy Wayne Dean's father, Roy Everett Dean Sr. Ex. 6, Moles Hearing Trans., 6:1-6. Dean Sr. admitted Dean came to him for assistance in destroying bloody clothes Dean wore the night of Kaye's murder. *Id.* at 21:18-22:18. Dean's ex-wife, Tina Rigsby, also heard Dean admit to killing something in the trailer park. Ex. 7, Rigsby Dep., 18:10-12.

**The Todd County Sheriff's Office and KSP Jointly Investigated Kaye's Homicide**

8.  The Todd County Sheriff's Office ("TCSO") and Kentucky State Police ("KSP") jointly investigated Kaye's homicide. Doc. 122-3, KSP File, Page ID#1995. Sheriff Laurin Morris[2]  was one of the first to arrive on scene. Ex. 2, '81 Trial, Vol. I, 59:25-60:1. He entered the trailer and observed Kaye was lying across the foot of the bed, nude, with her hands bound with a black boot lace behind her back. Doc. 122-3, KSP File, Page ID#1995. "The knot used resembled that

---

[2] Sheriff Morris died in 2013. Doc. 46, PageID#465.

of a knot used to tie calves' legs at a rodeo." *Id.* A red jumpsuit had been cut from her body and was on the floor; a knife was on the floor beside the bed and a black boot lace was at the foot of the bed on the floor. *Id.*

9.   Sheriff Morris called for state police assistance, and KSP Detective Vernon Albro arrived. Ex. 2, '81 Trial, Vol. I, 69:9-12; 178:20-179:2. Morris collected evidence from the scene and canvassed the trailer park. *Id.* at 69:14-70:4; Doc. 122-3, KSP File, PageID#1996. A neighbor, unidentified in Albro's report, who lived "three trailers down" said she heard screaming around 3:00 am. *Id.* Accordingly, investigators believed this to be the time of Kaye's death. *Id.* at PageID#1990; 2148.

**Norman Cooperated with Investigators; Morris Learned He Had an Alibi**

10.   Norman provided Morris and Albro a voluntary statement at the scene. Ex. 2, '81 Trial, Vol. I, 73:9-11; Doc. 122-3, KSP File, PageID#1996. He informed the officers that he had left his home around 4:00 pm on Sunday, bar hopped, slept in his car in a hotel bar parking lot after a night of drinking, woke up at approximately 4:20 am, drove home, and discovered Kaye's body. *Id.* Norman's ex-wife Sandra corroborated his account of being at the bar, eating an early breakfast at Elaine's diner, and leaving him asleep in his car. *Id.* at #1997.

11. Norman voluntarily provided Morris with the clothes and boots he was wearing, as well as a pocket knife he was carrying. *Id.* at #1996. He informed officers that he had never seen the knife found on the floor of the bedroom. Doc. 117-5, Graham St., PageID#1188. Norman also told Morris he had consensual sex with Kaye the morning of June 29, 1980. *Id.* at PageID#1189.

**No Physical Evidence Tied Norman to the Murder**

12. Morris and state police investigators conducted a thorough search of Norman's trailer. Ex. 2, '81 Trial, Vol. I, 86:24-87:3. No boots were recovered that were missing their laces. *Id.* at

87:8-9. The only "knives or sharp instruments" recovered from the trailer was the one found on the floor in the bedroom and the one Norman had in his pocket that he voluntarily turned over to Morris. *Id.* at 88:19.

13. Subsequent forensic testing revealed no physical evidence tying Norman to Kaye's murder. According to an October 1, 1980 KSP Laboratory Report, there was no blood found on the knife Norman gave to Morris, the knife recovered from the scene, Norman's shirt or boots, or Kaye's jumpsuit. Doc. 122-3, KSP File, PageID#2039-40. According to the pathologist who conducted Kaye's autopsy, Kaye was killed by the severing of her carotid artery. Ex. 2, '81 Trial Tr., Vol. 1, 112:25-113:10. Such an injury would cause a "massive hemorrhage in a very short period of time" that would have caused the blood to "spurt" further "than a hand length." *Id.* at 113:17-114:13.

14. No semen was found on the jumpsuit during the initial testing. Doc. 122-3, KSP File, PageID#2040.

15. During the autopsy, pathologist Dr. Frank Pitzer - and two of his colleagues - found no sperm in the vaginal smears. Ex. 8, Autopsy Excerpt, GRAHAM 002942; Ex. 2, '81 Trial Tr., 108:7-109:1. Dr. Pitzer stood by that finding in a letter he sent to the Commonwealth's Attorney on September 1, 1981 – prior to trial. Ex. 9, Letter, GRAHAM 002944. But, the acid phosphatase study on the vaginal washings indicated "recent sexual activity." Ex. 8, Autopsy Excerpt, GRAHAM 002942; see also, Ex. 2, '81 Trial Tr., 106:19-107:9. According to the pathologist, "a level this high would indicate to me that the [sexual] activity occurred *less than twelve hours previous to my examination." Id.* at 108:3-5 (emphasis added).  The autopsy began at 9:10 am, thereby indicating Kaye had sexual intercourse with someone at 9:00 pm or later. *Id.* at 115:21-25. Testified the pathologist: "there is no question that there's semen, there's no

5

question that it's less than twelve hours old. The question is whether or not there was viable sperm that could be identified in the specimen." *Id.* at 111:3-8.

16.  Dr. Pitzer later analyzed a semen specimen provided by Norman; Norman "had a tremendous number of sperm, he had mobile sperm." *Id.* at 111:12-19. Based on the level and mobility of Norman's sperm, he determined that Norman's sperm should have been found in Kaye's vaginal smears *if* Norman was the last person to have had sex with her prior to her death, causing the high acid phosphatase level. *Id.* at 119:4-13. A January 13, 1981 KSP Crime Lab report confirmed the presence of sperm in Norman's semen sample. Doc. 122-3, KSP File, PageID#2047.

**Investigators Learned of Multiple Suspects and Collected, But Withheld, Exculpatory Evidence**

17.  Though Norman and Kaye were dating, their relationship was not exclusive. On July 3, 1980, investigators learned that Kaye had been dating a Ft. Campbell soldier, Daniel Drzeziniski, aka "Ski," and that Drzeziniski's car was seen in Tiny Town on the night of Kaye's death. Doc. 122-3, KSP File, PageID#1997. During a November 28, 1980 interview, Kaye's mother, Virginia Merriweather, informed Morris that Ski was in the area on day of Kaye's murder. *Id.* at PageID#2014. Ski admitted to being at Kaye's sister's trailer, located next to Norman's. *Id.* at PageID#1997.

