COMMONWEALTH OF KENTUCKY
SEVENTH JUDICIAL CIRCUIT
TODD CIRCUIT COURT
INDICTMENT NO. 81-CR-019

COMMONWEALTH OF KENTUCKY,                          PLAINTIFF,

VS.                **TRANSCRIPT OF EVIDENCE**
                   **VOLUME NO. 1**

NORMAN LEE GRAHAM,                                 DEFENDANT.

Elkton, Kentucky
November 30 - December 2, 1981

**A P P E A R A N C E S :**

**PRESIDING JUDGE:**  Honorable William Fuqua

**ATTORNEY FOR PLAINTIFF:**  Hon. Jesse L. Riley
                             Hon. Charles Gill

**ATTORNEYS FOR DEFENDANT:**  Hon. Carol Johnson
                              Hon. Dale Prince

**Jones Court Reporting**
Brenda S. Jones, Owner
P.O. BOX 803
HOPKINSVILLE, KENTUCKY 42241
(270) 886-8631
1-800-273-1857

GRAHAM 006401

The case of **COMMONWEALTH OF KENTUCKY vs. NORMAN LEE GRAHAM** was called on for trial before Honorable William Fuqua on November 30, 1981.

Following is all evidence presented or offered to be presented, and all exhibits introduced or offered to be introduced.

## INDEX

**OPENING STATEMENT:** Mr. Riley:                                    5
**OPENING STATEMENT:** Mr. Johnson:                                 12

**CASE FOR THE COMMONWEALTH:**

**JUDY BLICK:**
Direct    Examination - Mr. Riley:                                  23
Cross     Examination - Mr. Prince:                                 34

**NICK MAHEA:**
Direct    Examination - Mr. Riley:                                  35
Cross     Examination - Mr. Johnson:                                41
Redirect  Examination - Mr. Riley:                                  50
Recross   Examination - Mr. Johnson:                                51

**BILLY WESTERMAN:**
Direct    Examination - Mr. Riley:                                  52
Cross     Examination - Mr. Prince:                                 55

**SHERIFF LAURIN MORRIS:**
Direct    Examination - Mr. Riley:                                  59
Cross     Examination - Mr. Johnson:                                79
Redirect  Examination - Mr. Riley:                                  95
Recross   Examination - Mr. Johnson:                                96

**FRANK PITZER:**
Direct    Examination - Mr. Riley:                                  97
Cross     Examination - Mr. Johnson:                                113
Redirect  Examination - Mr. Riley:                                  122
Recross   Examination - Mr. Johnson:                                124

**DR. GEORGE NICHOLS:**   (Testimony by Deposition)                 125

GRAHAM 006402

**JOEY WEATHERFORD:**
Direct    Examination - Mr. Riley:       125
Cross     Examination - Mr. Prince:      131
Redirect  Examination - Mr. Riley:       137
Recross   Examination - Mr. Prince:      138

**TAMARA MCCLURE:**
Direct    Examination - Mr. Riley:       142
Cross     Examination - Mr. Johnson:     150
Redirect  Examination - Mr. Riley:       155

**RALPH BLICK:**
Direct    Examination - Mr. Riley:       156
Cross     Examination - Mr. Johnson:     163
Redirect  Examination - Mr. Riley:       173
Recross   Examination - Mr. Johnson:     175

**DETECTIVE C. L. ALBRO:**
Direct    Examination - Mr. Riley:       176
Cross     Examination - Mr. Johnson:     205

**DR. FRANK PITZER:  (Recalled)**
Direct    Examination - Mr. Riley:       219
Cross     Examination - Mr. Johnson:     221
Redirect  Examination - Mr. Riley:       230

**DETECTIVE C. L. ALBRO:  (Recalled)**
Cross     Examination - Mr. Johnson (Cont.):   231
Redirect  Examination - Mr. Riley:       235
Recross   Examination - Mr. Johnson:     236

**SHANKLIN:**
Direct    Examination - Mr. Gill:        238
Cross     Examination - Mr. Johnson:     240

**GLEN BAXTER:**
Direct    Examination - Mr. Riley:       246
Cross     Examination - Mr. Johnson:     252
Redirect  Examination - Mr. Riley:       253
Recross   Examination - Mr. Johnson:     254

**DAVID ALFORD:**
Direct    Examination - Mr. Riley:       255
Cross     Examination - Mr. Johnson:     268

**CASE FOR THE DEFENDANT:**

**MICHELLE ARMS:**
Direct    Examination - Mr. Prince:      296
Cross     Examination - Mr. Riley:       304

GRAHAM 006403

**C. L. ALBRO: (Recalled)**
Direct    Examination - Mr. Johnson:          307
Cross     Examination - Mr. Riley:            308
Redirect  Examination - Mr. Johnson:         309

**LAURIN MORRIS:  (Recalled)**
Direct    Examination - Mr. Johnson:          311
Cross     Examination - Mr. Riley:            318

**CERTIFICATE:**                               320

**LIST OF EXHIBITS**

CW  1 - Photograph of Janis Kay Williams' Body
CW  2 - Jumpsuit
CW  3 - Photograph Depicting Location of Knife
CW  4 - Photograph Showing Cut/Wounds to Body
CW  5 - Photograph w/Bootlaces
CW  6 - Photograph w/Bootlaces
CW  7 - Photograph w/Roach Holder
CW  8 - Photograph w/Entrance to Trailer Park
CW  9 - Photograph of Trailer
CW 10 - Photograph of Trailer
CW 11 - Photograph of Weatherford Trailer
CW 12 - Small Knife Found at Scene
CW 13 - Larger Knife Taken from Norman Graham
CW 14 - Waiver of Rights
CW 15 - Graham Statement  (Attached to transcript)
CW 16 - Semen Sample Slide
CW 17 - Report/Drawing of Dr. Pitzer
CW 18 - McClure Time Card
CW 19 - Graham Shirt/Bluejeans
CW 20 - Sheets/Pillowcase from Bedroom
CW 21 - Bootlaces
CW 22 - Bootlaces that Bound Deceased
CW 23 - Drawing
CW 24 - Vaginal Slide
CW 25 - Defendant's Semen Slides
CW 29 - 2 Photograph Slides

DF  1 - Weatherford Diagram

***   - CW 26, 27 & 28 Not Identified on Record

GRAHAM 006404

TRANSCRIPT OF EVIDENCE


(VOIR DIRE & JURY SEATED)

(Rule invoked on witnesses)


OPENING STATEMENT BY MR. RILEY

Mr. Johnson, Mr. Gill, Ladies and Gentlemen of the jury.  The evidence that you ladies and gentlemen of the jury are going to hear is not going to be at all pretty.

In the beginning of any criminal case, Perry Mason and other TV shows to the contrary, you have the right on the part of the Commonwealth to make an opening statement.  An opening statement is simply that which the Commonwealth intends to prove in the case regarding the murder of Janis Kay Williams. Since I have been your Commonwealth attorney I have attempted right from the beginning to tell you ladies and gentlemen what the facts are going to show as the Commonwealth believes in order that we can kind of have a type of road map as to the witnesses who testify and as the case unfolds.

This same duty is not upon the

GRAHAM 006405

defendant.   The defendant has a right now to make an opening statement, or the defendant can wait until the Commonwealth has presented its case, and then at that time tell you what his story is going to be.

Ladies and Gentlemen of the jury, the morning, the 30th of June, 1980, the proof will show that Janis Kay Williams, a young lady that lived with the defendant, Norman Lee Graham, in a trailer at the Tiny Town Trailer Park, was brutally murdered.

The proof in this case will be that Graham and Williams had lived together in the trailer rented by Norman Graham for approximately six months.

The proof will be that on Sunday afternoon that Norman Graham left approximately four or five o'clock in the afternoon and went honky-tonking, went from one bar to another down around Clarksville, and by his own statement, about 9:30 that night he was so drunk that he didn't remember anything else until some time later.

The proof will be that Norman Graham's story is that he woke up at approximately 4:20

GRAHAM 006406

1   with his car being parked in the parking lot of

2   the Red Carpet Inn down in Montgomery County, and

3   that he drove immediately from the Red Carpet

4   Inn, which is my understanding is down on 41, by

5   you going on the interstate, turning across the

6   KAO Campgrounds, and coming back into Guthrie,

7   and that he found the body of Janis Kay Williams

8   when he returned.

9        Ladies and gentlemen, the proof in this

10  case will reveal that Janis Kay Williams was at

11  the trailer after about ten o'clock that night,

12  and possibly before, that the last time anyone

13  saw her she was wearing a red jumpsuit.

14       The proof will be that Janis Kay

15  Williams was brutally murdered, that she was put

16  on the bed, that her hands were tied behind her,

17  that at one time apparently her legs were tied

18  behind -- tied together, and that this red

19  jumpsuit which she had on was cut off right down

20  here (indicating), and pulled away from her.

21       The proof will be that Janis Kay

22  Williams died from twenty-seven stab marks in the

23  area of the heart, that the left side of her face

24  starting here from here was completely slit.  Her

25  throat was cut so that the carotid artery that

-7-

GRAHAM 006407

supplies the blood, the big artery that supplies the blood to the brain, and the jugular vein, which brings it back, were completely severed. The pathologist will testify that either the stab wounds, some of which penetrated her heart, or the cutting of the throat would have caused her death.

The proof will also show that shortly before her death that she had had recent sexual activity, and that is shown by a test that is run on the semen that the man ejects, that the acid phosotate level in the semen specimen that was found on autopsy in the vagina of Janis Kay Williams had a high reading of five hundred and fifty-eight DR units, which the pathologist will testify will signify recent sexual activity.

The proof in this case will be that when the law enforcement officers, the rescue unit arrived at the scene shortly after five o'clock when Norman Graham went next door to Janis Williams' sister's, and Norman Graham told Janis Kay Williams' sister that Janis has committed suicide, "She's cut her (GD) throat."

The sister went in and saw the gruesome scene. The rescue squad from Guthrie was called,

-8-

1    and, of course, there was nothing could be done

2    because Janis was dead.

3        The proof will be in this case, and

4    there will be numerous testimony relative to this

5    fact, that the story that Norman Graham had just

6    driven from the Red Carpet Inn some twenty miles

7    away in some twenty minutes will not hold water,

8    because Nick Mahea, the rescue squad driver,

9    Sheriff Laurin Morris, Joey Weatherford, who

10    lived across the street, several other people,

11    examined the car driven by this man, and, number

12    one, the block in the radiator was almost cold,

13    and, number two, the entire car was completely

14    covered with dew, both inside and outside of the

15    windshield, and on the hood, on the top, and on

16    the trunk, which would mean that that car had

17    been there for an extended period of time.

18        The proof will be, and Mr. Mahea will

19    tell you, that when he got the van that was used

20    by the rescue squad he had to turn the windshield

21    wiper on to get the dew off.  Sheriff Morris will

22    tell you the same thing.

23        And what's even more important, Joe

24    Weatherford, a man that lived across the road --

25    trailer from Norman Graham, will testify that he

-9-

GRAHAM 006409

was sitting in his bathroom and that by sitting

on the commode in his trailer, he looked straight

out across the street over to the Graham trailer

and that he had been sitting there at least five

minutes that morning, and that he didn't see

anybody come into the trailer while he was

sitting there, and that he noticed Norman Graham

amble out, not running, but amble out, and walk

next door, and knock on the door.

The police officers got to the scene,

and the proof will be that in their investigation

they got the pants of Norman Graham.  They sent

those pants to the Kentucky State Police crime

laboratory, and that on those pants, on the pants

right in this area, there was a large quantity of

semen, and, also, that on the outside of the

pants they found human blood.  The proof will be

that the blood was not in sufficient quantity to

be able to type and tell whose blood type it was.

The proof will further reveal that a

knife was found at the end of the bed where

Janis' body was discovered.  Another knife was

taken from the defendant.  And while it's

impossible to show where a knife is sharpened by

a stone, but it was sharpened on the same

-10-

GRAHAM 006410

1     instrument.

2          The proof will be, and you ladies and

3     gentlemen can see and judge for yourself, that

4     there are similarities relative to the way that

5     the knives were sharpened, the one that was found

6     at the bottom of the bed, which the defendant

7     denied knowing anything about, and the one that

8     was in his possession.

9          The proof will further reveal that a

10    portion of the red jumpsuit was found in the

11    bathroom, that somebody had recently taken a

12    bath, and that in this red piece of fabric was

13    found, number one, semen, and, number two, two

14    pubic hairs which were identical in all charac-

15    teristics to the pubic hair specimens of the

16    defendant, and which were completely different

17    from the pubic hair specimen sent to the crime

18    laboratory that came from Janis Kay Williams.

19          Ladies and Gentlemen of the jury, there

20    will be proof by witnesses that Norman Graham's

21    car was not in the parking lot of the Red Carpet

22    Inn in Guthrie at even three o'clock in the

23    morning.  Witnesses from the Red Carpet Inn will

24    testify, and will verify this by time cards, that

25    they left at approximately three o'clock in the

-11-

1    morning, that there was only one car there, and

2    they knew whose car that was, and that the

3    defendant's car had already left, contrary to

4    what he says, keeping his car there and not

5    leaving until four o'clock in the morning.

6         Ladies and Gentlemen, the proof in this

7    case will circumstantially prove that this man

8    sitting between his counsel was the one that

9    brutally murdered Janis Kay Williams, and at the

10   conclusion of this trial we ask that based upon

11   the instructions which His Honor will give you,

12   you will find the defendant guilty and punish him

13   as you ladies and gentlemen feel would be

14   (inaudible) under the circumstances.

15        Thank you.

16        **THE COURT:**  All right.  Mr. Johnson,

17   do you or Mr. Prince want to make a statement?

18        **MR. JOHNSON:**  Yes, Your Honor.

19

20        **OPENING STATEMENT BY MR. JOHNSON**

21

22        Ladies and gentlemen, as Mr. Riley has

23   explained to you, now is the time in the case

24   where we tell you what we expect to prove, and,

25   you know, we show a whole lot of different

GRAHAM 006412

circumstances than what (background noise).

One thing that the proof will show beyond any reasonable doubt or anything else, that this young lady was killed in a very brutal way. In fact, you will see, as Mr. Riley has described to you, that it was almost systematically, almost a surgery stabbing, or almost a mania type situation where it had to be just stabbed constantly, long after, obviously, the person had been injured or rendered incapacitated.

Further, we feel that the proof will show this, that not only we will show -- there will be the injuries to the chest, there will also be a cut lip right inside here that will be consistent with someone being struck.

We feel the proof will show that Ms. Williams was probably rendered incapacitated prior to any struggle because there is no -- the proof will show that the room, the bedroom of this trailer, was not in disarray, other than the body being on the bed and, obviously, being very bloody.

The proof, as Mr. Riley will show in the autopsy, shows that Janis Kay Williams had

GRAHAM 006413

sexual intercourse in a period of time which the
pathologist will describe as being -- not any
permanent, but within a recent period of time
(inaudible).

The proof will further show from the
pathologist, Dr. Frank Pitzer, who did the
autopsy, that there was semen in the vagina, but
that this semen, which just looks the same,
contained no sperm.

The proof will show that semen is the
excretement of a male sexual organ, that sperm,
as one of the culprit, is the content of a
fertile male semen.  In this instance Dr. Pitzer
will testify that there was no sperm within his
semen that was found on the person that done it.

He will further testify that sperm dies
after a period of time.  He will further testify
that there should have been sperm in the test
results when they die if sperm were ever present
in the semen in the beginning.

The proof will further show this
happened -- will further show that in December
still no arrest had been made (coughing noise)
during the sequence of events and the rendering
of how long the sequence of time was.  But in

GRAHAM 006414

1   December Norman Graham, in the company of a state

2   policeman and Mr. Morris, went to Dr. Pitzer's

3   office and gave a semen specimen.  It showed that

4   he produced sperm.  We anticipate that based upon

5   the medical knowledge of Dr. Frank Pitzer, the

6   pathologist, who did the autopsy, and his test

7   conducted on Norman Graham, that he will be able

8   to conclusively state under oath that Norman

9   Graham was not the last person to have sexual

10  intercourse with Janis Williams.

11          The proof will show that on this

12  occasion earlier that extensive examination of

13  the defendant occurred that day; he cooperated

14  fully.  You will hear the statement that he gave

15  Sheriff Morris.  That the investigation continued

16  with his cooperation on up until December, at

17  which time -- at that time the sheriff understood

18  the results of Dr. Pitzer's pathol -- autopsy and

19  requested Mr. Graham give a semen specimen, which

20  he did.  That not anything happened until March.

21  For some unknown reason, in March, some six

22  months later, is when they decided to arrest Mr.

23  Graham.

24          The proof will further show that all of

25  the proof that Mr. Riley has shown to you be the

GRAHAM 006415

incriminating evidence was known to the
Commonwealth within ten days after the death of
Ms. Williams, that no arrest was made until March
(inaudible).  At that time the defendant was
charged with rape and murder.  He continued to be
charged with rape and murder until this morning,
at which time the Commonwealth saw fit to dismiss
the rape charge.  How is that important?

Well, the proof will show about these
knives.  The proof will show that one knife was
kind of real near the body, kind of underneath
the bed or kind of beside the bed.  You can
actually see by photographs that will be
introduced exactly where it was found.  Mr.
Graham denies any knowledge of that particular
knife, that Mr. Graham turned over his pocket
knife to the state police laboratory for their
investigation.

And what did the state police
laboratory find concerning these knives is that
there's no way to tell from tool mark
identification about whether the same stone was
used on a particular knife or not.  The police
state cannot make an ascertation -- ascertain
about him.  What they can ascertain about these

-16-

GRAHAM 006416

knives is this:  They can ascertain that after
microscopic examination there is no blood or
residue of blood on either knife.  There is
absolutely no evidence that either of these
knives was used in the stabbing Ms. Williams.

They will further testify that they
compared these, oh, cotton fa -- or I assume it's
cotton.  It's a fa -- the fabric of the jumpsuit,
which the testimony will show, and probably the
Commonwealth will produce the jumpsuit, to show
that the jumpsuit was not rip -- probably not
ripped from Ms. Williams, but actually cut from
her.  Microscopic examination was made in
comparison to ascertain the -- the organic kind
of lint residue on either one of these knives to
indicate they had been used in cutting that
jumpsuit, that test was negative.

The proof will further show, the
testimony will further reveal, that probably in
the commission of this crime or in the severance
of the jugular vein there would be a great
exposure of blood, there would be a -- the puddle
that you would expect the heart to pump, it would
not be circulated but actually leaving.  In other
words, you've seen -- it would be very similar to

-17-

GRAHAM 006417

1    a hog hit, if you've been -- if you've seen a hog

2    strung up, the neck severed, the gushing of

3    blood, and no residue of blood was found at all

4    on any of Mr. Graham's clothing, except Mr. Riley

5    will contend that there is one speck of blood on

6    Mr. Graham's pants.  This could not be typed or

7    any implication could be made by the laboratory

8    simply because it was such a small, small portion

9    of blood.  It could only be identified as human

10   blood.  Whether Mr. Graham, or the police,

11   whatever, it's completely a nanno speck.

12          Legally, the proof will show, and it's

13   consistent, that Ms. Williams, indeed, was raped.

14   She was probably killed by the same steel

15   (inaudible) person.  But that person was not the

16   defendant.

17          We will further show to you by the

18   evidence and the reasoned inferences that you can

19   gather therefrom that the Commonwealth and

20   investigator, officers probably didn't think so,

21   either.  We will show by the proof that some six

22   months -- or from June until March when they

23   arrested -- or when the warrant stated -- we will

24   show that there was constant contact between

25   Detective Albro, Sheriff Morris, and the

GRAHAM 006418

1   defendant, Norman Graham, that he maintained not

2   the same residence, but he maintained the same

3   job over in Clarksville.  They had been on the

4   job site often, knew where he worked, worked the

5   same place for ten years, still works there, that

6   the warrant was issued on something like March

7   2nd charging a person with rape and murder, a

8   _vicious,_ _vicious_ murder, as you will -- the proof

9   will be overwhelming as to the savageness of the

10  matter in which Ms. Williams was killed.

11          Sheriff Morris, knowing where the

12  defendant was, did not arrest him, did not go see

13  him until like some four days later, on March 6.

14  Went to the job site where he was over at

15  (coughing).  Didn't tell Graham that he had a

16  warrant for him, didn't give it to the Tennessee

17  authorities to be served, but asked Norman if

18  he'd come back to Elkton with him on that

19  particular occasion.  The proof will show that

20  Mr. Graham told him that it would be inconvenient

21  because this was Friday, they're probably going

22  to be working late, so could he see him the next

23  day.  Sheriff Morris said that'd be fine, shows

24  the warrant, and left the person accused of a

25  hideous crime and went back home to Elkton.

-19-

GRAHAM 006419

1          The next day Mr. Graham came in as he

2     told him would, and wanted to arrest him.  We

3     feel that that proof will show and very much of

4     an inconsistency of that person being a killer

5     and a raper as he could be.  It's very

6     inconsistent with the arresting officers accusing

7     a person of such a hideous crime and then going

8     about the arrest in that way.  The explanation of

9     that must be purely speculative.  You may draw

10    your own conclusion.

11         But take notice the proof will show the

12    indictment or warrant that's usually procured by

13    the arresting officer going to the county

14    attorney and the Commonwealth attorney, obtain a

15    warrant, and then going through the grand jury

16    process of the arrest, and it will be noted that

17    those principals were Mr. Riley, Mr. Morris and

18    Mr. Gill.  And it'll be further noted that all

19    three of those individuals were candidates in the

20    upcoming primaries in May.  It will be noted that

21    there had been a horrible death, just no arrest

22    had been made until that time.  It will be the

23    contingency of the defendant that this arrest

24    came about at that particular time because of the

25    pressure felt and the best case be made against

GRAHAM 006420

1   this defendant, or that a case be made against

2   this defendant, or the only case that would be

3   anywhere near possible (inaudible - voice low).

4       We believe the proof will show no

5   weapon, no blood on the defendant, and the

6   quantity there had to be on the person involved.

7       And the most conclusive factor of all

8   is the semen test that Dr. Pitzer performed.

9   That conclusively shows that Ms. Williams had

10  sexual intercourse in the relatively short time

11  frame prior to her death with someone other than

12  this defendant.

13      We believe that it's a logical

14  conclusion which you as the juror -- jury must

15  reach is that Norman Graham was not the person

16  that committed this hideous act.

17      The proof and the law in his -- that

18  the purpose is not -- it's -- it's about making

19  any determination of the guilt or innocence of

20  Norman Graham.  We are not in a position to tell

21  you who or make accusations as to who might be

22  guilty.  There is, potentially, where evidence

23  will be offered to show that there were other

24  type suspects, that there were other similar type

25  homicides within the geographic area within a

GRAHAM 006421

1    certain time frame.  But that's what the judge

2    will instruct.  That is not an issue that you are

3    trying.  Your function will be (inaudible) based

4    upon the law and the evidence whether or not this

5    defendant is the person that killed Ms. Williams.