18.  A few days later, investigators learned that Kaye was dating another man from Ft. Campbell, known as "T-Bone," who was a rodeo rider. *Id.* The record is void of any further investigation the officers conducted into the rodeo rider suspect or information learned about him. In fact, though Albro noted in July 1980 that "over the past week approximately 35-40 potential witnesses and suspects have been interviewed," the investigative file only names 8

6

individuals who were interviewed by that time. *Id.* The names of the other suspects and witnesses interviewed and the information learned during those interviews was never disclosed.

19. On November 26, 1980, investigators learned that prior to Kaye's death, Kaye's mother Virginia Merriweather received an anonymous letter directing "several obscene threats towards Kaye and her child." Doc. 122-3, KSP File, PageID#2008. Defendant KSP Trooper Robert "Bobby" Miller collected the letter. *Id;* see also, PageID#2013. To this day, Def. Miller has never disclosed that letter or revealed who investigators believed to be the author. Doc. 122-1, Miller Dep. Pt. 1, PageID#1949, 65:4-6, 15-18.

20.  On November 26, 1980, Def. Miller and Albro interviewed Michele Arms, who told them that she and Denise Gushea were with Kaye the evening before her death. Doc. 122-3, KSP File, PageID#2010. They went to a park in Clarksville, Tenn. where Kaye "gave her address and phone number" to a soldier, believed to be named Rick; he "wrote his name and address on a brown envelope which she placed in her purse." *Id.* Though Kaye's purse was located at the scene that Morris secured and searched, the contents of the purse were not documented, the investigative file is void of the information contained on the envelope or any investigation conducted into "Rick", and the envelope was never disclosed. Doc. 117-3, '81 Trial, Vol. II, PageID#1102, 210:21-23.

21. On November 26, Def. Miller and other investigators also interviewed Rita Kelly, Norman's neighbor. Doc. 122-3, KSP File, PageID#2008. Rita informed Miller she had received several threatening phone calls after Kaye's death. *Id.* The caller admitted to killing Kaye, referenced Kaye's body, and said "that was nothing compared to what he was going to do to [Rita]." *Id.* at PageID#2009. Investigators noted they were going to place an " intercept" on Rita's phone to determine the calls' origin, but investigators never disclosed those results. *Id.*

22. On December 2, 1980, Def. Miller and other investigators interviewed Robert Woosley at the Todd County Sheriff's Office.  Doc. 122-3, KSP File, PageID#2020. Woosley stated he was in love with Kaye, and the two planned to marry once he turned 20 years-old. *Id.* Around 10:30 pm on June 29, Kaye drove up in front of his house, saw Woosley with another girl, and then drove off angry. *Id.* Woosley's date, Kathy Shield, too left - leaving Woosley alone for the rest of the night. *Id.* Woosley informed investigators that Norman was aware, and did "not appear to care," that he and Kaye dated, and that he had been to Norman's trailer on multiple occasions to visit with Kaye. *Id.* at PageID#2025. On December 4, 1980, Woosley failed a polygraph relating to Kaye's death. *Id.* at PageID#2026. That same day, December 4, Miller interviewed Shield and confirmed Shield left Woosley's home around 10:00 pm after Kaye pulled away angry. *Id.* at PageID#2028.

**Sheriff Morris Was Actively Involved in the Investigation and Influenced the Decision to Prosecute**

23. Sheriff Morris was actively involved in the murder investigation. In addition to the interview of Norman at the scene, he talked with and/or "interviewed" Norman "several times," including traveling to Norman's job site to talk with him on multiple occasions. Ex. 2, '81 Trial Tr., Vol I., 73:12-25, 76:1-20 81:6-25, 82:9-12. According to Morris' trial testimony, Norman cooperated. *Id.* at 82:18. Morris did not document in the case file any of these interviews or interrogations.

24. Morris also interviewed and/or participated in the interviews of multiple witnesses, including those mentioned above, and: a) Kaye's sister and neighbor, Judith Blick, Doc. 122-3, KSP File, PageID# #2017; b) Norman's employer, *Id.* at PageID#2027; c) alternate suspect Joe Weatherford, *Id.* at PageID#2030; d) hotel bar employee Roxanne Voca, *Id.* at PageID#2031; e) hotel bar employee Tamara McClure, and f) Kaye**'s** brother in law and alternate suspect Ralph

8

Blick. Ex. 2, '81 Trial Tr., Vol I, 90:24-25. Morris, with Def. Miller, also met with the medical examiner about the case. *Id.* at PageID#2018. Morris did not document in the case file any of these interviews or the information learned from them.

25. Morris, along with Miller, also met with prosecutor Jessie Riley on multiple occasions to discuss the evidence, suspects, and investigative tasks from their joint investigation, including meetings on September 9, December 1, and December 3, 1980, and January 20, 1981. *Id.* at PageID#2018, 2022, 2055; Doc. 122-2, Miller Dep. Vol. II, PageID#1907, 8:17-10:5. Morris did not document in the case file any of these meetings.

**Sheriff Morris and Def. Miller Obtained Semen Samples from Norman and Returned the Jumpsuit to Lab where Semen was Then Discovered**

26. Morris and Miller again interrogated Norman on December 16, 1980. Ex. 2, '81 Trial Tr., Vol I., 76:1-20; Doc. 117-5, Graham St., PageID#1185. Norman participated voluntarily and reiterated what he had told investigators since his initial statement. *Id.* at PageID#1186-87; *see also,* Ex. 2, '81 Trial Tr., Vol I, 76:15-20 (Morris testifying that statement reiterates what Norman had been telling them for several months); 82:17-25 (Morris testifying Norman cooperated with investigators).

27. Thereafter, Norman voluntarily went with Def. Miller and Sheriff Morris to the pathologist's office and voluntarily provided head hair, pubic hair, and semen samples. Ex. 2, '81 Trial Tr., Vol I., 83:1-23. At that time, Miller and Morris were aware that semen, but no sperm, was found in Kaye's vaginal smears, and no semen had been found on the jumpsuit. *Id.* at 83:22-84:3. Morris did not document in the case file this interrogation or collection of evidence.

28. On April 1, 1981, after obtaining Norman's semen sample, Miller personally returned the jumpsuit to the KSP Crime Lab.[3] Doc. 122-3, KSP File, PageID#2060. Curiously, "upon reexamining" the jumpsuit upon its return to the lab, "semen was found." *Id.* at PageID#2061.

**Sheriff Morris Interrogated Norman through a Hypnotist, Withholding the Interrogation and the Exculpatory Information Learned Therein**

29. Sheriff Morris[4] also "interrogated" Norman through a hypnotist to whom Morris admittedly took him. Doc. 122-4, Trial Tr., PageID#2418, 179:8-9. The investigative file is void of any mention of this "interrogation" or of the exculpatory information learned during the hypnosis. In fact, the investigative file is void of *any* reports from Morris.