6        And in -- in concluding, much like Mr.

7    Riley, this -- the proof will show this to be a

8    hideous deal.  You will easily ascertain at the

9    very beginning that, no reason for me to harp on

10   that because that's something that's going to be

11   the outstanding memory that you have of your next

12   day or two of being here, is just the

13   unbelievable idea anyone could do this to another

14   human being, not necessarily killing-- and I

15   think we can all understand that at certain times

16   that there are certain emotions that might make

17   us potential killers, put a man under certain

18   circumstances, but the brutality, senseless

19   brutality, of this makes it a madness.  I think

20   you can ascertain this.  I think the proof will

21   conclusively show that this was not something

22   that after -- not done in a -- just to cause

23   death, but almost a mania about the situation,

24   something that you read about that happens in

25   California with (inaudible) mass murders, noth --

GRAHAM 006422

1        noth -- nothing that happens here.  This borders

2        on the kooky, not just a revenge war, or a

3        lover's fight, or anything like that, just

4        something that's far more unexplainable.

5                Thank you.

6

7                (Judy Blick called)

8

9    CASE FOR THE COMMONWEALTH:

10

11   JUDY BLICK:  After first being duly sworn, testified as

12   follows:

13

14   DIRECT EXAMINATION BY MR. RILEY:

15

16   Q.        Your name is Judy Blick?

17   A.        Yes, sir.

18   Q.        Where do you live now?

19   A.        Route 1, Olmstead, Kentucky.

20   Q.        In June of 1980 tell the ladies and gentlemen of

21   the grand jury -- I mean, ladies and gentlemen of the jury

22   where you lived.

23   A.        Lived in Todd County, (inaudible), Tiny Town,

24   Kentucky.

25   Q.        Are you married?

GRAHAM 006423

1    A.        Yes, sir.

2    Q.        What's your husband's name?

3    A.        Ralph.

4              COURT REPORTER:  What was the name?

5              MR. RILEY:  Ralph.

6              MS. BLICK:  Ralph.

7              COURT REPORTER:  Oh.

8    Q.        And does he live with you now?

9    A.        Yes, sir.

10   Q.        And did he at that time?

11   A.        Yes, sir.

12   Q.        Now, are you related to Kay Williams?

13   A.        Yes, sir.

14   Q.        What kin is Kay -- was Kay to you?

15   A.        My sister.

16   Q.        And at the time you all lived at Tiny Town

17   Trailer Park, tell the ladies and gentlemen of the jury how

18   close you lived to her.

19   A.        Right next door.

20   Q.        Now, as you go into the trailer park off of

21   Highway 79, would that be on the left or the right?

22   A.        Left.  Tiny Town Road going to Clarksville, as

23   you turned in, we lived in the second house straight on the

24   right, and Kay's is the third.

25   Q.        All right.  Now, at the time -- and I'm talking

GRAHAM 006424

1    about the time starting -- and any time you want me to

2    stop, you -- okay, Judy?

3    A.        Okay.

4    Q.        At the time, and referring to the time, I mean

5    the early part of Jan -- starting in January through the

6    time this incident happened, did Kay live in the trailer by

7    herself or someone else?

8    A.        The trailer was rented to a Norman Lee Graham,

9    and she, more or less, lived with him.

10   Q.        Is that Norman Lee Graham there?

11   A.        Yes, sir.

12   Q.        Now, when was the last time that you saw your

13   sister alive?

14   A.        The Sunday afternoon or evening, I think that's

15   right, before he came to my home the 30th.

16   Q.        I believe this incident -- Norman came the next

17   morning, which would've been Monday morning then?

18   A.        Yes, sir.

19   Q.        And you saw -- you saw her Sunday afternoon?

20   A.        Well, Sunday evening.  It was dark when she left

21   my home.

22   Q.        And at that time what was she wearing?

23   A.        A ju -- a redish-orange jump pantsuit.

24   Q.        I'm exhibiting to you what purports to be a red

25   jumpsuit, and I'll ask you whether or not, Ms. Blick, does

-25-

GRAHAM 006425

1    this appear to be the same type jumpsuit that your sister

2    was wearing?

3    A.        It is.

4    Q.        As far as you can tell, is that the same

5    jumpsuit?

6    A.        Far as I can tell.

7    Q.        Is it the same color and marked this way?

8    A.        Yes.

9

10              (COMMONWEALTH EXHIBIT 2 - Jumpsuit)

11

12   Q.        Now, did Kay and Norman have one or two cars, Ms.

13   Blick?

14   A.        Norman had his own and Kay had her own.

15   Q.        Now, what kind of car did Kay have?

16   A.        She had just traded for either a silver or a --

17   silver or gray Mustang.

18   Q.        And what kind of car did Norman have?

19   A.        He had a (inaudible) colored, I think it was

20   (inaudible) colored, Buick.

21   Q.        Now, did Kay return to the -- did Kay's car come

22   back to the -- the trailer in the early part of the night?

23   A.        Yes, sir.  At 10:15 I looked out and there set

24   her car.

25   Q.        In front -- in its usual spot in front of the

GRAHAM 006426

1    trailer?

2    A.        Yes, sir.

3    Q.        And did you check -- or did you happen to look

4    out any later than that and determine her car was there?

5    A.        Yes.  I couldn't sleep, so about 12:20 I was up

6    and I looked out the kitchen window and her car was settin'

7    where it was previously.

8    Q.        And ask you whether or not, was Norman Lee

9    Graham's car there?

10   A.        No, sir, I did not see his car.

11   Q.        Now, ask you whether or not, now, the next

12   morning did anything happen or anything awaken you?

13   A.        The morning prior to seeing Kay the night before?

14   Q.        The morning that you found her.

15   A.        Well, I guess around 4:30, I'm not too sure of

16   the time, there come a significant knocking at the door.  I

17   got up, got my housecoat on, answered the door and opened

18   it, there stood Norman.  And I looked for Kay and she

19   wasn't there.  I looked back at Norman.  I don't remember

20   whether I said anything to Norman or not for sure, I was

21   startled, but he said, "Kay's dead."  And I looked at him,

22   and he said, "She's cut her (GD) throat," and he said, "I

23   knew she was depressed down at her grandmother's, and if

24   I'd known she'd been that depressed I never would've left

25   her alone."  And then I said, "Not my Kay."

-27-

GRAHAM 006427

1    Q.      Now, as far as the GD, he did use -- he used the

2    words, didn't he?

3    A.      He used the words.  He didn't use the initials.

4    Q.      And when you saw Kay the afternoon before was she

5    depressed?

6    A.      I don't really know, because she was -- Kay was a

7    moody type person, that one minute she'd be real happy, and

8    the next minute she'd be just, you know, just kind of calm.

9    But she was kind of moody.  I don't know that she was

10   necessarily depressed.

11   Q.      Now, then, when Norman said this to you, that Kay

12   had killed herself and cut her throat, what did you do?

13   A.      I went to Kay's.

14   Q.      And you found her?

15   A.      (No audible response.)

16   Q.      And where did you find your sister?

17   A.      In the back bedroom.

                    **(Witness crying; inaudible)**

19              **COURT REPORTER:**  What did she say,

20       Jess?  I didn't understand her, did you?

21              **MR. RILEY:**  In the back bedroom.

22   A.      She was in the back bedroom laying across the

23   bed.

24   Q.      Did she have any clothes on?

25   A.      She didn't even have any shoes on, and she was

GRAHAM 006428

1  naked.

2  Q.      And did you observe any injuries?

3          (Witness answering, still emotional - inaudible)

4                      COURT REPORTER:  What'd you say?

5  A.      I don't --

6  Q.      Now, did you touch her or --

7  A.      No.  I couldn't go in the room.

8  Q.      You couldn't go to --

9  A.      My husband stopped me and I couldn't go to her.

10  Q.      And could you tell whether or not she was dead?

11  A.      Well, I guess.  I felt her, if she was dead, and,

12  obviously, she was.

13  Q.      And then after you saw this what did you do?

14  A.      I don't know.  Just the next thing I knew, I was

15  back at my home with coffee in front of me.

16  Q.      Ms. Blick, I hate to ask you this, but I'll --

17  since you were the first one to see Kay, is this basically

18  the way you saw her and -- on the bed?

19                      (Witness emotional)

20  A.      Yes, sir.

21  Q.      And she was in that position?

22  A.      (No audible response.)

23                      MR. RILEY:  I'd like this introduced --

24          be introduced as Commonwealth Exhibit 1.

25                      MR. PRINCE:  Your Honor, I'm going to

-29-

GRAHAM 006429

1          object to it being introduced at the present time

2          to this lady now.  I think there's no reason

3          to continually abuse this witness.

4                    MR. RILEY:  Well, she says this is the

5          way she found her sister, Mr. Prince.

6                    MS. BLICK:  According to what I think

7          of --

8     Q.   Doesn't -- Mrs. -- Mrs. Blick, does this fairly

9     and accurately represent the scene you saw or the position

10    you saw your sister's body lying in in the beds -- on the

11    bed and does fairly what she and Norman Graham --

12    A.   I even told how she laid before I seen --

13                   MR. PRINCE:  Again, Your Honor, I

14         object again to this picture at this time.

15                   THE COURT:  Well, who took the picture

16         then?

17                   MR. RILEY:  Detective Albro.

18                   That fairly and accurately represents

19         it, and if he don't like what's being introduced

20         he can --

21                   MR. PRINCE:  Your Honor, the only

22         purpose for introducing the picture at the

23         present time is for the emotional

24         sensationalizing.

25                   MR. RILEY:  That's certainly not true.

GRAHAM 006430

1          **THE COURT:**  Well, why don't we just

2    wait and introduce it when the detective --

3

4              **(Tape 1 - Side 2)**

5

6              **(Bench conference)**

7    **(Photograph designated as Number 2 - Objection by Defense)**

8              **THE COURT:**  Okay.

9              **(End Bench Conference)**

10

11   Q.      Now, Mrs. Blick, did you or did anyone in your

12   presence call anyone at this time after you got back to

13   your trailer?

14   A.      My husband called Nick Mahea, which is our rescue

15   squad person.

16   Q.      All right.

17   A.      Then he called Laurin Morris, and then he -- he

18   was just calling my mom.

19              **COURT REPORTER:**  Done what?

20              **MS. BLICK:**  Called my mom.

21   Q.      And who is your mom?

22   A.      Virginia Merriweather.

23   Q.      Now, did Mr. Mahea, Mr. Morris immediately come?

24   A.      Yes, sir.

25   Q.      Which one got there first, if you know?

GRAHAM 006431

1    A.        I don't know which one for sure.

2    Q.        Now, Mrs. Blick, I ask you whether or not after

3    the officers got there did you observe anything on the car

4    that Norman Lee Graham had been driving?

5    A.        It was -- it was like my car, like Kay's car, it

6    was covered in dew, the outside of that, from the --

7    Q.        It was covered in dew?

8    A.        It (inaudible) outside.

9    Q.        Your car, had it been driven all night?

10   A.        No.  I hadn't -- hadn't been anywhere since I

11   left my grandmother's that afternoon before.

12   Q.        And --

13                    COURT REPORTER:  Since you went where?

14                    MS. BLICK:  My grandmother's --

15                    COURT REPORTER:  Okay.

16                    MS. BLICK:  -- the afternoon before.

17   Q.        And Norman Graham's car was covered with dew?

18   A.        Yes, sir, with the dew.

19   Q.        Like every other car that had been there for some

20   time; would that be correct?

21   A.        Yes.

22   Q.        Your husband, Ralph, I believe, was supposed to

23   be here later today or in the morning to testify?

24   A.        Monday morning.

25   Q.        Monday morning to testify.  And he's the one that

-32-

1    actually made the calls to the rescue people?

2    A.        Yes.

3    Q.        Was Norman visibly upset when he told you that

4    your sister was dead?

5    A.        Well, that's hard to explain, because I've never

6    met anyone quite like Norman.  When he got upset he didn't

7    show it as, say, I would show it, you know.  I mean, he --

8    he acted -- he acted like he was some upset, but not to the

9    extent, you know, like, say, if -- if -- if that'd been me

10   that didn't know anything about it and just walked in

11   there.  But, like I say, Norman didn't show -- doesn't show

12   his feelings as well as other people do.  He kind of has a

13   tendency to, I don't know, hide his feelings, keep 'em in,

14   or something.  I mean, he just --

15   Q.        Did he look you in the eye and say --

16   A.        No.

17   Q.        -- "Judy, your sister's dead"?

18   A.        No, he didn't look me in the eye.

19   Q.        Did you observe your sister's hands at the time

20   that you --

21   A.        No.

22   Q.        -- went in there to see her?

23             You didn't see them?

24   A.        No.  Just --

25   Q.        Just took one look and left?

-33-

GRAHAM 006433

1    A.        Well, I -- I mean, you know, I had -- my husband

2    took me in the room.  I -- I could see this much of this

3    arm, but no hand.

4                        MR. RILEY:  You may ask, Mr. Prince.

5

6    CROSS EXAMINATION BY MR. PRINCE:

7

8    Q.        Ms. Blick, when you went in to the trailer was

9    the light on in the bedroom?

10   A.        The back bedroom, yes.

11   Q.        Where your sister was?

12   A.        Right.

13                        MR. PRINCE:  That's all the questions I

14   have.

15                        MR. RILEY:  Thank you, ma'am.

16                        Call Nick Mahea.

17                        THE COURT:  Nick Mahea.

18                        MR. RILEY:  Your Honor, I understand

19   that there's an objection on Norman's part --

20                        MR. PRINCE:  We're not going to recall

21   her.

22                        MR. RILEY:  Sir?

23                        MR. JOHNSON:  We have no intention of

24   recalling her.

25

-34-

GRAHAM 006434

1    **NICK MAHEA:**  After first being duly sworn, testified as

2    follows:

3

4    **DIRECT EXAMINATION BY MR. RILEY:**

5

6    Q.      Mr. Mahea, state your name, please.

7    A.      Nicholas Mahea.

8    Q.      What is your occupation, sir?

9    A.      I'm a crosstie buyer with L & N Railroad.

10   Q.      And where --

11           **COURT REPORTER:**  I'm sorry, sir.

12   Q.      -- do you live?

13           **COURT REPORTER:**  What did you say?

14           **MR. MAHEA:**  Crosstie buyer.

15           **COURT REPORTER:**  Okay.

16   Q.      And where do you live, sir?

17   A.      In Guthrie.

18   Q.      Do you perform any civic function with the rescue

19   squad in Guthrie?

20   A.      Yes, I do.

21   Q.      What is that, sir?

22   A.      Well, I handle all the emergencies that -- as

23   many as possible.

24   Q.      Ask you whether or not in the early morning of

25   the 30th of June, 1980, did you receive a -- a call for

GRAHAM 006435

1    help?

2    A.        Yes, I did.

3    Q.        Who did you receive it from?

4    A.        The name wasn't given, but I -- well, he did give

5    it, but I don't know his name.  I know the individual when

6    I see him.  I recognize his name, but I don't remember it.

7    But I knew who it was.

8    Q.        Would it have been Ralph Vick -- Ralph Blick, or

9    do you remember?

10   A.        I don't remember his name.  I -- I know him when

11   I see him, and that's it.

12   Q.        And without repeating any conversation, did this

13   man tell you that your help was needed at some location?

14   A.        Yes, sir.

15   Q.        Where did he tell you about?

16   A.        At Tiny Town Trailer Park.

17   Q.        And did you go to the trailer park?

18   A.        Yes, I did.

19   Q.        Now, Mr. Mahea, when you -- what kind of vehicle

20   do you -- does the rescue squad have?

21   A.        We have a 1972 Chevy van, which was -- it's not

22   an ambulance, it's just a carry-all.

23   Q.        And is that parked inside or outside?

24   A.        Outside.

25   Q.        State whether or not when you got the van out was

-36-

GRAHAM 006436

1   it necessary for you to clear the windshield or do anything

2   relative to the van?

3   A.        Yes, it was.  I had -- after cranking the engine

4   I turned on the windshield wipers to clear the windshield,

5   to take the dew off the windshield.

6   Q.        There was dew on the -- on the van?

7   A.        Yes, sir.

8   Q.        And then did you go to the scene?

9   A.        Yes, sir.

10  Q.        Were you the first person other than members of

11  the immediate family that went in and found Kay Williams?

12  A.        I don't know if I was the first.  Probably one of

13  the first, yes.

14  Q.        What did you observe, sir?

15  A.        Well, as I entered the trailer, I went --

16  proceeded to the back bedroom and opened the door and saw

17  the young lady on the bed with her -- with her throat cut.

18  Q.        Exhibit to you what purports to be Commonwealth

19  Exhibit 1 and ask you does this reasonably -- reasonably

20  depict the scene which you saw when you arrived on the

21  scene?

22  A.        Yes, it does.

23  Q.        At that time did you notify any other law

24  enforcement officer or was any other law enforcement

25  officer there?

-37-

GRAHAM 006437

1    A.        Yes, sir.  I didn't know him by name or -- the

2    county sheriff was there, and the Guthrie police chief was

3    there, also.

4    Q.        All right, sir.

5    A.        We all got there at the same time approximately.

6    Q.        Now, ask you whether or not, did you observe at

7    the scene a knife?

8    A.        Yes, sir.

9    Q.        Where was it located?

10   A.        Laying on the floor just inside the -- the door

11   of the bedroom next to the bed.

12   Q.        Exhibit to you what purports to be a photograph,

13   and you can see a foot there and knife on the floor, and

14   ask you whether or not does that reasonably represent the

15   location of the knife that you observed?

16   A.        Yes, it does.

17                   MR. RILEY:  I'd like this be marked as

18           Commonwealth Exhibit --

19                   COURT REPORTER:  Three (3)

20

21     (CW EXHIBIT 3 - Photograph Depicting Location of Knife)

22

23   Q.        Tell whether or not did you observe any bootlaces

24   on the floor?

25   A.        The bootlaces that I -- that I saw were tied

-38-

GRAHAM 006438

1     around -- around the girl's hands, which was behind her

2     back, and that was primarily --

3     Q.     In other words, Janis Williams' hands were tied

4     behind her back?

5     A.     Yes, sir.

6     Q.     With boot -- bootlaces?

7     A.     Yes, sir.

8     Q.     Now, Mr. Mahea, ask you whether or not, sir, did

9     you thereafter see Norman Lee Graham at the scene?

10    A.     Yes, I did.

11    Q.     Is that Norman Lee Graham sitting between

12    counsel?

13    A.     Yes, sir.

14    Q.     Ask you whether or not did you observe his red or

15    maroon automobile that was parked at the trailer?

16    A.     Yes, sir.

17    Q.     Tell the ladies and gentlemen of the jury what

18    you observed about it.

19    A.     Well, it was like -- it was like the van, it was

20    covered in dew.  There was -- I did notice that part of it.

21    As a matter of fact, it was pointed out to me.  I don't

22    remember at this time who pointed it out.  But I did notice

23    that it had dew on the windshield.

24    Q.     Was the entire automobile covered with dew?

25    A.     Best of my knowledge, yes.

GRAHAM 006439

1    Q.    Did it appear that it had been driven in the last

2    few minutes or that it had been there some time so that the

3    dew settled and covered the entire automobile?

4                    MR. PRINCE:  Objection, Your Honor.  He

5            can testify as to the facts, what he observed,

6            and not an opinion about it, unless he's going to

7            be shown to be an expert.  He can testify to what

8            he saw and not -- not opinions concerning that

9            with --

10                   THE COURT:  Okay; sustained.

11   Q.    Did it appear as the car had been driven within

12   the past few minutes?

13                   MR. JOHNSON:  Objection, Your Honor.

14           He's doing the same thing you told him not to do.

15                   THE COURT:  Well, I'm -- I'm going to

16           overrule it.  I think he can state that.

17   Q.    Did it appear the car had been driven within the

18   past few minutes?

19   A.    No, sir.  It looked like it had not been.

20   Q.    It had not been?

21   A.    Yes, sir, it had not been.

22                   MR. RILEY:  You may ask.

23                   MR. PRINCE:  Could we have a brief

24           recess?

25                   THE COURT:  Okay.  How long do you

-40-

GRAHAM 006440

1          think it'll take?

2                    MR. PRINCE:  Five minutes.

3                    THE COURT:  Okay.  You want to -- let's

4          see.

5                    All right.  Ladies and Gentlemen of the

6          jury, we'll take about a five-minute recess.

7          Remember the admonition I've given you not to

8          discuss the case or make any decision, and be

9          back in five minutes.

10

11                    (OFF THE RECORD)

12

13    CROSS EXAMINATION BY MR. JOHNSON:

14

15    Q.      I'll refer to you as Nick, if that's okay,

16    because I have a little trouble with your last name.

17    A.      That's fine.  That's what I'm called.

18                    COURT REPORTER:  Refer to you as what,

19          Mr. Johnson?

20                    MR. JOHNSON:  I have a little trouble

21          with his last name.

22                    COURT REPORTER:  I know.  But what did

23          you call him?

24                    MR. JOHNSON:  Nick.

25                    COURT REPORTER:  Nick; okay.

-41-

Q.       Now, Nick, on this particular occasion do you know what time you arrived, or do you have any record?

A.       Arrived, I -- I have a record of 5:10 as going into the trailer and coming back out, and -- well, I'm not the coroner, so I don't -- I don't do any (inaudible).  But that's why I picked my time out as far as my -- my time's concerned.

Q.       Did you make any kind of written report?  When you make a run do you make any kind of written report?

A.       Oh, yes, we do.

Q.       Do you have those with you?

A.       Well, I have a copy of it, which is -- which is something that I refer to.

Q.       May I see that, please?

A.       Sure.

Q.       Was this made at the time that you made the run or shortly thereafter?

A.       Part of the report.  Part I added to for my own purpose.

              MR. RILEY:  May I see it, please, Mr. Johnson, too?

              MR. JOHNSON:  Yes.

A.       Some was added later.  The ballpoint pen was added later.

Q.       Okay.

-42-

1              (Microphone being moved)

2                    MR. JOHNSON:  Do you have any objection

3       to us later to make copies of this, Your Honor --

4                    THE COURT:  No, that's fine.

5                    MR. JOHNSON:  Pardon?

6                    THE COURT:  I say that's fine.

7                    MR. JOHNSON:  Could we get the

8       bailiff --

9                    THE COURT:  Yeah.

10                   MR. JOHNSON:  -- to make copies of

11      it --

12                   THE COURT:  Uh-huh.

13                   MR. JOHNSON:  -- so the original can

14      be returned to him.

15      Q.      And what would -- what information do you have

16      when you started going over there?

17      A.      Well, the call that I received, there was a

18      gentleman on the phone, said, "Nick, you'd better get out

19      here.  I think Kay's dead," and he said, "You better come

20      on in a hurry."

21      Q.      So, in other words, you had the information that

22      probably you're going to find a dead body there?