**Norman was Arrested and Indicted for Rape and Murder; Morris Testified at Grand Jury**

30. Just two months after Kaye's murder and before the forensic testing results had been received, Sheriff Morris and Det. Albro met with the Todd County Commonwealth's Attorney to discuss "the results of the lab examinations" and  convening a grand jury. Doc. 122-3, KSP File, PageID#2006.

31. Ultimately, a warrant for Norman's arrest for rape and murder was issued on March 2, 1981. *Id.* at PageID#2056-58. Morris testified that he drafted the warrant. Doc. 117-3, '81 Trial, Vol. II, PageID#1127, 312:3-14. On March 7, 1981, Morris arrested him *Id.* at 312:3-314:4; *see also,* Doc. 122-3, KSP File, PageID#2056-58. On March 9, 1981, Albro and Morris testified before the Grand Jury, obtaining indictments for rape and murder, knowing probable cause did not exist. Doc. 122-3, KSP File, PageID#2006. In fact, the Commonwealth's Attorney sent two

---

[3] According to the investigative file, "evidence" in the case was stored at the Todd County Sheriff's Office. Doc. 122-3, KSP File, PageID#2059.
[4] Def. Miller could not remember if he participated in this "interrogation." Doc. 122-2, Miller Dep., Vol. II, PageID#1975, 39:8-14.

separate letters to investigators, dated March 18 and March 20, 1981, asking them to conduct additional investigation before a March 30, 1981 hearing in the case. *Id.* at PageID#2059.

**The 1981 Trial Ended in a Hung Jury but Miller Continued His Investigation, Withholding Additional Exculpatory Evidence**

32. Norman's case went to trial in September 1981. Because no probable cause existed for rape, the Commonwealth dismissed that charge. Ex. 12, Motion Dismiss, GRAHAM 3317. Morris testified to the various duties he conducted in the investigation, including his alleged personal observation of dew on Norman's car and a warm radiator. Ex. 2, '81 Trial Tr., Vol I, 72:15-22. The murder charge ended in a hung jury. Doc. 122-3, KSP File, PageID#2067. The Court re-set the trial for March of 1982. *Id.* at PageID#2068.

33. After the mistrial, the investigators continued their quest to convict Norman. According to a January 19, 1982 letter from the Commonwealth's Attorney to Miller, Miller met with the prosecutor about some "developments" in the investigation. *Id.* at PageID#2069. Thereafter, the prosecutor spoke with Kaye's family about the newly-obtained information and the family "agreed the case should be dismissed" against Norman. *Id.* The investigative file is void of any documentation from Miller about what those exculpatory "developments" were, and Miller allegedly has no memory of the developments, his meeting with the prosecutor, or why he did not draft a report. Doc. 122-2, Miller Dep. Vol. II, PageID#1975: 40:19-42:21. Clearly having found no real evidence against Norman, on February 28, 1982, the Commonwealth moved to dismiss the charges. Doc. 122-3, KSP File, PageID#2067. But, the Defendant Officers continued their investigation against Norman for years, learning of and continuing to withhold exculpatory evidence.

**Investigators Withheld Exculpatory Evidence Relating to Multiple Similar Murders in the Area**

34. Before and after Kaye Williams' murder, a series of similar murders took place within close proximity to Todd County. Eva Ransom was murdered just two months prior to Kaye, Dee Ann Rapp was murdered in August 1984, and Brenda Church was murdered in September 1984. Def. Miller investigated and/or learned about each of the homicides, observing multiple, striking similarities between the murders with Kaye's, and determining and withholding that a serial killer – Roy Wayne Dean – was the perpetrator.[5] Ex. 13, Miller Dep., Vol. I, PageID#1944, 45:11-15.

**Kaye's Murder was Classified as a Cold Case; DNA Evidence Indicated Alternate Perpetrator**

35. Kaye's murder investigation was ultimately reclassified as a cold case, where it laid dormant with "no new leads" for over 16 years. Doc 122-3, KSP File, PageID#2082-92. From 2001-2006, KSP Detective Brad Stevenson led the investigation. Ex. 18, Stevenson Dep., 39:23-40:1.

36. In a June 5, 2002 report, Stevenson noted that a KSP analyst advised that "there were two different sources of DNA found in evidence from this case. One is higher intensity than the other due to a difference in time frame of sexual activity." *Id.* at PageID#2108. Stevenson provided further information in a search warrant affidavit, averring:

> There were two separate semen deposits found on Williams' body. Investigators have determined that Williams had intercourse with one man between the hours of 8:00 a.m. and 10:00 a.m. on June 29, 1980, and that she was raped by a second man sometime after midnight on June 30, 1980. The individual implicated in the crime…said Norman Graham, states that he did have intercourse with Williams on the morning of June 29, 1980. **Police believe the second sample found on Williams' body is from the individual who raped and killed her.**

---

[5] *See,* Plaintiff's Response to KSP Defendants' Motion for Summary Judgment, Doc. 128, ¶¶33-38, for further facts about the Dean investigations.

*Id.* at PageID#2127 (emphasis added). Based on that information, Stevenson continued investigating potential alternate perpetrators in the case. Ex. 18, Stevenson Dep., 102:13-19; Doc. 122-3, KSP File, PageID#2096, 2108-09.

37. During the five years that Stevenson was the lead investigator on Kaye's case, he discovered no new evidence pointing to Norman as Kaye's killer. *Id.* at 119:7-15. Having no probable cause to do so, Det. Stevenson did not seek to re-indict Norman. *Id.* at 119:16-120:22.

**Defendant Silfies Takes Over as Lead Investigator and Immediately Seeks Re-indictment of Norman Based on Fabricated Evidence, with No New Evidence or Probable Cause**

38. In October 2006, KSP Defendant Detective Steven Silfies[6] took over as lead investigator on Kaye's case. Doc. 122-3, KSP File, PageID#2166. Def. Smith continued to assist in the investigation. Doc. 122-5, Smith Dep., PageID#2466, 43:5-22. In an October 31, 2006 report, Silfies documented there were "no new leads" in the case. Doc. 122-3, KSP File, PageID#2166.

39. Thereafter, the only "investigation" Silfies and Smith document are December 31, 2006 interviews of two of Kaye's sisters and an interview of Sheriff Morris. *Id.* at PageID#2167. Two days later, Silfies contacted the Commonwealth's Attorney and advised that he "was ready to present the case to Grand Jury." *Id.* at PageID#2170. When questioned at Smith's deposition about what "new evidence" he and Silfies had obtained in the approximate 60 days that he and Silfies investigated the case equating to probable cause for seeking a new indictment against Norman, Smith responded, "There was no new evidence. It was evidence already in the file." Doc. 122-5, Smith Dep., PageID#2480, 134:16-20. The evidence "already in the file," according to Smith, was Norman's semen found on the jumpsuit – though Norman had immediately told investigators he had consensual sex with Kaye the morning before her death and no semen was

---

[6] Def. Silfies passed away on May 20, 2017. Doc.34, PageID#367.

found on the jumpsuit in 1981 after Norman provided Morris and Miller with the sample. *Id.* at 132:15-134:3. Smith conceded there was no new evidence obtained between October 31, 2006 and January 2, 2007 equating to probable cause sufficient to secure an indictment against Norman. *Id.* at 134:24-135:7.