23      A.      Yes, sir.

24      Q.      I assume as -- as soon as you arrived, who was

25      there?

-43-

GRAHAM 006443

1    A.        The brother-in-law, and, like I said, the sheriff

2    got there the same time I did, as well as the Guthrie

3    police chief.

4    Q.        So it was you, Mr. Morris, the police chief, and

5    what member of the family?

6    A.        That's the one I saw immediately.

7    Q.        Did you go into the trailer alone, or did someone

8    accompany you?

9    A.        I didn't go -- I did by -- by myself, first of

10   all, because I knew the way.  I don't know who was behind

11   me because there was only room for one person going down

12   the hall, and that's what I did.

13   Q.        Well, did you go --

14   A.        I think there was somebody behind me.  I think

15   the police chief was behind me.

16   Q.        When you go back outside what did you notice?

17   A.        Well, you had various of people, for one thing,

18   and, of course, I met the -- the brother-in-law and --

19   outside.

20   Q.        Didn't notice the vehicles at that time?

21   A.        No, sir.

22   Q.        Later on -- when do you think you noticed the

23   vehicle as you described to Mr. Riley?

24   A.        Some time after I came out of this bedroom we

25   were standing outside waiting for the coroner.

-44-

1    Q.        We could assume -- I assume you spent some time

2    inside.

3    A.        We did.

4    Q.        And do you remember who was standing outside?

5    A.        Well, I saw the -- I saw Mr. Norman here, Graham,

6    and I saw the sheriff after I came out, and the police

7    chief and the brother-in-law, whatever his name is, and I

8    don't remember who all.

9    Q.        And you started -- at some point in time you

10   start noticing the -- Mr. Graham's vehicle?

11   A.        Yes.

12   Q.        You don't remember what time that was?

13   A.        Not really, no.

14   Q.        Would it have been after daylight?

15   A.        Could've been.

16   Q.        Just not sure?  You're just not sure?

17   A.        No;, not pinning down an exact time, no.

18   Q.        Did you notice any other vehicles around?

19   A.        Yes, sir.

20   Q.        What other vehicles were around?

21   A.        Kay's little gray Mustang, for one.

22   Q.        You recognized -- you recognized her car as being

23   -- you knew what kind of car she had?

24   A.        Sure.

25   Q.        Did you know what kind of car Norman had prior to

-45-

GRAHAM 006445

1    that time?

2    A.        No.

3    Q.        But you knew Kay, but didn't know Norman.    Is

4    that right?

5    A.        Right.

6    Q.        Did you know Norman by sight?

7    A.        No.

8    Q.        Was there any other vehicle there?

9    A.        There was several up and down the -- the parking

10   way.

11   Q.        Was the sheriff's car there?

12   A.        He was right behind me.

13   Q.        Your van was there?

14   A.        Yes.

15   Q.        And you described Mr. Graham's car as having dew

16   on it.    Was there any difference in appearance than Kay's

17   car?

18   A.        None that I could tell that much.

19   Q.        So it gave the same -- the same appearance to you

20   as her car did as far as dew; correct?

21   A.        As far as I -- I know.

22   Q.        Now, what did you observe about the sheriff's

23   car?

24   A.        I didn't pay no attention to the sheriff's car.

25   Q.        Did your van have dew on it?

-46-

GRAHAM 006446

A.      Yes, sir.

Q.      Did it have dew on the windshield?

A.      Yes, sir.

Q.      On the metal portions, too?

A.      All over.

Q.      What normally causes dew from your -- if you know from your own personal knowledge, what normally causes dew that's wet on -- on a vehicle?

A.      That -- that's outside of my range.  I'm not -- I'm not a scientist or anything.  All I know, when I see it I know it's dew.

Q.      Well, you feel you've got pretty good common sense, don't you, Nick?

A.      Fair.

Q.      Okay.  If you parked a car in the garage, would you expect to have dew on it the next morning?

A.      No, sir.

Q.      Okay.  So then would it be a wild guess then that maybe the car might've been outside in order to collect dew?

A.      I would suspect that, yeah.

Q.      So you have no idea what range of temperature it takes in appearance of dew?

A.      No.

Q.      You have no idea what humidity to make dew?

-47-

GRAHAM 006447

1    A.        No, sir.

2    Q.        What do you recall about the weather on that

3    particular occasion?

4    A.        Well, I don't know.  I didn't pay that much mind

5    to it.  I don't remember having on a jacket or anything

6    like that.  It could've been I could've had, could not

7    have.

8    Q.        Would you describe the weather as -- this is June

9    30th.  Would you describe it as maybe being fairly seasonal

10   for that year -- I mean, for that time?  Was it unusually

11   cool or unusually hot, that you can recall?

12   A.        No; I -- I don't recall any of that.

13   Q.        Getting back to the dew, would you expect that,

14   from your own personal knowledge, if it was cloudy or if it

15   was clear having any effect on the dew that might collect

16   on an automobile?

17   A.        Well, I don't know what would have an effect on

18   it, whether it was clear or otherwise, because it was

19   before dawn when I went out there, so whether it was clear

20   or not.  When you're called at that time in the morning you

21   don't take time to look up and see the clouds.

22   Q.        But you don't recall whether it was daylight or

23   dark when you made the observation?

24   A.        Well, I -- I would assume it was after, I'd say,

25   break of day.  I have to wait -- wait for the coroner,

GRAHAM 006448

1    because I cannot leave a scene until the coroner gets here

2    and dismisses me.

3    Q.      I -- I assume that you arrived before daylight

4    and left after -- after -- by the time you might've left

5    the scene it was already light?

6    A.      Yes, sir.

7    Q.      And when you arrived it was completely dark?

8    A.      I don't know how dark, but I had to use my

9    headlights going up.

10   Q.      You couldn't -- I mean, you couldn't acknowledge

11   -- it could've been cloudy this morning.  I mean, you

12   needed artificial lights on your automobile?

13   A.      Yes, sir.

14   Q.      (Microphone movement over talking).  And I think

15   we have a (inaudible)?

16   A.      Yes.

17   Q.      You indicated that you checked out at

18   approximately 5:00 and returned approximately 7:30.

19   A.      Yes.

20   Q.      So you were gone for two and a half -- two and a

21   half hours?

22   A.      Yes.

23   Q.      And did Tom Bastian and Neil Allison go with you?

24   A.      Yes.  I picked up Tom actually en route, and Neil

25   Allison came later.

-49-

GRAHAM 006449

1   Q.      Did you ever see Detective Albro; had he arrived

2   when you were there?

3   A.      He could have.  I don't remember.  There were a

4   lot of people there after.

5   Q.      Do you know Detective Albro?

6   A.      I know him now, yes, sir.  I didn't know him

7   then.

8   Q.      But, specifically, you don't remember him being

9   there?

10  A.      No.

11  Q.      Were you there when the coroner come in?

12  A.      Yes, sir.

13  Q.      Did you leave shortly after the coroner got

14  there?

15  A.      Yes, sir.

16  Q.      I assume you felt as though any official duties

17  or anything that you had at that time were over with when

18  the coroner arrived?

19  A.      Yes, sir.

20              MR. JOHNSON:  I have no further

21      questions.

22              THE COURT:  Anything else, Mr. Riley?

23              MR. RILEY:  Yes, sir.

24

25  REDIRECT EXAMINATION BY MR. RILEY:

GRAHAM 006450

1    Q.        Mr. Mahea, when you have an automobile with --

2    with a lot of dew on it, or with dew on it, after you

3    drive, say, forty or fifty miles per hour, what happens to

4    the dew?

5    A.        Well, I suppose part of it blows off.

6    Q.        Did it appear that this car, the defendant's, did

7    it appear that that had happened?

8    A.        As I remember, it did not.

9              **MR. RILEY:**  Thank you, sir.

10

11   **RECROSS EXAMINATION BY MR. JOHNSON:**

12

13   Q.        Now, Nick, getting back to the same line of

14   questions, if the car remained outside, I assume you would

15   collect again.  Would that be reasonable to assume?

16   A.        (Inaudible).

17   Q.        Would you have any idea how long it took the dew

18   that would form on the automobile?

19   A.        No, sir, I don't.

20   Q.        I assume that there was still -- probably some

21   dew on your van when you arrived at the scene.  Do you

22   recall that?

23   A.        Yes, sir.

24   Q.        It hadn't all blown away --

25   A.        No.


-51-

GRAHAM 006451

1   Q.        -- when you was driving over there?

2   A.        (No audible response).

3            MR. JOHNSON:  No further questions.

4            THE COURT:  Okay.

5            MR. RILEY:  Call Billy Westerman.

6

7   BILLY WESTERMAN:  After first being duly sworn, testified

8   as follows:

9

10  DIRECT EXAMINATION BY MR. RILEY:

11

12  Q.        State your name, please.

13  A.        Billy Westerman.

14  Q.        Do you have any official capacity or job that you

15  hold for the City of Guthrie?

16  A.        Chief of police.

17  Q.        How long have you been chief of police, Mr.

18  Westerman?

19  A.        Four years.

20  Q.        Ask you whether or not were you on duty on the

21  20th (sic) of June, 1980, when a call came from the trailer

22  park located west of Guthrie?

23  A.        I was.

24  Q.        I ask you whether or not did you go to the scene?

25  A.        Yes, sir.

GRAHAM 006452

1    Q.       Did you observe the body of Kay Williams?

2    A.       Yes, sir.

3    Q.       And did you observe the defendant, Norman Graham,

4    there?

5    A.       Yes.

6    Q.       Ask you whether or not, sir, did you observe

7    Norman Graham's red automobile while you were at the scene?

8    A.       Yes, sir.

9    Q.       What time did you get to the scene, or how

10   quickly after the police call came out did you get to the

11   scene, Mr. Wes -- Mr. Westerman?

12   A.       I'd say approximately five -- nine minutes after

13   five.

14                    COURT REPORTER:  Did you say twenty

15           after 5:00?  Huh?

16   Q.       How long --

17                    MR. WESTERMAN:  Nine.

18   Q.       How long had you been there when you saw the

19   automobile belonging to the defendant?

20   A.       I parked right in front of it when I pulled up.

21   Q.       Tell the ladies and gentlemen of the jury whether

22   or not you examined the car, and, if so, what did you do?

23   A.       Well, the top was full, it -- and the hood had

24   dew on it, and inside the windshield was fogged up.  And I

25   held my hand down in front of the radiator and I couldn't

-53-

1    feel no heat coming out of the radiator.

2    Q.        I realize you're not a mechanic.  The fact that

3    there was no heat coming out of the radiator, did that

4    indicate to you that the car had been driv -- driven

5    recently?

6              MR. JOHNSON:  Objection.  He can

7              testify about what he observed.  As Mr. Riley

8              said, he's no auto mechanic.

9              MR. RILEY:  Well, I started asking Mr.

10             Mahea about what causes dew and so forth, and

11             this is a proper question.

12             THE COURT:  Okay; overruled.  Go ahead.

13   Q.        You may answer.

14   A.        (Inaudible).

15   Q.        Did -- when you felt the radiator, I believe you

16   testified you didn't feel any heat.  Was that an indication

17   to you that the car had been driven recently or had not

18   been driven in some time?

19   A.        I would feel it'd take some time to get the dew

20   there.

21   Q.        And there was dew on the outside of the car?

22   A.        Yes.

23   Q.        And what did you say about the inside, the

24   windshield?

25   A.        The inside of the windshield was fogged up.

-54-

GRAHAM 006454

1    Q.        Is that an indication to you that the car had

2    been driven recently?

3    A.        No.

4                        MR. RILEY:  You may ask.

5

6    CROSS EXAMINATION BY MR. PRINCE:

7

8    Q.        Chief Westerman, you said the windshield did not

9    have dew on it?

10   A.        The inside of it was fogged up.

11   Q.        I'm asking you the windshield did not have dew on

12   it.  Is that correct?

13   A.        Well, the windshield?

14   Q.        Yes, sir.

15   A.        The outside?

16   Q.        Yes, sir.

17   A.        Yes, it had dew on it.

18   Q.        You just testified that it did not have dew on

19   it.  You said the hood had dew on it, you said the front

20   had dew on it, but the windshield did not have dew on it.

21   A.        The windshield was fogged up on the inside.

22   Q.        On the inside; okay.  But no dew was on the

23   outside?

24   A.        I never noticed that on the outside, no.

25   Q.        Did your car have dew on it?

-55-

GRAHAM 006455

1     A.     No, sir. It hadn't been sitting still that well.

2 But Norman's, it was parked, it looked like (inaudible).

3     Q.     Now, you arrived approximately 5:10 a.m. Is that

4 correct?

5     A.     That's an estimate, yes, sir.

6     Q.     And on the scene at that time was Nick Mahea, and

7 you arrived approximately the same time as he did?

8     A.     Approximately, yes.

9     Q.     And Mr. Mahea went into the door first?

10     A.     Yes, sir.

11     Q.     And then you went in?

12     A.     No, I wasn't in. One of the rescue men went in,

13 and I went in behind him.

14     Q.     Did Sheriff Morris go in before you did, or did

15 you go in right behind the rescue squad members?

16     A.     I don't remember whether the sheriff was -- I

17 don't remember whether it was (inaudible), when he went in.

18     Q.     Do you know how long you were inside?

19     A.     I wasn't in but just a few minutes.

20     Q.     You said when you drove up you parked in front of

21 Norman Graham's car?

22     A.     Along side in front of it.

23     Q.     Where was Kay Williams' car?

24     A.     It was sitting there near the trailer, but I

25 don't remember just exactly where.

-56-

1    Q.      You didn't see Ms. Williams' car?

2    A.      Yeah, I saw it.

3    Q.      But you don't remember where it was?

4    A.      Sitting right beside of it on the -- on the drive

5    there, there at the trailer.

6    Q.      Was it in front of or behind Mr. Graham's car?

7    A.      I don't remember.

8    Q.      How did you know -- how did you know it was

9    Norman's car?

10   A.      I was familiar with his car.

11   Q.      How -- how were you familiar?

12   A.      I'd seen him drive it.

13   Q.      I assume you were familiar with Ms. Williams'

14   car, also?

15   A.      Yes.

16   Q.      But you didn't know -- you don't remember where

17   that was?

18   A.      I don't remember whether her car was parked

19   behind his or he was behind her.  I don't remember.

20   Q.      You say the inside of the car was fogged up?

21   A.      Yes, sir.

22   Q.      Well, isn't it common knowledge when the inside

23   of a car is fogged up, that means that someone had recently

24   been in that car?

              MR. RILEY:  Objection.  Well, let him

25

GRAHAM 006457

1              go ahead and answer.  I don't know that

2              (inaudible portion).

3   Q.        I mean, something has got to cause that

4   aspiration, has to cause the moisture on the windshield.

5   Is that not correct?

6              MR. RILEY:  Judge, is Mr. Prince

7              testifying, or is he examining the witness?

8              Objection.

9              MR. PRINCE:  As to cross examine, I can

10             lead the witness.

11             MR. RILEY:  Well, actually not -- you

12             can't testify, though, Mr. Prince.

13             MR. PRINCE:  I'm not testifying.

14             THE COURT:  Okay; all right.

15  A.        Well, I couldn't say about that.

16             THE COURT:  We'll let him answer, if he

17             knows.

18             COURT REPORTER:  Did you say, "I could

19             not say about that"?

20             MR. WESTERMAN:  (No audible response.)

21             COURT REPORTER:  Okay.

22             MR. PRINCE:  That's all, Your Honor.

23             THE COURT:  Okay.

24             MR. RILEY:  May this witness be

25  excused?

GRAHAM 006458

1          **MR. JOHNSON:**  Oh, yes, sir.

2          **MR. RILEY:**  Thank you, Mr. Westerman.

3          Call Sheriff Laurin Morris.

4

5   **SHERIFF LAURIN MORRIS:**  After first being duly sworn,

6   testified as follows:

7

8   **DIRECT EXAMINATION BY MR. RILEY:**

9

10  **Q.**        Your name is Laurin Morris and you're the sheriff

11  of Todd County?

12  **A.**        Yes, sir.

13  **Q.**        Ask you whether or not were you the sheriff of

14  Todd County in June of 1980 when Janis Kay Williams was

15  murdered?

16  **A.**        Yes, sir.

17  **Q.**        Now, relative to the trailer park where Janis --

18  where Kay lived, how far do you live from there?

19  **A.**        It's approximately a mile.

20  **Q.**        And do you remember what time of day or night you

21  received a call relative to an incident at the trailer

22  park?

23  **A.**        I think it was around five o'clock in the

24  morning.

25  **Q.**        Did you immediately go to the scene?

GRAHAM 006459

1    A.        Just as quick as I could get my clothes on, yes.

2    Q.        Was your car parked under cover or was it parked

3    outside?

4    A.        No, sir; it was parked outside.

5    Q.        And what was the condition of the car relative to

6    dew?

7    A.        The windows had heavy dew on 'em.

8    Q.        Was it necessary to use your windshield wipers to

9    clear them so you could see to drive?

10   A.        Yes, sir.

11   Q.        And then did you immediately go to the scene?

12   A.        Yes, sir.

13   Q.        Did you observe Norman Graham at the scene?

14   A.        Yes.  Norman was standing in the yard, I believe,

15   when I got there.

16   Q.        Did you go into the house that was occupied by

17   Norman Graham and -- and Kay Williams?

18   A.        Yes, sir.

19                    MR. RILEY:  This has been marked as

20            Commonwealth Exhibit 1.

21   Q.        And I'll ask you whether or not does that depict

22   the body of Kay Williams as you observed it when you went

23   into the trailer?

24   A.        Yes.

25                    MR. RILEY:  Judge -- Judge, I don't

-60-

1    know how to question the -- so that the jury can

2    see this unless pass it around.  But if --

3             MR. JOHNSON:  Your Honor, I have a

4    simple solution to that.  I see no beneficial --

5    the only purpose Mr. Riley introducing that

6    picture or showing it to the jury is purely an

7    emotional type basis to influence the jury, to

8    prejudice, that type, and there's no evidentiary

9    value.  Everything's been testified to, and it's

10   obviously -- it's a picture, and the only

11   thing --

12            MR. RILEY:  Just -- would you,

13   please --

14            THE COURT:  Okay.

15            MR. RILEY:  Is it all right if I give

16   it to the jury?

17            MR. JOHNSON:  The only purpose is to

18   emphasize the gore, the blood and the gore.

19            THE COURT:  What do you -- what do you

20   want to do on it?

21            MR. RILEY:  Well, ask him about the

22   hands being tied and several other facts about

23   it.

24            MR. JOHNSON:  I recall that all those

25   things are --

-61-

GRAHAM 006461

1          **THE COURT:**  Okay.  Well, I'm going to

2          overrule the objection and --

3  **Q.**     Mr. --

4          **THE COURT:**  -- subject -- you know, I

5          mean, you know, if you're going to show it to the

6          jury, it's going to be subject to being --

7          **MR. RILEY:**  Okay.

8          **THE COURT:**  -- introduced properly by

9          the detective.

10         **MR. RILEY:**  I understand that.

11         **THE COURT:**  Or whoever took it.

12 **Q.**     Mr. Morris, I ask you to describe to the jury,

13 and they will see this later, how you observed the hands of

14 Kay Williams when you saw her there on the bed.

15 **A.**     They were bound behind her, and her left arm, if

16 I remember correctly, was tucked under her body --

17 **Q.**     All right.

18 **A.**     -- some such kind of a way.

19 **Q.**     All right.  Show -- stand up and show it.

20 **A.**     More or less tucked under the body, down --

21 **Q.**     The hands were under right around beside?

22         Now, ask you whether or not, did you observe any

23 wounds about the body?

24 **A.**     Yes, sir.

25 **Q.**     What did you observe?

-62-

GRAHAM 006462

A.        There was a long gash on -- on her neck, and then several puncture wounds to the chest.  As to exact amount in the chest, I do not know.

Q.        Does that reasonably depict the punture wounds and the cut on the neck?

A.        Yes, sir.

                MR. RILEY:  I ask this be introduced,
        subject to -- as Commonwealth Exhibit --

                COURT REPORTER:  Four (4).

                MR. RILEY:  Four (4) -- four (4),
        subject to being authenticated by --

                MR. JOHNSON:  Let my same objection be
        noted for that particular photograph, Your Honor.

                THE COURT:  Okay.


(COMMONWEALTH EXHIBIT 4 - Photograph of Body w/Cut Marks)


Q.        Now, Mr. Morris, I ask you whether or not, sir, did you observe a -- anything on the floor?

A.        Yes, sir.  There was a small pocket knife at her feet beside of the bed.

Q.        I exhibit to you what's been marked as Commonwealth Exhibit 3, and ask you to tell the ladies and gentlemen of the jury what that is.

A.        That is a picture of the pocket knife that was

GRAHAM 006463

1    laying beside the bed.

2    Q.        And the leg, is that Ms. Williams' leg?

3    A.        Yes, sir.

4    Q.        Now, relative to anything else, did you find

5    anything else on the floor?

6    A.        There was what appeared to be a terrycloth

7    garment laying at the foot of the bed, which, after looking

8    at it, what you call a little jumpsuit.

9    Q.        It's been introduced as Commonwealth Exhibit 2

10   what purports to be a jumpsuit.  Ask you, sir, is that what

11   you observed?

12   A.        Yes, sir.

13   Q.        Now, what appeared to have been done to that?

14   A.        It appeared to have been torn from the body.

15   Q.        Now, I will -- now, you say torn.  Show me where

16   you're talking about being -- right down the --

17   A.        It appears to be the front side of it.

18   Q.        And where was this located then (inaudible)?

19   A.        This was at the foot of the bed --

20   Q.        At --

21   A.        -- on the floor.

22   Q.        At the foot of the bed on the floor.

23            Now, ask you whether or not were there any kind

24   of rope or laces, or anything of that nature --

25   A.        There was what appeared to be bootlaces laying on

-64-

1    the floor.

2                         MR. RILEY:  May I mark these for

3             identification, please, Your Honor?

4                         COURT REPORTER:  Number 5.

5                         THE COURT:  Okay.  Let's see what --

6                         COURT REPORTER:  Five (5) and 6, isn't

7    it?

8                         MR. RILEY:  Those photographs.

9                         THE COURT:  Uh-huh.  Well --

10                        COURT REPORTER:  Which is the lace and

11   which is --

12                        MR. RILEY:  They're both the same

13   thing, bootlaces.

14                        THE COURT:  They're both the same

15   thing.

16                        COURT REPORTER:  Five (5) is the knife,

17   isn't it?

18                        THE COURT:  No; they're both bootlaces.

19                        COURT REPORTER:  Okay.

20                        THE COURT:  Or 6.  That's the only

21   way I know to tell you.

22                        MR. RILEY:  All right, sir.

23                        THE COURT:  Number 5 has a foot

24   showing in it.  And --

25                        COURT REPORTER:  That's the one -- 5,

GRAHAM 006465

1          yeah, uh-huh.