**Lacking Probable Cause, Silfies Indicted Norman, Morris Testified, and Norman was Wrongfully Convicted**

40. On January 19, 2007, Silfies obtained an indictment against Norman for rape in the first degree and capital murder. Doc. 122-3, KSP File, PageID#2181, 2185. In April 2007, the Commonwealth filed notice of its intent to seek the death penalty. Doc. 122-3, KSP File, PageID#2179. The case proceeded to trial where Sheriff Morris again testified against Norman. *See,* Doc. 122-4, Trial Tr., PageID#2381. On October 8, 2008, a Todd County jury convicted Norman of rape and murder and sentenced him to 40 years' imprisonment. *Id.* at PageID#2190. Norman was 62 years-old.

**Norman was Finally Exonerated, but Not Before the Defendants Stripped Years of His Life**

41. For years, Norman continued to maintain his innocence in post-conviction proceedings. In October 2017, after an evidentiary hearing in which the Court heard exculpatory evidence pointing to Dean as Kaye's killer, Norman was finally obtained a new trial. Ex. 20, New Trial Order. The Kentucky Court of Appeals affirmed. *Commonwealth v. Graham,* 585 S.W.3d 754 (Ky.Ct.App. 2019). Thereafter, the Commonwealth's Attorney "carefully reviewed the entire record in this case," and moved to dismiss the indictment against Norman. Ex. 21, Order Dismissing. In December 2019, the Todd Circuit Court granted the prosecutor's motion, noting "it is entirely reasonable and appropriate for a prosecutor to dismiss a case when further developments, such as compelling new and exculpatory evidence, come to light." *Id.* at GRAHAM 00240. But, the damage to Norman could not be undone.

14

42. Robbed of the opportunity to grieve the loss of Kaye, Norman looked over his shoulder and fought to clear his name for 39 years. He faced the death penalty and spent over nine years wrongfully incarcerated for a crime he did not commit, stripping him of time with his family and friends. While incarcerated, Norman's mother passed away; he was deprived of telling her goodbye or attending her funeral. Ex. 1, Susan Graham Dep., 29:1-23. A foreman and structural steel iron worker, Norman was robbed of his ability to earn wages and provide for his family. Ex. 19, B. Graham Dep., 12:23-13:6; 15:4-12.

43. While wrongfully incarcerated, Norman was physically assaulted, robbed, and subjected to a riot where inmates set the prison on fire. *Id.* at 38:19-40:8. He was also diagnosed with cancer and deprived of medically-ordered treatment, including a bone-marrow transplant. *Id.* at 40:17-41:9; *see also,* Ex. 1, Susan Graham Dep., 27:4-28:23. He lived with the knowledge that he would never be paroled because he always maintained his innocence. Ex. 19, B. Graham Dep., 43:1-9.

44. Even after his release from prison, Norman was not the same. *Id.* at 42:9-19. He lived in fear he would again be arrested and falsely accused. *Id.* at 45:6-16. It was "like a dark cloud following him around." *Id.* at 46:1-2. He was sad, physically, psychologically, and emotionally damaged, and "didn't enjoy life as much as before all this happened." *Id.* at 45:15-16. Tragically, Norman passed away on July 9, 2023. *Id.* at 46:24.

**Todd County Lacked Policies on Constitutional Obligations During Investigations**

45. From June 1, 1980 through December 31, 1981, the Todd County Sheriff's Department had no written policies guiding investigators on how to comply with constitutional mandates during investigations. *See,* Ex. 22, Response Doc. Request, p. 3. In fact, the Defendants concede "the first written policies and procedures for the Todd County Sheriff's Department, that

Defendant Todd County, Kentucky, is aware of after a diligent search on the matter, were implemented by Sheriff Joey Johnson who was in office from 2011-2014." *Id.*

46.  Former Todd County Sheriff Joey Johnson testified as Todd County's 30(b)(6) representative about policies and training in effect at the Sheriff's office. Ex. 23, Johnson Dep., 9:14-16. Though he served as Sheriff between 2010 and 2014, he initially worked for the Todd County Sheriff's Department as a special deputy from 1982 to 1985. *Id.* at 9:20; 13:13-17. During his tenure as a deputy, Johnson never saw and was unaware of the existence of any written policies and procedures. *Id.* at 13:18-22. When Johnson was elected Sheriff, he "checked to see" if policies and procedures existed and "couldn't find any" so he began drafting written policies and procedures. *Id.* at 15:13-15. When he asked the judge executive and magistrates about whether the Department had any written policies, they said "no." *Id.* at 17:7-9. To Johnson's knowledge, the Sheriff's Department had no written policies until he drafted them and the fiscal court adopted them early after his election in 2010. *Id.* at 18:14-17; 22:16-21.

**Plaintiff's Police Practices Expert**

47. Craig Miller is a police practices expert. Doc. 116-1, Miller Report, PageID#728. He reviewed the evidence in this case and detailed the ways in which the Defendants' handling of the Williams' murder investigation did not meet the generally accepted standards of investigative behavior in a murder investigation. *Id.* Mr. Miller determined: (1) the Defendant Officers from the Todd County Sheriff's Department and Kentucky State Police did not act consistently with generally accepted police practices when they failed to sufficiently document and disclose exculpatory evidence; *Id.* at PageID#739; (2) the Defendant Officers did not act consistently with generally accepted police practices if they planted Plaintiff's DNA on the physical evidence (as alleged by Plaintiff); *Id.* at PageID#743; and, (3) the Todd County Sheriff's Office did not

provide written policies and procedures guiding officers on how to properly handle homicide investigations. *Id.* at PageID#744.

## ARGUMENT

### I. The Summary Judgment Standard Mandates the Case Proceed to Trial Against Defendant Todd County

This is not a case to be resolved at summary judgment. There are genuine issues of material fact and ample evidence supporting Plaintiff's claims,[7] which must proceed to a jury trial. *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *see* Fed.R.Civ P. 56(c). On Defendant's motion for summary judgment, the Court "must believe [Plaintiffs'] evidence … and disregard [Defendants'] conflicting evidence that the jury is not required to believe." *Gambrel v. Knox Cnty.,* 25 F.4th 391, 404 (6th Cir. 2022) (cleaned up). Under the "well-recognized standard of Rule 56…at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Clay v. Emmi,* 797 F.3d 364, 370 (6th Cir. 2015). "[T]he evidence is construed and all reasonable inferences are drawn in favor of Plaintiff. *Palma v. Johns,* 27 F.4th 419, 427 (6th Cir. 2022) (internal citations and quotation marks omitted).