2                    **THE COURT:**  Okay.

3                    **COURT REPORTER:**  Must be a knife, yeah.

4                    **MR. JOHNSON:**  There are no objections

5          to that -- that -- of the photograph of the knife

6          being introduced, Your Honor.

7                    **THE COURT:**  All right, now, there's no

8          knife -- is there a knife there?

9                    **MR. RILEY:**  That's all right.  We've

10         already done that.

11                   **THE COURT:**  Okay.

12    **Q.**      Now --

13                   **THE COURT:**  That's bootlaces.

14

15         (COMMONWEALTH EXHIBIT 5 - Photograph w/BootLaces)

16         (COMMONWEALTH EXHIBIT 6 - Photograph w/BootLaces)

17

18    **Q.**      -- exhibit to you what purports to be

19    Commonwealth Exhibit 5 and 6, and would you tell the ladies

20    and gentlemen of the jury what that is, sir?

21    **A.**      These were what appear to be the bootlaces,

22    pieces of 'em.

23    **Q.**      All right, sir.

24         Now, I have a picture here, sir.

25

-66-

GRAHAM 006466

1                        **(Tape 2 - Side 1)**

2   A.       They're known as a roach holder.

3   Q.       Okay.  And where was this picture taken, sir?

4   A.       That -- that was laying on the end table beside

5   the bed.

6   Q.       All right, sir.

7               **MR. RILEY:**  I'd like that be introduced

8            as Commonwealth Exhibit --

9               **COURT REPORTER:**  Seven (7).

10

11      **(COMMONWEALTH EXHIBIT 7 - Photograph w/Roach Holder)**

12

13  Q.       See if you can identify that, sir.

14  A.       This is the -- the street that the trailer park

15  -- I mean, that the trailer was on, located on.

16               **COURT REPORTER:**  Seven (7).

17               **THE COURT:**  Seven (7) or si --

18               **COURT REPORTER:**  Oh, okay.  I remember.

19               **THE COURT:**  I'm not sure.

20               **COURT REPORTER:**  Yeah.  That's been --

21               **THE COURT:**  I --

22               **COURT REPORTER:**  -- tendered.

23

24      **(CW EXHIBIT 8 - Photograph of Entrance of Trailer Park)**

25

GRAHAM 006467

1                    (Off cassette tape)

2    Q.        ... which is Commonwealth Exhibit 8, is the -- is

3    the entrance to the trailer park?

4    A.        That's the street that the trailer is located

5    on --

6    Q.        All right.

7    A.        -- yes, sir.

8

9      (COMMONWEALTH EXHIBITS 9 & 10 - Photographs of Trailer)

10

11    Q.        And I exhibit to you what purports to be Exhibits

12    Number 9 and 10 and ask you what those are photographs of,

13    sir.

14    A.        That would be the trailer in which Norman and Kay

15    was living.

16    Q.        And Commonwealth Exhibit Number --

17              MR. RILEY:  What's the next one, Judge.

18              I don't believe you --

19              COURT REPORTER:  Eleven (11).

20              MR. RILEY:  All right.

21              THE COURT:  Oh, I didn't mark it?

22              MR. RILEY:  No, sir.

23    Q.        -- Commonwealth Exhibit 11, and ask you what is

24    that, sir?

25    A.        That's the trailer in which Joe Weatherford lives

GRAHAM 006468

1    in.   That's directly across the street from it.

2    Q.      And the Weatherford trailer is directly across

3    the street from the trailer occupied by the defendant and

4    the decedent?

5    A.      Yes, sir.

6

7        (CW EXHIBIT 11 -  Photograph of Weatherford Trailer)

8

9    Q.      Now, I believe that you, after you got to the

10   scene, called for state police assistance, and Detective

11   Albro came to the scene, did he not?

12   A.      Yes, sir.

13   Q.      And you, in conjunction with Detective Albro, I

14   ask you whether or not, did you all take possession of

15   various items of personal property you found at the scene?

16   A.      Yes, sir.  Detective Albro and I did.

17   Q.      State whether or not did you take possession of

18   the knife that you have just identified in the photograph?

19   A.      Yes.

20   Q.      Ask you whether or not was any other knife taken

21   from anyone at the scene?

22   A.      Yes, sir.  I believe Detective Albro.

23   Q.      And --

24              MR. JOHNSON:  Judge, I object to him

25              testifying about what Detective Albro did, and he

*-69-*

1              testified he took possession of another knife.

2     Q.        Was this taken in possession in your presence?

3     A.        I personally took possession of the knife from

4     Norman myself.

5     Q.        And gave it to Detective Albro?

6     A.        Yes, sir.

7                         THE COURT:   Okay.

8     A.        That's the (inaudible) right there.   The

9     detective and I walked to the door and looked at the knife

10    myself, and then turned around and gave it back to him,

11    Detective Albro.

12    Q.        Now, exhibit to you what purports to be two

13    knives, one a GESCO knife, and an Uncle Henry knife, and

14    ask you, sir, can you identify those?

15    A.        This smaller knife is the knife that was laying

16    on the floor --

17    Q.        All right, sir.

18    A.        -- next to the bed.   And this is the knife that

19    Norman handed me out of his left, front pocket, if I

20    remember correctly.

21    Q.        All right, sir.

22                        MR. RILEY:   At this time I'd like for

23               these to be marked, the smaller knife found on

24               the floor the first exhibit, and the one taken

25               from the defendant on the second exhibit.

GRAHAM 006470

1          COURT REPORTER:  Be 12 and 13.

2          THE COURT:  Now, let's see here.  Make

3     sure I get the right one now.  There's Number 12.

4          COURT REPORTER:  I have 12, is the

5     small knife off the floor.

6          MR. RILEY:  All right.

7          THE COURT:  Now, have I got it -- is

8     that right?  Is that the small one?

9          MR. RILEY:  Yes, sir, that's correct.

10          MR. PRINCE:  Your Honor, I object to

11     the introduction of the knife concerning Mr.

12     Graham.  There's absolutely no evidentiary value.

13          MR. RILEY:  I will show that in a few

14     minutes.

15          THE COURT:  Okay.  Well, introduce it

16     subject to further substantiation of its

17     relevancy.

18

19     (COMMONWEALTH EXHIBIT 12 - Small Knife on Floor at Scene)

20      (COMMONWEALTH EXHIBIT 13 - Knife Taken from Defendant)

21

22     Q.     Now, the smaller knife, which will be as Exhibit

23     12, was found on the floor?

24     A.     Yes, sir.

25     Q.     And the larger knife was taken from the

-71-

1     possession of the defendant, which is our Exhibit 13?

2     A.        Yes, sir.

3     Q.        Now, Mr. Morris, ask you whether or not, sir, did

4     you and Detective Albro take possession of any of the

5     bootlaces, or did he do that him -- himself?

6     A.        Detective Albro, I believe, was --

7     Q.        All right.

8     A.        -- took the bootlaces and put them in an evidence

9     bag.

10    Q.        All right.

11              Now, Mr. Morris, after you got to the scene, I'll

12    ask you whether or not did you observe the car belonging to

13    the defendant?

14    A.        Yes.

15    Q.        Tell the ladies and gentlemen of the jury what

16    you observed about that car.

17    A.        The car had heavy dew on -- on it from -- the

18    top, the hood.  The windshield was fogged up on the inside.

19    Q.        And did you feel the engine, or the radiator, or

20    that part of the car?

21    A.        I bent down and reached under the car and felt

22    the bottom of the radiator and it was just barely warm.

23    Q.        State whether or not, does that indicate to you

24    that the car had been driven recently?

25    A.        Had the car been driven recently I wouldn't of

-72-

GRAHAM 006472

1    been able to have held it, my hand on the radiator.

2    Q.    But it was just barely warm?

3    A.    Yes, sir.

4    Q.    And the car had dew all over it?

5    A.    Yes, sir.

6    Q.    Did the car appear to have been driven any time

7    within the immediate past?

8    A.    It didn't show any appearance of it, no.

9    Q.    Now, Mr. Morris, at the scene that day, I'll ask

10   you whether or not did you talk to Norman Lee Graham?

11   A.    Yes.

12   Q.    And over the insuing several months as the case

13   was developed did you again talk to Norman Lee Graham from

14   time to time?

15   A.    Yes, sir.

16   Q.    Ask you whether or not was what he had told you

17   relative to his version of the incidents that happened

18   reduced to a statement on or about the 16th day of

19   December, 1980?

20   A.    Yes, sir.

21   Q.    Prior to the asking Mr. Graham any questions,

22   I'll ask you whether or not did you receive and request of

23   him, and also receive a waiver of his rights?

24   A.    Yes.

25   Q.    Is that the copy, sir?

-73-

A.        That is the copy.

                THE COURT:  That's Number 14.

                COURT REPORTER:  Uh-huh.

                MR. RILEY:  While we're at it, the
statement will be 15.

                THE COURT:  Statement, Number 15.

                COURT REPORTER:  What's 14 then?

                THE COURT:  Fourteen (14) was that.

                COURT REPORTER:  Waiver of Rights.

                THE COURT:  And 15 is the statement.


        (COMMONWEALTH EXHIBIT 14 - Waiver of Rights)

        (COMMONWEALTH EXHIBIT 15 - Graham Statement)


Q.        After the waiver of rights was signed, I'll ask
you whether or not was a statement taken at your request by
asking various questions and witnessed to you by you and
Linda Robertson, a notary public?

A.        Yes, sir, and Detective Albro was also present.

Q.        Exhibit to you what purports to be the original
statement, sir, and ask you is that the statement you took
from Norman Lee Graham?

A.        This is the statement, yes, sir.

                MR. RILEY:  Do you have a copy of this?

Q.        At this time I'll ask you, sir, would you read to


-74-

GRAHAM 006474

the jury the statement Norman Lee Graham gave you?

**(Bench Conference)**

MR. JOHNSON:  Your Honor, I ask that the Court do an in camera inspection of his statement, that some of the questions in the statement are inadmissible in which Mr. Riley --

COURT REPORTER:  Some portions are what?

MR. JOHNSON:  Are inadmissible.

MR. RILEY:  I think it may be --

MR. JOHNSON:  I would ask that we do this outside the hearing of the jury, and the court do an in camera inspection so specific objections can be made to portions of the statement.

THE COURT:  Okay.

**(End Bench Conference)**

THE COURT:  All right, Ladies and Gentlemen of the jury, you all can rest easy. You can stand up and stretch if you want to. We've got to go out just a minute and let me look at this statement.

**(Parties retire to Judge's chambers; then open court)**

-75-

1    Q.        All right, my question was, I asked you whether

2    or not did Norman Lee Graham on the 16th day of December,

3    1980, give you a statement relative to facts that he had

4    been giving to you since the murder of Janis Kay Williams?

5    A.        Yes.

6    Q.        Was that reduced to writing in the form of a

7    seven-page statement?

8    A.        Yes, sir.

9    Q.        At this time will you please read the statement

10   that Norman Lee Graham gave you to the jury?

11            **(Commonwealth Exhibit 15 read by witness)**

12   Q.        This is the statement that Norman Graham gave you

13   on the 16th day of December, 1980?

14   A.        Yes, sir.

15   Q.        And state whether or not do the statements that

16   are contained in there reiterate what Norman Graham had

17   been telling you for several months since Kay had been

18   murdered?

19   A.        This is what he had been orally telling, yes,

20   sir, and decided to reduce it to writing.

21   Q.        Now, I ask you, Mr. Morris, when you examined the

22   car driven by Norman Graham, did it appear to have been

23   driven from, say, the Red Carpet, some fifteen or sixteen

24   miles away --

              **MR. JOHNSON:** Your Honor, I'm going to

-76-

GRAHAM 006476

1    object to this.  This is calling for a

2    conclusion.  He can testify to what he saw, but

3    the conclusion is going to have to be some kind

4    of qualification of an expert.

5         **THE COURT:**  Okay.  Uh --

6         **MR. RILEY:**  Judge, he can tell his

7    answer and tell why.

8         **MR. JOHNSON:**  He can tell what he

9    observed, but if he has no more knowledge of

10   (inaudible), the jury can reach -- the jury can

11   reach their own conclusion.  But if he has -- if

12   he's an expert, then he can express his opinion

13   on it.

14        **THE COURT:**  Okay.  Well, of course, I

15   think the jury understands he's not an expert on

16   that.  I think whatever's a logical conclusion

17   from anything he observed, he can -- he can say.

18   So I'll overrule the objection.

19   Q.    You may answer.

20   A.    The car that Norman was driving still had the dew

21   and everything on it, and the radiator was just barely

22   warm.  And had it been driven twenty miles, I wouldn't of

23   been able to have kept my hand on that radiator.  It

24   would've been too hot to hold.

25   Q.    State whether or not did you interview persons at

GRAHAM 006477

the Red Carpet Inn relative to Norman Graham's car being in the parking lot at --

MR. JOHNSON: Your Honor -- the objection is, Your Honor, the best evidence to that is those people to testify. He can't --

MR. RILEY: I'm going to ask him -- I'm not asking what they said, I'm asking him did he interview them.

THE COURT: Okay; overruled. Go ahead.

Q.      Did you interview people at the Red Carpet Inn to determine whether or not Norman Graham's car was at the Red Carpet Inn at 4:00 or 4:20 in the morning?

A.      I was with Detective Albro when the people at the (inaudible) talked to, yes.

Q.      And I believe some of them will testify here tomorrow relative to that.

A.      Yes, sir.

Q.      Now, how soon after this call came out did you arrive at the scene?

A.      It was approximately ten minutes.

Q.      And how long had you been there when you looked at Norman Graham's car and saw the dew all over it?

A.      I would say fifteen to twenty minutes, would be a guess.

Q.      Fifteen to twenty minutes after the call came

-78-

GRAHAM 006478

1 through?

2 A.  After I arrived on the scene.

3 Q.  So about -- about twenty-five or thirty minutes

4 from the time the call came through.  Would that be

5 correct?

6 A.  Yes, sir.  That -- that could've been.

7 Q.  And at that time the dew was all over the car and

8 the radiator just barely warm?

9 A.  The dew was still on the car when Detective Albro

10 arrived somewhat later.

11      **MR. RILEY:**  You may ask, Mr. Johnson,

12 or, Mr. Prince.

13      **MR. JOHNSON:**  Your Honor, may I

14 approach the bench?

15      **THE COURT:**  Uh-huh.

16    **(Bench Conference off record)**

17

18 **CROSS EXAMINATION BY MR. JOHNSON:**

19

20 Q.  ... when you got to the scene?

21 A.  Actual trailer?

22 Q.  Yes, sir.

23 A.  I would say approximately ten minutes after 5:00.

24 Q.  Did you arrive before or after the rescue

25 service?

GRAHAM 006479

1    A.        We were all pulling in approximately the same

2    time.  I mean, if I'm not badly mistaken, the rescue unit

3    passed me just before we got out to the trailer park.

4    Q.        How did you -- how did you get notified?

5    A.        By the dispatcher at the police department.

6    Q.        Guthrie Police Department?

7    A.        Guthrie Police Department.

8    Q.        Do you recall testifying under oath in this case

9    previously?

10   A.        Yes, sir.  But as to my exact testimony, I cannot

11   recall that.

12   Q.        Do you recall testifying to the fact that the

13   jumpsuit was cut?

14   A.        I -- I may have said that, yes, sir.

15   Q.        And today you testified as to being torn.

16   A.        I said appears to be.

17   Q.        So either one was just a guess on your part, I

18   assume.  Are -- are you saying you know for sure that it

19   was cut, or that it was torn, or either one?

20   A.        No, sir, I'm not -- I'm not saying either way.

21   Q.        You just know that it was severed?

22   A.        Right.

23   Q.        And you wouldn't know whether it was torn or cut,

24   or what Mr. Riley, myself, or members of the jury would

25   know from observing the material itself?

GRAHAM 006480

1   A.          No, sir.

2   Q.          Where was Mr. Graham working?

3   A.          Where?

4   Q.          Yes, sir.

5   A.          At Union Carbide, (inaudible).

6   Q.          You've been down on the job site and seen him at

7   various times, have you not?

8   A.          I think I've been down there maybe twice or three

9   times.  I'm not -- I'm not going to say for sure exactly

10  how many.

11  Q.          Was he employed there at the time of Ms.

12  Williams' death?

13  A.          To the best of my knowledge.

14  Q.          And he'd been employed since -- actually -- on

15  June of 1980 was he employed there previously, to the best

16  of your knowledge?

17  A.          I believe that's what Norman told me, yes.

18  Q.          And, to the best of your knowledge, even today

19  he's still employed at the same --

20  A.          As far as I know.

21  Q.          And you have been on the job site at various

22  times.  In March at the time -- the day before you made the

23  arrest I believe you were on the job site.

24  A.          I think -- it seems like, I can't remember,

25  either two or three times I've been down there.

GRAHAM 006481

1  Q.        During this period of time, from the time of the

2  discovery of the body until the arrest was made of Mr.

3  Graham, which I believe was March 9th, or March 7th -- do

4  you recall offhand?

5  A.        No, sir, I don't.

6  Q.        It was the early part of March, though, when you

7  (voice trails)?

8  A.        Somewhere along there, I think.

9  Q.        I assume you had various conversations with Mr.

10 Graham?

11 A.        As to exact amount, I -- I don't know.  But I

12 have talked to him several times.

13 Q.        Starting with the day of -- the day of the

14 discovery of the body, continuing on -- on until December,

15 and even after that?

16 A.        Yes.

17 Q.        Do you think he was cooperative with you?

18 A.        Yes, sir.  Norman has cooperated.

19 Q.        Has he ever refused to give you anything that you

20 wanted?

21 A.        No, sir.

22 Q.        Did he ever refuse to go with you for

23 examinations or conversations with other law enforcement

24 officers any time you requested him to?

25 A.        Not with law enforcement officers, no, sir.

-82-

GRAHAM 006482

1    **Q.**    And in December did you accompany some other law

2    enforcement officer to take Norman over to Dr. Pitzer's

3    office?

4    **A.**    Yes, sir.  Right offhand, I don't remember who

5    the other officer was.  But I do know there was a state

6    police officer with him.

7    **Q.**    And you did take him over there?

8    **A.**    Yes.

9    **Q.**    Was this at your request?

10    **A.**    I asked --

11    **Q.**    You asked -- you asked Norman --

12    **A.**    I asked Norman if he would go over there and

13    submit some samples.

14    **Q.**    And what type of sample did you take at that

15    point in time?

16    **A.**    Head hair, pubic hair, and semen.

17    **Q.**    Why was it -- did you feel it was necessary -- or

18    what was your understanding of taking the semen sample at

19    that time?

20    **A.**    At that time?

21    **Q.**    Yes, sir.

22    **A.**    Because there was semen found on the evidence

23    that was sent in to the state lab.

24    **Q.**    At that time did you know that the autopsy report

25    had showed a lack of sperm in the vaginal smears?

GRAHAM 006483

1    A.        Dr. Pitzer's report showed that, yes, sir.

2    Q.        So you were aware of that at the time?

3    A.        Yes, sir.

4    Q.        You were later furnished a copy of Dr. Pitzer's

5    report?

6    A.        And that's -- yes, I think I have one in the

7    office.

8    Q.        These particular knives that you happen to spot

9    -- or, excuse me, saw there, discovered there, one was kind

10   of at the foot of the bed or near the body -- in close

11   proximity to the body?

12   A.        Yes, sir.  It was laying on the floor right at

13   the edge of the bed near her feet.

14   Q.        And then the one that you took from -- that

15   Norman gave to you, or you took from Norman?

16   A.        Yes, sir.

17   Q.        Was there anything unusual about either one of

18   these knives?

19   A.        To me, it wasn't, no, sir.

20   Q.        And did -- what did you do with them?

21   A.        They were given to Detective Albro.

22             Now, the small knife, Detective Albro got it.

23   But the larger knife, Norman handed it to me, and then I

24   gave it back to Detective Albro.

25   Q.        For what purpose did you -- for what purpose did

GRAHAM 006484

1  you give it to Detective Albro?

2  A.        He was the -- after he arrived there, I turned

3  the investigation over to him, and he was the investigating

4  officer from that point on.

5  Q.        Was your understanding that certain tests at the

6  Kentucky State Police laboratory were to be conducted of

7  that knife -- or those knives?

8  A.        That was my understanding.

9  Q.        And was that the purpose of turning most of the

10  things over to Detective Albro, to make it more convenient

11  to getting test results and this type of thing?

12  A.        Yes, sir.  It saved me a lot of runnin', too.

13  Q.        And does normally state policemen get better and

14  quicker service out of the state police laboratory than

15  normally --

16  A.        Yes.

17  Q.        -- the sheriff's department?

18          Now, here -- I assume that you knew the decedent.

19  A.        No, sir.  That morning was the first time that I

20  ever really knew Norman's name.  I had seen --

21  Q.        The decedent.

22  A.        Oh, excuse me; excuse me.  Yeah, I knew Kay.

23  Excuse me.

24  Q.        How long have you known Kay?

25  A.        I would say some ten, twelve, fifteen years,

GRAHAM 006485

1    somewhere along there.

2    Q.        You stated you didn't know Mr. Graham?

3    A.        No.

4    Q.        Now, and knowing Kay, I assume you knew her

5    before you ever became sheriff?

6    A.        Yes, sir

7    Q.        I assume you'd had apparently dealings with her

8    since you've been sheriff?

9    A.        Not that I can recall.

10    Q.        Did you know her well enough to know anything

11    about her personality?

12    A.        You mean, the type of person she was or anything

13    like that?  No, sir, I wouldn't expect so.  I just knew her

14    from seeing her there in town and her mother and all.

15    Q.        Would you have known her enough to classify as a

16    passive or aggressive person as far as physical

17    relationships and so far as combative?

18    A.        No, sir.

19    Q.        You don't know whether she would take up her part

20    or whether she would be completely passive --

21    A.        No.

22    Q.        -- in actions with others?

23    A.        No.

24    Q.        I assume, Mr. -- Sheriff, that you all -- you, in

25    connection with the state police, conducted a reasonable

-86-

1    and thorough search of that trailer.

2    A.        We looked around pretty good, yes, we -- we

3    thought at the time.

4    A.        You saw those bootlaces, or long shoestrings, or

5    long pieces of fabric that appeared to be shoestrings?

6    A.        Yes, sir.

7    Q.        Was there any boots in that place?

8    A.        No.  We couldn't find any that the laces were

9    gone out there.

10   Q.        Did you find any the same color?

11   A.        No, sir, I don't believe we did.

12   Q.        What color were these laces?

13   A.        Black.

14   Q.        Sir, were you ever in the military service?

15   A.        Me?

16   Q.        Yes.

17   A.        Yes.

18   Q.        In the Army or --

19   A.        Yes, sir.

20   Q.        Were these shoelaces or bootlaces you observed

21   there at the trailer that were apparently used in

22   connection with subduing or tying up Ms. Williams, would

23   they be similar in nature to Army bootlaces?