### II. The Record Presents a Triable *Monell* Claim (Count VII)

Defendant Todd County moves for summary judgment on Plaintiff's *Monell* claim on two grounds, arguing 1) nothing in the record establishes Sheriff Morris violated a constitutional right, and 2) Plaintiff has not shown that a Todd County policy or custom was the "moving force" behind his injury. Doc. 117-1, PageID#960. As explained below, Defendant's arguments fail on both accounts. Summary judgment should be denied.

---

[7] Plaintiff no longer pursues the following claims against Defendant: Respondeat Superior, Supervisory Liability, Negligent Supervision, and Intentional Infliction of Emotional Distress.

Although a municipality may not be held liable under § 1983 "solely because it employs a tortfeasor," the municipality itself is liable for constitutional violations its causes. *See, Jackson v. City of Cleveland,* 925 F.3d 793, 828 (6th Cir. 2019). In particular, a municipality is liable where its policy or custom causes a constitutional violation, such that the municipality's deliberate conduct is the moving force behind the injury. *Id.* at 828.

Defendant Todd County can be directly liable under § 1983 for constitutional violations caused by (1) enforcement of a municipal policy, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); (2) a widespread, though unwritten, custom or practice, *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); or (3) action of a municipal final policymaker, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). "Policy or custom does not have to be written law; it can be created 'by those whose edits or acts may fairly be said to represent official policy.'" *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell*, 436 U.S. at 694).

### A. The Record Establishes Todd County Sheriff Morris Violated Plaintiff's Constitutional Rights

As an initial matter, providing no caselaw in support, Defendant attempts to limit the analysis of "Graham's 'proof' regarding Sheriff Morris' involvement in this matter" to the expert report of Plaintiff's police practices expert, Craig Miller. *See,* Doc. 117-1, PageID#960-62. This attempt fails for numerous reasons. First, at this stage, nothing limits the Court's analysis of Plaintiff's "proof" to the expert report alone. Instead, when deciding a motion for summary judgment, this court must view *all* the factual evidence and draw all reasonable inferences in Plaintiff's favor. *See, Bard v. Brown Cnty., Ohio,* 970 F.3d 738, 748 (6th Cir. 2020) *citing B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 591-92 (6th Cir. 2001); *see also, Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 106 S.Ct. 1348, 1356 (1986) ("Where the *record taken as a whole* could not lead a rational trier of fact to find for the non-moving party, there is

not 'genuine issue for trial.') (citation omitted) (emphasis added). Even circumstantial evidence may be sufficient for Plaintiff to meet this burden. *Bard,* 970 F.3d at 748 citing *Adams v. Metiva,* 31 F.3d 375, 382 (6th Cir. 1994).

As demonstrated *passim,* Plaintiff has presented an extensive record detailing Sheriff Morris' involvement in this matter, including the investigative file documenting his participation in the investigation and prosecution and the deposition testimony of fellow investigators. *See,* Doc. 122-3, KSP; *see also,* Doc. 122-1, Miller Dep., Vol. I; Doc. 122-2, Miller Dep., Vol. II; Doc. 122-5, Smith Dep. Further, in addition to the allegations of Morris' involvement included in Plaintiff's Second Amended Complaint, s*ee,* Doc. 29, Plaintiff documented Morris' participation in great detail in Plaintiff's Responses to Todd County's First Set of Interrogatories. *See,* Ex. 24, Plaintiff Interr. Responses, Nos. 4, 5.

And, Defendant's assertion that "Graham's own expert confirms that Morris' involvement was limited to" "participating in interviews" and testifying at the 1981 and 2008 trials is simply false. *See,* Doc. 117-1, PageID#960-61. A review of the expert report reveals that Expert Miller not only discussed the *multiple* witness interviews in which Morris participated and the testimony he provided at both trials, but also notes Morris: a) responded to the crime scene, where he interviewed Plaintiff, Doc. 116-1, PageID#731, ¶¶12-13; b) interrogated Plaintiff, *Id.* at PageID#733, ¶20; c) took Plaintiff to the pathologist's office, where he obtained Plaintiff's hair and semen samples, prompting thereafter the discovery of semen on the jumpsuit that was not present during the initial examination, *Id.* ¶20; d) testified before the 1981 Grand Jury, *Id.* at ¶21; and, e) met with KSP investigators in 2006 about the case. *Id.* at PageID#737, ¶34. Further, Expert Miller documents KSP Defendant Smith's testimony that it was the semen found on the jumpsuit, after Morris and Miller obtained Plaintiff's semen sample and re-

19

submitted the jumpsuit for re-examination, that established probable cause (in his view) for the 2007 indictment. *Id.* at ¶35.

Finally, Defendant's "attack" of Expert Miller's opinions as speculative, *see* Doc. 117-1, PageID#961-92, is best suited for a *Daubert* challenge and is thoroughly addressed in Plaintiff's Response to Defendant's Motion to Exclude the Testimony and Opinions of Police Practices Expert Craig Miller. *See,* Doc. 129, *Daubert* Response. Plaintiff addresses Defendant's speculation claims, as necessary, in the arguments below.

### 1. The Record Establishes that Morris Maliciously Prosecuted Plaintiff

The Sixth Circuit recognizes a Fourth Amendment malicious prosecution claim, encompassing "wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson,* 625 F.3d 294, 308 (6th Cir. 2010). A malicious prosecution claim has four elements:

> (1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty…apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor.

*Jackson v. City of Cleveland,* 925 F.3d 793, 820 (6th Cir. 2019) (cleaned up).

It appears Defendant challenges only the first two elements and therefore has conceded, as it must, that Plaintiff suffered a deprivation of liberty and the criminal proceedings resolved in his favor. Doc. 117-1 at PageID#962-63. Defendant's arguments regarding the first two elements also fail.