24   A.        Yes, sir.  But they also have the same type on

25   the open market, too.

GRAHAM 006487

1    Q.        But they would be of this same -- same nature?

2    A.        Uh-huh.

3    Q.        That you can buy them commercially, but also

4    might be GI issued --

5    A.        Uh-huh.

6    Q.        -- type?

7              I assume, too, that you looked for any items that

8    might contain blood.

9    A.        Yes, sir.

10   Q.        And I assume you didn't find any?

11   A.        The only thing we found was just what's probably

12   already been introduced, I don't know, blood on the bed

13   sheets and --

14   Q.        Bed sheets and -- the bed sheets was sent to the

15   Kentucky State Police lab?

16   A.        Yes.

17   Q.        I assume that you found no other knives or sharp

18   instruments?

19   A.        No, sir, we didn't find any instruments.

20   Q.        And I assume that you continued to search around

21   in the immediate area of the trailer, and you didn't

22   confine it just to the inside of the trailer, I assume.

23   A.        We -- we even went and looked in the dumpsters --

24   Q.        Surrounding the --

25   A.        -- the dumpsters.

-88-

1          I'd say yes, sir.

2     Q.        Getting back to your car observation.  Do you

3     remember whether it was daylight or dark when you went to

4     inspect it?

5     A.        It was daylight.

6     Q.        You're positive, no question in your mind?

7     A.        No, sir.  I -- I -- you know, it wasn't -- the

8     sun wasn't up or anything like that.  But --

9     Q.        But certainly wouldn't have to use your

10    headlights on your car to --

11    A.        No, sir.

12    Q.        And -- so you got out there, you got there about

13    the same time as Nick did, or I think you said he had

14    passed you on the way?

15    A.        I -- I think Nick, if I'm not badly mistaken, he

16    passed me between the Guthrie city limits and Tiny Town.

17    Q.        So you all arrived at the scene of the trailer in

18    very close proximity of --

19    A.        Yes.

20    Q.        Probably in each other's -- you could actually

21    see him pulling in if he was ahead of you?

22    A.        Yes, sir.

23    Q.        And I assume you went inside and he went inside?

24    A.        No, sir.  I was outside trying to find out

25    exactly what was wrong, because I hadn't been told what was

GRAHAM 006489

1    wrong by the dispatcher.  The dispatcher just called me and

2    said, "You're needed at Tiny Town immediately."

3    Q.        So you actually didn't go out there expecting to

4    find a body?

5    A.        No, sir.

6    Q.        And you -- I assume you didn't observe his car at

7    that point in time?  There wasn't the very need to or --

8    anything that called your attention to even --

9    A.        No.

10   Q.        -- any automobiles at that time?

11   A.        At that particular time?

12   Q.        Yes, sir.

13   A.        No, sir.

14   Q.        So it was some period of time later?

15   A.        Yes, sir.

16   Q.        So I assume as soon as you found out there was a

17   dead body, that you then went into the trailer?

18   A.        When Nick got there, and -- and when he -- he

19   immediately went into the trailer, and Norman and I believe

20   the brother-in-law Blick and Ms. Blick, the sister, if I'm

21   not badly mistaken, were outside.  Or Ms. Blick may have

22   been back in the trailer at this time.  I -- I don't

23   remember exactly.

24            But, anyway, I was talking with Mr. Blick.  I

25   asked Mr. Blick, I believe it was, what had happened or

-90-

GRAHAM 006490

1  what was going on, and about that time Nick came back to

2  the door and said, "Laurin, you need to get in here, you

3  need to see this." Excuse me.  So I went into the trailer

4  and saw Kay laying on the bed, and I (inaudible) backed out

5  of here and secured the place, and then I called the state

6  police for a detective, and backed out of the trailer.  And

7  I went to the radio and called Epson and had him call

8  Madisonville and send a detective down.

9  Q.      And I would assume that, also, you tried to call

10 the coroner?

11 A.      I had Epson to call him.

12 Q.      And then I assume in time you had some

13 conversations with various people around, I assume?

14 A.      I believe at that time, if I remember correctly,

15 Mr. Blick and Ms. Blick may have been the only ones I

16 talked to.  I may have said something to Norman.  I'm not

17 -- I'm not gonna say for sure.

18         But, anyway, Norman, during this time while we

19 were waiting on the state police, Norman had walked down

20 the street to the end of the tree, and sat down, and leaned

21 back against the tree next to the dumpster down there.

22 Q.      And then sometime after that period of time is

23 when you started -- when you observed the automobile?

24 A.      Yes, sir.

25 Q.      Okay.

GRAHAM 006491

1    A.    Some -- well, some time during that -- this --

2    this time, while he was sitting under the tree and all.

3    Q.    But it was certainly after -- after -- way after

4    daylight by this time?

5    A.    Yes, sir.

6    Q.    The sun would've probably been -- been close to

7    getting up by that time?

8    A.    I would say that -- that it was -- well, it -- it

9    wasn't an hour or so after that I would -- I would say

10    then.  Anywhere from twenty-five, thirty, forty minutes

11    from the time that I arrived it was up.

12    Q.    A significant time span, but not a longer period

13    of time?

14    A.    Yes, sir.

15    Q.    Now, I believe you stated that you had noticed

16    there was dew on the outside of the vehicle, on the trunk,

17    window, hood.

18    A.    No.  I said the top of the hood.

19    Q.    How about the window?

20    A.    And the windshield was fogged up on the inside.

21    Q.    Fogged up in the inside?  There wasn't any dew on

22    the window itself?

23    A.    On the windshield itself?

24    Q.    Yes.

25    A.    Not that I could see.

GRAHAM 006492

1    Q.        You believe -- it appeared to be fogged up from

2    the inside?

3    A.        Yes, sir.

4    Q.        Was the windows up or down in that automobile at

5    that time?

6    A.        I believe that they were up.  I'm not going to

7    say for sure, but I believe they were up.

8    Q.        Is that car equipped with an air conditioner?

9    A.        I think that's right, yes, sir.

10   Q.        Would it have been logical to assume if a person

11   had been driving that car approximately during that period

12   of day they might see fit to use an air conditioner?

13   A.        Yes, sir.  It -- it was still good and warm.  I

14   would say sixty-five/seventy degree range, somewhere along

15   in there.

16   Q.        Do you believe that the idea of a window fogged

17   up from the inside would indicate that somebody had been

18   inside that automobile freezing or some kind of air gets

19   stirred in the car?

20   A.        I think that -- I've had mine to do it on

21   occasion.  When it'll be warm like that, you run an air

22   conditioner at night, pull it up and let it sit for a

23   while, your -- inside on the windshield will fog up.

24   Q.        Now, did you observe Kay's car?

25   A.        It was in front of Norman's truck.

-93-

GRAHAM 006493

Q.      Did it have any dew on it?

A.      Yes, sir.

Q.      Did it have dew on the trunk?

A.      Ever -- everything, the whole car, the windshield and all, yes.

Q.      It was on the windshield?

A.      Just like it had been settin' for a good, long while.

Q.      So it was quite obvious to you from looking at those two automobiles that you would've said that Kay's car had been sitting a lot longer than Norman's car had?

A.      Yes, sir.

Q.      Obviously there's no way you could tell or with any exactness how long either one of them had been sitting?

A.      No, sir, not with any exact pinpoint, no specific time.

Q.      Say three hours for one and eight hours the other, or half hour for one, six hours to the other.  But in your observation, I mean, it was quite apparent to you that they had not been equal amount of time that they would've --

A.      That's right.

                MR. JOHNSON:  Your Honor, I don't have anything further, Mr. Prince and I.

                THE COURT:  Okay.

-94-

GRAHAM 006494

1          **MR. JOHNSON:**  We can conclude the

2     cross examination.

3          **THE COURT:**  Okay.

4

5     **REDIRECT EXAMINATION BY MR. RILEY:**

6

7     **Q.**     Ask you whether or not did your investigation

8     determine that Norman Lee Graham was assigned in the United

9     States Army at Fort Campbell?

10    **A.**     Yes.

11    **Q.**     And these bootlaces that Mr. Johnson questioned

12    you about, I believe they can be bought on the open market?

13    **A.**     Yes.

14    **Q.**     But they're also the type bootlaces that people

15    that are in the Service, particularly the paratroopers and

16    others, use, are they not?

17    **A.**     They appear to be, yes, sir.

18    **Q.**     Now, relative to the dew, the fog, and so forth,

19    you've testified about that.  But the radiator on Norman

20    Graham's car, what was the condition of that some twenty,

21    thirty minutes after you arrived at the scene?

22    **A.**     Just barely warm.

23          **MR. RILEY:**  That's all.

24          **THE COURT:**  Okay; anything else?

25          **MR. PRINCE:**  Just a couple (inaudible).

-95-

GRAHAM 006495

**RECROSS EXAMINATION BY MR. JOHNSON:**

Q.        The radiator then did give the impression the car had been driven some time in the immediate past?

A.        Some time that morning, yes, sir.

Q.        Of course, there's no way you can give a time frame?

A.        No.

Q.        It would obviously make a whole lot of difference about the temperature of that radiator whether it was full -- whether it was full of water or whether it ran hot, about how hot it could get from (inaudible).

A.        Over a twenty mile -- fifteen or twenty mile span?

Q.        No.  Over a five-mile period or a hundred-mile period would make a heck a lot of difference to the water gauge of a radiator.

A.        If it was full and everything, or if it's a half or two-thirds empty, it'd make a difference.

Q.        Obviously, you didn't check that part out?

A.        No.

Q.        All right, sir.  It'd make a difference how long and how -- what -- for what distance you'd drive, I assume.

A.        It would make a -- a difference in the temperature, if that's what happened, yes.

GRAHAM 006496

1    Q.        That, in turn, would make it whether it would be

2    hot or not?

3    A.        Yes, sir.

4    Q.        Of course, there's no way of you judging how hot

5    it was other than --

6                    MR. JOHNSON:  Excuse me just a moment.

7    Q.        -- other than it was -- you could put your hand

8    on it?

9    A.        I could hold my hand on the radiator (inaudible).

10   Q.        And you haven't tested that car any other time?

11   A.        No.

12                   MR. JOHNSON:  I have no further

13              questions.

14                   MR. RILEY:  You may step down.

15                   Ask Dr. Frank Pitzer to come in.

16                   THE COURT:  Okay.

17

18   DR. FRANK PITZER:  After first being duly sworn, testified

19   as follows:

20

21   DIRECT EXAMINATION BY MR. RILEY:

22

23   Q.        Your name is Frank Pitzer, and you're the

24   pathologist at Jennie Stuart Hospital in Hopkinsville,

25   Kentucky?

-97-

GRAHAM 006497

A.        That's correct.

Q.        Doctor, I ask you how long have you been a physician?

A.        Since September 1961.

Q.        And from what medical school did you graduate?

A.        I graduated from the University of Tennessee College of Medicine in Memphis, Tennessee.

Q.        After graduation did you undergo any internship or residency?

A.        Yes, sir.  I did my internship and residency training at the City of Memphis Hospital and at the University of Tennessee, which included pathology, in Memphis, and I completed my training there at Memphis.  And after completing my training I stayed on the faculty and taught at the medical school.

Q.        Ask you whether or not is your practice of medicine restricted to any particular specialty?

A.        Yes, sir.  I limit my practice to the practice of pathology.

Q.        And what is the practice of pathology, sir?

A.        The practice of pathology is that branch of medicine that has to do with the investigation of causes of disease, and, basically, that means that we do tissue examination, chemical analysis to determine the origin of disease.

-98-

GRAHAM 006498

Q.        Ask you whether or not as part of this practice
of medicine does a pathologist perform autopsies upon
various bodies?

A.        Yes, we do.  That's part of the -- part of the
work that we do, yes, sir.

Q.        I believe you are a deputy regional medical
examiner, are you not?

A.        Yes.  I serve the state of Kentucky as regional
medical director of Western Kentucky, yes.

Q.        And I believe the chief medical examiner of the
state of Kentucky is Dr. George Nichols in Louisville, is
it not?

A.        Currently Dr. George Nichols at the University of
Louisville serves as the chief medical examiner.

Q.        Now, Doctor, I ask you whether or not on the 30th
of June, 1980, under Case Number A8044, were you asked to
perform an autopsy upon the body of Janis Kay Williams?

A.        Yes, I was, at the request of the coroner in Todd
County, which is Jay Mallory.

Q.        Ask you, sir, would you recite to the ladies and
gentlemen of the jury the clinical information which was
given to you prior to the time that you started your
examination of the body?

A.        Yes, sir.  I'll have to refer to my records here.
I've got so many records, I'll have to find that particular

-99-

GRAHAM 006499

1   one.  I -- I can tell you offhand that the request form --

2   do you have it?

3   Q.        Yes, sir.

4   A.        Okay.

5            Basically, the information I had from Mr. Mallory

6   was that this female patient had been found dead, and there

7   were stab wounds, and he wanted me to do the examination to

8   determine cause of death and the mode of death, and, if

9   possible, any other factors that were related to her cause

10  of death.

11  Q.        At this time I'll ask you whether or not were the

12  hands still tied behind the body?

13  A.        At the time I received her, no, they were not.

14  But she had markings on both wrists indicating that she had

15  been bound.  She also had markings on her ankle indicating

16  that she had been bound.

17  Q.        Exhibit to you what purports to be Commonwealth

18  Exhibit 4, sir, and ask you are they some of the wounds

19  that you observed when you performed the autopsy on this

20  victim?

21  A.        Yes, this is a -- this is not the way I saw her

22  because this was taken at the site.  But this is a true

23  picture of the way that the body appeared, yes, sir.

24  Q.        Now, relative to your examination, the external

25  examination of the body, what did that reveal?

-100-

GRAHAM 006500

A.          She had multiple stab wounds -- and if I may refer to my notes.  She had multiple stab wounds about her chest, in her (inaudible) pattern in this area.  I could identify definitely twenty-five stab wounds over the anterior chest.  She also had her throat cut from here to here, primarily from the midline across to the base of the left ear, with the wound in the neck going through all the major vessels, the skin, the soft tissue, and the trachea.

Q.          And I believe the -- the carotid artery and also the jugular vein in the neck were severed, were they not?

A.          Yes.  Yes, sir.

Q.          Would that cut in itself be sufficient to cause death?

A.          That cut in itself could have produced death in short order, yes.

Q.          Now, relative to a person, I ask you whether or not they'd almost immediately bleed to death?

A.          They would bleed to death in just a very few minutes, yes, sir.

Q.          Now, relative to the twenty-some stab wounds in -- in the chest, did you -- did you open the chest?

A.          Yes, I did.  I did a complete autopsy examination in the standard manner, and those stab wounds in the chest entered both the left chest and the right chest.  In addition, at least one of the wounds penetrated the heart

GRAHAM 006501

with a through-and-through entry to the left ventricle of
the heart, which is the main chamber of the heart, the one
that does the pumping, and the -- one of the stab wounds
had gone into the left ventricle and into the chamber of
the left side of the heart.

Q.      Was that wound in itself sufficient to cause
death?

A.      Yes, sir, it was.

Q.      Now, Doctor, relative to the stab wounds in the
chest, were they produced by a -- a wide-bladed instrument?
Or what type of instrument did you determine whether --
produced these?

A.      Well, in general terms, it was a sharp
instrument, a knife, most likely, and it was of -- of
fairly large size.

Q.      Now, I believe you have examined on one previous
occasion a knife which has been introduced in this case as
Exhibit 13.  Ask you whether or not, sir, would this knife
be capable of producing such a -- a wound in the -- in the
chest?

A.      This knife would be capable of the wounds here
that I described, yes.

Q.      Ask you whether or not, sir, does the -- the size
of this blade, is that compatible with the size of the
opening on the skin surface where the knife went into the

GRAHAM 006502

1    -- into the chest?

2    A.       Yes, sir.  That -- that instrument that you have

3    there could've -- could've produced the size injuries that

4    I described, yes, sir.

5    Q.       Now, relative to the cutting the neck -- of

6    course, this instrument, a -- a shorter knife, but the

7    blade's really not the criteria as far as causing the

8    injury to the neck, is it?

9    A.       Well, in order to produce the kind of injury that

10   we would've had to have, since it involved both skin, soft

11   tissue, muscle, trachea -- and the trachea does have

12   cartilage -- it would've needed to be a strong-bladed

13   knife.  One of the flimsy blades would not have been able

14   to do this.

15   Q.       Would this be a strong enough blade?

16   A.       Oh, yes, sir.  That would've been -- been fine.

17   Q.       Now, Doctor, exhibit to you another knife, which

18   was found at the scene, which I believe also you have

19   examined, and ask you whether or not, sir, in your opinion

20   would this knife have a blade sufficient to penetrate the

21   chest and the -- into the -- the heart itself?

22   A.       This knife would not -- the blade would not have

23   been long enough, no.

24   Q.       Now, I believe whenever the chest is compressed

25   -- the -- the chest itself gives and comes closer to the

GRAHAM 006503

1    heart, does it not?

2    A.        It does.

3    Q.        But it would still take a blade longer than this

4    in order to -- to go into the chest and to penetrate the

5    chest wall and go into the heart itself?

6    A.        With the distance from the skin and into the

7    anterior chamber of the heart, where I describe the injury,

8    would have taken a minimum of three and a half inches.

9    Q.        Now, Doctor, after opening the chest and doing a

10   complete autopsy, did you find any other condition

11   internally which would cause, or bring about, or contribute

12   to the death of this individual?

13   A.        No.  The cutting of the neck, which we've

14   previously described, was primarily on the left side, came

15   across the midline, or the primary, on the left, and then

16   the multiple stab wounds in the chest.  She had, as you

17   note on the report, she had blood in both sides of the

18   chest called hemothorax, which is a medical term.  She also

19   had blood in the sac around the heart, and the medial term

20   for that is hemopericardia.  And she also had the stab

21   wound in the heart.  She also had injury into the liver.

22   One of the stab wounds had gone slightly downward and had

23   produced an injury into the liver.

24            But the primary wound was, first of all, the

25   neck, and, second of all, the heart.  And either one of

GRAHAM 006504

1    those could have produced death.

2    Q.        Now, relative to your examination, I'll ask you

3    whether or not did you -- did you also prepare a drawing?

4    A.        This -- this is one of the drawings that I

5    prepared.  This is in my handwriting, and a copy of -- a

6    copy of the report -- in the report that I prepared.

7    Q.        And does that show the lacerations to the neck

8    and the penetrating chest wounds?

9    A.        It shows here the laceration of the neck, it

10   shows the multiple stab wounds over the anterior chest.  It

11   shows the marks that we've previously described about both

12   wrists, and also about the ankle.

13   Q.        All right, sir.  And this is your report, the

14   report that you prepared relative to Janis Williams?

15   A.        Yes, it is.

16                  MR. RILEY:  I'd like this be introduced

17           as Exhibit --

18                  COURT REPORTER:  Seventeen (17).

19                  THE COURT:  Seventeen (17).

20                  COURT REPORTER:  Uh-huh.

21

22   (COMMONWEALTH EXHIBIT 17 -  Report/Drawing of Dr. Pitzer)

23

24   Q.        Now, Doctor, ask you whether or not did you

25   secure some swabs from the vagina of this individual and

-105-

1    turn those over to the state police for analysis?

2    A.        Yes, sir.  There was some question about -- at

3    least -- or the people in attendance at the time of the

4    autopsy were concerned about whether or not she'd had

5    sexual activity, and during the course of the examination I

6    collected, by swab technique, slides from her vaginal vault

7    and from the mouth of the cervix.  I made a duplicate set

8    of slides.  One set of slides I gave to the state police to

9    take to the state police crime lab.  The other set of

10   slides I kept in my institute to evaluate.  I also

11   collected a chemical sample from the vaginal vault for

12   chemical analysis, which they have.

13   Q.        Now, the chemical sample that analysis was made

14   on, that was done at Jennie Stuart.  Correct?

15   A.        Yes, sir.

16   Q.        Now, tell the ladies and gentlemen of the jury

17   what that chemical analysis was, and what does that tell

18   us?

19   A.        Well, this particular analysis that we did was

20   what's called an acid phosotates determination, and this is

21   an enzyme that occurs in the body.  And in the female body

22   the acid phosotate level is very, very low.  The primary

23   source of acid phosotate is the male, and the phosatatic

24   fluid that's in the vesicle fluid and the semen from the

25   penis is very rich in acid phosotates, as well as some

GRAHAM 006506

1    other enzymes.

2         And we did this aspiration from her vaginal

3    vault.  We analyzed the chemical analysis and we found out

4    that she had more than three hundred fifty units, which is

5    a very, very high level.  Normal is .5 to five, so she had

6    a little over three hundred and fifty-eight.

7    Q.        What does that indicate to you, sir?

8    A.        Well, that indicates only one thing, recent

9    sexual activity.

10   Q.        Now, with recent, can you say with any -- within

11   an hour, or two hours, or three hours, or within any degree

12   of certainty relative to that?

13   A.        This particular chemical analysis can be accurate

14   up to twenty-four hours.  Twelve to twenty-four hours it's

15   fairly -- twelve to twenty-four hours it's very accurate.

16   Q.        And would you say that the intercourse that Janis

17   Williams had had was within what time span?

18   A.        Well, in this case I can tell you it was less

19   than twenty-four hours.

20   Q.        Well, would you -- could you tie it down any

21   closer to that because of the high acid phosotate level?

22   A.        Well, of course, the way that test is set up,

23   there's marked variation from one male to another.  For

24   example, a young boy has a very low level.  After puberty

25   his level goes up tremendously.  You get a male twenty-

*-107-*

GRAHAM 006507

five, thirty years of age, his level is high.  As he gets

older it goes down, plus the fact that marked individual

variation from male to male.  But a level this high would

indicate to me that the activity occurred less than twelve

hours previous to my examination.

Q.       All right, sir.

         Now, Doctor, I believe also in this case that

there's been -- well, I wouldn't say disagreement as far as

experts are concerned, but in looking at the slides there

was a question, I believe, of whether or not there was

actually semen in -- I mean, actually sperm in the semen?

A.       Yes.  In this -- in this particular examination

myself, Dr. Patel, my associate, and Dr. Nguen, my

associate, looked at these, and we could not definitely

identify sperm, which is the little -- little -- what

causes pregnancy, we could not definitely identify sperm in

this specimen.  And I very carefully delineated what was in

there.  We divide the white cells, and the red cells, and

proteinageous debris, and cellular debris, but I could not

unequivocally identify sperm.

Q.       I understand.

         As I understand it, you're not saying that there

was sperm -- or you're not saying there is sperm.  Is that

correct?

A.       Like I said, I could not identify definitely

GRAHAM 006508

1    sperm from this specimen.

2          Now, there was some nuclear debris and cellular

3    debris which could not be identified.  And what happens, is

4    the body deteriorates after death.  At about three or four

5    hours cells begin to break down.  And even the epithelial

6    cells in this woman's vaginal vault were beginning to

7    undergo what's called cytolysis, which is a big fancy word

8    for meaning they're beginning to break up and you can't

9    identify them to be theirself.