### a. A Reasonable Jury Could Conclude Morris Made, Influenced, or Participated in the Decision to Prosecute Plaintiff and/or Contributed to His Continued Detention

The first element, that Defendant made, influenced, or participated in the decision to prosecute, is met here. The Sixth Circuit has held that "an officer may be responsible for

commencing a criminal proceeding against a plaintiff, where the officer made, influenced, or participated in the decision to prosecute." *Sykes,* 625 F.3d at 311 (quoting *Fox v. DeSoto,* 489 F.3d 227, 237 (6th Cir. 2007)). "To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Miller v. Maddox,* 866 F.3d 386, 390 (6th Cir. 2017) (quoting *Webb v. United States,* 789 F.3d 647, 660 (6th Cir. 2015). "[I]nfluence" can be based on "misstatements . . . to the prosecutor" or "pressure or influence" over an individual who either made the decision to prosecute or testified at the preliminary hearing. *Sykes,* 625 F.3d at 316 (quoting *Reed v. City of Chicago,* 77 F.3d 1049, 1053 (7th Cir. 1996)). Liability for malicious prosecution is proper where an officer's "investigatory materials . . . contain knowing misstatements" and are in the prosecution's possession. *Id.*at 316-17; *see also Jackson v. City of Cleveland,* 925 F.3d 793, 821 (6th Cir. 2019) ("This element is met when an officer includes 'misstatements and falsehoods in his investigatory materials' and those materials influence a prosecutor's decision to bring charges."). "The first element of the malicious prosecution claim is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so." *Jackson,* 925 F.3d at 820-821.

Malicious prosecution under § 1983 also can support a claim for "'continued detention without probable cause.'" *Mills v. Barnard,* 869 F.3d 473, 480 (6th Cir. 2017) (quoting *Sanders v. Jones,* 845 F.3d 721, 728 n.4 (6th Cir. 2017). Specifically, Plaintiff must present "some evidence" that the impact of the Defendants' "misstatements and falsehoods in [their] investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced Plaintiff's continued detention." *Sykes,* 625 F.3d at 316.

Defendant Todd County attempts to avoid liability by downplaying Sheriff Morris' role in Plaintiff's prosecution, but Defendant's efforts are contradicted by the record. Doc. 117-1, PageID#963. Morris actively participated in the homicide investigation, conducting multiple investigative tasks explained more thoroughly above in §II(A), and Plaintiff's prosecution. *See also,* PSOF ¶¶23-27, 29-31. Morris met with the Commonwealth's Attorney on multiple occasions to discuss the investigative tasks in the joint investigation the Sheriff's Department conducted with KSP, the evidence and "lab results," and the possibility of convening a grand jury. PSOF ¶¶25, 30. Morris ultimately testified before the 1981 Grand Jury, seeking an indictment against Plaintiff for rape and murder. PSOF ¶31. That indictment was based on knowing false statements and fabricated evidence – the planted semen on the jumpsuit discussed more thoroughly below – which also served as the basis for seeking the 2007 indictment. PSOF ¶¶27-28. And, he drafted Plaintiff's arrest warrant. PSOF ¶31.

"The first element of the malicious prosecution claim is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so." *Jackson,* 925 F.3d at 820-821; *see also*, *Mills*, 869 F.3d at 482–83 ("Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials…ultimately influenced [a plaintiff's] continued detention.'"); *King,* 852 F.3d at 586. Thus, the same evidence that proves Plaintiffs' fabrication of evidence claim below also establishes participation. *See, e.g., Mills*, 869 F.3d at 482–83 (finding that forensic examiner participated in plaintiff's continued detention by fabricating DNA report provided to prosecutors); *Sykes*, 625 F.3d at 316–17 (holding fact that investigative materials containing officer's knowing misstatements were in the prosecutor's possession and were relied upon by the prosecutor constituted evidence of

22

influence); *Webb,* 789 F.3d at 664 (finding that officer aided in decision to prosecute by misdating phone recording which was later presented as evidence). That Morris did not hold the official title of "lead investigator" on the case matters not; it is enough that his actions were material and "influenced" or "played a role" in the decision to prosecute. *Mills,* 869 F.3d at 482-83; *Tlapnaco v. Elges,* 969 F.3d 638, 655 (6th Cir. 2020). Because a reasonable jury could conclude that Morris influenced or played a role in Plaintiff's prosecution and continued detention, the first element of the malicious prosecution claim has been satisfied as to Morris.

### b. A Reasonable Jury Could Conclude the Grand Jury Indictment was Tainted, Rebutting Probable Cause

In regard to the probable cause analysis, Todd County does not argue no probable cause existed. Doc. 117-1, PageID#963. Instead, Defendant's "argument" consists entirely of the following sentence: "[a]s a matter of law, 'an indictment fair upon its face, by a properly constituted grand jury conclusively determines that there was probable cause.'"[8] *Id.,* citing *Bakos v. City of Olmstead Falls,* 73 Fed. Appx. 152, 158 (2003) citing *Higgason v. Stephens,* 288 F.3d 868, 877 (6th Cir. 2002). "But a *tainted* grand-jury indictment cannot provide a basis for probable cause." *Leath v. Webb*, 323 F. Supp.3d 882, 895 (E.D. Ky. 2018) (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017)). There is a "'long-held exception to that general rule'— 'when the defendant knowingly or recklessly presented false testimony to, or omitted other critical information from, the grand jury in order to obtain that indictment,' the presumption of probable cause is rebuttable." *Hoskins v. Knox Cnty, Kentucky*, 2018 WL 1352163 at *8

---

[8] Defendant has waived any further argument on this point. *See, e.g. McPherson v. Kelsey,* 125 F.3d 989, 995 (6th Cir. 1997) (holding that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (cleaned up)); *Ricks v. Pauch,* No. 17-12784, 2020 WL 1640166, at *25 (E.D.Mich. Apr. 2, 2020) ("Defendants were obligated to explain why they are entitled to summary judgment…it is not for the court to search the record and construct arguments. Parties must do that for themselves.")

(E.D.Ky. Mar. 15, 2018). As the Sixth Circuit holds, a plaintiff may rebut the probable cause presumption when he satisfies the following:

> (1) A law-enforcement officer, in the course of setting a prosecution in motion either knowingly or recklessly makes false statements (such as affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omission do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*King*, 852 F.3d at 587-88.

Further, it is well settled that "in a § 1983 action, the existence of probable cause is a question of fact." *Gregory,* 444 F.3d at 743; *Webb*, 789 F.3d at 665. When the facts underlying a probable cause analysis are disputed, a jury must decide whether probable cause supported the charges. *See Alman v. Reed,* 703 F.3d 887, 896 (6th Cir. 2013) ("If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts."); *see also, Clark v. Louisville-Jefferson Cnty. Metro Gov.,* No. 3:17-CV-00419-GNS-CHL, 2024 WL 56938 at *16 (W.D.Ky. Jan. 4, 2024) ("In Section 1983 cases, probable cause poses a jury question unless only one reasonable determination is possible.") (quoting *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir.1995). And, on Defendant's motion for summary judgment, the probable cause analysis may only be conducted after "[g]iving [Plaintiff] all reasonable inferences from the factual record." *See King,* 852 F.3d at 582 (reversing district court's grant of summary judgment to defendants for failure to consider probable cause in light most favorable to plaintiff).