10          Now, I could not, could not, on my samples, and

11   later, after Dr. Nichols said he could see them, they

12   brought the slides down from the state and let me look at

13   his slides in the presence of the detective.  I could not

14   unequivocally identify sperm in either my sample or the

15   sample that I collected and sent to the state.  There was

16   some nuclear material, which could or could not have been,

17   but I could not definitely say, "This is a sperm."

18   Q.          And, there again, as I understand it, then after

19   -- after that the -- the sperm, along with the other cells

20   in the body, came to deteriorate.  Would that be correct?

21   A.          That's right.  Ju -- right after ejaculation,

22   right after the specimen is deposited, the normal male will

23   have somewhere between seventy and a hundred and twenty

24   million sperm in a two-seed, which is a little -- kind of

25   this.  These cells are notable, you know, they got tails on

GRAHAM 006509

1    them and they can swim, there, or --

2          What happens in about three to four hours after

3    the ejaculation, the motility suddenly drops and these

4    cells begin to die, and they deteriorate at a fairly rapid

5    rate over the next eight to ten hours.

6          Experts disagree on how long they can stay in the

7    vaginal vault.  Some people say up to twenty-four hours,

8    but the average is around three to four hours in a viable

9    form in which you can definitely say this cell is

10   unequivocally a sperm.

11   Q.      So, in other words, after three or four hours

12   after intercourse, then these cells deteriorate, so there

13   is some question, and since there is some question, you

14   aren't going to say that you did find them?

15   A.      No, sir.  I -- I've been in this business a long

16   time, and I've done a lot of medical legal work, and I

17   found out a long time ago unless you can unequivocally say,

18   "This is it," you don't say it.  I mean, it has to be, in

19   my mind, absolute, because we're talking about people's

20   lives and livelihood.  And unless it's absolute, I will not

21   call it.

22   Q.      That's fine.  And in this time doctors, like

23   lawyers, sometimes disagree as to what they find and what

24   they see?

25   A.      Experts are experts.  You have to take what you

GRAHAM 006510

1    can believe in and -- you -- you pay your fee and take your

2    choice.

3    Q.        But there's no question but what you found semen

4    in this case?

5    A.        There is no question that there's semen, there's

6    no question that it's less than twelve hours old.  The

7    question is whether or not there was viable sperm that

8    could be identified in the specimen.

9    Q.        Now, I believe you also analyzed a semen specimen

10   which was given to you by Norman Graham and found that he

11   did, in fact, have a high sperm count?

12   A.        Yes, sir.  Mr. Graham was brought to my facility

13   late one evening with the sheriff and a state police

14   detective.  He voluntarily agreed to collect us a specimen.

15   We locked him in a sealed room where there's no way in and

16   out.  He collected us a specimen, and immediately

17   thereafter I personally examined his specimen, and he had a

18   tremendous number of sperm, he had mobile sperm, and there

19   was no question about identifying them.

20   Q.        All right.  Well, now, that was just -- that was

21   at the time of ejaculation or shortly thereafter and not

22   three or four hours later?

23   A.        Well, I examined it within fifteen, twenty

24   minutes after he collected the specimen, yes.

25   Q.        All right.

-111-

GRAHAM 006511

1          Now, Doctor, I ask you whether or not -- now,

2     isn't it true that the sperm count on an individual varies

3     from day to day based upon activities, and how much sexual

4     activity the individual's had, and other factors?

5     A.        Yes, sir.  You can -- you can wear it out.  It --

6     normally, most normal males in a reproductive age would

7     have three to four cc's of semen, with a count of about a

8     hundred million to a two hundred million per cc.  If

9     they've had repeated activity that last three or four days,

10    that may go down.  If they've abstained for some time, they

11    will have considerably more, yes, sir.

12    Q.        How does alcohol affect that?

13    A.        Well, generally speaking, the more alcohol you

14    have the less semen you produce, because --

15    Q.        Would that be relevant to sperm, too?

16    A.        Well, there's some arguing about that.  But,

17    generally speaking, excessive alcohol intake cuts down on

18    your production.

19    Q.        So as I would understand your testimony, Doctor,

20    is there are two things you can be sure of - that the stab

21    wounds in the chest and also the cut on the neck could have

22    caused or brought about -- either one of them individually

23    or together, caused or brought about the death of Janis Kay

24    Williams?

25    A.        There's no question in my mind the stab wound in

-112-

GRAHAM 006512

1   the neck or the heart, either one, would have produced her

2   death.

3                    MR. RILEY:  You may ask, Mr. Prince or

4          Mr. Johnson.

5

6   CROSS EXAMINATION BY MR. JOHNSON:

7

8   Q.        Dr. Pitzer, this severance of the throat that

9   severed the jugular vein --

10  A.        Carotid artery?

11  Q.        Right.

12                   COURT REPORTER:  What artery, sir?

13                   DR. PITZER:  Carotid.

14                   COURT REPORTER:  Okay.

15  Q.        Would this -- what kind of flow of blood would be

16  expected from such an injury?

17  A.        The injury of the type she had in her neck, there

18  would be massive hemorrhage in a very short period of time.

19  This was a cut that went from here to here, and it was deep

20  and about that wide across, and in its course it cut

21  everything.

22  Q.        Would you ex -- could you expect that under

23  normal circumstances the blood would spurt in a pumping-

24  like method from the wound?

25  A.        Oh, yes, definitely.  If the heart it still

GRAHAM 006513

1  functioning, the carotid vessel has -- it's not very far

2  from the heart, and you would've had a spurting action from

3  the carotid vessel, yes, sir.

4  Q.      Could you give me an estimate -- would this blood

5  be spurting as much as five or six inches?

6  A.      Oh, it -- it would spurt at least that, yes, sir.

7  Q.      Maybe up to twelve inches, eighteen inches

8  (inaudible)?

9  A.      It depends on whether you're laying down, whether

10  you're standing up, whether you're excited at the time

11  you're cut.  There's a whole bunch of factors that

12  influence that.  But it would spurt more than a hand

13  length, yes, sir.

14  Q.      All right.  In other words, you could expect it

15  -- if I cut your throat, I'd have some blood on my hand as

16  a result?

17  A.      Well, maybe not on your hand, but depending on

18  how fast you are and how quick you cut.  But there would be

19  blood in the air, yes, sir.

20  Q.      Very shortly after that?

21  A.      Yes, sir.

22  Q.      And I assume there's a very substantial discharge

23  of blood in a very short period of time?

24  A.      Yes, sir.  You will -- you would exsanguinate in

25  a period of minutes.

-114-

Q.        And approximately how much fluid does the average

human body contain in the form of blood?

A.        Well, they generally, from this type of wound,

will bleed somewhere between three thousand and five

thousand cc's of blood.  That's about -- if you've ever

seen a bag of blood in the hospital, that would be

equivalent to about eight or nine bottles of blood from

this type of injury.

Of course, from this type of injury, you will not

totally exsanguinate because you'll quit bleeding before it

all comes out.  But you'll bleed about five thousand cc's.

Q.        Can you give us that according to maybe quarts or

pints?

A.        Well, a pint's about five hundred cc's, roughly.

Q.        So we're talking about ten pints of blood?

A.        About that, yes, sir.

Q.        And that's a heck of a lot of blood?

A.        Yes, sir, it's a good bit of blood.  She had

about five hundred cc's, where it'd dried on her chest and

neck, and everything, besides the --

Q.        Doctor, when you started this autopsy, or the

start or finish of that, I believe I noticed a time of

9:10?

A.        That's about -- we started early in the morning.

As I recall, that was when we started, yes, sir.

GRAHAM 006515

1  Q.        Was there any way that you could tell

2  approximately how long this individual had been dead at the

3  time?

4  A.        As I recall, my estimation was nine to twelve

5  hours, based on a number of factors - rigor mortis, liver

6  mortis, uh -- you know, a whole bunch of factors.

7            But you've got to remember that the putting of

8  the time of death is not as scientific as many people would

9  have you believe, and it's determined.  That's why we use

10 the term estimated time of death.

11           Nine to twelve hours was my estimation, yes, sir.

12 Q.        And I assume that a lot of factors would go into

13 de -- how the body decomposed during that period of time,

14 temperature, uh --

15 A.        A number of factors -- a number of factors will

16 influence the estimation of the time, body temperature,

17 physical activity prior to death, room temperature,

18 relative humidity, clothing on the body, the material in

19 which the body is reclining, the age of the patient, the

20 weight of the patient.  There are a number of factors that

21 go into estimating the time of death.  That's why we use

22 the term estimated time, not time of death.

23           Even under the best of scientific facts where --

24 it's -- when you get into a two-hour or three-hour limit,

25 you're speaking on thin ice.  So that's why I said nine to

-116-

GRAHAM 006516

1    twelve hours.

2            The fact that she did not have well deformed

3    rigor in all muscles, the fact that she did have some rigor

4    in some distal muscle, the fact that the rigor mortis was

5    not well -- the liver mortis was not well formed, the fact

6    that the deep muscles were still viable, the fact that the

7    blood had not, what we call, gone to chicken fat, a very

8    slimy looking thing, all those factors allowed me to

9    estimate nine to twelve hours.

10   Q.        In other words, if you again examined her at

11   approximately nine o'clock in the morning, you are

12   relatively sure she would've been dead at one o'clock that

13   morning?

14   A.        Well, you'd have to backtrack --

15   Q.        That's eight hours.

16   A.        Nine to twelve hours is how long she'd been dead

17   when I got her.

18   Q.        So nine o'clock in the morning, in your opinion,

19   she would've been dead at one o'clock that night (sic)?

20   A.        I'd say that could be a fair time frame, yes,

21   sir.

22   Q.        And maybe she was dead at midnight?

23   A.        She could've been dead; fair enough.

24   Q.        But when you -- the longer you go, one o'clock,

25   two o'clock, for sure, in your own mind, that she was dead

-117-

1    at that time?

2    A.        Well, I would believe in -- when I said nine to

3    twelve hours, I didn't -- she had not been dead twenty

4    minutes or three hours, she'd been dead more than four

5    hours, and less than twelve.

6    Q.        Now, you have performed and taken semen samples

7    of the defendant, Norman Graham?

8    A.        Yes, sir.

9    Q.        And analyzed those?

10   A.        Yes, sir.

11   Q.        You have analyzed -- taken samples of the vagina

12   smears.  How many slides did you view?

13   A.        If I recall, I took about six or eight.  I'd have

14   to go back and look at my records in the office.  I sent,

15   as recall, three or four to the state and kept the others

16   in mine.  I had -- I've still got in my possession four.

17   So I had at least eight.

18   Q.        But you examined all of those?

19   A.        Yes.

20   Q.        Can you state within reasonable medical certainty

21   whether or not, based upon your examination, whether or not

22   Norman Graham was the last person to have sexual

23   intercourse with this -- Ms. Stevenson (sic)?

24   A.        I -- I couldn't tell you that, Mr. Johnson.  All

25   I can tell you is the fact that she had sexual intercourse.

GRAHAM 006518

1   With whom, there's no doctor in the world can tell you who.

2   Q.        Would it'd of been -- but the finding of no

3   sperms -- would you expect to find sperm?

4   A.        My personal evaluation of this case is, having

5   examined his specimen, and knowing that he has an adequate

6   number of sperm, because he has over a hundred million

7   sperm per cc, and knowing that his sperm is very mobile, I

8   personally would feel that I should have found some of

9   those sperm in the vagina, yes, sir.

10   Q.        And if he was the last person (inaudible part),

11   wouldn't it?

12   A.        I would say -- that -- that's my personal

13   evaluation.  I've got the advantage of having made sure

14   that he collected a specimen, I know that the specimen I

15   examined was his specimen, I know that he's got

16   microscopical, normal sperm.  They are well formed sperm

17   with accurate tails.  They've got ninety percent motility.

18   He produces an adequate three or four cc's volume, and I

19   would've suspected that I should've been able at twelve

20   hours to have found, unquestionably, well-formed sperm to

21   compare to that one, yes, sir.

22        Now, I know that she'd had sexual intercourse by

23   acid phosotates level.  I can't tell you whether she had

24   intercourse four hours, six hours, twelve hours.  I can

25   tell you it's less than twenty-four hours.

GRAHAM 006519

1          And no doctor in the world can tell you what male

2     produced these sperm.  We're not that scientific yet.

3     Q.        I understand.  But you are testifying to the best

4     of your knowledge and under the information you had, you

5     would expect that if Norman Graham had had intercourse with

6     her, you'd find sperm?

7     A.        Well, not -- we're going back to twenty-five

8     years of active medical practice, and based on my twenty-

9     five years' experience, I know that this young man produces

10    active, viable sperm, and I would've suspected that Dr.

11    Feldine would've been able to find sperm in her

12    (inaudible), unquestionable nature, if he'd of been

13    informed, yes, sir.

14    Q.        Okay.  Has anyone -- do you feel as though you're

15    better qualified to answer that question and make that

16    evaluation than any other person at the hospital based upon

17    the knowledge you had available to you?

18    A.        Well, of course, I'm prejudiced; I did it.

19         But I think any doctor would agree, the man at

20    the site doing the work has the best chance to do it.  And

21    it's sort of like fixing a car, the guy that is there

22    standing and looking at the motor can you tell you more

23    about it than the guy on the telephone that are not aware

24    of it.  I don't know whether that's a fair pair-up or not.

25    But I was there, I had all the equipment available.  I did

-120-

1    the best job we could.  I had it checked by my associate,

2    my second associate, and we could not definitely,

3    unequivocally find viable sperm in the vaginal vault.

4            Now, you can certainly question it, but like I

5    told Jess earlier, unless it's unequivocal, I'm not going

6    to call it, because I've got to defend what I do, and I

7    can't defend it unless I can be sure, and I just couldn't

8    be sure.

9    Q.        And, Doctor, going back to your qualifications

10   just a minute.  Do you -- have you held any titles or

11   elected offices in any societies?

12   A.        Yes.  I'm very active in the medical circle and

13   I've held many offices.  I've been president of the

14   Pennyrile Medical Society, the Christian County Medical

15   Society, Chief of Staff at Jennie Stuart Hospital, member

16   of the KMA Board of Trustee for six years, on the HFA

17   Health Finding Counsel for six years, the (inaudible) Board

18   for two years, president of the Kentucky Society of

19   Pathology, Chairman of the Board of Health for about twelve

20   years, and president of the Kentucky Medical Association

21   last year.  Yes, sir, I'm -- I'm what's known as an active,

22   political, medical politician, yes, sir.

23            MR. JOHNSON:  Thank you, sir.

24

25   REDIRECT EXAMINATION BY MR. RILEY:

-121-

GRAHAM 006521

1    Q.        Now, Mr. Johnson talked about all the blood and

2    the bleeding.  Assuming, sir, that -- that the stabbing had

3    taken place first, and the penetrating wounds to the heart

4    had -- had been made first, now, would that've been

5    sufficient to have stopped the heart from pumping?

6    A.        Yes, sir, it would compromise it very severely,

7    and if you did that, then the pressure at the carotid

8    would've been less and there -- there would not have been

9    the intense squirting that I described earlier.  If you

10   injure the pump, then where you're pumping won't go as far.

11   Q.        That's what I was look -- in other words, if

12   these stabbing -- the stabbing had taken place first, and

13   the heart had been impaired or even stopped, then if you

14   cut here there's not going to be that spurting from the

15   carotid artery that you would have if the heart was working

16   full and fast and then squirting out?

17   A.        That's true, yes, sir.

18   Q.        Now, relative to sperm, what do those little

19   rascals look like?

20   A.        Well, it's -- normally, a normal sperm is -- it

21   sort of looks a little bit like a tadpole.  It's got sort

22   of an ovoid head on one end with a taper down the back and

23   then a long tail.  And you should be able to definitely see

24   the nuclear material in the head, which is what impregnates

25   the female, the (inaudible) material.  And you should be

GRAHAM 006522

1    able to definitely identify unequivocally the tail.  But I

2    can draw you one.

3    Q.        Draw me one.  That's what I'd like for you to do.

4                    **(Drawing prepared)**

5    A.        That's what it should look like, and a trained

6    physician, particularly one trained in pathology and

7    cytology, will easily recognize those that are unequivocal.

8              I would point out to you, Mr. Riley, that there

9    are other cellular debris in the vaginal material that can

10   be confused.  For example, the epithelial cells in a

11   vagina, as they undergo degeneration can take on a tadpole

12   configuration.  One of the classic exams we do on females

13   is the so-called PAP test, and one of the things that you

14   look for in a PAP test is the tadpole type cells that

15   indicate degeneration and possible cancer.

16             So there are things that normally occur in the

17   vagina that can, to the minimally trained eye, easily be

18   confused with sperm.

19   Q.        Now -- and I believe your testimony is that Janis

20   Kay Williams, at the time that you examined her, was -- had

21   been dead more than four hours and less than twelve?

22   A.        Yes, sir.

23   Q.        And as a result, she died from either one of

24   these wounds, the stab wounds, or the throat where the

25   vessels were cut?

-123-

GRAHAM 006523

1    A.        That's right.

2                        MR. RILEY:  That's all.  Thank you,

3          sir.

4

5    RECROSS EXAMINATION BY MR. JOHNSON:

6

7    Q.        Doctor, I realize that this is something that you

8    can't be specific in.  Your first estimation of time was

9    nine to twelve hours, I believe.

10   A.        That is -- my estimated time of death is nine to

11   twelve hours.  I was using the point of four hours to point

12   out to you that she hadn't been dead -- when I said nine to

13   twelve hours, I was pointing out that she should -- she

14   could not have been dead four hours or less.  My estimate

15   was nine to twelve hours.

16   Q.        Okay.  So you've just -- it's im -- it was

17   impossible for her to have been dead for less than four

18   hours?

19   A.        That -- that's correct.

20   Q.        Okay.  And your best estimate is nine to twelve?

21   A.        My best estimate is nine to twelve hours, yes,

22   sir.

23                        MR. JOHNSON:  No further questions.

24                        THE COURT:  Anything else, Mr. Riley?

25                        MR. RILEY:  No, sir.

GRAHAM 006524

1           THE COURT:  All right, Doctor.  Thank

2    you.

3           DR. PITZER:  Would it be okay if I go?

4           THE COURT:  Yes, sir.

5           DR. PITZER:  I've got to go take care

6    of some more medical politics.  We're trying to

7    get an extension for the health department in

8    Todd County, (inaudible), so I've got to go do

9    some more politicing.

10          THE COURT:  Okay.

11

12          (From reporter's notes)

13          MR. RILEY:  At this time I would

14    (illegible) Dr. Nichols.

15

16    (Deposition of Dr. George Nichols Read Into Evidence)

17

18          (OFF THE RECORD)

19

20    JOEY WEATHERFORD:    After first being duly sworn, testified

21    as follows:

22

23    DIRECT EXAMINATION BY MR. RILEY:

24    Q.       Where ....

25          (Starts from Off the Record)


-125-

GRAHAM 006525

1    Q.        Where do you live?

2    A.        (Illegible), New York.

3    Q.        You flew down here to testify at my request, did

4    you not?

5    A.        Yes, sir.

6    Q.        And in June of 1980 where did you live, sir?

7    A.        Lived in Guthrie Trailer Park.

8    Q.        And is that in Guthrie?

9    A.        Yes, sir.

10   Q.        I exhibit to you what's been introduced as

11   Commonwealth's Exhibit 8, and been identified as the

12   entrance to the trailer park.  And would you hold that up

13   and show the ladies and gentlemen of the jury where --which

14   trailer you lived in?

15   A.        I lived in this trailer right here.

16   Q.        All right, sir.  That's this one right here?

17   A.        That's the one along here.

18   Q.        May I draw a circle around it?

19   A.        Yes, sir.

20                 THE COURT:  What exhibit's that on?

21                 MR. RILEY:  On Exhibit 8.

22   Q.        Now, I've drawn a circle around that.  Is that

23   the trailer you lived in?

24   A.        Yes, sir.

25   Q.        Now, ask you whether or not, do you know Norman

GRAHAM 006526

1   Lee Graham, the defendant?

2   A.      I saw him, yes.

3   Q.      Did he live in the trailer park?

4   A.      Yes, sir, right across the front of me.

5   Q.      All right, sir.  And in which trailer did he live

6   in, sir?

7   A.      He lived in here.

8   Q.      Right -- right here?

9   A.      Yes, sir.

10  Q.      All right.  I'm putting a circle around that.

11          Now, exhibit to you what purports to be

12  Commonwealth Exhibit 11, and ask you can you identify that

13  as a close-up?

14  A.      Yes, sir.  That's my trailer.

15  Q.      And Commonwealth Exhibit 10, and ask you if you

16  can identify that, sir?

17  A.      That's the trailer.

18  Q.      That's the trailer the defendant lived in?

19  A.      Yes, sir.

20  Q.      Now, Mr. Weatherford, I'll ask you whether or

21  not, do you remember the day back in June of 1980 when Kay

22  Williams was murdered?

23  A.      Yes, sir.

24  Q.      Where were you working at that time?

25  A.      Over in Clarksville, Tennessee, on Craft Street.

GRAHAM 006527

1    Q.        Ask you whether or not -- and, if you would, just

2    tell the ladies and gentlemen of the jury in your own words

3    where you were when you first observed anybody either going

4    in or coming out of the trailer occupied by the defendant.

5    A.        Well, that morning I woke up and had to go to the

6    bathroom, and, on occasion, I get up and smoke.  And I went

7    in the bathroom and used the bathroom, number two, and I

8    sat -- while I was there I sat there and smoked a

9    cigarette.

10   Q.        All right.  Now, you sat on the commode?

11   A.        Yes, sir.

12   Q.        All right.  And then go ahead.  Excuse me.

13   A.        (Someone coughing - inaudible) I could see the

14   trailer right across the thing.  (Inaudible) be in the

15   bathroom (inaudible).  And I'd been sittin' there I guess

16   five, maybe seven minutes, could've been maybe ten, I

17   believe, and I saw Norman come out of the trailer.  The

18   lights were on in the trailer.

19   Q.        All right.  Now, as I understand it, you -- you

20   got up and -- what time was this approximately?  Do you

21   have any idea?

22   A.        I'd say somewhere around 4:30, twenty minutes

23   'til 5:00, somewhere.

24   Q.        And you went in and you sat down on the commode?

25   A.        Yes, sir.

-128-

GRAHAM 006528

1    Q.       And the -- as you look at the window you see the

2    Graham trailer.  Is that correct?

3    A.       Yes, sir.

4    Q.       And you were there somewhere between five to ten

5    minutes?

6    A.       Yes, sir.

7    Q.       Now, during that time did Norman Graham go into

8    the trailer?

9    A.       No, sir.

10   Q.       And the first time you saw Norman Graham was

11   when?