Here, a reasonable jury could easily conclude that Morris fabricated false evidence and knowingly or recklessly made false statements used to obtain an indictment, thus rebutting the probable cause presumption.

### 2.  The Record Establishes that Morris Withheld Exculpatory Evidence

An officer who withholds material exculpatory evidence may be held liable under § 1983. *Moldowan v. City of Warren,* 578 F.3d 351, 179 (6th Cir.2009); *see also, Jackson,* 925 F.3d at 813-14. "A deprivation of due process occurs" when exculpatory evidence is suppressed by the State and prejudice resulted. *Clark* 2024 WL 56938 at *5 citing *United States v. White,* 492 F.3d 380, 410 (6th Cir. 2007).

In his Complaint, Plaintiff raised a Fourteenth Amendment Due Process Claim, arguing the Defendants "conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false forensic evidence, and other evidence." Doc. 29, PageID#320. The *Brady* claims raised by Plaintiff involving Morris, include the envelope placed in her purse (found at the scene that was secured by Morris) containing contact information for a soldier with whom Kaye had exchanged addresses and phone numbers on the night of her murder that was never documented or disclosed (PSOF ¶20), and the exculpatory information Morris learned during his "interrogation" of Plaintiff with the hypnotist that Morris never documented nor disclosed. PSOF ¶29. In fact, the investigative file is void of *any* reports from Morris regarding his information he learned during the investigation. Defendant does not address or refute these claims, waiving any further argument on this point. *See, McPherson,* 125 F.3d 989, 995; *see also,* Doc. 117-1, PageID#964.

### 3.  The Record Establishes that Morris Fabricated Evidence

As the Sixth Circuit has repeatedly recognized, a plaintiff makes "a fabrication-of-evidence claim under § 1983" where "a defendant knowingly fabricated evidence against [a plaintiff], and…there is a reasonable likelihood that the false evidence could have affected the

judgment of the jury." *Mills v. Barnard,* 869 F.3d 473, 484 (6th Cir. 2017) (internal citation and quotation marks omitted); *see also Jackson,* 925 F.3d at 815-16; *Gregory,* 444 F.3d at 737. The only argument Defendant makes regarding Plaintiff's fabrication claim is that "there is nothing in the record to suggest that Sheriff Morris – or any of the KSP Detectives for that matter – fabricated evidence." Doc. 117-1, PageID#965. But, a review of the record indicates otherwise.

Specifically, Plaintiff has alleged that Sheriff Morris and KS Defendant Miller manufactured false evidence by planting Plaintiff's semen on the jumpsuit they then re-submitted for re-examination to the crime lab. PSOF ¶¶27-28. In support, the record establishes that Morris and Miller interrogated Plaintiff in December 1980 and thereafter, transported him to the pathologist's officer where they obtained semen samples from him. PSOF ¶¶26-27. After they obtained Plaintiff's sample, Miller transported the jumpsuit taken from the crime scene that had been stored at the Sheriff's Office, back to the crime lab. PSOF ¶¶27-28. While no semen was detected on the jumpsuit during its first examination, *after* obtaining Norman's sample and returning the jumpsuit for re-examination, semen was then detected. PSOF ¶¶14, 28. That forensic evidence contributed to the decision to prosecute, both in 1981 and 2007. PSOF ¶47.

"[W]hether evidence is 'fabricated' will often turn on circumstantial evidence," and circumstantial evidence is sufficient to defeat summary judgment if it would allow a reasonable jury to infer the elements of the claim. *Ferris v. City of Cadillac,* 726 F.App'x 473, 479 (6th Cir. 2018). And, at this stage, the Court "must believe [Plaintiffs'] evidence." *Gambrel,* 25 F.4th at 404 (6th Cir. 2022). "[T]he evidence is construed and all reasonable inferences are drawn in favor of Plaintiff." *Palma,* 27 F.4th at 427 (internal citations and quotation marks omitted). Under the "well-recognized standard of Rule 56…at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Clay,* 797 F.3d at 370. Put simply, whether

Morris fabricated evidence is a jury question.

### 4. The Record Establishes that Morris Failed to Intervene and Conspired with the KSP Defendants to Violate Plaintiff's Rights

There is no dispute over the governing standard regarding a failure to intervene claim: an

officer can be liable for failure to intervene when he "observed or had reason to know" of a

fellow officer's constitutional violation and "had both the opportunity and means to prevent the

harm from occurring." *Sheffey v. City of Covington,* 564 F.App'x 783, 793 (6th Cir. 2014).

Defendant simply states Plaintiff's failure to intervene claim fails "because there is nothing in the

record proving Sheriff Morris had any knowledge of any constitutional harm or the opportunity

to prevent such harm from occurring." Doc. 117-1, PageID#965-66. But, the record proves

otherwise.

A § 1983 civil conspiracy is "an agreement between two or more persons to injure

another by unlawful action." *Bazzi v. City of Dearborn,* 658 F.3d 598, 602 (6th Cir. 2011)

(internal citations and quotations omitted). Liability is proper when there is: (1) a single plan; (2)

the officer shared in the general conspiratorial objective; and (3) an overt act was committed in

furtherance of the conspiracy that caused injury. *Id.* Importantly, "[r]arely in a conspiracy case

will there be direct evidence of an express agreement among all conspirators to conspire…[and]

circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks,* 229 F.3d

514, 528 (6th Cir. 2000); *Webb,* 789 F.3d at 671; *Clark,* 2024 WL 56938 at *18. In relation to

the conspiracy claim, Defendant asks a series of questions, ie: what was the plan, when did the

officers agree to it, etc. – and simply state "no conspiracy existed," and thus, Plaintiff's claim

fails.  Doc. 117-1, PageID# 966. Defendant is wrong.

27

First, Defendant's cursory "arguments" do not shift the summary judgment burden to Plaintiff. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"). The moving party must support his or her "assert[ion] that a fact cannot be ... disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed.R.Civ.P. 56(c)(1)(A). Accordingly, the failure to intervene and conspiracy claims should proceed to trial on this basis alone.

Further, based on the facts discussed above, a reasonable jury could conclude that Sheriff Morris and the KSP Defendants shared a single plan and conspiratorial objective, were "voluntary participants in a common venture to railroad" Plaintiff, and failed to intervene when the other Defendants violated Plaintiff's rights. *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 2002). As described above, Todd County Sheriff Morris and KSP Defendant Miller jointly investigated Kaye's murder in the early 1980s. PSOF ¶8. They conducted numerous witness interviews together, obtaining exculpatory evidence that was never disclosed, and met together multiple times with the prosecutor where they discussed convening a grand jury though they knew no probable cause existed. PSOF ¶¶23-25, 30. They jointly interrogated Norman, obtained semen samples from him, and then planted that evidence on the jumpsuit PSOF ¶¶26-28. Years later, Morris met with Silfies and did nothing to stop Silfies from seeking an indictment against

Plaintiff, knowing the indictment was based on the evidence Morris and Miller fabricated on the jumpsuit. PSOF ¶39.