12   A.       When he came out of the trailer.

13   Q.       When he came out of the trailer?

14   A.       Yes, sir.

15   Q.       Well, when he came out of the trailer was he

16   running, or what?

17   A.       No, sir.  He walked casually around the car, had

18   to walk to the trailer next door.

19   Q.       Now, who lived in the trailer next door; do you

20   know?

21   A.       It was some kinfolk to the girl that was living

22   in that trailer.

23   Q.       All right.  In other words, some of Kay's

24   kinfolks?

25   A.       (Inaudible).

GRAHAM 006529

Q.        But he just walked out casually?

A.        Yes, sir.  I wouldn't say fast, I wouldn't say slowly, just a casual walk.

Q.        And during the five to ten minutes that you were in there in the bathroom you did not see the defendant drive his car up and go into the trailer?

A.        No, sir, I did not.

Q.        You only saw him come out?

A.        Yes.

Q.        Now, after he came out I believe the authorities came?

A.        Yes, sir.

Q.        State whether or not did you observe his car?

A.        Yes, sir, I did.

Q.        What kind of car did he have?

A.        A maroon Oldsmobile, or something like that.

Q.        Tell the ladies and gentlemen of the jury what you observed of his car.

A.        Well, I just know (inaudible), I went outside and I saw the police there, and I was just standing there asking with the rest of them what happened, and he said that a girl got killed in -- in the trailer there.  Then the -- then I went to the patrol car, and you could look at the car, the car hadn't been moved.  It had dew --

Q.        Why do you say --

-130-

GRAHAM 006530

1    A.        -- on it.

2    Q.        -- that?

3    A.        Well, it had dew all over it, all over the

4    windshield and hood, the top of the car, the windows, like

5    it'd been sittin' there for quite some time.

6    Q.        And during the time that you were sitting there

7    on the commode you didn't see the defendant drive his car

8    up?

9    A.        No, sir.  The car was -- the car was already

10   there.

11   Q.        And it appeared to have been there some time due

12   to the dew?

13   A.        Yes, sir, (inaudible).

14   Q.        And if the defendant had driven up his car and

15   then just gone right in and then come right back out, you

16   would've seen it, wouldn't you?

17   A.        Yes, sir, I'd of had to seen it.  The commode's

18   right in front of the window, you know, facing right out

19   the window.

20            MR. RILEY:  You may ask, Mr. Prince.

21

22   CROSS EXAMINATION BY MR. PRINCE:

23

24            MR. PRINCE:  May I see those pictures

25            first, Your Honor?

GRAHAM 006531

1            THE COURT:  I believe the jury has 'em.

2

3    Q.        And this is your trailer?

4    A.        Yes, sir, it is.

5    Q.        And Exhibit -- is that -- Exhibit 11, that's your

6    trailer?

7    A.        Yes, sir.

8    Q.        And this window here, is that the bathroom

9    window?

10   A.        Yes, sir, it is, the one with the (inaudible).

11   Q.        Could you draw me a diagram of the inside of your

12   trailer?

13   A.        Yes, sir.

14

15                    (OFF THE RECORD)

16

17   Q.        This picture here?

18   A.        Yes, sir.

19   Q.        Okay.  Let's say this is the front end of the

20   trailer where the window is.

21            MR. PRINCE:  I say this is the front

22            end of the trailer, Ladies and Gentlemen.

23            MR. WEATHERFORD:  Yeah.

24   Q.        Okay.  This diagram that you have just drawn,

25   which is the front end?

GRAHAM 006532

1    A.        (No audible response.)

2    Q.        Okay, this is the front end?

3    A.        Right.

4    Q.        And this is the back end?

5    A.        This whole front is the trailer.

6    Q.        This whole front?

7    A.        Right.

8            (Conversation between Mr. Prince and Mr. Riley)

9                    MR. PRINCE:  Identify this as Defense

10        Exhibit Number 1.

11                    THE COURT:  Okay.

12

13            (DEFENSE EXHIBIT 1 -- Weatherford Diagram)

14

15    A.        That'd be the right front and the back end.

16    Q.        Okay.  And if you would, write then --

17        And the front faces Mr. Graham's trailer?

18    A.        Yeah.

19    Q.        And (background noise - inaudible) right in front

20        of the window.

21    A.        Okay.

22    Q.        How many feet did you say is between the commode

23        and the window?

24    A.        Well (inaudible portion).

25                    COURT REPORTER:  I can't hear you,

-133-

1              Mr. --

2      A.      If I bent over far enough I could touch the

3      window.  (Inaudible).

4      Q.      Now, if I recall from looking at the picture,

5      there are drapes in that window.

6      A.      Yes, sir, there are, but you can see out the

7      window.  They were nice, what I would call, silk, but you

8      can see right through 'em.

9      Q.      And the window's, oh -- where's the bottom of the

10     window?

11     A.      Sittin' on the commode it was -- it'd be probably

12     over here.

13     Q.      And you say you were on the commode about 4:30?

14     I know you probably don't have an exact time --

15                      **(Tape 3, Side 2)**

16     Q.      In time you noticed Norman walk over to the

17     victim's sister's trailer?

18     A.      Yeah.  I had sat there and smoked a cigarette.  I

19     don't know how long it takes to smoke a cigarette.  And I'd

20     say between five, six, seven minutes, somewhere around in

21     there.

22     Q.      Now, I believe you testified you had looked at

23     Norman Graham's car and had noticed dew on the windshield?

24     A.      Yes, I did.

25     Q.      Did you notice anything that happened inside?


-134-

1    A.     I had no reason to look inside his car.

2    Q.     Well, did you notice whether it was fogged up or

3  whether it was just dew on the windshield?

4    A.     It looked to me like dew.

5    Q.     But it wasn't fogged up in the inside?

6    A.     It could've been.  I didn't see it (inaudible

7  portion).

8    Q.     Okay, but definitely dew on the windshield?

9    A.     Yes, sir.

10    Q.     Do you know that (background noise) -- do you

11  know that for sure?

12    A.     Well, it -- I know there was dew on the hood and

13  top of the car.  The windows looked like they had dew on

14  'em, (inaudible), you know, the covering of dew.

15    Q.     Okay.

16          What is your wife's name?

17    A.     Cathleen.

18    Q.     Do you have a stepdaughter or a daughter by the

19  name Denise Ducheau?

20    A.     Yes, I do.

21    Q.     Is -- is she your stepdaughter?

22    A.     Yes, she is.

23    Q.     Okay.  Now, Denise Decheau was with the victim

24  the night of the murder; is that correct?

25          MR. RILEY:  Now, if you know from your

GRAHAM 006535

1        own personal knowledge.  I don't know --

2             **MR. PRINCE:**  Okay.

3  A.     I don't know; I couldn't answer.

4  Q.     Okay.  Now, Denise lived with you in the trailer?

5  A.     Yes, she did.

6  Q.     She was good friends with Kay Williams?

7  A.     I would say so, yes.

8  Q.     Kay, in fact, visited your trailer quite a few

9 times, didn't she?

10  A.     If she did, I have no knowledge of that.

11  Q.     In fact, she was there that very night, wasn't

12 she?

13  A.     I have no -- no (inaudible).

14  Q.     Were you there that night?

15  A.     I didn't get home until late that night.

16  Q.     What time did you get home?

17  A.     Well, I would go to work at 7:00 in the morning

18 and never got away from work until 7:00 or 8:00 at night.

19 Sometimes I quit early, and sometimes I worked later.

20  Q.     Were you there at 10:30?

21  A.     I couldn't recall.

22  Q.     Were you there when Kay Williams brought Denise

23 Decheau and Michelle Arms back to the trailer after they'd

24 been -- been riding around?

25  A.     No, sir, not that I can recall.

GRAHAM 006536

1    Q.    So you don't know what time you got home, do you?

2    A.    No, sir.

3    Q.    Have you -- did you observe Kay Williams out in

4    the yard any (inaudible)?

5    A.    I only knew her when I saw her, you know.  As far

6    as knowing her, I -- I didn't.

7              MR. PRINCE:  That's all the questions I

8         have, Your Honor.

9              THE COURT:  Okay.  Any redirect?

10             MR. RILEY:  Yes, sir.

11             May I have the drawing, please, Mr.

12        Prince?

13

14   REDIRECT EXAMINATION BY MR. RILEY:

15

16   Q.    You know, so there won't be any -- any question

17   about this -- this drawing, you have a C.  Now, is that

18   commode?

19   A.    Commode.

20   Q.    All right.  If I put a circle there, that's

21   alright?

22        Now, where I put the circle, that's the commode?

23   A.    Yes, sir.

24   Q.    And the trailer -- would the street be out in

25   front here?

GRAHAM 006537

1    A.        Yes, sir.

2    Q.        The street would be here?

3    A.        Yeah.

4    Q.        And the Graham trailer would be right here?

5    A.        Yes, sir.

6    Q.        So when you said you were actually looking right

7    straight into the Graham trailer, that's exactly what you

8    were doing, wasn't it, through that window right straight

9    into the trailer?

10   A.        Yes, sir.  I could lay in my bed and see the

11   whole trailer.

12   Q.        But this time you weren't laying in your bed, you

13   were sitting on the commode, and you could see right in

14   there?

15   A.        Yes, sir.

16   Q.        During the five to ten minutes Norman Graham did

17   not come into the house, but you only saw him leave and

18   walk out?

19   A.        Yes, sir.

20              MR. RILEY:  I have no further questions

21          of this witness.

22

23   RECROSS EXAMINATION BY MR. PRINCE:

24

25   Q.        Mr. Weatherford, were you on the commode at 4:25?

GRAHAM 006538

1    A.        At 4:25?

2    Q.        Right.

3    A.        I could've been; 4:30 -- 4:25, 4:30 to 4:35 -- I

4    was there before the police ever got there.

5    Q.        Okay.

6    A.        It took a good ten minutes before the police ever

7    got there.

8    Q.        Okay.  You were there a good ten minutes before

9    the police got there?

10   A.        Well, but -- when Norman got up and came out of

11   the house and went next door, I was there -- you know, I

12   thought the guy was going to work.  And he knocked on the

13   door next door and the guy came to the door, and he had his

14   shirt off and his shoes off, and they were talking.  And he

15   was waiving his hands over to the trailer next door.  So,

16   you know, I sat right there and watched him, you know, see

17   what was going on.

18   Q.        But you don't know, really, you know, what time

19   you were on the toilet?

20   A.        It would have to be somewhere around 4:30 or

21   shortly after that.

22                    MR. PRINCE:  That's all.

23                    MR. RILEY:  Mr. Prince, may this

24           witness be finally excused -- he is here taking

25           off time from work -- so he can go back home?


-139-

THE COURT:  Okay.  Any objection?
Oh, okay.  We're going to turn him back to New
York.

(OFF THE RECORD)

THE COURT:  Okay; we'll have to ask him
to stay another day.

MR. RILEY:  Well, Judge, let me ask you
this:  Can he be excused -- can he be excused
after tomorrow?

THE COURT:  I -- I don't know -- of
course, I don't know how many witnesses you have
left or how many they have, but I was hoping --
we've gone late enough, I was kind of hoping we'd
finish all the testimony tomorrow, anyway.

MR. RILEY:  Well, I think I can finish
with mine, Judge.

THE COURT:  Okay.

MR. RILEY:  It shouldn't take more than
a half a day.  But, you know --

THE COURT:  What -- what -- what --
where does he have his flight?

MR. RILEY:  He has a flight at seven
o'clock -- about seven o'clock Wednesday morning.

-140-

1          THE COURT:  But if he could go back

2     earlier, he'd like to?

3          MR. RILEY:  Well, yes, sir.

4          THE COURT:  Okay.  Let's watch it in

5     the morning and we'll see.  Bring it up again in

6     the morning and (inaudible).

7          MR. RILEY:  Well, if he can stay at his

8     brother's then, and then we can go get him if we

9     need him tomorrow so he won't have to come back

10    to court.

11         THE COURT:  As long as he stays where

12    we can get him if they need him.

13         MR. RILEY:  Are you going to stay at

14    your brother's?

15         MR. WEATHERFORD:  Yes.

16         MR. RILEY:  Fine.

17         THE COURT:  But is his brother the

18    police --

19         MR. RILEY:  No, sir.  He lives here in

20    Guthrie, not in Elkton.

21         THE COURT:  Oh, okay.  All right, sir.

22    You can be excused, but remain available at your

23    brother's where we can get to you if we need you,

24    or come -- (inaudible).  You should be down here

25    at the courthouse.

-141-

GRAHAM 006541

MR. WEATHERFORD:  All right.

(Recess for the day - jury admonished)


(Tape 4 - Side 1)

December 1, 1981:


TAMARA MCCLURE:  After first being duly sworn, testified as follows:


DIRECT EXAMINATION BY MR. RILEY:


A.       Helen Miller.

Q.       And where do you live?

         COURT REPORTER:  That's going to have

to be a little bit closer.

         MR. RILEY:  Okay.

Q.       And where do you live?

A.       117 Gibson Drive.

Q.       And what town?

A.       Olmstead.

Q.       And where are you employed now?

A.       Quincy's Steakhouse?

         COURT REPORTER:  What?

         MR. RILEY:  Quincy's Steakhouse.

Q.       Back in June of 1980, Ms. -- well, where -- where


-142-

GRAHAM 006542

1  were you employed?

2  A.       Red Carpet.

3  Q.       Now, is the Red Carpet a -- a bar?

4  A.       Yes, sir.

5  Q.       And where is it located?

6  A.       (Inaudible).

7  Q.       Near what town?

8  A.       Clarksville.

9  Q.       In Montgomery County, Tennessee?

10 A.       Uh-huh.

11          COURT REPORTER:  What town did she say?

12          MS. MILLER:  Clarksville.

13          COURT REPORTER:  Okay.

14 Q.       Now, if -- is it near Highway 41 that goes to

15 Fort Campbell?

16 A.       Yes.

17 Q.       How close is it to, say, one of the gates at Fort

18 Campbell?

19 A.       Close to Gate 3.

20 Q.       Within how far would you say?

21 A.       A mile.

22 Q.       A mile?

23          And what was your job at the Red Carpet back in

24 June of 1980?

25 A.       I was the bartender.

GRAHAM 006543

1    Q.        Now, ask you whether or not do you remember an

2    incident which took place on Sunday, the 29th of June,

3    1980, at the Red Carpet?

4    A.        There was a brawl out in the parking lot.

5    Q.        A wh -- a brawl?

6    A.        Uh-huh.

7    Q.        Now, what time did this -- this brawl take place

8    out in the parking lot?

9    A.        After I gave last call, around 2:30.

10   Q.        And that would've been 2:30 on Sunday morning?

11   Or Monday morning it would've been; Monday morning it

12   would've been.  At approximately 2:30 there was a -- was it

13   a fight?

14   A.        Uh-huh.  This guy tried to run over everybody in

15   the parking lot and the police were called.

16   Q.        All right.  And did you call -- did you call the

17   police?

18   A.        Yes.

19   Q.        And did the police come?

20   A.        Yes.

21   Q.        What did the police do at the parking lot at the

22   Red Carpet?

23   A.        They made everybody leave.

24   Q.        And would I be correct in saying that the parking

25   lot was cleared?

-144-

GRAHAM 006544

1    A.        Uh-huh.

2    Q.        At about 2:30 on Monday morning?

3    A.        There was one car there.

4    Q.        All right.  And one car was there.  Did you call

5    for the owner of that car?

6    A.        Yes, I did.

7    Q.        Now, do you know who the person was?

8    A.        No, I don't.

9    Q.        Do you know Norman Graham?

10   A.        Yes, I do.

11   Q.        Is that Norman Graham sitting at counsel table?

12   A.        Yes, sir.

13   Q.        And was this Norman Graham's car?

14   A.        No.

15   Q.        And why was the car still in the parking lot?

16   A.        He had lost his keys.

17   Q.        And -- now, what time was this that you went out

18   and looked and saw that there was only one car in the

19   parking lot?

20   A.        Three (3:00).

21   Q.        About three o'clock?

22   A.        Uh-huh.

23   Q.        And that -- how can you be sure about that?

24   A.        Because my girlfriend's car was there and we were

25   all out in the parking lot.

-145-

1    Q.       And you observed only the one car, and that was

2    the fellow that had lost his key?

3    A.       Uh-huh.

4    Q.       Did you see in the front, or at the back, or any

5    part of the parking lot Norman Graham or any other car?

6    A.       No, I didn't.

7    Q.       Now, what time that night did you clock out?

8    A.       Three (3:00).

9    Q.       At three o'clock?

10   A.       (No audible response).

11   Q.       Now, exhibit to you what purports to be your time

12   card, and ask you, is this your time card?

13   A.       Yes.

14   Q.       And I notice right here there's some numbers.

15   Now, how are those put on there?

16   A.       By a time clock.

17   Q.       In other words, you have a time clock you clock

18   in and clock out?

19   A.       Uh-huh.

20   Q.       Okay.  And is that on -- is that time clock on a

21   twelve-hour, or is it a full twenty-four hours?

22   A.       Twenty-four.

23   Q.       All right.  And turning your attention to the

24   Sunday right here, it looks like 16:09.  What time -- what

25   time would that have been?

GRAHAM 006546

1    A.        4:09.

2    Q.        4:09?

3    A.        Uh-huh.

4    Q.        Now, is this clock -- is this right, or is there

5    a difference in the time?

6    A.        There is an hour difference.

7    Q.        And why is that?

8    A.        Because the time changed and we never change the

9    time clock.

10    Q.        In other words, the clock stays the same,

11    daylight savings time or not?

12    A.        Uh-huh.

13    Q.        And what time did you -- did you check in at the

14    Red Carpet on that Sunday afternoon?

15    A.        Five o'clock.

16    Q.        Okay.  And that -- actually, then, this would be

17    -- it shows nine minutes after 4:00, but it would actually

18    be nine minutes after 5:00 --

19    A.        Uh-huh.

20    Q.        -- when you checked in?

21             Now, at the time when you clocked out, I believe

22    it shows 2:01.  That'd actually be what, 3:01?

23    A.        (No audible response).

24    Q.        And at the time you checked out is the time that

25    you and your girlfriend went out and checked the parking

-147-

1      lot?

2      A.        (No audible response).

3                        MR. RILEY:  Judge, I'd like this be

4           introduced as Commonwealth Exhibit --

5                        COURT REPORTER:  Eighteen (18).

6                        MR. RILEY:  Eighteen (18).

7

8           (COMMONWEALTH EXHIBIT 18 - McClure Time Card)

9

10     Q.        So you can document by this, at 3:01 you went out

11     and Norman Graham's car was not in the parking lot?

12     A.        No.

13     Q.        Now, after you clocked out, did you do any more

14     work at the Red Carpet?

15     A.        I stayed in there for forty minutes.

16     Q.        And what were you doing during that time?

17                        COURT REPORTER:  What did she say?

18                        MR. RILEY:  Stayed in there there f --

19           about forty minutes.

20                        COURT REPORTER:  Oh.

21     Q.        And during that time what did you do?

22     A.        I was just cleaning up the office and everything,

23     and then we sat around and talked for a while.

24     Q.        And would I be correct that saying about -- about

25     3:40 or 3:45 you left the Red Carpet?

-148-

1    A.        Yes.

2    Q.        And at that time were there any cars in the

3    parking lot?

4    A.        None except for that one.

5    Q.        Except for that one that the fellow lost his

6    keys, and not Norman Graham?

7    A.        Yes.

8    Q.        So at three o'clock, if Norman Graham said his

9    car was there until 4:20 in the morning, is that right or

10   wrong?

11   A.        What?

12   Q.        He said his car was there until 4:20 in the

13   morning.  Was that right or wrong?

14   A.        It's -- well, I left at a quarter 'til 4:00 and

15   his car wasn't there.  But I wasn't there after that, after

16   that time frame.

17   Q.        But at three o'clock his car wasn't there?

18   A.        Uh-huh.

19   Q.        And at 3:45 his car wasn't there?

20   A.        Uh-huh.

21   Q.        And you are sure because of the altercation that

22   took place and had the police completely clear the lot?

23   A.        Uh-huh.

24                    MR. RILEY:  You may ask.

25


-149-

GRAHAM 006549

CROSS EXAMINATION BY MR. JOHNSON:

Q.      You say you remember Norman being there earlier
that night?

A.      Yes, I do.

Q.      Who was he in the company of?

A.      I believe it was a Sandy Graham, and I -- I know
the other two people, but I can't remember their names.

Q.      Who is Sandy Graham?

A.      I -- I just know her as -- from her coming in.  I
just know her just to speak to her.

Q.      Did she work there?

A.      No.

Q.      But you know her, that she was -- there was a
person that had the same -- but you knew her as Sandy
Graham --

A.      Uh-huh.

Q.      -- with Mr. Graham on that particular occasion?

A.      Yes.

Q.      Do you recall what time they were in there?

A.      No.

Q.      Do you know what time they left?

A.      No, sir.  They -- I was at the -- I was
bartending, they was sittin' out there, and I just know
that they were there that night.

-150-

GRAHAM 006550

1    Q.      So you weren't waiting on them --

2    A.      No.

3    Q.      -- (inaudible)?

4    A.      No.

5    Q.      Now, this incident that happened at three o'clock

6   in the morning, somebody had a fight, I assume?

7    A.      Yes.

8    Q.      And Mr. Graham wasn't involved in that fight?

9    A.      No, he wasn't.

10   Q.      To the best of your knowledge, had he already

11  left -- left the premises by that time?

12   A.      Yes.

13   Q.      But you don't remember when that time occurred?

14   A.      No.

15   Q.      Now, you stated at that time the police cleared

16  the lot.

17   A.      Yes.

18   Q.      Were you -- did you observe all the automobiles

19  that was on the lot before the police started clearing the

20  lot?

21   A.      No.

22   Q.      So it would've been possible that Mr. Graham's

23  car would've still been there at that time?

24   A.      Yes.

25   Q.      You just simply don't know?

GRAHAM 006551

1    A.        No.

2    Q.        The only thing that you know is that at 3:06

3    (sic), basically when you clocked out?

4    A.        Uh-huh.

5    Q.        All right.  And then later on when you left --

6    A.        Uh-huh.

7    Q.        -- and the police weren't there, at that time

8    there was only one car that you observed on the lot?

9    A.        Uh-huh.

10   Q.        And that vehicle was a red -- little red Ford?

11   A.        I don't remember what model.  That's what it

12   looked like, but I don't remember right now what kind of

13   car it was.

14   Q.        Some type automobile in which you knew the owner?

15   A.        I didn't know the owner.  He just said that he'd

16   lost his keys and I assume that was his car.

17   Q.        Okay.  Some guy --

18   A.        Right.

19   Q.        -- purporting to be the owner?

20   A.        Right.

21   Q.        Of course, (coughing background noise) whether he

22   actually owned the car, he didn't?