Accordingly, Plaintiff has raised facts from which a reasonable jury could infer that Morris and the KSP Defendants shared a plan and conspiratorial objective to maliciously prosecute Plaintiff and to fabricate and withhold evidence, and that they failed to intervene to stop those violations. Because Plaintiff's facts must be credited at this stage, these claims survive summary judgment. *See, Clark,* 2024 WL 56938 at *19; *see also, Weberg,* 229 F.3d at 528 (circumstantial evidence may provide adequate proof of conspiracy).

### B. The County's Conscious Choice Not to Have Policies on *Brady,* Fabrication, and Other Crucial Issues Amounts to Deliberate Indifference and Was The Moving Force Behind Plaintiff's Injury

A municipality may be held liable under § 1983 for its deliberate choice not to have a policy when one is called for. In *Canton,* the Supreme Court "distinguished between a city's deliberate or conscious choice not to have a policy, which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." 489 U.S. at 391. Liability occurs in "a situation that demands a policy," where the failure to implement a policy "ignored a plainly obvious danger." *Armstrong v. Sqaudrito,* 152 F.3d 564, 577-58 (7th Cir. 1998).

Moreover, Plaintiff need not prove a pattern of unconstitutional conduct to prevail on this type of claim regarding the failure to adopt a policy where the need for policy is obvious. "If the decision to adopt [a] particular course of action is properly made by the government's authorized decision makers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur,* 475 U.S. at 481. "More importantly, where action is directed by those who establish government policy, the municipality is equally responsible

whether that action is to be taken only once or to be taken repeatedly." *Id.*; *see also Gregory*, 444 F.3d at 755 (plaintiff can show the municipality's inaction had the "obvious consequence" of leading to a constitutional violation of the sort experienced by the plaintiff); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 816–17 (6th Cir. 2005) (if the violation is a "known and obvious" or "highly predictable consequence" of an ongoing course of action or inaction, knowledge of past violations is unnecessary and deliberate indifference will be assumed).

Here, Defendant Todd County had *no* written policies and procedures in place during the time of the homicide investigation or prior to either of Plaintiff's trials. PSOF ¶¶45-46; Ex. 22, Response Doc. Request, p. 3. No policies existed guiding investigators on how to conduct criminal investigations. No policies existed guiding investigators on how to comply with constitutional mandates during investigations. No policies existed instructing investigators not to fabricate evidence. No policies existed guiding investigators on how to properly collect and document physical evidence or how to document and disclose exculpatory information.

Defendant's contention that "Graham assumes but has not proven – and cannot prove – that no written policies and procedures existed in 1980-1981" is curious considering it is in direct contradiction to what Defendant stated in writing during discovery and in contradiction with the testimony of its own 30(b)(b) witness. *See,* Doc. 117-1, PageID#968. Specifically, during discovery, Plaintiff requested relevant Policies and Procedures of the Todd County Sheriff's Office from 1980-81. *See,* Ex. 22, Response Doc. Request. In Response, on July 2, 2024, Defendant stated,

> RESPONSE: Objection. This request is unduly burdensome. Further objecting, this Interrogatory seeks information neither relevant nor likely to lead to the discovery of admissible evidence. Subject to and without waiving foregoing objection, the first written policies and procedures for the Todd County Sheriff's Department were implemented by Sheriff Joey Johnson who was in office from 2011-2014. Sheriff Johnson and his administration drafted these policies and procedures. Todd County is not in possession of any responsive documents because they do not exist.

*Id.*

Likewise, Joey Johnson testified, as Todd County's 30(b)(6) witness, that the Sheriff's Department had no written policies until he drafted them and the fiscal court adopted them early after his election in 2010. PSOF ¶46. Johnson further testified that he initially worked for the Todd County Sheriff's Department as a special deputy from 1982 to 1985 and was unaware of the existence of any policies during that time. *Id.*

Regardless, Defendant's new and contradictory "argument" that Plaintiff cannot prove that Todd County lacked written policies in 1980 is a disputed genuine issue of material fact that must be decided by a jury. *See, Clay,* 797 F.3d at 370.

Further, Todd County's failure to have policies and procedures in place ignored the obvious danger that citizens' constitutional rights would be violated in the absence of such policies. The lack of policies and procedures was endemic to numerous crucial areas of policing, including the collection, preservation, documentation, and disclosure of exculpatory evidence and the fabrication of evidence. As police practices expert Miller explains, "to have effective constitutional policing, every law enforcement agency must have the three critical pillars which link the operational standard of the department: policy, training, and supervision." Doc. 116-1, PageID#744, ¶62. Expert Miller opines, "in the early 1980s, it was reasonably foreseeable to

expect a member of the Todd County Sheriff's Office to not only conduct a homicide investigation but also to participate in a joint criminal investigation with other state and surrounding agencies. Accordingly, it was imperative that Todd County provide its employees with adequate policies and training on those policies regulating the proper procedures for homicide investigations, interrogations and production of exculpatory evidence. It is my professional opinion that Todd County failed in those regards." *Id.* at ¶63.

Given this, and drawing inferences in Plaintiff's favor, a jury could conclude that the County's deliberate choice not to have policies regarding investigators' obligations played a direct role in and was the "moving force" behind Plaintiff's wrongful incarceration – especially when the evidence Morris and Miller fabricated directly led to both of Plaintiff's trials and conviction. A trial is warranted on Plaintiff's *Monell* claim.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Defendant's Motion for Summary Judgment and grant Plaintiff a trial.

Respectfully Submitted,

*/s/Amy Robinson Staples*
Amy Robinson Staples, Esq.
LOEVY & LOEVY
*18 Village Plaza, PMB 181
Shelbyville, KY 40065
amy@loevy.com

Arthur Loevy, Esq.
Jon Loevy, Esq.
Mike Kanovitz, Esq.
Elliot Slosar, Esq.
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
arthur@loevy.com
jon@loevy.com

mike@loevy.com
elliot@loevy.com

*local address*

*Attorneys for Plaintiff Brenda Graham*

## <u>CERTIFICATE OF SERVICE</u>

I, Amy Robinson Staples, an attorney, hereby certify that on October 27, 2025, I filed the

foregoing response via the Court's CM/ECF System and thereby served a copy on all counsel of

record.

<div align="center" style="text-align:right">

*/s/ Amy Robinson Staples*
*One of Plaintiff's Attorneys*

</div>