23   A.        No.

24   Q.        Somebody else claimed to be the owner of that?

25   A.        (No audible response).


-152-

1   Q.      At 3:06 (sic) you know you clocked out --

2   A.      Uh-huh.

3   Q.      -- by the time -- by the time card.

4           This 3:45, obviously, is an approximation?

5   A.      Right.

6   Q.      And I assume you all served on up to three

7   o'clock?

8   A.      We did last call at 2:30, and everybody has to be

9   out at 3:00.

10  Q.      As to whether Mr. Graham left at 10:30, 1:30, or

11  2:00 as a customer, you don't have any recollection?

12  A.      No.

13  Q.      How many persons -- the Red Carpet, what's the

14  seating capacity; do you recall?

15  A.      Maybe seventy-five, a hundred.

16  Q.      It has a parking lot?

17  A.      Uh-huh.  It has a front parking lot and a back

18  parking lot.

19  Q.      Now, what -- is it close to any business

20  establishment?

21  A.      Yes.

22  Q.      What business is that?

23  A.      There's an oriental shop right next to it and --

24          COURT REPORTER:  There's a what kind of

25  shop, honey?

-153-

GRAHAM 006553

1          **MS. MCCLURE:**  Oriental.

2          **COURT REPORTER:**  Okay.

3          **MS. MCCLURE:**  -- (inaudible), or

4     something like that.

5     A.          And the parking lot's almost like (inaudible

6     portion), and then there's a garage type building right

7     there.  So they have the parking lot that's (inaudible).

8     Q.          So, actually, when you all have a big crowd, you

9     all have facilities to -- I assume the oriental shop

10    wouldn't be open and going at the same time you all are.

11    A.          No.

12    Q.          But -- so it would be -- if you have a big crowd,

13    your crowd can overflow --

14    A.          Right.

15    Q.          -- to other parking areas there that weren't

16    particularly the Red Carpet?

17    A.          Right.

18    Q.          But nobody objected to it because they weren't

19    using it?

20    A.          Right.

21    Q.          Just approximately, how many parking fac -- how

22    many cars could you park in the front?  Do you have any

23    idea?

24    A.          Oh, maybe sixty.  I don't --

25    Q.          How about the rear?

GRAHAM 006554

1    A.        Excuse me?

2    Q.        How about the rear parking lot?

3    A.        Oh, maybe twenty.

4    Q.        Do you all -- does the Red Carpet have any

5    special lighting?

6    A.        As far as what?

7    Q.        Flood lights in the parking lot?

8    A.        No.

9    Q.        Or was it just regular street lighting?

10    A.        Our business one.  I'm not -- I'm not for sure.

11    Q.        Were there street lights?

12    A.        There's one -- I know there's one on the corner,

13    but -- I believe there's one in the middle of the parking

14    lot, but I'm not sure about it.

15            MR. JOHNSON:  (Inaudible - background

16            noise).

17

18    REDIRECT EXAMINATION BY MR. RILEY:

19

20    Q.        Mrs. McClure, you know at three o'clock Norman

21    Graham's car was not parked in the front of the Red Carpet

22    Inn?

23    A.        No.

24    Q.        And you also know that approximately 3:45 Norman

25    Graham's car was not parked in the parking lot of the Red

GRAHAM 006555

1    Carpet Inn?

2    A.        That's right.

3                         MR. RILEY:  That's all.  Thank you.

4                         THE COURT:  Okay.

5                         MR. RILEY:  Judge, may this witness be

6    excused?

7                         THE COURT:  Any objection her being --

8                         MR. JOHNSON:  No.

9                         THE COURT:  Okay, she can be excused.

10                        MR. RILEY:  Call Ralph Blick.

11

12   RALPH BLICK:  After first being duly sworn, testified as

13   follows:

14

15      (OFF THE RECORD - Mr. Johnson speaking with Court/Riley)

16

17   DIRECT EXAMINATION BY MR. RILEY:

18

19                    (This portion off audio tape)

20   Q.        Your name is Ralph Blick?

21   A.        Yes.

22   Q.        Where do you live?

23   A.        (Illegible).

24                    (Back on audio tape)

25   Q.        ... right next door to the Norman Graham trailer?

GRAHAM 006556

1    A.      Yes, sir.

2    Q.      And I'm sure you still remember some of the

3    events that transpired on that morning back in June 1980 --

4    A.      Yes, sir.

5    Q.      -- when Janis was found.

6          That morning did anything awaken you all?

7    A.      Yes, sir, a knock at the door.

8    Q.      And did you later determine who that was?

9    A.      Yes, sir.

10    Q.      Who?

11    A.      Norman Graham.

12    Q.      Sitting here?

13    A.      Yes, sir.

14    Q.      Did he relay any statement to you relative to

15    anything that had happened to Kay?

16    A.      My wife got up and went to the door, and I (makes

17    noise) on the door, and I just barely heard.  He said it

18    was Norman.  And he said something.  And I got up and run

19    to the door, and my wife turned to me and says, "Oh, my

20    God!  My sister's dead!"

21          And I run back in my room and got my housecoat on

22    and run over to their trailer, and my wife had came in in

23    there, and I grabbed her and brought her back over to the

24    house, and I went back over to the trailer, run into where

25    Kay was to see if I could do anything.  And right then I

GRAHAM 006557

1   knowed that I can't do nothin', so I came back over there

2   and called the sheriff's office.

3   Q.      Did you touch her body to see if she was dead?

4   A.      Yeah.

5   Q.      And did you make a determination that she was

6   dead?

7   A.      Yes, sir.

8   Q.      Exhibit to you what purports to be Commonwealth

9   Exhibit 1 and Commonwealth Exhibit 4 and ask you is this

10  the state that you saw the body in when you went to the

11  scene?

12  A.      Yes, sir.

13  Q.      You did not move the body -- or did you move the

14  body or anything, or just touch it to see if she was dead?

15  A.      No, sir.  I just touched it to see -- see if she

16  was dead.

17  Q.      Now, after you found out she was dead, did you

18  notify any authorities or anybody?

19  A.      Yes, sir.

20  Q.      Tell the ladies and gentlemen of the jury what

21  you did.

22  A.      I come back over to the house, and I got on the

23  phone and I tried to call the police department in Guthrie,

24  and the operator said, "I couldn't get 'em."  I said,

25  "Well, give me the sheriff's office and the rescue squad."

GRAHAM 006558

1    And she asked me what was going on and I told her to get

2    'em out here right quick, there's been a murder.

3    Q.        And she -- did you talk to the rescue squad or

4    the sheriff, or did the operator take it from there?

5    A.        The operator took it from there.

6    Q.        All right.  And did the rescue squad and also

7    Sheriff Morris come on out immediately?

8    A.        Yes, sir, they did.

9    Q.        How long would you say it was before they got

10   there?

11   A.        Say about five minutes maybe, maybe a little

12   longer, when the sheriff and rescue squad got there.

13   Q.        And where was Norman all this time?

14   A.        He was settin' in my house.

15   Q.        Nor -- had Norman been drinking?

16   A.        Well, sir, I wasn't close enough to tell whether

17   he was drinking or not.  I couldn't say.

18   Q.        And did he make any statement about coming from

19   the Red Carpet Inn or anything that -- that -- that night?

20   A.        Yes, sir.

21   Q.        What did he tell you?

22   A.        He said that he got drunk and he laid down in his

23   car and passed out, and he had a weird feeling, and he woke

24   up and he drove the fastest to Guthrie, and he walked in

25   and found Kay and come over and woke us up.

-159-

1    Q.        Did he how tell you how fast he was driving?

2    A.        He said he was driving a speed of eighty to a

3    hundred miles an hour.

4    Q.        Now, was Norman visibly upset at this time after

5    having found Kay?

6    A.        To me, no, sir.

7    Q.        Now, after the sheriff got there did you go out

8    and make any observations relative to Norman Graham's car?

9    A.        Yes, sir, I did.

10   Q.        Tell the ladies and gentlemen of the jury what

11   you observed, and to whom did you point this out?

12   A.        Well, I went outside.  The sheriff and I was out

13   there talking.  We was standing out there, and I just

14   happened to notice Norman's car, and I asked Sheriff

15   Morris, "Don't it seem funny that a man coming from

16   Clarksville to Guthrie running eighty miles an hour didn't

17   knock of the dew on his car."  The car was covered with

18   dew.

19   Q.        Was the hood covered with dew?

20   A.        Beg your pardon?

21   Q.        Was the hood covered with dew?

22   A.        Yes, sir, it was.

23   Q.        Top covered with dew?

24   A.        Yes, sir.

25   Q.        Trunk lid?

GRAHAM 006560

1    A.        Yes, sir.

2    Q.        And were there any streaks where the dew had

3    streaked, or was it just the solid sheet?

4    A.        Just a solid sheet of water; looked like it was

5    rained on.

6    Q.        Did you make any other check relative to the car,

7    or the engine, or any part?

8    A.        We walked up there to the front of the car, and

9    the sheriff and I stuck our hand underneath and we could

10   feel just a little heat coming from it.

11   Q.        Could you put your hand on the radiator?

12   A.        Yes, sir.

13   Q.        Hold your hand on the radiator, would it burn it?

14   A.        No, sir.

15   Q.        Now, Norman used to be in the military service,

16   didn't he?

17   A.        He told me he was, yes, sir.

18   Q.        And have you ever noticed any military boots

19   around the house?

20   A.        I know he wore boots, yeah.

21   Q.        Did you see any after this night or any time

22   after that?

23   A.        No, sir.

24   Q.        These military boots, were they the lace-up type,

25   or how did they buckle?

GRAHAM 006561

1    A.      They was lace-up.

2    Q.      Use the military type strings and laces?

3    A.      Yes, sir.

4

5                    **(OFF THE RECORD)**

6

7    Q.      In your opinion, had Norman Graham's car been

8  recently driven?

9    A.      No, sir.

10    Q.      And you base that on what?

11    A.      Well, I base that on the fact if the car had been

12  driven and as fast as he say it was, it wouldn't have no

13  dew on it, and there'd be streaks all over the car.

14    Q.      What about the radiator?

15    A.      The radiator was -- was warm.  It -- it had been

16  driven, to me, several hours before that.  And if -- if it

17  just come in, you could lay your hand on the radiator, it'd

18  burn you at eighty, ninety miles an hour.

19              **MR. RILEY:**  You may ask.

20              **MR. JOHNSON:**  Could I have a few

21      minutes to confer with Mr. Prince?

22              **THE COURT:**  All right.

23

24                    **(OFF THE RECORD)**

25

GRAHAM 006562

1    CROSS EXAMINATION BY MR. JOHNSON:

2

3    Q.    Mr. Blick, how long have you been married to Ms.

4    Williams' sister?

5    A.    Going on three years, sir.

6    Q.    Was it -- during this time I assume you became

7    relatively well acquainted with Ms. Williams and would see

8    her?

9    A.    Yes, sir.

10    Q.    How long had she been living there?

11    A.    Several months, I think, sir.  I couldn't tell

12    you for sure.

13    Q.    What?

14    A.    Several months.

15    Q.    Some period of time?

16    A.    Yes, sir.

17    Q.    And they were living next door to you?

18    A.    Yes, sir.

19    Q.    Do you remember who moved in first, you or Mr.

20    Graham?

21    A.    I think Graham was there, sir.  I'm not --

22    Q.    Some time thereafter you guys moved in with them?

23    A.    I -- I think.

24    Q.    I assume that Janis came to your house real --

25    relatively often?

-163-

1    A.        Yes, sir.

2    Q.        I believe Janis had been married before; is that

3    right?

4    A.        I think so, sir, yes, sir.

5    Q.        Did she have any children?

6    A.        Yes, sir.

7    Q.        How many children does she have?

8    A.        Got one.

9    Q.        And where does that -- where is that child

10   living?

11   A.        Staying with her grandmother.

12   Q.        And when you say her grandmother, do you mean the

13   child's grandmother or Janis' grandmother?

14   A.        Kay's mother.

15   Q.        Kay's mother; okay.

16             And how old is that child?

17   A.        I think she's about a year and half, or

18   something.  I'm not real sure.

19   Q.        Now or at that time?

20   A.        At that time.

21   Q.        Still -- or was she still in diapers?

22   A.        Yes, sir.

23   Q.        This particular occasion, you say you noticed the

24   car and called it to Sheriff Morris' attention.  Is this

25   correct?

GRAHAM 006564

1    A.        Yes, sir.

2    Q.        To the best of your recollection, the car had dew

3    all over it?

4    A.        Yes, sir, except the windshield.

5    Q.        Pardon?

6    A.        Except the windshield.

7    Q.        The windshield didn't have any.  Did you notice

8    anything about the windshield?

9    A.        Yes, sir.  It was fogged up on the inside.

10   Q.        Fogged up.

11             And how did you feel the radiator?

12   A.        Raised the hood on the car, sir.

13   Q.        Oh, you raised the hood on the car.

14   A.        I didn't, the sheriff did.

15   Q.        Your wife, I think earlier -- oh, the night

16   before -- when was the last time that you saw your sister-

17   in-law?

18   A.        That day, sir.

19   Q.        Okay.  You're talking about the Sunday?

20   A.        Yes, sir.

21   Q.        The 29th?

22   A.        Yes, sir.

23   Q.        Okay.  When was that?

24   A.        About four o'clock in the evening.

25   Q.        Did she come over to your house?

-165-

1    A.      Yes, sir.

2    Q.      Was anyone with her?  Was anyone with her?

3    A.      No, sir.

4    Q.      Later on that night did you notice her car being

5    home?

6    A.      No, sir.  I never paid no attention, sir.

7    Q.      So you have no earthly idea when she came in or

8    what time?

9    A.      No, sir.

10   Q.      When you saw her that afternoon, was Mr. Graham

11   at home?

12   A.      I couldn't tell you that.

13   Q.      You didn't have any conversations with him that

14   (inaudible) about --

15   A.      Well, see, there at the house he was just talking

16   to everybody, family and all.

17   Q.      But you don't remember any specific conversation

18   you had with him?

19   A.      No, sir.

20   Q.      Now, I assume that you had talked -- about what

21   time did Norman come over to your house?

22   A.      Oh, it was 4:30, something to 5:00, somewhere

23   along there.

24   Q.      Do you remember having any conversation with

25   Detective Albro on May the 18th, 1981?

GRAHAM 006566

1    A.        I think so, yes.

2    Q.        Do you recall telling him that it was about four

3    o'clock when you seen him?

4    A.        I can't exactly tell the time, sir.  About half

5    asleep when it all happened, and I was -- I figured it was

6    about 4:00, 4:30, somewhere along there.

7    Q.        You told Detective Albro that Norman had on a

8    striped shirt, didn't you?

9    A.        My best recollection, yeah.

10    Q.        Do you remember how long after you found Kay's

11    body, or observed Kay's body, that you talked to Sheriff

12    Morris about the automobile?

13    A.        Oh, I think fifteen, twenty minutes.

14    Q.        Do you recall at the time that you were

15    discussing the automobile whether it was daylight or dark?

16    A.        It was gettin' daylight.

17    Q.        You don't think the sun was up?

18    A.        No, sir, the sun was not up.

19    Q.        Do you remember if there was any outside lights

20    on the trailer, or street lights, or anything like that?

21    A.        Well, there was a street light outside beside the

22    trailer I lived in.

23    Q.        This was what was used to lodge your observation?

24    A.        Yes, sir.

25

-167-

1                          (OFF THE RECORD)

2

3    Q.        How many times did you talk to law enforcement

4    officials from the time of the death until May the 18th?

5    A.        I wouldn't have no idea.

6    Q.        Numerous occasions?

7    A.        Several.

8    Q.        I'm sure you talked to them extensively the first

9    day.

10   A.        That morning.

11   Q.        I assume they came back later and talked to you,

12   maybe a day or two, that kind of thing?

13   A.        Yes.

14   Q.        I'm sure there was a whole lot of activity around

15   there, especially the first couple of days.

16   A.        Yes.

17   Q.        And later on did you talk to them periodically

18   again, or through the winter?  Did they ever come back and

19   talk to you or anything like that?

20   A.        No, sir.

21   Q.        Back after the first week or so after her death

22   do you recall ever talking to anyone until in May when

23   Detective Albro came by and talked to you?

24   A.        No.

25   Q.        Do you remember ever making a statement or

                              -168-

GRAHAM 006568

1    whether you signed any kind of statement?

2    A.        Yes, sir.

3    Q.        You did make a statement where you signed the

4    statement?

5    A.        Yes, sir.

6    Q.        And who was that for?

7    A.        Of --

8

9                    (Simultaneous conversations)

10                        MR. JOHNSON:  Your Honor, I --

11                        COURT REPORTER:  I'm sorry.  Where did

12        you say, or when did you say?  Where did you say

13        that statement was?

14                        MR. BLICK:  I had to make it.

15                        MR. JOHNSON:  I haven't been furnished

16        with that and --

17                        COURT REPORTER:  I didn't know what the

18        answer was to that question.  Huh?

19                        MR. BLICK:  (Inaudible).

20                        COURT REPORTER:  What was everybody

21        talking about?

22                        THE COURT:  He hadn't been furnished

23        with a copy.

24                        COURT REPORTER:  Oh, okay.

25                    (End simultaneous conversations)

GRAHAM 006569

1                   **MR. RILEY:**  We don't have a signed

2      statement.

3                   **MR. JOHNSON:**  Your Honor, he just

4      testified under oath --

5                   **MR. RILEY:**  I understand what he said,

6      but I -- and I'll go check with the other

7      officers.

8                   **MR. JOHNSON:**  I mean, Judge --

9                   **MR. RILEY:**  I think it should be

10     (inaudible portion).

11

12                     **(OFF THE RECORD)**

13

14     **A.**      ... statement.  I might not've signed it, but I

15     know I gave a statement to one of the officers.

16     **Q.**      Which officer did you give it to?

17     **A.**      Well --

18     **Q.**      Who did you give the statement?

19     **A.**      Down there at the sheriff's office.

20     **Q.**      Do you think it was Detective Albro that you gave

21     it to?

22     **A.**      It might've been, yes, sir.

23     **Q.**      You don't remember.  Would this be maybe the

24     statement of May the 18th?

25     **A.**      I can't recollect the date.  It might've been.

GRAHAM 006570

1  Q.       Do you remember whether it was warm weather or

2  cold weather?

3  A.       Kinda cool.

4  Q.       Do you remember whether or not Mr. Graham had

5  already been arrested or not?

6  A.       No, sir, I don't know.

7  Q.       Mr. Blick, you did realize that Mr. Graham, that

8  he got arrested and charged with this crime?

9  A.       Well, I didn't know for a while, sir, because I

10 never was around him.

11 Q.       Do you remember whether you gave, the statement

12 that you gave, in the morning or the afternoon at the

13 sheriff's office?

14 A.       I -- I think it was in the mornin'.

15 Q.       Do you remember who was there?

16 A.       Just me and the detective.

17 Q.       Which detective?

18 A.       I think -- I don't know which one it was.

19 Q.       Was it Detective Albro?

20 A.       It might've been, sir.  I don't remember.

21 Q.       Do you remember signing a statement, or --

22 A.       I got a -- I thought I signed it.  If I didn't

23 sign, I didn't sign it, if that's what they say.  But I

24 thought one of the detectives --

25 Q.       I'm asking you.  You testified already that you

-171-

1    signed a statement.

2    A.    Yes, sir.

3    Q.    To the best of your knowledge, recollection right

4    now, did you ever give a statement to this detective that

5    you can't remember who it was, can't remember if it was

6    Detective Albro or not, if you ever did sign a statement?

7    A.    I thought I did.  (Inaudible portion).

8         MR. JOHNSON:  Well, will you --

9    Detective Albro, would you stand up?

10   Q.    Is this the man you gave a statement to?

11   A.    Sir, I don't know.  I'm going to be honest, I

12   don't know.  I know I gave a statement to a detective, but

13   which one it was -- it was just one of the detectives.

14   Q.    Do you know Detective Miller?

15   A.    Yes, sir.

16   Q.    Do you know Sheriff Morris?

17   A.    Yes, sir.

18   Q.    Was he there at the time you gave this statement?

19   A.    No, sir.

20   Q.    How did you happen to come in to the sheriff's

21   office on this particular occasion?

22   A.    They called me.

23   Q.    Okay; who called you?

24   A.    I don't know.  My wife told me they wanted to see

25   me.

-172-

1   Q.       To the best of your knowledge, this statement

2   that you think you had to sign, I assume you read it over

3   before?

4   A.       Beg your pardon?

5   Q.       I assume you read that statement over before you

6   signed it, or thought you signed it?

7   A.       Yes, sir.

8   Q.       Was it handwritten or typed?

9   A.       Handwritten.

10  Q.       Okay.  Was it on a yellow sheet, something like

11  this?

12  A.       I think it was like that, yes, sir.

13  Q.       You think it was on a yellow sheet or something

14  like that?

15  A.       (No audible response).

16

17                    (OFF THE RECORD)

18      (Mr. Riley speaking - cannot read reporter notes)

19

20                    MR. JOHNSON:  I have no further

21          questions.

22

23  REDIRECT EXAMINATION BY MR. RILEY:

24

25  Q.       ... talked about a statement, and so forth.  What

GRAHAM 006573

1    you have testified to here today, is what you've told the

2    ladies and gentlemen of the jury the truth?

3    A.        Yes, sir.

4    Q.        Is it true that you recall the events on the day

5    that Kay was killed?

6    A.        Yes.

7    Q.        And you were questioned by law enforcement

8    officers?

9    A.        Yes, sir.

10   Q.        And in the sheriff's office, you did -- were

11   questioned there?

12   A.        Yes, sir, and I thought that was a statement

13   they'd taken.

14   Q.        And whether you signed it or not, you could be

15   mistaken?

16   A.        Yes, sir.

17   Q.        But you do know about the dew on the car?

18   A.        I do.

19   Q.        You do know about the radiator?

20   A.        Yes, sir.

21   Q.        You do know about the condition of Norman Graham?

22   A.        Yes, sir.

23   Q.        And these are things that are vivid in your mind?

24   A.        Yes, sir.

25   Q.        Things that are in your mind that you'll probably

-174-

GRAHAM 006574

1    never forget?

2    A.        I try to.

3                        MR. RILEY:  That's all.

4                        THE COURT:  Okay.  Anything else, Mr.

5    Johnson?

6

7    RECROSS EXAMINATION BY MR. JOHNSON:

8

9    Q.        But you don't ever recall whether you talked to

10   Detective Albro or not?

11   A.        No.

12   Q.        Would you describe him as being a (inaudible)

13   person, a person you should recognize again?

14   A.        Beg your pardon?

15   Q.        Would you describe Detective Albro as being the

16   type person that you should be able to re -- recall that

17   easy, being of a physical description that you could easily

18   forget him?

19   A.        I don't know that, sir.

20                        MR. JOHNSON:  (No further questions).

21                        MR. RILEY:  May this witness be finally

22   excused?

23                        MR. PRINCE:  No, Your Honor.

24                        MR. RILEY:  In that case you're going

25   to have to wait outside.  We're going to give you

-175-