1          IN THE UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF KENTUCKY

3                 BOWLING GREEN DIVISION

4              CASE NO. 1:20-CV-210-GNS

5

6

7                    BRENDA GRAHAM, AS

8            ADMINISTRATOR FOR THE ESTATE OF

9                    NORMAN GRAHAM,

10                      Plaintiff

11

12                         v.

13

14                 TODD COUNTY, ET AL.,

15                     Defendants

16

17

18

19          WRITTEN QUESTION DEPOSITION OF

20             ROBERT MILLER, VOL. I

21

22

23

24   DATE:      JANUARY 30, 2024

25   REPORTER:  SOPHIE JONES



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

                    APPEARANCES

ON BEHALF OF THE DEFENDANTS, ROBERT MILLER AND
SCOTT SMITH:
Alea Amber Arnett, Esquire
Kentucky State Police - Legal Services
919 Versailles Road
Frankfort, Kentucky 40601
Telephone No.: (502) 782-2163
E-mail: alea.arnett@ky.gov

Also present: Amanda Sankey, Videographer

Page 4

                    STIPULATION

The VIDEO deposition of ROBERT MILLER, VOL. I was taken
at ELPO LAW, 12 PUBLIC SQUARE, ELKTON, KENTUCKY 42220, on
TUESDAY the 30th day of JANUARY 2024 at 12:53 p.m. CT;
said VIDEO DEPOSITION was taken pursuant to the FEDERAL
Rules of Civil Procedure.

It is agreed that SOPHIE JONES, being a Notary Public
and Court Reporter for the State of KENTUCKY, may swear
the witness.

Page 3

                       INDEX

                                                Page
PROCEEDINGS                                        5
DIRECT EXAMINATION BY THE REPORTER                 6

                     EXHIBITS

Exhibit                                          Page
1 - Excerpt of the Church Investigative File      10
    GRAHAM 286-304
2 - Affidavit for Search Warrant                  17
    GRAHAM 004322-26
3 - Arrest Warrant - GRAHAM 4342                  25
4 - Haley Affidavit for Search Warrant            26
    GRAHAM 334-339
5 - Chronicle Article - October 2, 1984           36
    GRAHAM 714
6 - Excerpt of the Williams' Investigative File   52
    KSP 55-160

Page 5

                     PROCEEDINGS

        THE VIDEOGRAPHER:  All right.  We are now on
the record.  My name is Amanda Sankey.  I'm the
videographer today, and Sophie Jones is the court
reporter.  Today is the 30th day of January 2024.
The time is 12:53 p.m. Central Time.  We are at the
ELPO Law Office located at 12 Public Square, Elkton,
Kentucky, 42220 to take the deposition of Robert
Miller in the matter of Brenda Graham as
Administrator for the Estate of Norman Graham v.
Todd County, et al., pending in the United States
District Court Western District of Kentucky Bowling
Green Division, Case number 1:20-CV-210-GNS.  Will
counsel please identify themselves for the record?
        MS. ARNETT:  I'm Amber Arnett, and I represent
Robert Miller.
        THE VIDEOGRAPHER:  Thank you.  And Mr. Miller,
will you please raise your hand to be sworn in by
the court reporter?
        MS. ARNETT:  Raise your right hand.  And she's
going to swear you in.
        THE REPORTER:  Do you solemnly swear or affirm
that the testimony you're about to give will be the
truth, the whole truth and nothing but the truth?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 6

```
1          THE WITNESS:  I do.
2                DIRECT EXAMINATION
3  BY THE REPORTER:
4      Q.   All right.  Please state your full name.
5      A.   Robert Clifton Miller.
6      Q.   Please state your current occupation.
7      A.   Retired.
8      Q.   Were you previously employed with the
9  Kentucky State Police?
10     A.   I was.
11     Q.   When?
12     A.   I -- I retired from the Kentucky State Police
13  in 1988.
14     Q.   And what was the highest rank you achieved?
15     A.   It was the detective.
16     Q.   Why did your employment with the Kentucky
17  State Police end?
18     A.   I was -- I had my time in, and I was retired.
19     Q.   Is it accurate that in the early to mid-1980s,
20  you worked as a detective with the Kentucky State
21  Police?
22     A.   Yes.
23     Q.   When did you first become a detective?
24     A.   '80 or '81.
25     Q.   Was your badge number 669?
```

Page 7

```
1      A.   It was.
2      Q.   As a detective with the Kentucky State Police,
3  did you investigate homicides in the Todd County,
4  Kentucky area?
5      A.   I -- I did.  When I was -- went transferred
6  into the detective division.
7      Q.   As an employee of the Kentucky State Police,
8  did you draft reports regarding your investigations?
9      A.   Pardon?
10     Q.   As an employee of the Kentucky State Police,
11  did you draft reports regarding your investigations?
12     A.   I did.
13     Q.   When drafting those reports, you understood
14  the reports might be relied upon by other officers when
15  investigating crimes, correct?
16     A.   I did.
17     Q.   When drafting those reports, you understood
18  they might be relied upon in prosecute -- by prosecutors
19  in criminal proceedings, correct?
20     A.   Correct.
21     Q.   When drafting those reports, you understood
22  they might be relied upon by criminal defense attorneys
23  in criminal proceedings, right?
24     A.   Right.
25     Q.   You understood the importance of those reports
```

Page 8

```
1  being accurate, correct?
2      A.   Correct.
3      Q.   You understood the importance of those reports
4  being thorough, right?
5      A.   Would you repeat that, please?
6      Q.   You understood the importance of those reports
7  being thorough, right?
8      A.   Yes.
9      Q.   What, if any, law enforcement agencies did you
10  work for before you were employed with the Kentucky
11  State Police?
12     A.   None.
13     Q.   What, if any, law enforcement agencies did you
14  work for after you completed your employment with the
15  Kentucky State Police?
16     A.   I was the Chief of Police of Elkton.
17     Q.   Are you a resident of Todd County, Kentucky?
18     A.   I am.
19     Q.   How long have you lived in Todd County?
20     A.   My entire life.
21     Q.   You were involved in the investigation of the
22  September 1984 murder of Brenda Church, correct?
23     A.   Correct.
24     Q.   You were the lead detective in that case,
25  right?
```

Page 9

```
1      A.   Correct.
2      Q.   The Church murder investigation was a
3  significant case in your career, wasn't it?
4      A.   Yes.
5      Q.   The Church murder occurred in Elkton,
6  Kentucky, correct?
7      A.   Outside the city limits, yes.
8      Q.   That's in Todd County, Kentucky, correct?
9      A.   In Todd County.
10     Q.   What independent recollection do you have
11  about the Brenda Church murder?
12     A.   Reference to what?  It was a --
13          MS. ARNETT:  What do you remember about the --
14  is that --
15          THE WITNESS:  Okay.
16          MS. ARNETT:  -- what do -- what recollection?
17  Independent recollection?
18          THE REPORTER:  I can repeat it.
19          MS. ARNETT:  Okay.
20  BY THE REPORTER:
21     Q.   What independent recollection do you have
22  about the Brenda Church murder?
23     A.   I don't remember the date, but I was sent to a
24  location.
25     Q.   Did you document the steps you took in the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1  investigation in a Uniform Offense Report?
2      A.  I did.
3      Q.  Please quickly take a look at the documents
4  that have been marked as Plaintiff's Exhibit 1, excerpts
5  from the Church investigative file, Bates stamped
6  Graham 286 through 304.
7          (EXHIBIT 1 MARKED FOR IDENTIFICAION)
8      MS. ARNETT:  Okay.  I'm going to have a copy
9  and you're going to have a copy.
10     THE WITNESS:  Oh, okay.
11     MS. ARNETT:  And you just take your time.
12 What's going to be the question about these, so he
13 can use that as he looks at it.
14     THE REPORTER:  Do you recognize this document?
15     MS. ARNETT:  Okay.  So look at each page.
16     THE WITNESS:  Okay.
17     MS. ARNETT:  And does that look like something
18 you've seen before?  Here, do you want to look at
19 this one?  Is that front and back?
20     THE WITNESS:  Yes.
21     MS. ARNETT:  Do you want to look at this one?
22 Look at that right now.
23     THE WITNESS:  Yep.
24     MS. ARNETT:   So that you can just turn each
25 page over here.  It's a little -- it's harder to

Page 11

1  figure out what's going on when you're doing front
2  and back. And look at the bottom and you see that as
3  well.
4      THE WITNESS:  Okay.
5      MS. ARNETT:  Okay.  I'm sorry.  On Page 14,
6  there's a big white space.  So I don't know if we
7  want to just note that.  I don't know if that was
8  intentional or not, but just to --
9      THE REPORTER:  Okay.
10     MS. ARNETT:  Because it looks like there were
11 some redactions in there, but I don't know what
12 that's about.
13 BY THE REPORTER:
14     Q.  Do you recognize that document?
15     A.  I do.
16     Q.  Do you agree it's the Uniform Offense Report
17 you drafted regarding the Brenda Church murder
18 investigation?
19     A.  Pardon?
20     Q.  Do you agree it's the Uniform Offense Report
21 you drafted regarding the Brenda Church murder
22 investigation?
23     A.  It -- it is.
24     Q.  Your name is listed at the bottom of the
25 report as the officer making the report, correct?

Page 12

1      A.  Correct.  And there may be one or two in here
2  that supplemented, that was added to it.  I'd have to go
3  back through and -- I thought I saw a name.  And this
4  all the enhancement work.  I thought I saw one in here
5  that someone signed other than me.
6      MS. ARNETT:  It looks like your name is on some
7  of the pages.
8      THE WITNESS:  Yeah.
9      MS. ARNETT:  But otherwise it's --
10     THE WITNESS:  Yes.
11     MS. ARNETT:  -- the officer making the report
12 is blank.
13     THE WITNESS:  Okay.  But I thought she asked me
14 if mine was the only name on it; is that correct?
15     THE REPORTER:  The question was: Your name is
16 listed at the bottom of the report --
17     THE WITNESS:  Yes.
18     THE REPORTER:  -- as the officer making the
19 report, correct?
20     THE WITNESS:  Yes.  Yes.  I'm sorry.
21 BY THE REPORTER:
22     Q.  According to this report, do you agree the
23 Church murder investigation is case number 2-84-840?
24     A.  I do.
25     Q.  Is that report an accurate depiction of your

Page 13

1  actions in the Church murder investigation?
2      MS. ARNETT:  And do you remember?
3      THE WITNESS:  It is.
4      MS. ARNETT:  Okay.  Do you have any doubts
5  about that?  He's looking at --
6      THE WITNESS:  Well, there may be some parts in
7  here that I have forgotten, but this is my report.
8      MS. ARNETT:  Okay.
9  BY THE REPORTER:
10     Q.  As lead investigator in the Church case, were
11 you responsible for the case file?
12     A.  Now --
13     MS. ARNETT:  Do you --
14     THE WITNESS:  -- clarify that.
15     MS. ARNETT:  Okay.  I was going to say, do you
16 understand the question?
17 BY THE REPORTER:
18     Q.  As lead investigator in the Church case, were
19 you responsible for the case file?
20     A.  The case file was kept on post.
21     Q.  How did you compile investigative files in the
22 1980s?
23     A.  How did I what?
24     Q.  Compile investigative files in the 1980s?
25     A.  I don't understand what -- the question.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB     Document 130-13     Filed 10/27/25     Page 5 of 31 PageID
#: 3660
The Deposition of ROBERT MILLER, VOL. I, taken on January 30, 2024
14...17

Page 14

1    MS. ARNETT: If you were the lead detective on
2  a case --
3    THE WITNESS: Yes.
4    MS. ARNETT: -- how would you put this report
5  together?
6    THE WITNESS: As it occurred.
7  BY THE REPORTER:
8    Q.  Where were the investigative files physically
9  stored?
10    A.  On post.
11    Q.  Did you also take handwritten notes during
12  your investigation in the Church murder?
13    A.  Pardon?
14    Q.  Did you also take handwritten notes during
15  your investigation in the Church murder?
16    A.  Yes.
17    Q.  What did you do with those handwritten notes?
18    A.  They were -- that's what these were taken
19  from.
20    Q.  Were they made part of the Church murder
21  investigative file?
22    A.  They should -- should have been.  Yes.
23    Q.  You went to the crime scene of Ms. Church's
24  murder, correct?
25    A.  Right.

Page 15

1    Q.  What did you observe at the crime scene?
2    A.  Brenda was lying on her back on the couch,
3  nude.  Her right leg was spread, and her foot was on the
4  floor.
5    Q.  What did you observe specifically about
6  Ms. Church's body at the crime scene?
7    A.  She had -- that you could physically see, she
8  had -- looked like where she would've been shot in the
9  right temple in her right eye.
10    Q.  You observed Ms. Church's hands were tied
11  behind her body, right?
12    A.  Right.  Right.
13    Q.  You observed that Ms. Church was nude from the
14  waist down, right?
15    A.  Right.
16    Q.  Did you observe that Ms. Church's blouse was
17  open?
18    A.  I do not remember.
19    Q.  Please turn your attention to Plaintiff's
20  Exhibit 1, Bates Page Graham 288, at 1535 hours.
21    MS. ARNETT: This right here.  You want to read
22  over that first?  288.
23    THE WITNESS: This one here?
24    MS. ARNETT: Yeah.  Just this one.  She said
25  1533 hours.

Page 16

1    THE WITNESS: Oh.
2    MS. ARNETT: So if you want to read that
3  paragraph because I think she's probably going to
4  ask you a question about it.
5    THE VIDEOGRAPHER: Would You mind angling your
6  mic more upwards?
7    MS. ARNETT: I think my fabric's not -- is that
8  okay?
9    THE VIDEOGRAPHER: Yeah, that's much better.
10  Thank you.
11    MS. ARNETT: Okay.  Okay.  Sorry about that.
12    THE VIDEOGRAPHER: No, it's okay.
13    MS. ARNETT: My fabric's too flimsy to support
14  the microphone.
15    THE WITNESS: Okay.
16  BY THE REPORTER:
17    Q.  According to your report, Ms. Church's blouse
18  was open, right?
19    A.  Right.
20    Q.  You also observed that Ms. Church's bra had
21  been pulled up over her breast, correct?
22    A.  Yes.
23    Q.  You are familiar with an individual named
24  Roy Wayne Dean right?
25    A.  At that particular time, I don't think so.  I

Page 17

1  mean, prior to this.
2    Q.  At some point, Roy Wayne Dean became a suspect
3  in the Church murder, didn't he?
4    A.  Right.
5    Q.  How?
6    A.  He helped Brenda's husband cut tobacco on --
7  on the farm.
8    Q.  Please review the documents marked as
9  Plaintiff's Exhibit 2, Affidavit for Search Warrant,
10  Base -- Bates Stamped Graham 004322 through 26.
11    (EXHIBIT 2 MARKED FOR IDENTIFICAION)
12    MS. ARNETT: Is this yours?
13    THE REPORTER: Yes.
14    MS. ARNETT: Because I need to --
15    THE REPORTER: You can put it --
16    MS. ARNETT: Okay.  Just make sure we don't
17  walk away with it.  Yeah.
18    THE REPORTER: Got you.
19  BY THE REPORTER:
20    Q.  Have you ever seen this document?
21    A.  Have I ever seen this one?  No.
22    Q.  Do you agree it's an affidavit for a search
23  warrant of Roy Wayne Dean's residence?
24    A.  I do.
25    Q.  According to this affidavit, you learned that



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  a car seen close to the Church resident on the morning
2  of her murder was registered to Roy Wayne's wife Tina,
3  right?
4      A.  Right.
5      Q.  And Roy Dean matched the description of the
6  individual seen driving that car that morning, correct?
7      A.  Correct.
8      Q.  You also learned that Roy Wayne Dean had
9  worked as a farm laborer for Ms. Church's husband,
10  didn't you?
11     A.  Yes.
12     Q.  You interrogated Roy Wayne Dean in regard to
13  Ms. Church's murder, correct?
14     A.  Yes.
15     Q.  What did you learn from Roy Wayne Dean in the
16  interrogation?
17     MS. ARNETT:  Do you have any memory of
18     interrogating --
19     THE WITNESS:  Not at that time, I don't.
20     MS. ARNETT:  -- Mr. Dean?  All right.
21  BY THE REPORTER:
22     Q.  What did you learn from Roy Wayne Dean in that
23  interrogation?
24     MS. ARNETT:  I don't think it's in the
25     affidavit.

Page 19

1      THE WITNESS:  I don't -- I have no clue.  I
2      don't remember.
3  BY THE REPORTER:
4      Q.  He stated Jimmy Haley killed Ms. Church,
5  correct?
6      A.  I don't remember.
7      Q.  Please turn your attention to Plaintiff's
8  Exhibit 1 at Bates Page Graham 291 through 292, 0630
9  hours.  Let me know once you've reviewed those pages.
10     MS. ARNETT:  630, is that what the --
11     THE REPORTER:  Correct.
12     MS. ARNETT:  -- entry -- so that one, and then
13     it goes on to the next page.  So just -- stop --
14     at that paragraph.
15     THE WITNESS:  Okay.
16  BY THE REPORTER:
17     Q.  According to your report, Roy Wayne Dean
18  stated Jimmy Haley killed Ms. Church, correct?
19     A.  Yes.
20     Q.  Were you present when a search warrant was
21  executed on Roy Wayne Dean's residence?
22     MS. ARNETT:  So let's put that paper down and
23     then we're going back to the search warrant.  Do you
24     have any memory of being present for the search?
25     THE WITNESS:  No.

Page 20

1      MS. ARNETT:  Okay.
2  BY THE REPORTER:
3      Q.  Was that a no?
4      MS. ARNETT:  You said no, correct?
5      THE WITNESS:  Uh-huh.
6      MS. ARNETT:  You have no -- and then, when you
7      look at this page, do you recognize that
8      handwriting?  Is that your handwriting?
9      THE WITNESS:  It looks like it.
10     MS. ARNETT:  Okay.  It -- that's not your
11     signature in the right-hand corner?
12     THE WITNESS:  No, no, no.  Mike -- that's a
13     detective -- Mike Wynn, executed the search warrant.
14  BY THE REPORTER:
15     Q.  Please review Plaintiff's Exhibit 2 at Bates
16  Page Graham 4324.
17     MS. ARNETT:  Yeah.  So we're on this page
18     and --
19     THE REPORTER:  This --
20     MS. ARNETT:  -- what's the question about?
21  BY THE REPORTER:
22     Q.  The search warrant affidavit notes you were
23  present, correct?
24     MS. ARNETT:  I think it's just this part.  The
25     handwritten part.

Page 21

1      THE WITNESS:  Oh, okay.
2      MS. ARNETT:  Down there it says, "This warrant
3      executed by searching the within-stated property."
4      THE WITNESS:  Yes.  I was party to this, I was.
5  BY THE REPORTER:
6      Q.  Multiple rounds of ammunition were seized at
7  the residence, weren't they?
8      A.  I don't remember.
9      Q.  Please review Plaintiff's Exhibit 2 at Bates
10  Page Graham 4324.  The list of items seized notes that
11  multiple rounds of ammunition were seized.
12     MS. ARNETT:  So it's 4325.  Is that your
13     handwriting?
14     THE WITNESS:  Uh-huh.
15     MS. ARNETT:  Do you have memory of writing that
16     down?
17     THE WITNESS:  I don't have memory of it, but it
18     appears to be my handwriting.
19     MS. ARNETT:  Okay.  And the question is --
20  BY THE REPORTER:
21     Q.  The list of items seized notes that multiple
22  rounds of ammunition were seized, correct?
23     A.  Right.  Correct.
24     Q.  Bullets and shell casings were found, correct?
25     A.  Pardon?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 7 of 31 PageID #:3662
The Deposition of ROBERT MILLER, VOL. I, taken on January 30, 2024
22..25

Page 22

1    Q.   Bullets and shell casings were found, correct?
2    MS. ARNETT:  This says -- number one says, "The
3    box containing. " And then number nine.  What does
4    that mean?
5    THE WITNESS:  The bullet casings.  Yes.
6    MS. ARNETT:  Okay.  And then --
7    THE REPORTER:  The --
8    MS. ARNETT:  -- number ten.  I'm sorry.
9    BY THE REPORTER:
10   Q.   The search warrant list of items seized notes
11   that bullets and shell casings were recovered, correct?
12   A.   Right.
13   Q.   You made requests for testing by the KSP Lab
14   on multiple pieces of evidence from the Church
15   investigation, didn't you?
16   A.   Yes.
17   MS. ARNETT:  Do you remember that?
18   THE WITNESS:  Yes.
19   MS. ARNETT:  Okay.
20   BY THE REPORTER:
21   Q.   Testing revealed Ms. Church had been raped,
22   correct?
23   A.   Yes.
24   Q.   During your investigation into the Church
25   murder, did you review Roy Wayne's wife, Tina?

Page 23

1    MS. ARNETT:  Review?
2    BY THE REPORTER:
3    Q.   Or did you interview?
4    MS. ARNETT:  Okay.
5    THE WITNESS:  I don't remember that.
6    BY THE REPORTER:
7    Q.   Please review Plaintiff's Exhibit 1 at Bates
8    Page Graham 294 at 1830 hours.
9    MS. ARNETT:  1830.
10   THE WITNESS:  Okay.
11   MS. ARNETT:  Okay.  Right there.
12   THE WITNESS:  Just -- according to this, I did.
13   BY THE REPORTER:
14   Q.   According to your report, you interviewed Tina
15   Rigsby Dean, Roy Wayne's wife, correct?
16   A.   Right.
17   Q.   What do you recall about that interview with
18   Roy Wayne's wife?
19   MS. ARNETT:  Do you recall anything about it?
20   THE WITNESS:  I don't recall anything.
21   BY THE REPORTER:
22   Q.   During that interview, Tina reported that Roy
23   Wayne had taken a gun to his parents' house on the day
24   of Ms. Church's murder, didn't she?
25   A.   I don't remember that either.

Page 24

1    Q.   Isn't it true that you presented the case
2    against Mr. Dean for Brenda Church's murder to the grand
3    jury?
4    A.   Did I?  I don't know.  I -- I -- I don't
5    remember doing that, but --
6    Q.   Ultimately, you --
7    MS. ARNETT:  That's fine.  That's fine.  If you
8    don't remember, you need to say you don't remember.
9    But if you remember -- and -- you just have to
10   answer what you know right now, what you can
11   remember.
12   BY THE REPORTER:
13   Q.   Ultimately, you arrested Roy Wayne Dean for
14   the murder of Brenda Church, didn't you?
15   A.   Yes.
16   Q.   Please turn your attention to Plaintiff's
17   Exhibit 1, Bates Stamp Page Graham 304.
18   A.   Okay.
19   Q.   According to this arrest data sheet, you
20   arrested Roy Wayne Dean for murder, right?
21   A.   Yes.
22   Q.   You arrested him on September 29th, 1984 for
23   that murder charge, correct?
24   A.   Yes.
25   Q.   Okay.  Please review the document marked as

Page 25

1    Plaintiff's Exhibit 3, Arrest Warrant, Bates Stamped
2    Graham 4342.  And let me know once you've finished.
3    (EXHIBIT 3 MARKED FOR IDENTIFICAION)
4    A.   Now repeat the question.
5    BY THE REPORTER:
6    Q.   Do you recognize this document?
7    A.   I do.
8    Q.   Do you agree this is a warrant of arrest of
9    Roy Wayne Dean?
10   A.   I do.
11   Q.   Do you agree your signature is at the bottom
12   of this document?
13   A.   It is.
14   Q.   According to this warrant, you also arrested
15   Dean for Rape First Degree, correct?
16   A.   Correct.
17   Q.   According to this warrant, you also arrested
18   Dean for Burglary First Degree, right?
19   A.   Right.  Yes, ma'am.
20   Q.   You arrested Dean on those charges on October
21   17th, 1984, correct?
22   MS. ARNETT:  So she's asking charges and the
23   date.  So answer two separate questions.
24   THE WITNESS:  Okay.  Yes.  I arrested him on
25   10-17 of '84.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

```
 1   BY THE REPORTER:
 2        Q.   You also arrested Jimmy Haley for Ms. Church's
 3   murder, didn't you?
 4        A.   Yes.
 5        MS. ARNETT:  Do you remember?
 6        THE WITNESS:  No, I do not.  No, I do not
 7   remember that.
 8        MS. ARNETT:  Okay.  We're done with that.
 9        THE WITNESS:  Okay.
10   BY THE REPORTER:
11        Q.   Isn't it true that your investigation revealed
12   that Mr. Haley and Mr. Dean were friends?
13        A.   They were, yes.
14        MS. ARNETT:  Okay.  Do you want to -- before
15   you ask another question, do you want to take a
16   break?
17        THE WITNESS:  Oh, I'm fine.
18        MS. ARNETT:  Okay.  I just -- we've been going
19   what about 45 minutes?  So --
20        THE REPORTER:  35.
21        MS. ARNETT:  Okay.  Okay.
22   BY THE REPORTER:
23        Q.   Please review the document marked as
24   Plaintiff's Exhibit 4, Haley Search Warrant, Bates Stamp
25   Graham 334 through 339.
```

Page 27

```
 1             (EXHIBIT 4 MARKED FOR IDENTIFICAION)
 2        A.   Okay.
 3        MS. ARNETT:  Wait, there's one more page.
 4        THE WITNESS:  Oh, there's another page?
 5        MS. ARNETT:  There's a couple more pages.
 6        THE WITNESS:  Oh, okay.
 7        MS. ARNETT:  Just two more.
 8        THE WITNESS:  Now repeat the question.
 9   BY THE REPORTER:
10        Q.   Do you recognize this document?
11        A.   Yes.
12        Q.   Do you agree it's an affidavit for a search
13   warrant for the residence of Jimmy Haley?
14        MS. ARNETT:  And she said, recognize.  Have you
15   seen it before, or do you just recognize that as an
16   affidavit, or you have seen it --
17        THE WITNESS:  I just recognize this from my
18   affidavit.  I don't remember seeing this before.
19        MS. ARNETT:  Is that your handwriting?
20        THE WITNESS:  No.
21        MS. ARNETT:  Okay.
22   BY THE REPORTER:
23        Q.   Okay.  Do you agree it's an affidavit for
24   search warrant for the residence of Jimmy Haley?
25        A.   It is.
```

Page 28

```
 1        MS. ARNETT:  Okay.
 2   BY THE REPORTER:
 3        Q.   A search was conducted of Mr. Haley's
 4   residence, wasn't it?
 5        A.   It -- if I don't have a copy of it, I don't --
 6        MS. ARNETT:  I guess, do you remember?  If --
 7        THE WITNESS:  Do I remember?  No, I do not.
 8   BY THE REPORTER:
 9        Q.   During the search of Haley's residence, a pair
10   of black military boots was found, right?
11        A.   According to this.
12        Q.   Please review Plaintiff's Exhibit 4, Bates
13   Page Graham 338, and let me know when you've done so.
14        MS. ARNETT:  And let you know what?
15        THE REPORTER:  Just once he reviewed it.
16        MS. ARNETT:  Okay.
17   BY THE REPORTER:
18        Q.   The list of items seized notes that one pair
19   of black -- of boot, black military-type was seized,
20   correct?
21        A.   Uh-huh.
22        Q.   Is that a yes?
23        MS. ARNETT:  You have to say yes or no.
24        THE WITNESS:  Yes.  I'm sorry.
25        MS. ARNETT:  She can't record it.  Okay.  That's
```

Page 29

```
 1   okay.
 2   BY THE REPORTER:
 3        Q.   An army green style coat was also found at
 4   Haley's residence, wasn't it?
 5        MS. ARNETT:  It might be --
 6        THE WITNESS:  I don't see it on this page, do
 7   you?  And repeat the question, please.
 8   BY THE REPORTER:
 9        Q.   An army style green coat was also found in
10   Haley's residence, wasn't it?
11        MS. ARNETT:  Just -- I guess, first of all, you
12   understand the question, was that coat found at the
13   residence?  And the second thing you need to think
14   about, do you have knowledge of that or are you just
15   reading what's on this?
16        THE WITNESS:  I'm just reading this.  I -- I
17   don't remember that.
18   BY THE REPORTER:
19        Q.   Please turn your attention to Plaintiff's
20   Exhibit 4, Bates Page Graham 338.  The list of items
21   seized notes that one army coat named Haley on it, green
22   military style, was seized, wasn't it?
23        A.   It's on the list.
24        MS. ARNETT:  Okay.
25   BY THE REPORTER:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of ROBERT MILLER, VOL. I, taken on January 30, 2024

30..33

```
                                                  Page 30
1        Q.   And another green military style jacket was
2   also seized, correct?
3        A.   It's on the last one.
4        MS. ARNETT:  Huh?
5        THE WITNESS:  Wasn't that on the last -- I
6   don't see another military green.
7   BY THE REPORTER:
8        Q.   Please turn your attention to Plaintiff's
9   Exhibit 4, Bates Page Graham 338.  The list of items
10  seized notes that one green military jacket was seized,
11  correct?
12       A.   Yes.  This one right here.
13       MS. ARNETT:  And there's -- is that a
14  separate --
15       THE WITNESS:  Okay.  Yes.  Okay.
16  BY THE REPORTER:
17       Q.   You learned about Roy Wayne Dean's criminal
18  history during the Church murder investigation, correct?
19       A.   I don't remember.
20       Q.   You learned during the investigation that
21  Roy Wayne Dean had a prior burglary conviction from
22  December of 1980, didn't you?
23       A.   That I do not remember either.
24       Q.   You learned during your investigation that
25  Roy Wayne Dean had lived in the Tiny Town Trailer Park
```

```
                                                  Page 31
1   in Guthrie, Kentucky, correct?
2        A.   I don't remember.
3        Q.   You also learned that he lived in a small home
4   right outside the trailer park in Guthrie, didn't you?
5        A.   That I do not remember either.
6        Q.   You testified at Roy Wayne Dean's trial for
7   Brenda Church's murder, didn't you?
8        A.   Yes.
9        Q.   What do you recall about your testimony?
10       A.   Pertaining to what?
11       Q.   You testified about your investigation, didn't
12  you?
13       A.   I did.  Yes.
14       Q.   You testified about the evidence against
15  Mr. Dean, correct?
16       A.   Correct.
17       Q.   That trial was in September of 1986, wasn't
18  it?
19       A.   I do not remember the date.
20       Q.   Mr. Dean was found guilty of the murder of
21  Ms. Church, right?
22       A.   Yes.
23       Q.   After the case was overturned on appeal,
24  Roy Wayne Dean ultimately pleaded guilty to Ms. Church's
25  murder, correct?
```

```
                                                  Page 32
1        A.   I do not know.
2        Q.   Would you agree that Mr. Dean's conviction was
3   a significant conviction in your career?
4        A.   It -- it was part of the job.
5        Q.   Isn't it true that you spent hundreds of hours
6   investigating the case?
7        A.   I did.
8        Q.   Isn't it true that you spent hundreds of hours
9   investigating Roy Wayne Dean?
10       A.   I don't know if I spent that many hours or
11  not.
12       Q.   Isn't it true that you came to believe that
13  Mr. Dean was a cold-blooded murderer?
14       A.   That wasn't my job.
15       Q.   You felt as though you'd been successful in
16  getting a violent man off the streets, right?
17       A.   I did not think that.
18       Q.   Were you proud of your work in that case?
19       A.   It came to a conclusion -- good conclusion,
20  from my understanding.
21       Q.   You're familiar with former Elkton Police
22  Chief Mike Moore, correct?
23       A.   Yes.
24       Q.   How?
25       A.   He was a police chief of Elkton.  I do not
```

```
                                                  Page 33
1   know for how long or --
2        Q.   While investigating the Brenda Church murder,
3   you learned of another murder that occurred in August
4   1984 in Clarksville, Tennessee, didn't you?
5        A.   Yes.
6        Q.   You learned of that -- of that murder from
7   Chief Moore, right?
8        A.   I do not remember.
9        Q.   Please turn your attention to Plaintiff's
10  Exhibit 1, Bates Page Graham 294.
11       MS. ARNETT:  What's the question?
12  BY THE REPORTER:
13       Q.   According to your investigative report, on
14  09-28-84 Elkton Police Chief Mike Moore advised you of
15  the similarities between the Church case and one -- and
16  the one in Montgomery County, Tennessee -- was working,
17  which occurred on August 9th, 1984, correct?
18       A.   Correct.
19       Q.   You learned that was the murder of Dee Ann
20  Rapp, didn't you?
21       A.   I do not remember the name.
22       Q.   Is it accurate that Elkton, Kentucky and
23  Clarksville, Tennessee are close in proximity to each
24  other?
25       A.   I don't know how far it is, but I -- I would
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 10 of 31
The Deposition of ROBERT PARRISH, v3665, taken on January 30, 2024
34..37

Page 34

1  say they were pretty close.
2      Q.  They're approximately 30 miles from each
3  other, aren't they?
4      A.  I would say about that.
5      Q.  What do you independently remember about the
6  Rapp murder investigation?
7      A.  The one in Tennessee?
8      Q.  The Rapp investigation.
9      MS. ARNETT:  I'm assuming that they're saying
10  that this Montgomery County, Tennessee murder is the
11  Rapp murder.  Do you remember anything about it?
12      THE WITNESS:  I was contacted by the
13  Clarksville Police Department for them to see if
14  there was any comparisons between that one and this
15  one.
16  BY THE REPORTER:
17      Q.  You learned during the investigation that
18  Ms. Rapp's body was discovered near a dumpster on
19  Tiny Town Road in Clarksville, correct?
20      A.  Yes.
21      Q.  Chief Moore advised you of the similarities
22  between Ms. Rapp's August 1984 murder and Ms. Church's
23  September 1, 1980 -- or September 1984 murder, correct?
24      A.  Correct.
25      Q.  Those similarities included that Ms. Rapp was

Page 35

1  found partially clothed like Ms. Church, right?
2      A.  I do not know.
3      Q.  The similarities included the fact that both
4  women had been shot, correct?
5      A.  They had, yes.
6      Q.  Did you investigate whether the Church and
7  Rapp murders were connected?
8      A.  I did not.
9      Q.  You spoke with law enforcement officers in
10  Clarksville who were investigating the Rapp murder,
11  correct?
12      A.  Correct.
13      Q.  Specifically, you spoke with Detective Frank
14  Wall from the Montgomery County Sheriff's Office about
15  the Rapp murder, right?
16      A.  I don't know who it was, but I was contacted
17  by the Sheriff's Office.
18      Q.  You and Detective Wall spoke about the
19  similarities between the two murders, didn't you?
20      A.  I do not remember.
21      Q.  Detective Wall advised you that a comparison
22  of Dean at the time of his arrest was very similar to an
23  eyewitness composite of a man that was seen at the
24  dumpster, correct?
25      A.  I do not remember that.

Page 36

1      Q.  You and Detective Wall conducted a joint
2  investigation into the Church and Rapp murders, didn't
3  you?
4      A.  I do not remember that.
5      Q.  Please review what has been marked as
6  Plaintiff's Exhibit 5, Bates Page Graham 714, and let me
7  know when you've done so.
8      (EXHIBIT 5 MARKED FOR IDENTIFICAION)
9      MS. ARNETT:  And anytime you need to take a
10  break, we can take a break, okay?
11      THE WITNESS:  Okay.
12      MS. ARNETT:  This is Exhibit 4.
13      THE WITNESS:  I can't read this.
14      UNIDENTIFIED SPEAKER:  Five.
15      MS. ARNETT:  Oh, that's very tiny.
16      THE WITNESS:  Yeah.  I don't -- I don't -- I
17  can't read that.  I don't know.
18  BY THE REPORTER:
19      Q.  The question is: According to this article
20  dated October 2, 1984, Lieutenant Tom Kujawa confirmed
21  that Frank Wall and other County investigators are
22  working with Kentucky State Police Detective Bob Miller
23  to determine if there is a connection between the
24  shooting deaths of Brenda Church, 42, Todd County and
25  Dee Ann Rapp, 36, Clarksville, correct?

Page 37

1      A.  I realize that they were in -- comparing them.
2      MS. ARNETT:  You can't read that because the
3  print's too small.
4      THE WITNESS:  No, I can't read that.
5  BY THE REPORTER:
6      Q.  Ultimately, didn't you determine the same
7  individual was responsible for both murders?
8      A.  I did not confirm it.
9      Q.  You knew that a serial killer was murdering
10  women in the Todd County area, right?
11      A.  That was hinted to -- toward.  I do not know
12  that.
13      Q.  Was investigating a serial killer a big deal
14  in your career?
15      A.  No different than any other case I worked.
16      Q.  How many other serial killer investigations
17  did you handle in your law enforcement career?
18      A.  I did not handle any serial killer, that I
19  know of.
20      Q.  How many other serial killers are you aware of
21  in the Todd County area?
22      A.  None.
23      Q.  Laboratory testing was conducted on the
24  physical evidence in the Church investigation, wasn't
25  it?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB   Document 130-13   Filed 10/27/25   Page 11 of 31
PageID #:3666
The Deposition of ROBERT RAPP, JR., taken on January 30, 2024

38..41

Page 38

1    A.   Yes.
2    Q.   Laboratory testing revealed the bullets and
3  shell casings found at the Church murder matched those
4  found at the Rapp murder, correct?
5    A.   I do not know that.
6    Q.   Please turn your attention to Plaintiff's
7  Exhibit 1, Bates Page Graham 294.
8        MS. ARNETT:  Any particular section or --
9        THE REPORTER:  Just 294.
10       MS. ARNETT:  Okay.
11       THE WITNESS:  Ma'am, repeat the question,
12  please.
13  BY THE REPORTER:
14   Q.   According to your investigative report on
15  10-01-84, Glen Baxter matched the bullets and shell
16  casings from the Tennessee case to those found at Dean's
17  residence, and those found at the Church residence,
18  correct?
19   A.   Right.
20   Q.   Sorry, what was that?
21   A.   Correct.
22   Q.   Those bullets and shell casings also match
23  those found at the Dean's -- at the Dean residence,
24  right?
25   A.   That's what it says.

Page 39

1    Q.   In regard to your investigation into Roy Wayne
2  Dean, isn't it true that you traveled to the Robertson
3  County Tennessee Sheriff's Office on multiple occasions?
4    A.   I do not recall that.
5    Q.   Specifically, you traveled to the Robertson
6  County, Tennessee Sheriff's Office on September 29,
7  1984, in regard to Roy Wayne Dean, didn't you?
8    A.   If it's in the report, but I -- I do not
9  remember it.
10   Q.   Please turn your attention to Plaintiff's
11  Exhibit 1, Bates Page Graham 294.
12       MS. ARNETT:  And on September 29th.  Is that
13  what --
14       THE WITNESS:  Yeah.
15       MS. ARNETT:  Okay.
16  BY THE REPORTER:
17   Q.   According to your investigative report on
18  09-29-84, you went to the Robertson County Sheriff's
19  Office.
20   A.   Now, where did you see that?
21       MS. ARNETT:  Oh, it's --
22       THE WITNESS:  Could you repeat the question,
23  please?
24  BY THE REPORTER:
25   Q.   According to your investigative report on

Page 40

1  09-29-84, you went to the Robertson County Sheriff's
2  Office.
3    A.   I do not see that.  Yeah.  Okay.  Ken
4  Dillingham and I went.  Let me turn the page.
5        THE WITNESS:  I don't see where it was --
6        MS. ARNETT:  Here, you want me to take it
7    apart, make it easier for you?
8        THE WITNESS:  Just leave --
9        MS. ARNETT:  The one here on the bottom.  So
10   the question is?
11  BY THE REPORTER:
12   Q.   According to your investigative report on
13  09-29-84, you went to the Robertson County Sheriff's
14  Office?
15   A.   According -- yes.
16   Q.   On that date, you met with multiple members of
17  the Robertson County Sheriff's Office about Mr. Dean,
18  correct?
19   A.   I don't see that either.  Do you?
20       MS. ARNETT:  So the two parts -- so met with
21   multiple what --
22  BY THE REPORTER:
23   Q.   On that date, you met with multiple members of
24  the Robertson County Sheriff's Office about Mr. Dean,
25  correct?

Page 41

1        MS. ARNETT:  The Sheriff's Office, and then
2    this says --
3        THE WITNESS:  Yes.  I'm sorry.
4  BY THE REPORTER:
5    Q.   Was Detective Wall of the Montgomery County
6  Sheriff's Office also present during that meeting?
7    A.   This shows Frank Wall was.
8    Q.   As a result of that September 29th meeting,
9  didn't the Robertson County Sheriff's Department execute
10 a search warrant on Roy Wayne's parents' home?
11   A.   According -- yes.  Search warrant.
12       MS. ARNETT:  Do you know that that's the parent
13   or --
14       THE WITNESS:  I don't.  I don't remember.
15       MS. ARNETT:  Because it says Roy E. Dean.  Do
16   you know who that is?
17       THE WITNESS:  No.  Roy E. -- Roy Wayne Dean.
18   It says Roy Edward Dean's residence.
19       MS. ARNETT:  Do you remember who that is?
20       THE WITNESS:  No, I do not remember a Roy
21   Edward Deans.
22  BY THE REPORTER:
23   Q.   What was discussed during that meeting in
24  regard to the need for a search warrant?
25   A.   I do not remember.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 12 of 31
The Deposition of ROBERT ROGERS, #3607, taken on January 30, 2024
PageID #: 3667
42..45

Page 42

1    Q.   You spoke with Larry Green from the Robertson
2    County Sheriff's Office about Roy Wayne Dean, didn't
3    you?
4         MS. ARNETT:  Here's the -- I think she's going
5    back to the --
6         THE WITNESS:  Going back to here.  Yeah.  Yeah,
7    I did.  I do not remember the discussion.
8    BY THE REPORTER:
9    Q.   Didn't Larry Green advise you in October of
10   1984 that the rifle believed to have been used in the
11   Church and Rapp murders had been stolen from Roy Dean's
12   cousin's home?
13        A.   I do not remember that.
14   Q.   Mr. Green also advised you that the rifle was
15   believed to have been thrown in Springfield Lake,
16   correct?
17        A.   I do not remember.
18   Q.   You met with Mr. Green and Detective Wall
19   again at the Robertson County Sheriff's Office
20   thereafter to discuss searching the lake, right?
21        MS. ARNETT:  Does she refer to any pages in
22   here?
23        THE WITNESS:  I don't see that, do you?  Would
24   you repeat the question, please?
25   BY THE REPORTER:

Page 43

1    Q.   You met with Mr. Green and Detective Wall
2    again at the Robertson County Sheriff's Office
3    thereafter to discuss searching the lake, right?
4         MS. ARNETT:  There's the page that's covered,
5    Bates Stamp 297 -- Graham 297.  There's the --
6         THE WITNESS:  Okay.
7         MS. ARNETT:  -- post-it note covers something,
8    but there's the word lake on there.  So -- see that
9    says --
10        THE WITNESS:  Yeah.
11        MS. ARNETT:  I don't know what all the rest of
12   that says.
13   BY THE REPORTER:
14   Q.   Would you agree that you ultimately determined
15   that Roy Wayne Dean was responsible for Ms. Rapp's
16   murder?
17        A.   That wasn't for me to decide.  That was for
18   the evidence to show.
19        MS. ARNETT:  And they said Rapp, right, not
20   Church?
21   BY THE REPORTER:
22   Q.   Correct.  Would you agree that ultimate --
23   that you ultimately determined that Roy Wayne Dean was
24   responsible for Ms. Rapp's murder?
25        A.   That -- yes.  I'm sorry.

Page 44

1    Q.   Did you participate in an interrogation of
2    Dean regarding Ms. Rapp's murder?
3         MS. ARNETT:  And Rapp's the one in Tennessee --
4         THE WITNESS:  Tennessee?  No --
5         MS. ARNETT:  Not the one in -- Church is the
6    one you worked on.
7         THE WITNESS:  Right.
8         MS. ARNETT:  Right.
9    BY THE REPORTER:
10   Q.   You learned during your investigation of Dean
11   that he had self-reported hearing voices, correct?
12        A.   That he heard voices?
13   Q.   You learned during your investigation of Dean,
14   that he had self-reported hearing voices, correct?
15        A.   I do -- do not remember that.
16   Q.   You knew that Dean reported taking
17   anti-psychotic medications, right?
18        A.   No.
19   Q.   You knew that Mr. Dean reported that the
20   anti-psychotic medications made him "violent and edgy,"
21   correct?
22        A.   No.
23   Q.   You learned that Roy Wayne Dean was indicted
24   in December 1984 for Ms. Rapp's murder, right?
25        A.   I don't remember when she -- when he was

Page 45

1    indicted.
2    Q.   You were aware that Dean ultimately pleaded
3    guilty to Ms. Rapp's murder, weren't you?
4         A.   No.
5    Q.   Is it accurate to state that you believed then
6    that Roy Wayne Dean was a serial killer?
7         A.   That wasn't my decision to make.
8    Q.   Do you still believe that today?
9         A.   I do -- I don't know how to answer that
10   question.
11        MS. ARNETT:  Did you ever believe that he was a
12   serial killer --
13        THE WITNESS:  Serial killer.
14        MS. ARNETT:  -- and do you think that today?
15        THE WITNESS:  I do.  I think he was.
16   BY THE REPORTER:
17   Q.   Is it accurate to state that you believed in
18   1984 that Dean was responsible for the murder of
19   multiple women in the area?
20        A.   Do I believe that he was responsible?
21   Q.   Is it accurate to state that you believed in
22   1984 that Dean was responsible for the murder of
23   multiple women in the area?
24        A.   I do not know.  I don't have an opinion on it.
25   Q.   Do you still believe that today?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 13 of 31
The Deposition of ROBERT PHELPS, v. RILEY, taken on January 30, 2024
PageID #:3668
46..49

Page 46

```
 1    A.  Yes.
 2         MS. ARNETT:  Are you okay?  You need to take a
 3    break or drink any water?  You want to stand up?
 4         THE WITNESS:  It's whatever you -- what do you
 5    want to do?
 6         MS. ARNETT:  How long have we been going?
 7         THE REPORTER:  One hour, two minutes.
 8         MS. ARNETT:  Okay.  Let's take a five-minute
 9    break.  Is that okay with you?
10         THE WITNESS:  Okay.
11         THE VIDEOGRAPHER:  All right.  The time is
12    1:56 p.m. Central.  We are going off record.
13         (OFF THE RECORD)
14         THE VIDEOGRAPHER:  The time is 2:07 p.m.
15    Central.  We are back on record.
16    BY THE REPORTER:
17    Q.  You were a detective with the Kentucky State
18    Police in June of 1980 when Janice Kay Williams was
19    murdered, correct?
20    A.  When who?
21    Q.  Janet --
22    A.  Repeat that.
23    Q.  You were a detective with the Kentucky State
24    Police in June of 1980 when Janice Kay Williams was
25    murdered, correct?
```

Page 47

```
 1    A.  I was -- no.  In '80?
 2    Q.  1980.
 3    A.  I was a road trooper.
 4    Q.  Who was your direct supervisor in June of 1980
 5    through February of 1982?
 6    A.  Now, you've asked me a question I do not know.
 7    Q.  What was your practice in the early 1980s
 8    regarding your communication with your supervisor about
 9    the homicide cases you were investigating?
10    A.  Well, back up one.  My supervisor in 1980, I
11    think, was Lieutenant Ed Dougherty (phonetic).  He is
12    deceased.  He was the head of the detective division.
13    Q.  What was your practice in the early 1980s
14    regarding your communication with your supervisor about
15    the homicide cases you were investigating?
16    A.  They were kept up to date by reports.  Made
17    reports on it daily.
18    Q.  Did you have scheduled meetings in the early
19    1980s with your supervisor to discuss cases?
20    A.  I'm sure we did it.
21    Q.  What's your independent recollection of the
22    circumstances surrounding Ms. Williams' murder?
23    A.  I don't have any recollection.  I was not the
24    -- the investigator on that case.
25    Q.  What's your independent recollection of the
```

Page 48

```
 1    investigation?
 2    A.  I have none.
 3    Q.  Isn't it true that you were very heavily
 4    involved in the investigation?
 5    A.  I would say I was involved like everyone else.
 6    I was not heavily involved in it.
 7    Q.  Were you the lead investigator?
 8    A.  In the Janice Kay Williams?
 9         MS. ARNETT:  And I think that's Exhibit 1.  Oh,
10    no, that's Brenda Church.  I'm sorry.  So Janice --
11    do you remember Janice Kay Williams?
12         THE WITNESS:  I remember the name, but I do not
13    remember the murder.
14    BY THE REPORTER:
15    Q.  Who was the lead investigator?
16    A.  Ma'am?
17    Q.  Who was the lead investigator?
18    A.  I have -- I don't know.  I honestly don't.
19         MS. ARNETT:  On -- that's the Janice Kay
20    Williams murder investigation is the one where
21    Norman Graham was convicted eventually.
22         THE WITNESS:  I don't have any recollection of
23    that one.
24    BY THE REPORTER:
25    Q.  Who were your supervisors on the case?
```

Page 49

```
 1    A.  I do not know.
 2    Q.  What investigative actions do you
 3    independently recall personally taking in the Williams
 4    murder investigation?
 5    A.  None that I recall.
 6    Q.  You interviewed multiple witnesses, right?
 7    A.  I do not know.
 8    Q.  You interviewed potential suspects, correct?
 9    A.  I do not have a case to refer back to so I
10    could -- do not -- no.
11    Q.  You interviewed some of Ms. Williams' family
12    members, didn't you?
13    A.  I do not remember.
14    Q.  You interviewed some of Ms. Williams'
15    neighbors, right?
16    A.  I do not remember.
17    Q.  You collected evidence from witnesses,
18    correct?
19    A.  I do not remember.
20    Q.  You met with Commonwealth Attorney --
21    Commonwealth's Attorney, Jesse Riley, about the
22    investigation, didn't you?
23    A.  I do not remember that.
24    Q.  You took a statement from Norman Graham's
25    ex-wife Sandra, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 14 of 31
The Deposition of ROBERT MITCHELL, v. 3669 taken on January 30, 2024
PageID #:3669
50..53

Page 50

1    A.   I do not remember that.
2    Q.   You obtained a copy of Norman Graham's
3  military record, didn't you?
4    A.   I do not remember doing that.
5    Q.   Isn't it true that you spoke with Norman
6  Graham's employer?
7    A.   I do not remember that.
8    Q.   You interrogated Norman Graham, correct?
9    A.   Not to my knowledge.
10   Q.   Would you agree that you collected two knives
11 from Norman Graham?
12   A.   I do not remember.
13   Q.   Didn't you turn those two knives over to the
14 crime lab for testing?
15   A.   I do not know.
16   Q.   You investigated how quickly a radiator would
17 cool down on a 1975 Oldsmobile, didn't you?
18   A.   I do not remember doing that.
19   Q.   You spoke with individuals at the crime lab
20 about the physical evidence in the case, correct?
21   A.   I do not remember that.
22   Q.   You spoke with the medical examiner who
23 conducted the autopsy of Ms. Williams, correct?
24   A.   I do not remember that.
25   Q.   Isn't it true that you investigated potential

Page 51

1  alternate suspects?
2    A.   I do not -- I don't know anything about what
3  you're asking me questions on.
4    Q.   Isn't it true that you investigated other
5  murders that you thought may have been committed by the
6  same perpetrator?
7    MS. ARNETT:  Do they get to questions where
8    she's referring to Exhibit 6?
9    THE REPORTER:  That's the next exhibit, yes.
10   MS. ARNETT:  Okay.  How many more questions?
11   THE REPORTER:  Three.
12   MS. ARNETT:  Okay.
13   THE WITNESS:  That case, I do not --
14   MS. ARNETT:  Well, just -- she's asking first
15   what you remember.  And then she'll --
16   THE WITNESS:  I don't remember any of it.
17   MS. ARNETT:  Okay.  Let her ask you three --
18   THE WITNESS:  Okay.
19   MS. ARNETT:  -- more questions and then
20   we'll --
21 BY THE REPORTER:
22   Q.   You became very familiar with the physical
23 evidence in the case, right?
24   A.   I do not remember.
25   Q.   You transported physical evidence to the KSP

Page 52

1  Crime Lab for testing, correct?
2    A.   Not that I remember.
3    Q.   You took photos of Mr. Graham's trailer,
4  didn't you?
5    A.   Not -- no, not that I remember.
6    Q.   Please take a quick look at what we've marked
7  as Plaintiff's Exhibit 6, part of the Williams
8  investigative file, Bates Stamped KSP 55 through 160.
9  I'm going to be asking several questions about your
10 specific participation in the investigation as
11 documented in this file but will direct you to specific
12 pages of the exhibit if needed.
13        (EXHIBIT 6 MARKED FOR IDENTIFICAION)
14   MS. ARNETT:  Can I have a copy of it too?
15   Okay.  You look through it.  I'll look through mine.
16   Thank you.
17   THE WITNESS:  Is this one mine?
18   MS. ARNETT:  That's your copy.
19   THE WITNESS:  Okay.
20   MS. ARNETT:  Let me fix that.
21 BY THE REPORTER:
22   Q.   Do you recognize this exhibit?
23   A.   No.
24   Q.   You have no reason to refute that this is part
25 of the investigative file regarding the murder of Janice

Page 53

1  Kay Williams, do you?
2    A.   According to this, I do not.
3    Q.   The Williams murder occurred in Tiny Town
4  Trailer Park in Guthrie, Kentucky, correct?
5    A.   I do not remember.
6    Q.   Please turn your attention to Plaintiff's
7  Exhibit 6, Bates Page KSP 55.
8    MS. ARNETT:  Okay.  It's this page.
9    THE WITNESS:  This page?
10   MS. ARNETT:  Yeah.
11   THE WITNESS:  Okay.
12 BY THE REPORTER:
13   Q.   You agree that this report notes under victim
14 data, that the victim is Janice Kay Williams, right?
15   A.   Yes.
16   Q.   And the address of the crime is Lot 52 Tiny
17 Town Trailer Court, Guthrie, Kentucky, isn't it?
18   A.   Lot 52 Tiny Town.
19   Q.   How far would you estimate that Guthrie and
20 Elkton are in relation to each other?
21   A.   Mileage wise?
22   Q.   Is it fair to say they're approximately
23 15 miles from each other?
24   A.   Approximately.
25   Q.   And Guthrie, Kentucky and Clarksville,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 15 of 31
The Deposition of ROBERT PRESTON, Page ID, #v3670I, taken on January 30, 2024
54..57

Page 54

1  Tennessee are approximately 20 miles from each other,
2  aren't they?
3      A.  I do not know that.
4      Q.  Ms. Williams' murder was another murder, in
5  addition to the Rapp and Church murders, of females in
6  the Todd County area in the early 1980s, right?
7      A.  This one wasn't my case.  I do not know if
8  they were.  I'd say the date on this one, I don't even
9  see it.  What is the date of that murder?
10         MS. ARNETT:  She's just going to read the
11     questions.  So --
12         THE WITNESS:  Ms. --
13         MS. ARNETT:  -- you don't --
14         THE REPORTER:  Yeah, I'll repeat the question.
15  BY THE REPORTER:
16     Q.  Ms. Williams' murder was another murder in
17  addition to the Rapp and Church murders of females in
18  the Todd County area in the early 1980s, right?
19     A.  I don't know what the two dates on the other
20  one was -- were.
21     Q.  Would you agree that Ms. Williams' murder was
22  a joint investigation by the Kentucky State Police and
23  the Todd County Sheriff's Office?
24     A.  It -- according to the report, it was.
25     Q.  Isn't it true that Todd County Sheriff, Laurin

Page 55

1  Morris was actively involved in the investigation?
2      A.  That I do not know.
3      Q.  You met with Sheriff Morris multiple times
4  about the investigation, didn't you?
5      A.  I don't remember doing that.
6      Q.  You worked closely with Detective Albro on the
7  investigation as well, correct?
8      A.  Albro, according to this, was the lead
9  detective.  And if he needed help, we helped, you know,
10  go interview or whatever needed to be done.
11     Q.  Did you go to the crime scene?
12     A.  I do not remember.
13     Q.  You canvased the trailer park to interview
14  neighbors, didn't you?
15     A.  I did.
16     Q.  And you learned during that canvas that Roy
17  Wayne Dean lived in the area, didn't you?
18     A.  I do not remember.
19     Q.  You participated in an interview of Michele
20  Arms with Detective Vernon Albro, correct?
21     A.  I do not remember doing that.
22     Q.  Please turn your attention to Plaintiff's
23  Exhibit 6, Bates Page KSP 73.  According to this Uniform
24  Offense report on 11-26-80 at 1545 hours, you were
25  present for an interview with Ms. Arms, correct?

Page 56

1          MS. ARNETT:  So 11-26-80 at 1545 hours.
2          THE WITNESS:  Michele Arms?
3  BY THE REPORTER:
4      Q.  You were present for an interview with
5  Ms. Arms, correct?
6      A.  Yes.
7      Q.  You wanted to obtain a statement from Michele
8  about whatever knowledge she had regarding
9  Ms. Williams' death, correct?
10     A.  Correct.
11     Q.  During that interview, Michelle reported that
12  she had been with Ms. Williams the day before her death,
13  correct?
14     A.  Now that I do not know.  It should be in here.
15  I don't see a date in here.  Ma'am, I don't see any date
16  on it, on the 1545 hours on 11-26 of '80.
17     Q.  She reported that on the day before
18  Ms. Williams' death, she, Denise Lee Gushea and
19  Ms. Williams had a conversation with three soldiers,
20  didn't she?
21     A.  I do not see that.
22     Q.  Please turn your attention to Plaintiff's
23  Exhibit 6, Bates Page KSP 73.
24         MS. ARNETT:  It doesn't have a date.  It just
25  says Sunday.  So there's a -- the question has

Page 57

1  another fact in it that's not -- right there is the
2  problem. Do you want to just read what it says.
3          THE WITNESS:  Which one?
4          MS. ARNETT:  Right there about Michele.
5          THE WITNESS:  Oh, okay.  1545 hours on 11-26 of
6  '80, interviewed with Michele Arms.  Present was
7  Trooper Miller, Unit 669, and Detective Bollinger,
8  Unit 604.  Michele was picked up at her home by the
9  victim around 1700 hours, which is 5:00 on Sunday.
10  They went to the victim's mother's house where she
11  would -- took a bath.  They then went to Lee
12  Gushea's trailer.  The rest of Michele's statement
13  is the same as Lee's except Michele thought the
14  first name of the GI was Rick.  And I do not
15  remember anything about that.
16  BY THE REPORTER:
17     Q.  According to this Uniform Offense report on
18  11-26-80 at 1520 hours, Denise reported that while in
19  her and Michele's presence, Ms. Williams engaged in a
20  conversation with three GIs, correct?
21     A.  I don't see that.
22         MS. ARNETT:  It's this paragraph right here.
23         THE WITNESS:  Oh, okay.  Just a second.  I
24  don't see where -- I don't see that in here, do you?
25         MS. ARNETT:  What was the question again?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 16 of 31
The Deposition of ROBERT REED, PageID #:3671, taken on January 30, 2024
58..61

Page 58

1    BY THE REPORTER:
2        Q.   According to this Uniform Offense Report on
3    11-26-80 at 1520 hours, Denise reported that while in
4    her and Michele's presence, Ms. Williams engaged in a
5    conversation with three GIs, correct?
6        A.   I don't see that in here, do you?
7        MS. ARNETT:  If you just want to read that.
8        THE WITNESS:  The victim engaged in
9    conversation.  Yeah, here, okay.  Three GIs.  Yes,
10   according to this.
11   BY THE REPORTER:
12       Q.   And according to Denise, Ms. Williams gave one
13   of the soldiers her address and phone number, correct?
14       A.   According to this, but this is not my report.
15       Q.   Michele informed you that she thought one of
16   the GIs was named Rick, didn't she?
17       A.   This report was Albro, Vernon Albro.
18       Q.   Please turn your attention to Plaintiff's
19   Exhibit 6, Bates Page KSP 73.  According to this Uniform
20   Offense Report, Michele thought the first name of the GI
21   was Rick?
22       A.   Ma'am, I have no idea.
23       MS. ARNETT:  It's okay.  You answered it.  It's
24   okay.
25   BY THE REPORTER:

Page 59

1        Q.   Michele also confirmed Denise's account that
2    Ms. Williams wrote the name and address of one of the
3    GIs on a brown paper envelope, which she placed in her
4    purse, right?
5        A.   I do not know that.
6        Q.   Please turn your attention to Plaintiff's
7    Exhibit 6, Bates Page KSP 73.  According to this Uniform
8    Offense Report, Denise said that one of the GIs wrote
9    his name and address down on a brown envelope, right?
10       A.   I do not see that.  I do not see that.
11       MS. ARNETT:  Do you know if you were in that?
12   You didn't write this is what you testified earlier,
13   right?
14       THE WITNESS:  Right.
15       MS. ARNETT:  And then who wrote this?
16       THE WITNESS:  Albro was the one that did this.
17       MS. ARNETT:  Okay.
18       THE WITNESS:  If my -- if I had interviewed
19   him, then I'd be in -- one in there with my name on
20   it.
21       MS. ARNETT:  Okay.  So you're reading
22   Albro's --
23       THE WITNESS:  Right.  I'm reading it, which I
24   have no idea what I'm talking about.  I'm just
25   reading what he --

Page 60

1        MS. ARNETT:  So what did he write here?
2        THE WITNESS:  She gave -- here, she gave her
3    address and phone number to one of them and wrote
4    his name and address on a brown envelope, which she
5    placed in her purse.
6    BY THE REPORTER:
7        Q.   And according to this statement, Ms. Williams
8    placed that envelope in her purse, correct?
9        A.   According to this statement that Vernon
10   Albro --
11       Q.   Did you believe that to be important
12   information in the investigation?
13       A.   I -- I don't know.
14       Q.   In fact, do you believe that GI to be a person
15   of interest in Ms. Williams' death, didn't you?
16       A.   I do not know.  This was not my case.  I --
17   this was not my interview.
18       Q.   You wanted to speak with that soldier,
19   correct?
20       A.   I do not know.
21       Q.   You never did actually speak with that
22   soldier, correct?
23       A.   To my knowledge, I did not.  If it is, I --
24   no, I didn't.
25       Q.   Why not?

Page 61

1        A.   It wasn't my case.
2        Q.   You did review the brown envelope that Michele
3    and Denise spoke of, didn't you?
4        A.   I don't see where I did.  If it's in here, I
5    -- let me -- let me -- I don't see that in here.  I have
6    no knowledge of that.
7        Q.   What steps, if any, did you take to
8    investigate the identity of these soldiers?
9        A.   None that I'm -- had I interviewed one of
10   them, I would have a report in there with my name on it.
11   That's what I did.  And it -- I don't see one in there.
12       Q.   What steps, if any, did you take to determine
13   whether any of those soldiers may have been involved in
14   Ms. Williams' murder?
15       A.   I don't think I did any because it was not my
16   case.
17       Q.   You didn't document any effort at trying to
18   locate those soldiers, did you?
19       A.   I did not personally, no, according to this.
20       Q.   You didn't document anything you learned about
21   those soldiers, did you?
22       A.   No.
23       Q.   Michele Arms didn't implicate Norman Graham in
24   Janice Kay Williams' murder during this interview,
25   right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 17 of 31
PageID #:3672
The Deposition of ROBERT THURMAN, taken on January 30, 2024
62..65

Page 62

1    A.  I do not know.
2    Q.  In fact, she never implicated Mr. Graham in
3  Ms. Williams' murder, did she?
4    A.  I do not know.
5    Q.  You also participated in an interview of
6  Lynn Bostic, correct?
7    A.  Just a second.  Is this it?  Yeah.
8    MS. ARNETT:  Did what with the interview?
9    THE WITNESS:  I did.  I was present when the
10  interview was taken.
11    MS. ARNETT:  And what was the question?  Did
12  he --
13  BY THE REPORTER:
14    Q.  You also participated in an interview of
15  Lynn Bostic, correct?
16    A.  I do not know whether I was involved in it,
17  but I was present when it was taken.
18    Q.  What's your independent recollection of the
19  interview with Ms. Bostic?
20    A.  I do not have an independent recollection
21  after 40 years.
22    Q.  Lynn Bostic stated she was Ms. Williams' best
23  friend, didn't she?
24    A.  Yes.  In the -- in this statement, she did.
25    Q.  Lynn Bostic never implicated Norman Graham in

Page 63

1  Ms. Williams' murder, correct?
2    A.  Not in this statement.
3    Q.  And had she, you personally would've been sure
4  to document that in a written report, correct?
5    A.  Ma'am.
6    Q.  And had she, you personally would've been sure
7  to document that in a written report, correct?
8    A.  If -- if that was it, it should have been in
9  the report.  But it -- it was not in the report, not
10  this one.
11    Q.  And if she had implicated Mr. Graham to
12  Detective Albro, you would've expected Detective Albro
13  to note that in his report as well, correct?
14    A.  He was the lead detective.
15    Q.  You also participated in an interview with
16  Detective Albro of Ms. Williams' mother, Virginia
17  Merriweather, on September 26, 1980, right?
18    A.  November 20 -- yes.
19    Q.  Detective Bollinger was also present for that
20  interview, wasn't he?
21    A.  Right.  Right.
22    Q.  Trooper Bell was also present for that
23  interview, wasn't he?
24    A.  Yes.
25    Q.  During that interview, didn't you learn that

Page 64

1  before her daughter's death, Ms. Merriweather had
2  received a threatening letter that was addressed to
3  Ms. Williams?
4    A.  According to this.
5    Q.  Isn't it true that the letter directed several
6  obscene threats toward Ms. Williams?
7    A.  According to this, it did.
8    Q.  What do you recall about this letter?
9    A.  I don't recall anything about it because I --
10  I might have been there, but I do not remember this.
11    Q.  What were the threats?
12    A.  I do not know.
13    Q.  You personally took possession of that letter,
14  didn't you?
15    A.  No.  I had no reason to take possession of it.
16    Q.  If Trooper Bell noted in a report that you had
17  recovered the letter, do you have any reason to repute
18  that?
19    A.  I do not see it's in here.  If I had, it
20  would've been in this report.
21    Q.  Did you recover any other letter during the
22  investigation of Ms. Williams' murder?
23    A.  Not to my knowledge.
24    Q.  What did you do with the letter you recovered
25  from Ms. Merriweather that contained the threats to

Page 65

1  Ms. Williams?
2    A.  I don't think I had those either if they're
3  here.
4    Q.  You never personally gave that letter to the
5  prosecutor in the Williams' case, did you?
6    A.  Not to my knowledge.
7    MS. ARNETT:  Can we take a break?  My hearing
8  aid battery's going on me.  I'm sorry.
9    THE VIDEOGRAPHER:  All right.  The time is
10  2:42 p.m. Central.  We are going off record.
11    (OFF THE RECORD)
12    THE VIDEOGRAPHER:  The time is 2:43 p.m.
13  Central.  We are back on record.
14  BY THE REPORTER:
15    Q.  You never personally gave that letter to
16  Norman Graham's defense attorney prior to --
17    A.  To my knowledge, I never had that letter, if
18  the letter existed.
19    Q.  What, if anything, did you do to investigate
20  the letter?
21    A.  This was not my case.
22    Q.  Was it important for you to determine who
23  wrote the letter, correct?
24    A.  To me -- it would've been important to them,
25  not to me, because I didn't have any knowledge of any of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB   Document 130-13   Filed 10/27/25   Page 18 of 31
The Deposition of ROBERT MCDANIEL, VOLUME I, taken on January 30, 2024   PageID #3673
66..69

Page 66

1  this.
2      Q.   The author of that letter may have a motive
3  for murdering Ms. Williams, correct?
4      A.   I don't know nothing.  I don't know.
5      Q.   Certainly, you wanted to identify anyone who
6  may have made threats to Ms. Williams prior to her
7  murder, wouldn't you?
8      A.   That would be normal procedure.
9      Q.   You developed leads into the source of this
10 letter, right?
11     A.   I did not.
12     Q.   Who did you determine authored the letter?
13     A.   I do not know.
14     Q.   You never documented the source of that letter
15 in a report, correct?
16     A.   I don't -- no, I didn't because I didn't have
17 the letter.  I don't know anything about the letter.
18     Q.   There was no evidence that Norman Graham wrote
19 this threatening letter, correct?
20     A.   I don't know.
21     Q.   In fact, there was no evidence that Norman
22 Graham had written any threatening letters to anyone
23 involved in this case, correct?
24     A.   Ma'am, I do not know.
25     Q.   You determined that Mr. Graham wasn't the

Page 67

1  author of the letter, didn't you?
2      A.   I do not know.
3      Q.   But you didn't document that in any
4  investigative report, did you?
5      A.   I did not.
6      Q.   Why not?
7      MS. ARNETT:  It's okay.  Take a deep breath.
8      THE WITNESS:  I had no knowledge of the letter
9  if there was a letter.
10 BY THE REPORTER:
11     Q.   Didn't you also participate in an interview of
12 Rita Gail Kelly?
13     A.   I did.
14     Q.   Ms. Kelly was a neighbor of Norman Graham and
15 Janice Kay Williams in the trailer park, correct?
16     A.   Correct.  Well, wait just a minute.  I do not
17 know.
18     Q.   What do you recall about the interview of
19 Ms. Kelly?
20     A.   I don't recall.  I don't recall anything about
21 that -- that.
22     Q.   Isn't it true that Ms. Kelly informed you and
23 the other officers that she'd been receiving threatening
24 phone calls?
25     A.   Not to my knowledge.  She didn't to me.

Page 68

1      Q.   Please review Plaintiff's Exhibit 6, Bates
2  Page KSP73 at 1720 hours on 11-26-80.
3      MS. ARNETT:  So this is --
4  BY THE REPORTER:
5      Q.   According to this report, Ms. Kelly informed
6  you on 11-26-80 that she'd been receiving threatening
7  phone calls, right?
8      MS. ARNETT:  So number 1, is this according to
9  you?
10     THE WITNESS:  No.  According to me, it might
11 have been the other unit.
12     MS. ARNETT:  Who's this according to, number 1?
13 Who's this according to?
14     THE WITNESS:  No.
15     MS. ARNETT:  No.  Who is this according to?
16     THE WITNESS:  Oh, I'm sorry.
17     MS. ARNETT:  Who wrote this?  Do you know who
18 wrote this?
19     THE WITNESS:  No, I do not.  Rita.  Now, who
20 Rita is, I don't know.
21     MS. ARNETT:  Do you know who wrote this page?
22     THE WITNESS:  No, I do not.
23     MS. ARNETT:  Is there anything on this page
24 that would tell you who wrote it?
25     THE WITNESS:  I don't -- to my knowledge, it's

Page 69

1  not.
2      MS. ARNETT:  Do you know who typed this up?
3      THE WITNESS:  No, I do not.  Oh, this?
4      MS. ARNETT:  Yeah.
5      THE WITNESS:  It's part of the case report.
6      MS. ARNETT:  Do you know who typed this up?  Who
7  said write this on there?
8      THE WITNESS:  I don't have a clue.
9      MS. ARNETT:  So who -- did you type this up?
10 Did you write this?
11     THE WITNESS:  No.  This is part of -- of the
12 case report.  It was turned in by the -- by Vernon
13 -- Vernon Albro.
14     MS. ARNETT:  So according to what's typed here.
15 And what was the question about what she said --
16 BY THE REPORTER:
17     Q.   According to this report, Ms. Kelly informed
18 you on 11-26-80 that she'd been receiving threatening
19 phone calls, right?
20     A.   I do not remember her -- yeah.  This --
21     MS. ARNETT:  This one.
22     THE WITNESS:  Yeah.  Okay.  There was Detective
23 Bollinger, Trooper Miller, and Trooper Bell.  I
24 would say the -- the Detective Bollinger.
25     MS. ARNETT:  And did this person, who was being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 19 of 31
The Deposition of ROBERT PIERCE, #3674, taken on January 30, 2024

70..73

Page 70

1    interviewed, report that she was receiving
2    threatening phone calls?
3            THE WITNESS:  To my knowledge, no.  I don't --
4    I don't know.
5            MS. ARNETT:  And what does it say right there?
6            THE WITNESS:  Yeah.  It says Rita had been
7    receiving threatening phone call.  The caller had
8    referred to case --
9            MS. ARNETT:  Okay.  We don't need to --
10           THE WITNESS:  Okay.
11           MS. ARNETT:  -- read the rest of that.
12           THE WITNESS:  Okay.
13   BY THE REPORTER:
14       Q.   So according to this report, Ms. Kelly
15   informed you on 11-26-80, that she'd been receiving
16   threatening phone calls, right?
17       A.   As well as these other detectives.
18       Q.   Miss --
19           MS. ARNETT:  Do you remember that?  Are you
20   testifying --
21           THE WITNESS:  No, I don't --
22           MS. ARNETT:  -- from memory, or are you
23   testifying from this?
24           THE WITNESS:  I -- I'm -- I'm testifying from
25   my memory.  I don't even remember -- remember being

Page 71

1    there.
2            MS. ARNETT:  Okay.
3            THE WITNESS:  But they were all -- three of us
4    were there according to this.
5            MS. ARNETT:  Okay.
6    BY THE REPORTER:
7        Q.   Ms. Kelly reported that the caller had
8    referred to Ms. Williams' body and said that what had
9    happened to Ms. Williams was nothing compared to what
10   he'd do to Ms. Kelly, correct?
11       A.   I do not know.
12       Q.   Please review Plaintiff's Exhibit 6, Bates
13   Page -- Bates Page KSP74.
14       A.   This page?
15           MS. ARNETT:  Yeah.
16   BY THE REPORTER:
17       Q.   According to this report, Ms. Kelly informed
18   you that the caller had referred to Ms. Williams' body
19   and said that -- and said that was nothing compared to
20   what he'd do to Ms. Kelly, correct?
21       A.   According to the supplement by Detective
22   Bollinger, that's what it says.
23       Q.   Ms. Kelly also stated that the caller had
24   admitted to killing Ms. Williams, correct?
25       A.   I do not see that.  I do not see that here.

Page 72

1        Q.   Please review Plaintiff's Exhibit 6, Bates
2    Page KSP74.
3            MS. ARNETT:  74?
4            THE REPORTER:  Yes.
5            MS. ARNETT:  That's what he --
6            THE WITNESS:  Is this it?
7            MS. ARNETT:  Yeah.
8            THE WITNESS:  Okay.  I see it now.  Yeah.
9    BY THE REPORTER:
10       Q.   According to this report, Ms. Kelly informed
11   you that the caller admitted to killing Kay, correct?
12       A.   I don't remember -- yeah.  I don't remember
13   who informed me.
14       Q.   And the caller told Ms. Kelly that Ms. Kelly
15   knew him, correct?
16       A.   Repeat that.
17       Q.   And the caller told Ms. Kelly that Ms. Kelly
18   knew him, correct?
19       A.   I do not see that in here.  I don't see that
20   in here.
21       Q.   Please review Plaintiff's Exhibit 6, Bates
22   Page KSP74.  According to this report, Ms. Kelly
23   informed you that the caller told Ms. Kelly she knew who
24   he was, correct?
25       A.   I do not see that.  I may be looking at the

Page 73

1    wrong thing, but I do not see it.
2            MS. ARNETT:  You're looking at the right thing.
3            THE WITNESS:  Huh?
4            MS. ARNETT:  You're looking at the right thing.
5    If you don't see it, you don't see it, so...
6            THE WITNESS:  The only thing I do, he says, "A
7    caller had referred to Kay's body and said that
8    nothing compared to what he would do to her."
9    BY THE REPORTER:
10       Q.   You would agree that Ms. Williams was never --
11   and was -- you would agree that Ms. Williams never
12   indicated the caller was Norman Graham, wouldn't you?
13       A.   I don't have a -- I don't know.
14           MS. ARNETT:  You said Williams, but this is
15   Rita Gail Kelly's interview and Ms. Williams was the
16   victim.
17           THE WITNESS:  Oh.
18           MS. ARNETT:  So what's the question?  It
19   says --
20   BY THE REPORTER:
21       Q.   You would agree that Ms. Williams never
22   indicated the caller was Norman Graham, wouldn't you?
23           MS. ARNETT:  So that's -- yeah, wrong.
24           THE WITNESS:  I don't --
25           MS. ARNETT:  I don't know if she met --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 20 of 31
The Deposition of ROBERT ALBRO, v. 3675, taken on January 30, 2024

74..77

Page 74

1    THE WITNESS: I don't see it in here.
2    MS. ARNETT: -- Kelly. Yeah. Well, she's
3    asking about the victim and it's not an interview --
4    the victim's dead, so...
5    BY THE REPORTER:
6    Q.   In fact, Ms. Kelly informed you that she knew
7    the caller was not Norman Graham, correct?
8    A.   Where are you seeing it?  I do not see that.
9    Q.   I'm not sure if it's referring --
10    MS. ARNETT: It's not in there.
11    THE REPORTER: -- to that or not.
12    BY THE REPORTER:
13    Q.   You didn't document that in a report, did you?
14    A.   Ma'am?
15    Q.   In fact, Ms. Kelly informed you that she knew
16    the caller was not Norman Graham, correct?
17    A.   I do not know.
18    Q.   You didn't document that in a report, did you?
19    A.   I did not -- no, I did not document it in --
20    one of the other officers may have, but I did not.
21    Q.   What did you personally do to investigate
22    these threatening phone calls?
23    A.   That was left up to the lead investigator.
24    Q.   You placed a phone interceptor on Ms. Kelly's
25    phone, correct?

Page 75

1    A.   No.
2    Q.   It was important for you to determine who was
3    making those threatening phone calls --
4    A.   Well, sure it was important.
5    Q.   -- to Ms. Kelly, correct?
6    A.   It was important to determine the source of
7    the calls because that individual may have been the
8    individual who killed Ms. Williams, correct?
9    A.   I have no knowledge of that, but it --
10    Q.   And you wanted to keep Ms. Kelly safe, didn't
11    you?
12    A.   I don't know what you're talking about, the
13    phone calls.  But I assume that if you came out and said
14    my job was to keep someone safe, I'd say yes, but I did
15    not do that.  Another -- if that was done, another unit
16    did.
17    Q.   Ultimately, you determined that threatening
18    phone calls to Ms. Kelly were not made by Norman Graham,
19    correct?
20    A.   I do not know.
21    Q.   But you didn't document that in a report, did
22    you?
23    A.   I didn't make the report.
24    Q.   You determined the calls were made by Roy
25    Wayne Dean, correct?

Page 76

1    A.   No.
2    Q.   You didn't document that in a report, did you?
3    A.   No.
4    Q.   Isn't it true that -- isn't it true that
5    during that interview, Ms. Kelly informed you that days
6    before Ms. Williams' death, Ms. Kelly discovered an
7    uninvited male in her home in the middle of the night?
8    A.   I do not know that.
9    Q.   She told you that male was not Norman Graham,
10    didn't she?
11    A.   I do not know.
12    Q.   She told you that individual was Roy Wayne
13    Dean, right?
14    A.   I do not know.
15    Q.   You didn't document that information in a
16    report, did you?
17    A.   I did not make a -- the report.
18    Q.   You assisted Detective Albro in interviewing
19    Barbara Riddle, right?
20    A.   I do not remember.
21    Q.   Please turn your attention to Plaintiff's
22    Exhibit 6, Bates Page KSP74.
23    A.   Yes, ma'am.
24    Q.   According to this report, you were present for
25    an interview of miss -- of Ms. Riddle at 2030 hours,

Page 77

1    correct?
2    A.   Now repeat the question?
3    Q.   According to this report, you were present for
4    an interview of Ms. Riddle at 2030 hours, correct?
5    A.   Yes.
6    Q.   What did Ms. Riddle inform you of during that
7    interview?
8    A.   We're talking about Tinker?  Is that the name
9    you have?
10    Q.   What did Ms. Riddle inform you of during that
11    interview?
12    A.   I don't see a Ms. Riddle, do you?
13    MS. ARNETT: This says, "Interview with Barbara
14    Riddle," and then it has Tinker in parentheses and
15    the rest of it talks about Tinker.  So we're going
16    to assume Barbara Riddle and Tinker are the same
17    person.  So she's asking what did Tinker say at her
18    interview?
19    BY THE REPORTER:
20    Q.   Inform you of during the interview.
21    A.   Tinker stated that she saw Kay leave the
22    trailer shortly after 2200 and return in about ten
23    minutes.  Tinker believes Kay may have gone to the
24    grocery store.  When Tinker left at 2345, Kay's car was
25    still parked in front of the -- Kay's trailer.  The rest

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 21 of 31
The Deposition of ROBERT ELLIOT MILLER, taken on January 30, 2024
PageID #3676
78..81

Page 78

1  of it talks about a Tom Robinson. Robinson had told
2  several employees that he wanted a date with Kay.
3  Robinson -- Robinson owned a trailer -- trailer which
4  was parked beside the truck stop.  On one occasion, he
5  called the truck stop and had Kay come to the trailer.
6  When she arrived, he was standing nude inside the
7  trailer.  Kay quit her job five months prior to her
8  death.  Robinson is being sought on a warrant of arson
9  from Clarksville, Tennessee.
10     **Q.   She informed you that Ms. Williams' prior**
11  **boss, Tom Robinson, had stated several times that he**
12  **wanted to date Ms. Williams, didn't she?**
13     A.   Wanted a date with Kay, yes.
14     **Q.   Barbara stated that Tom requested Ms. Williams**
15  **to come to his home.  And when Ms. Williams arrives, Tom**
16  **was nude, right?**
17     A.   According to this report, yes.
18     **Q.   What steps, if any, did you take to**
19  **investigate Tom Robinson in relation to Ms. Williams'**
20  **death?**
21     A.   I do not know.
22     **Q.   At no point during this interview did**
23  **Ms. Riddle implicate Norman Graham in Ms. Williams'**
24  **murder, correct?**
25     A.   I do not know.

Page 79

1     **Q.   You interviewed Ms. Williams' mother, Virginia**
2  **Merriweather, a second time on November 28, 1980,**
3  **correct?**
4     MS. ARNETT:  I guess, do you remember that?
5  She may --
6     THE WITNESS:  I do not remember.
7     MS. ARNETT:  -- be able to point you to a page.
8  BY THE REPORTER:
9     **Q.   Please turn your attention to Plaintiff's**
10  **Exhibit 6, Bates Page KSP79.**
11     A.   Okay.
12     **Q.   Do you recognize this report?**
13     A.   Yes.
14     MS. ARNETT:  Have we gone an hour since the
15  last time?
16     THE REPORTER:  56 minutes.
17     MS. ARNETT:  Okay.  Do you want to take a
18  break?  It's been about an hour since the last.
19     THE WITNESS:  I don't understand this.
20     MS. ARNETT:  It's okay.
21     THE WITNESS:  What are you --
22     MS. ARNETT:  Let's go off the record.  We'll
23  take a break.
24     THE VIDEOGRAPHER:  All right.  The time is
25  3:02 p.m. Central.  We are going off record.

Page 80

1     (OFF THE RECORD)
2     THE VIDEOGRAPHER:  Time is 3:09 p.m. Central.
3  We are back on record.
4     MS. ARNETT:  Do you want me to go ahead?  Okay.
5  Due to Mr. Miller's health concerns, he is 80 years
6  old, and this is not an easy process, we are going
7  to stop for the day and set a different -- another
8  date to continue the deposition.
9     THE REPORTER:  All right.  And before we go off
10  record, Amber, did you want to order a copy of the
11  transcript?
12     MS. ARNETT:  I don't know if Amy wanted us to
13  order it at the end.
14     THE REPORTER:  It's totally up to you.  We can
15  figure it out later.
16     MS. ARNETT:  I will want a copy, but I don't
17  think I'm -- I would want one in the interim.
18     THE REPORTER:  Okay.  Got you.  And did you
19  want a copy of the video?
20     MS. ARNETT:  Yes.
21     THE REPORTER:  Okay.
22     THE VIDEOGRAPHER:  All right.  The time is
23  3:10 p.m. Central.  We're going off record.
24     (DEPOSITION CONCLUDED AT 3:10 P.M. CT)
25

Page 81

1           CERTIFICATE OF REPORTER
2        COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page here of by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded digitally by me and then reduced to
10  typwritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability.  I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  SOPHIE JONES,
23  COURT REPORTER/NOTARY
24  COMMISSION EXPIRES:  09/30/2025
25  SUBMITTED ON:  02/02/2024

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

---

**Exhibits**

**Exhibit 1_
Miller** 10:4,7
15:20 19:8 23:7
24:17 33:10
38:7 39:11 48:9

**Exhibit 2_
Miller** 17:9,11
20:15 21:9

**Exhibit 3_
Miller** 25:1,3

**Exhibit 4_
Miller** 26:24
27:1 28:12
29:20 30:9
36:12

**Exhibit 5_
Miller** 36:6,8

**Exhibit 6_
Miller** 51:8
52:7,13 53:7
55:23 56:23
58:19 59:7 68:1
71:12 72:1,21
76:22 79:10

---

**0**

**004322** 17:10

**0630** 19:8

**09-28-84** 33:14

**09-29-84** 39:18
40:1,13

---

**1**

**1** 10:4,7 15:20
19:8 23:7 24:17
33:10 34:23
38:7 39:11 48:9
68:8,12

**10-01-84** 38:15

**10-17** 25:25

**11-26** 56:16
57:5

**11-26-80** 55:24
56:17 57:18 58:3
68:2,6 69:18
70:15

**12** 5:8

**12:53** 5:7

**14** 11:5

**15** 53:23

**1520** 57:18
58:3

**1533** 15:25

**1535** 15:20

**1545** 55:24
56:1,16 57:5

**160** 52:8

**1700** 57:9

**1720** 68:2

**17th** 25:21

**1830** 23:8,9

**1975** 50:17

**1980** 30:22
34:23 46:18,24
47:2,4,10 63:17
79:2

**1980s** 13:22,24
47:7,13,19
54:6,18

**1982** 47:5

**1984** 8:22
24:22 25:21
33:4,17 34:22,
23 36:20 39:7
42:10 44:24
45:18,22

**1986** 31:17

**1988** 6:13

**1:20-CV-210-
GNS** 5:14

**1:56** 46:12

---

**2**

**2** 17:9,11 20:15

**21:9** 36:20

**2-84-840** 12:23

**20** 54:1 63:18

**2024** 5:6

**2030** 76:25
77:4

**2200** 77:22

**2345** 77:24

**26** 17:10 63:17

**28** 79:2

**286** 10:6

**288** 15:20,22

**29** 39:6

**291** 19:8

**292** 19:8

**294** 23:8 33:10
38:7,9 39:11

**297** 43:5

**29th** 24:22
39:12 41:8

**2:07** 46:14

**2:42** 65:10

**2:43** 65:12

---

**3**

**3** 25:1,3

**30** 34:2

**304** 10:6 24:17

**30th** 5:6

**334** 26:25

**338** 28:13
29:20 30:9

**339** 26:25

**35** 26:20

**36** 36:25

**3:02** 79:25

**3:09** 80:2

**3:10** 80:23,24

---

**4**

**4** 26:24 27:1
28:12 29:20
30:9 36:12

**40** 62:21

**42** 36:24

**42220** 5:9

**4324** 20:16
21:10

**4325** 21:12

**4342** 25:2

**45** 26:19

---

**5**

**5** 36:6,8

**52** 53:16,18

**55** 52:8 53:7

**56** 79:16

**5:00** 57:9

---

**6**

**6** 51:8 52:7,13
53:7 55:23
56:23 58:19
59:7 68:1 71:12
72:1,21 76:22
79:10

**604** 57:8

**630** 19:10

**669** 6:25 57:7

---

**7**

**714** 36:6

**73** 55:23 56:23
58:19 59:7

**74** 72:3

---

**8**

**80** 6:24 47:1
56:16 57:6 80:5

**81** 6:24

**84** 25:25

---

**9**

**9th** 33:17

---

**A**

**account** 59:1

**accurate** 6:19
8:1 12:25 33:22
45:5,17,21

**achieved** 6:14

**actions** 13:1
49:2

**actively** 55:1

**added** 12:2

**addition** 54:5,
17

**address** 53:16
58:13 59:2,9
60:3,4

**addressed**
64:2

**Administrator**
5:11

**admitted** 71:24
72:11

**advise** 42:9

**advised** 33:14
34:21 35:21
42:14

**affidavit** 17:9,
22,25 18:25
20:22 27:12,16,
18,23

**affirm** 5:23

**agencies** 8:9,
13



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 23 of 31
The Deposition of ROBERT MILLER, taken on January 30, 2024
PageID #: 3678

83

**agree** 11:16,20
12:22 17:22
25:8,11 27:12,
23 32:2 43:14,
22 50:10 53:13
54:21 73:10,11,
21

**ahead** 80:4

**aid** 65:8

**Albro** 55:6,8,20
58:17 59:16
60:10 63:12,16
69:13 76:18

**Albro's** 59:22

**alternate** 51:1

**Amanda** 5:4

**Amber** 5:16
80:10

**ammunition**
21:6,11,22

**Amy** 80:12

**angling** 16:5

**Ann** 33:19
36:25

**anti-psychotic**
44:17,20

**anytime** 36:9

**appeal** 31:23

**appears** 21:18

**approximately**
34:2 53:22,24
54:1

**area** 7:4 37:10,
21 45:19,23
54:6,18 55:17

**Arms** 55:20,25
56:2,5 57:6
61:23

**army** 29:3,9,21

**Arnett** 5:16,21
9:13,16,19
10:8,11,15,17,
21,24 11:5,10
12:6,9,11 13:2,
4,8,13,15 14:1,

4 15:21,24
16:2,7,11,13
17:12,14,16
18:17,20,24
19:10,12,22
20:1,4,6,10,17,
20,24 21:2,12,
15,19 22:2,6,8,
17,19 23:1,4,9,
11,19 24:7
25:22 26:5,8,
14,18,21 27:3,
5,7,14,19,21
28:1,6,14,16,
23,25 29:5,11,
24 30:4,13
33:11 34:9
36:9,12,15 37:2
38:8,10 39:12,
15,21 40:6,9,20
41:1,12,15,19
42:4,21 43:4,7,
11,19 44:3,5,8
45:11,14 46:2,
6,8 48:9,19
51:7,10,12,14,
17,19 52:14,18,
20 53:8,10
54:10,13 56:1,
24 57:4,22,25
58:7,23 59:11,
15,17,21 60:1
62:8,11 65:7
67:7 68:3,8,12,
15,17,21,23
69:2,4,6,9,14,
21,25 70:5,9,
11,19,22 71:2,
5,15 72:3,5,7
73:2,4,14,18,
23,25 74:2,10
77:13 79:4,7,
14,17,20,22
80:4,12,16,20

**arrest** 24:19
25:1,8 35:22

**arrested**
24:13,20,22
25:14,17,20,24
26:2

**arrived** 78:6

**arrives** 78:15

**arson** 78:8

**article** 36:19

**assisted** 76:18

**assume** 75:13
77:16

**assuming** 34:9

**attention**
15:19 19:7
24:16 29:19
30:8 33:9 38:6
39:10 53:6
55:22 56:22
58:18 59:6
76:21 79:9

**attorney**
49:20,21 65:16

**attorneys** 7:22

**August** 33:3,
17 34:22

**author** 66:2
67:1

**authored**
66:12

**autopsy** 50:23

**aware** 37:20
45:2

---

**B**

**back** 10:19
11:2 12:3 15:2
19:23 42:5,6
46:15 47:10
49:9 65:13 80:3

**badge** 6:25

**Barbara** 76:19
77:13,16 78:14

**Base** 17:10

**Bates** 10:5
15:20 17:10
19:8 20:15 21:9
23:7 24:17 25:1
26:24 28:12
29:20 30:9
33:10 36:6 38:7
39:11 43:5 52:8
53:7 55:23
56:23 58:19

**article** 36:19

**bath** 57:11

**battery's** 65:8

**Baxter** 38:15

**believed**
42:10,15 45:5,
17,21

**believes** 77:23

**Bell** 63:22
64:16 69:23

**big** 11:6 37:13

**black** 28:10,19

**blank** 12:12

**blouse** 15:16
16:17

**Bob** 36:22

**body** 15:6,11
34:18 71:8,18
73:7

**Bollinger** 57:7
63:19 69:23,24
71:22

**boot** 28:19

**boots** 28:10

**boss** 78:11

**Bostic** 62:6,15,
19,22,25

**bottom** 11:2,24
12:16 25:11
40:9

**Bowling** 5:13

**box** 22:3

**bra** 16:20

**break** 26:16
36:10 46:3,9
65:7 79:18,23

**breast** 16:21

**breath** 67:7

**Brenda** 5:10
8:22 9:11,22
11:17,21 15:2

59:7 68:1
71:12,13 72:1,
21 76:22 79:10

24:2,14 31:7
33:2 36:24
48:10

**Brenda's** 17:6

**brown** 59:3,9
60:4 61:2

**bullet** 22:5

**bullets** 21:24
22:1,11 38:2,
15,22

**burglary** 25:18
30:21

---

**C**

**call** 70:7

**called** 78:5

**caller** 70:7
71:7,18,23
72:11,14,17,23
73:7,12,22
74:7,16

**calls** 67:24
68:7 69:19
70:2,16 74:22
75:3,7,13,18,24

**canvas** 55:16

**canvased**
55:13

**car** 18:1,6
77:24

**career** 9:3 32:3
37:14,17

**case** 5:14 8:24
9:3 12:23
13:10,11,18,19,
20 14:2 24:1
31:23 32:6,18
33:15 37:15
38:16 47:24
48:25 49:9
50:20 51:13,23
54:7 60:16
61:1,16 65:5,21
66:23 69:5,12
70:8

**cases** 47:9,15,
19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**casings** 21:24 22:1,5,11 38:3, 16,22

**Central** 5:7 46:12,15 65:10, 13 79:25 80:2, 23

**charge** 24:23

**charges** 25:20, 22

**chief** 8:16 32:22,25 33:7, 14 34:21

**Church** 8:22 9:2,5,11,22 10:5 11:17,21 12:23 13:1,10, 18 14:12,15,20 15:13 17:3 18:1 19:4,18 22:14, 21,24 24:14 30:18 31:21 33:2,15 35:1,6 36:2,24 37:24 38:3,17 42:11 43:20 44:5 48:10 54:5,17

**Church's** 14:23 15:6,10, 16 16:17,20 18:9,13 23:24 24:2 26:2 31:7, 24 34:22

**circumstances** 47:22

**city** 9:7

**clarify** 13:14

**Clarksville** 33:4,23 34:13, 19 35:10 36:25 53:25 78:9

**Clifton** 6:5

**close** 18:1 33:23 34:1

**closely** 55:6

**clothed** 35:1

**clue** 19:1 69:8

**coat** 29:3,9,12, 21

**cold-blooded** 32:13

**collected** 49:17 50:10

**committed** 51:5

**Commonwealth** 49:20

**Commonwealth's** 49:21

**communication** 47:8,14

**compared** 71:9,19 73:8

**comparing** 37:1

**comparison** 35:21

**comparisons** 34:14

**compile** 13:21, 24

**completed** 8:14

**composite** 35:23

**concerns** 80:5

**CONCLUDED** 80:24

**conclusion** 32:19

**conducted** 28:3 36:1 37:23 50:23

**confirm** 37:8

**confirmed** 36:20 59:1

**connected** 35:7

**connection** 36:23

**contacted** 34:12 35:16

**contained** 64:25

**continue** 80:8

**conversation** 56:19 57:20 58:5,9

**convicted** 48:21

**conviction** 30:21 32:2,3

**cool** 50:17

**copy** 10:8,9 28:5 50:2 52:14,18 80:10, 16,19

**corner** 20:11

**correct** 7:15, 19,20 8:1,2,22, 23 9:1,6,8 11:25 12:1,14, 19 14:24 16:21 18:6,7,13 19:5, 11,18 20:4,23 21:22,23,24 22:1,11,22 23:15 24:23 25:15,16,21 28:20 30:2,11, 18 31:1,15,16, 25 32:22 33:17, 18 34:19,23,24 35:4,11,12,24 36:25 38:4,18, 21 40:18,25 42:16 43:22 44:11,14,21 46:19,25 49:8, 18,25 50:8,20, 23 52:1 53:4 55:7,20,25 56:5,9,10,13 57:20 58:5,13 60:8,19,22 62:6,15 63:1,4, 7,13 65:23 66:3,15,19,23 67:15,16 71:10, 20,24 72:11,15, 18,24 74:7,16,

25 75:5,19,25 77:1,4 78:24 79:3

**couch** 15:2

**counsel** 5:15

**County** 5:12 7:3 8:17,19 9:8, 9 33:16 34:10 35:14 36:21,24 37:10,21 39:3, 6,18 40:1,13, 17,24 41:5,9 42:2,19 43:2 54:6,18,23,25

**couple** 27:5

**court** 5:5,13,20 53:17

**cousin's** 42:12

**covered** 43:4

**covers** 43:7

**crime** 14:23 15:1,6 50:14,19 52:1 53:16 55:11

**crimes** 7:15

**criminal** 7:19, 22,23 30:17

**CT** 80:24

**current** 6:6

**cut** 17:6

**D**

**daily** 47:17

**data** 24:19 53:14

**date** 9:23 25:23 31:19 40:16,23 47:16 54:8,9 56:15,24 78:2, 12,13 80:8

**dated** 36:20

**dates** 54:19

**daughter's** 64:1

**day** 5:6 23:23 56:12,17 80:7

**days** 76:5

**dead** 74:4

**deal** 37:13

**Dean** 16:24 17:2 18:5,8,12, 15,20,22 19:17 23:15 24:2,13, 20 25:9,15,18, 20 26:12 30:21, 25 31:15,20,24 32:9,13 35:22 38:23 39:2,7 40:17,24 41:15, 17 42:2 43:15, 23 44:2,10,13, 16,19,23 45:2, 6,18,22 55:17 75:25 76:13

**Dean's** 17:23 19:21 30:17 31:6 32:2 38:16,23 41:18 42:11

**Deans** 41:21

**death** 56:9,12, 18 60:15 64:1 76:6 78:8,20

**deaths** 36:24

**deceased** 47:12

**December** 30:22 44:24

**decide** 43:17

**decision** 45:7

**Dee** 33:19 36:25

**deep** 67:7

**defense** 7:22 65:16

**Degree** 25:15, 18

**Denise** 56:18 57:18 58:3,12 59:8 61:3



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Denise's 59:1

**Department** 34:13 41:9

**depiction** 12:25

**deposition** 5:9 80:8,24

**description** 18:5

**detective** 6:15, 20,23 7:2,6 8:24 14:1 20:13 35:13,18,21 36:1,22 41:5 42:18 43:1 46:17,23 47:12 55:6,9,20 57:7 63:12,14,16,19 69:22,24 71:21 76:18

**detectives** 70:17

**determine** 36:23 37:6 61:12 65:22 66:12 75:2,6

**determined** 43:14,23 66:25 75:17,24

**developed** 66:9

**Dillingham** 40:4

**direct** 6:2 47:4 52:11

**directed** 64:5

**discovered** 34:18 76:6

**discuss** 42:20 43:3 47:19

**discussed** 41:23

**discussion** 42:7

**District** 5:13

**division** 5:14

7:6 47:12

**document** 9:25 10:14 11:14 17:20 24:25 25:6,12 26:23 27:10 61:17,20 63:4,7 67:3 74:13,18, 19 75:21 76:2, 15

**documented** 52:11 66:14

**documents** 10:3 17:8

**doubts** 13:4

**Dougherty** 47:11

**draft** 7:8,11

**drafted** 11:17, 21

**drafting** 7:13, 17,21

**drink** 46:3

**driving** 18:6

**Due** 80:5

**dumpster** 34:18 35:24

———————

**E**

**earlier** 59:12

**early** 6:19 47:7, 13,18 54:6,18

**easier** 40:7

**easy** 80:6

**Ed** 47:11

**edgy** 44:20

**Edward** 41:18, 21

**effort** 61:17

**Elkton** 5:8 8:16 9:5 32:21,25 33:14,22 53:20

**ELPO** 5:8

**employed** 6:8 8:10

**employee** 7:7, 10

**employees** 78:2

**employer** 50:6

**employment** 6:16 8:14

**end** 6:17 80:13

**enforcement** 8:9,13 35:9 37:17

**engaged** 57:19 58:4,8

**enhancement** 12:4

**entire** 8:20

**entry** 19:12

**envelope** 59:3, 9 60:4,8 61:2

**Estate** 5:11

**estimate** 53:19

**et al** 5:12

**eventually** 48:21

**evidence** 22:14 31:14 37:24 43:18 49:17 50:20 51:23,25 66:18, 21

**ex-wife** 49:25

**EXAMINATIO N** 6:2

**examiner** 50:22

**excerpts** 10:4

**execute** 41:9

**executed** 19:21 20:13 21:3

**exhibit** 10:4,7 15:20 17:9,11 19:8 20:15 21:9 23:7 24:17 25:1,3 26:24 27:1 28:12 29:20 30:9 33:10 36:6,8,12 38:7 39:11 48:9 51:8,9 52:7,12, 13,22 53:7 55:23 56:23 58:19 59:7 68:1 71:12 72:1,21 76:22 79:10

**existed** 65:18

**expected** 63:12

**eye** 15:9

**eyewitness** 35:23

———————

**F**

**fabric's** 16:7, 13

**fact** 35:3 57:1 60:14 62:2 66:21 74:6,15

**fair** 53:22

**familiar** 16:23 32:21 51:22

**family** 49:11

**farm** 17:7 18:9

**February** 47:5

**felt** 32:15

**females** 54:5, 17

**figure** 11:1 80:15

**file** 10:5 13:11, 19,20 14:21 52:8,11,25

**files** 13:21,24 14:8

**fine** 24:7 26:17

**finished** 25:2

**five-minute** 46:8

**fix** 52:20

**flimsy** 16:13

**floor** 15:4

**foot** 15:3

**forgotten** 13:7

**found** 21:24 22:1 28:10 29:3,9,12 31:20 35:1 38:3,4,16, 17,23

**Frank** 35:13 36:21 41:7

**friend** 62:23

**friends** 26:12

**front** 10:19 11:1 77:25

**full** 6:4

———————

**G**

**Gail** 67:12 73:15

**gave** 58:12 60:2 65:4,15

**GI** 57:14 58:20 60:14

**GIS** 57:20 58:5, 9,16 59:3,8

**give** 5:24

**Glen** 38:15

**good** 32:19

**Graham** 5:10, 11 10:6 15:20 17:10 19:8 20:16 21:10 23:8 24:17 25:2 26:25 28:13 29:20 30:9 33:10 36:6 38:7 39:11 43:5 48:21 50:8,11 61:23 62:2,25



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 26 of 31
The Deposition of ROBERT MILLER, taken on January 30, 2024
Page ID #: 3681
86

63:11 66:18,22,
25 67:14 73:12,
22 74:7,16
75:18 76:9
78:23

**Graham's**
49:24 50:2,6
52:3 65:16

**grand** 24:2

**green** 5:14
29:3,9,21 30:1,
6,10 42:1,9,14,
18 43:1

**grocery** 77:24

**guess** 28:6
29:11 79:4

**guilty** 31:20,24
45:3

**gun** 23:23

**Gushea** 56:18

**Gushea's**
57:12

**Guthrie** 31:1,4
53:4,17,19,25

---

**H**

**Haley** 19:4,18
26:2,12,24
27:13,24 29:21

**Haley's** 28:3,9
29:4,10

**hand** 5:19,21

**handle** 37:17,
18

**hands** 15:10

**handwriting**
20:8 21:13,18
27:19

**handwritten**
14:11,14,17
20:25

**happened**
71:9

**harder** 10:25

**head** 47:12

**health** 80:5

**heard** 44:12

**hearing** 44:11,
14 65:7

**heavily** 48:3,6

**helped** 17:6
55:9

**highest** 6:14

**hinted** 37:11

**history** 30:18

**home** 31:3
41:10 42:12
57:8 76:7 78:15

**homicide** 47:9,
15

**homicides** 7:3

**honestly** 48:18

**hour** 46:7
79:14,18

**hours** 15:20,25
19:9 23:8 32:5,
8,10 55:24
56:1,16 57:5,9,
18 58:3 68:2
76:25 77:4

**house** 23:23
57:10

**hundreds**
32:5,8

**husband** 17:6
18:9

---

**I**

**idea** 58:22
59:24

**IDENTIFICAIO
N** 10:7 17:11
25:3 27:1 36:8
52:13

**identify** 5:15
66:5

**identity** 61:8

**implicate**
61:23 78:23

**implicated**
62:2,25 63:11

**importance**
7:25 8:3,6

**important**
60:11 65:22,24
75:2,4,6

**included** 34:25
35:3

**independent**
9:10,17,21
47:21,25 62:18,
20

**independently**
34:5 49:3

**indicted** 44:23
45:1

**individual**
16:23 18:6 37:7
75:7,8 76:12

**individuals**
50:19

**inform** 77:6,10,
20

**information**
60:12 76:15

**informed**
58:15 67:22
68:5 69:17
70:15 71:17
72:10,13,23
74:6,15 76:5
78:10

**inside** 78:6

**intentional**
11:8

**interceptor**
74:24

**interest** 60:15

**interim** 80:17

**interrogated**
18:12 50:8

**interrogating**
18:18

**interrogation**
18:16,23 44:1

**interview** 23:3,
17,22 55:10,13,
19,25 56:4,11
60:17 61:24
62:5,8,10,14,19
63:15,20,23,25
67:11,18 73:15
74:3 76:5,25
77:4,7,11,13,
18,20 78:22

**interviewed**
23:14 49:6,8,
11,14 57:6
59:18 61:9 70:1
79:1

**interviewing**
76:18

**investigate**
7:3 35:6 61:8
65:19 74:21
78:19

**investigated**
50:16,25 51:4

**investigating**
7:15 32:6,9
33:2 35:10
37:13 47:9,15

**investigation**
8:21 9:2 10:1
11:18,22 12:23
13:1 14:12,15
22:15,24 26:11
30:18,20,24
31:11 34:6,8,17
36:2 37:24 39:1
44:10,13 48:1,
4,20 49:4,22
52:10 54:22
55:1,4,7 60:12
64:22

**investigations**
7:8,11 37:16

**investigative**
10:5 13:21,24
14:8,21 33:13
38:14 39:17,25
40:12 49:2
52:8,25 67:4

**investigator**
13:10,18 47:24
48:7,15,17
74:23

**investigators**
36:21

**involved** 8:21
48:4,5,6 55:1
61:13 62:16
66:23

**items** 21:10,21
22:10 28:18
29:20 30:9

---

**J**

**jacket** 30:1,10

**Janet** 46:21

**Janice** 46:18,
24 48:8,10,11,
19 52:25 53:14
61:24 67:15

**January** 5:6

**Jesse** 49:21

**Jimmy** 19:4,18
26:2 27:13,24

**job** 32:4,14
75:14 78:7

**joint** 36:1 54:22

**Jones** 5:5

**June** 46:18,24
47:4

**jury** 24:3

---

**K**

**Kay** 46:18,24
48:8,11,19
53:1,14 61:24
67:15 72:11
77:21,23 78:2,
5,7,13

**Kay's** 73:7
77:24,25

**Kelly** 67:12,14,
19,22 68:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB     Document 130-13     Filed 10/27/25     Page 27 of 31
The Deposition of ROBERT MILLER, taken on January 30, 2024

Page ID #: 3682

87

69:17 70:14
71:7,10,17,20,
23 72:10,14,17,
22,23 74:2,6,15
75:5,10,18
76:5,6

**Kelly's** 73:15
74:24

**Ken** 40:3

**Kentucky** 5:9,
13 6:9,12,16,20
7:2,4,7,10 8:10,
15,17 9:6,8
31:1 33:22
36:22 46:17,23
53:4,17,25
54:22

**killed** 19:4,18
75:8

**killer** 37:9,13,
16,18 45:6,12,
13

**killers** 37:20

**killing** 71:24
72:11

**knew** 37:9
44:16,19 72:15,
18,23 74:6,15

**knives** 50:10,
13

**knowledge**
29:14 50:9 56:8
60:23 61:6
64:23 65:6,17,
25 67:8,25
68:25 70:3 75:9

**KSP** 22:13
51:25 52:8 53:7
55:23 56:23
58:19 59:7

**KSP73** 68:2

**KSP74** 71:13
72:2,22 76:22

**KSP79** 79:10

**Kujawa** 36:20

---

**— L —**

**lab** 22:13
50:14,19 52:1

**Laboratory**
37:23 38:2

**laborer** 18:9

**lake** 42:15,20
43:3,8

**Larry** 42:1,9

**Laurin** 54:25

**law** 5:8 8:9,13
35:9 37:17

**lead** 8:24
13:10,18 14:1
48:7,15,17 55:8
63:14 74:23

**leads** 66:9

**learn** 18:15,22
63:25

**learned** 17:25
18:8 30:17,20,
24 31:3 33:3,6,
19 34:17 44:10,
13,23 55:16
61:20

**leave** 40:8
77:21

**Lee** 56:18
57:11

**Lee's** 57:13

**left** 74:23 77:24

**leg** 15:3

**letter** 64:2,5,8,
13,17,21,24
65:4,15,17,18,
20,23 66:2,10,
12,14,17,19
67:1,8,9

**letters** 66:22

**Lieutenant**
36:20 47:11

**life** 8:20

**limits** 9:7

---

**list** 21:10,21
22:10 28:18
29:20,23 30:9

**listed** 11:24
12:16

**lived** 8:19
30:25 31:3
55:17

**locate** 61:18

**located** 5:8

**location** 9:24

**long** 8:19 33:1
46:6

**looked** 15:8

**Lot** 53:16,18

**lying** 15:2

**Lynn** 62:6,15,
22,25

---

**— M —**

**made** 14:20
22:13 44:20
47:16 66:6
75:18,24

**make** 17:16
40:7 45:7 75:23
76:17

**making** 11:25
12:11,18 75:3

**male** 76:7,9

**man** 32:16
35:23

**marked** 10:4,7
17:8,11 24:25
25:3 26:23 27:1
36:5,8 52:6,13

**match** 38:22

**matched** 18:5
38:3,15

**matter** 5:10

**medical** 50:22

**medications**
44:17,20

---

**meeting** 41:6,
8,23

**meetings**
47:18

**members**
40:16,23 49:12

**memory** 18:17
19:24 21:15,17
70:22,25

**Merriweather**
63:17 64:1,25
79:2

**met** 40:16,20,
23 42:18 43:1
49:20 55:3
73:25

**mic** 16:6

**Michele** 55:19
56:2,7 57:4,6,8,
13 58:15,20
59:1 61:2,23

**Michele's**
57:12,19 58:4

**Michelle** 56:11

**microphone**
16:14

**mid-1980s**
6:19

**middle** 76:7

**Mike** 20:12,13
32:22 33:14

**Mileage** 53:21

**miles** 34:2
53:23 54:1

**military** 28:10
29:22 30:1,6,10
50:3

**military-type**
28:19

**Miller** 5:10,17,
18 6:5 36:22
57:7 69:23

**Miller's** 80:5

**mind** 16:5

---

**mine** 12:14
52:15,17

**minute** 67:16

**minutes** 26:19
46:7 77:23
79:16

**Montgomery**
33:16 34:10
35:14 41:5

**months** 78:7

**Moore** 32:22
33:7,14 34:21

**morning** 18:1,
6

**Morris** 55:1,3

**mother** 63:16
79:1

**mother's**
57:10

**motive** 66:2

**multiple** 21:6,
11,21 22:14
39:3 40:16,21,
23 45:19,23
49:6 55:3

**murder** 8:22
9:2,5,11,22
11:17,21 12:23
13:1 14:12,15,
20,24 17:3
18:2,13 22:25
23:24 24:2,14,
20,23 26:3
30:18 31:7,20,
25 33:2,3,6,19
34:6,10,11,22,
23 35:10,15
38:3,4 43:16,24
44:2,24 45:3,
18,22 47:22
48:13,20 49:4
52:25 53:3
54:4,9,16,21
61:14,24 62:3
63:1 64:22 66:7
78:24

**murdered**
46:19,25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 28 of 31
The Deposition of ROBERT MILLER, Given on January 30, 2024
Page ID #: 3688
88

**murderer**
32:13

**murdering**
37:9 66:3

**murders** 35:7,
19 36:2 37:7
42:11 51:5
54:5,17

**N**

**named** 16:23
29:21 58:16

**needed** 52:12
55:9,10

**neighbor**
67:14

**neighbors**
49:15 55:14

**night** 76:7

**normal** 66:8

**Norman** 5:11
48:21 49:24
50:2,5,8,11
61:23 62:25
65:16 66:18,21
67:14 73:12,22
74:7,16 75:18
76:9 78:23

**note** 11:7 43:7
63:13

**noted** 64:16

**notes** 14:11,
14,17 20:22
21:10,21 22:10
28:18 29:21
30:10 53:13

**November**
63:18 79:2

**nude** 15:3,13
78:6,16

**number** 5:14
6:25 12:23
22:2,3,8 58:13
60:3 68:8,12

**O**

**obscene** 64:6

**observe** 15:1,
5,16

**observed**
15:10,13 16:20

**obtain** 56:7

**obtained** 50:2

**occasion** 78:4

**occasions**
39:3

**occupation**
6:6

**occurred** 9:5
14:6 33:3,17
53:3

**October** 25:20
36:20 42:9

**Offense** 10:1
11:16,20 55:24
57:17 58:2,20
59:8

**Office** 5:8
35:14,17 39:3,
6,19 40:2,14,
17,24 41:1,6
42:2,19 43:2
54:23

**officer** 11:25
12:11,18

**officers** 7:14
35:9 67:23
74:20

**Oldsmobile**
50:17

**open** 15:17
16:18

**opinion** 45:24

**order** 80:10,13

**overturned**
31:23

**owned** 78:3

**P**

**p.m.** 5:7 46:12,
14 65:10,12
79:25 80:2,23,
24

**pages** 12:7
19:9 27:5 42:21
52:12

**pair** 28:9,18

**paper** 19:22
59:3

**paragraph**
16:3 19:14
57:22

**Pardon** 7:9
11:19 14:13
21:25

**parent** 41:12

**parentheses**
77:14

**parents'** 23:23
41:10

**park** 30:25 31:4
53:4 55:13
67:15

**parked** 77:25
78:4

**part** 14:20
20:24,25 32:4
52:7,24 69:5,11

**partially** 35:1

**participate**
44:1 67:11

**participated**
55:19 62:5,14
63:15

**participation**
52:10

**parts** 13:6
40:20

**party** 21:4

**pending** 5:12

**perpetrator**
51:6

**person** 60:14
69:25 77:17

**personally**
49:3 61:19
63:3,6 64:13
65:4,15 74:21

**Pertaining**
31:10

**phone** 58:13
60:3 67:24 68:7
69:19 70:2,7,16
74:22,24,25
75:3,13,18

**phonetic** 47:11

**photos** 52:3

**physical** 37:24
50:20 51:22,25

**physically**
14:8 15:7

**picked** 57:8

**pieces** 22:14

**Plaintiff's** 10:4
15:19 17:9 19:7
20:15 21:9 23:7
24:16 25:1
26:24 28:12
29:19 30:8 33:9
36:6 38:6 39:10
52:7 53:6 55:22
56:22 58:18
59:6 68:1 71:12
72:1,21 76:21
79:9

**pleaded** 31:24
45:2

**point** 17:2
78:22 79:7

**police** 6:9,12,
17,21 7:2,7,10
8:11,15,16
32:21,25 33:14
34:13 36:22
46:18,24 54:22

**possession**
64:13,15

**post** 13:20
14:10

**post-it** 43:7

**potential** 49:8
50:25

**practice** 47:7,
13

**presence**
57:19 58:4

**present** 19:20,
24 20:23 41:6
55:25 56:4 57:6
62:9,17 63:19,
22 76:24 77:3

**presented**
24:1

**pretty** 34:1

**previously** 6:8

**print's** 37:3

**prior** 17:1
30:21 65:16
66:6 78:7,10

**problem** 57:2

**procedure**
66:8

**proceedings**
5:1 7:19,23

**process** 80:6

**property** 21:3

**prosecute**
7:18

**prosecutor**
65:5

**prosecutors**
7:18

**proud** 32:18

**proximity**
33:23

**Public** 5:8

**pulled** 16:21

**purse** 59:4
60:5,8

**put** 14:4 17:15
19:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 29 of 31
The Deposition of ROBERT MILLER, Taken on January 30, 2024

Page 1,364

89

**Q**

question 10:12
12:15 13:16,25
16:4 20:20
21:19 25:4
26:15 27:8
29:7,12 33:11
36:19 38:11
39:22 40:10
42:24 45:10
47:6 54:14
56:25 57:25
62:11 69:15
73:18 77:2

questions
25:23 51:3,7,
10,19 52:9
54:11

quick 52:6

quickly 10:3
50:16

quit 78:7

**R**

radiator 50:16

raise 5:19,21

rank 6:14

Rape 25:15

raped 22:21

Rapp 33:20
34:6,8,11,25
35:7,10,15
36:2,25 38:4
42:11 43:19
54:5,17

Rapp's 34:18,
22 43:15,24
44:2,3,24 45:3

read 15:21 16:2
36:13,17 37:2,4
54:10 57:2 58:7
70:11

reading 29:15,
16 59:21,23,25

realize 37:1

reason 52:24
64:15,17

recall 23:17,19,
20 31:9 39:4
49:3,5 64:8,9
67:18,20

received 64:2

receiving
67:23 68:6
69:18 70:1,7,15

recognize
10:14 11:14
20:7 25:6
27:10,14,15,17
52:22 79:12

recollection
9:10,16,17,21
47:21,23,25
48:22 62:18,20

record 5:4,15
28:25 46:12,13,
15 50:3 65:10,
11,13 79:22,25
80:1,3,10,23

recover 64:21

recovered
22:11 64:17,24

redactions
11:11

refer 42:21
49:9

Reference
9:12

referred 70:8
71:8,18 73:7

referring 51:8
74:9

refute 52:24

regard 18:12
39:1,7 41:24

registered
18:2

relation 53:20
78:19

relied 7:14,18,
22

remember
9:13,23 13:2
15:18 19:2,6
21:8 22:17
23:5,25 24:5,8,
9,11 26:5,7
27:18 28:6,7
29:17 30:19,23
31:2,5,19 33:8,
21 34:5,11
35:20,25 36:4
39:9 41:14,19,
20,25 42:7,13,
17 44:15,25
48:11,12,13
49:13,16,19,23
50:1,4,7,12,18,
21,24 51:15,16,
24 52:2,5 53:5
55:5,12,18,21
57:15 64:10
69:20 70:19,25
72:12 76:20
79:4,6

repeat 8:5 9:18
25:4 27:8 29:7
38:11 39:22
42:24 46:22
54:14 72:16
77:2

report 10:1
11:16,20,25
12:11,16,19,22,
25 13:7 14:4
16:17 19:17
23:14 33:13
38:14 39:8,17,
25 40:12 53:13
54:24 55:24
57:17 58:2,14,
17,20 59:8
61:10 63:4,7,9,
13 64:16,20
66:15 67:4 68:5
69:5,12,17
70:1,14 71:17
72:10,22 74:13,
18 75:21,23
76:2,16,17,24
77:3 78:17
79:12

reported 23:22
44:16,19 56:11,
17 57:18 58:3
71:7

reporter 5:6,
20,23 6:3 9:18,
20 10:14 11:9,
13 12:15,18,21
13:9,17 14:7
16:16 17:13,15,
18,19 18:21
19:3,11,16
20:2,14,19,21
21:5,20 22:7,9,
20 23:2,6,13,21
24:12 25:5
26:1,10,20,22
27:9,22 28:2,8,
15,17 29:2,8,
18,25 30:7,16
33:12 34:16
36:18 37:5
38:9,13 39:16,
24 40:11,22
41:4,22 42:8,25
43:13,21 44:9
45:16 46:7,16
48:14,24 51:9,
11,21 52:21
53:12 54:14,15
56:3 57:16
58:1,11,25 60:6
62:13 65:14
67:10 68:4
69:16 70:13
71:6,16 72:4,9
73:9,20 74:5,
11,12 77:19
79:8,16 80:9,
14,18,21

reports 7:8,11,
13,14,17,21,25
8:3,6 47:16,17

represent 5:16

repute 64:17

requested
78:14

requests
22:13

residence
17:23 19:21
21:7 27:13,24

28:4,9 29:4,10,
13 38:17,23
41:18

resident 8:17
18:1

responsible
13:11,19 37:7
43:15,24 45:18,
20,22

rest 43:11
57:12 70:11
77:15,25

result 41:8

retired 6:7,12,
18

return 77:22

revealed 22:21
26:11 38:2

review 17:8
20:15 21:9
22:25 23:1,7
24:25 26:23
28:12 36:5 61:2
68:1 71:12
72:1,21

reviewed 19:9
28:15

Rick 57:14
58:16,21

Riddle 76:19,
25 77:4,6,10,
12,14,16 78:23

rifle 42:10,14

right-hand
20:11

Rigsby 23:15

Riley 49:21

Rita 67:12
68:19,20 70:6
73:15

road 34:19
47:3

Robert 5:9,17
6:5

Robertson
39:2,5,18 40:1,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-13    Filed 10/27/25    Page 30 of 31
The Deposition of ROBERT MILLER, taken on January 30, 2024
Page ID #: 3685
90

13,17,24 41:9
42:1,19 43:2

**Robinson**
78:1,3,8,11,19

**rounds** 21:6,
11,22

**Roy** 16:24 17:2,
23 18:2,5,8,12,
15,22 19:17,21
22:25 23:15,18,
22 24:13,20
25:9 30:17,21,
25 31:6,24 32:9
39:1,7 41:10,
15,17,18,20
42:2,11 43:15,
23 44:23 45:6
55:16 75:24
76:12

—————

**S**

—————

**safe** 75:10,14

**Sandra** 49:25

**Sankey** 5:4

**scene** 14:23
15:1,6 55:11

**scheduled**
47:18

**search** 17:9,22
19:20,23,24
20:13,22 22:10
26:24 27:12,24
28:3,9 41:10,
11,24

**searching**
21:3 42:20 43:3

**section** 38:8

**seized** 21:6,10,
11,21,22 22:10
28:18,19 29:21,
22 30:2,10

**self-reported**
44:11,14

**separate** 25:23
30:14

**September**
8:22 24:22

31:17 34:23
39:6,12 41:8
63:17

**serial** 37:9,13,
16,18,20 45:6,
12,13

**set** 80:7

**she'd** 67:23
68:6 69:18
70:15

**she'll** 51:15

**sheet** 24:19

**shell** 21:24
22:1,11 38:3,
15,22

**Sheriff** 54:25
55:3

**Sheriff's**
35:14,17 39:3,
6,18 40:1,13,
17,24 41:1,6,9
42:2,19 43:2
54:23

**shooting**
36:24

**shortly** 77:22

**shot** 15:8 35:4

**show** 43:18

**shows** 41:7

**signature**
20:11 25:11

**signed** 12:5

**significant** 9:3
32:3

**similar** 35:22

**similarities**
33:15 34:21,25
35:3,19

**small** 31:3 37:3

**soldier** 60:18,
22

**soldiers** 56:19
58:13 61:8,13,
18,21

**solemnly** 5:23

**Sophie** 5:5

**sought** 78:8

**source** 66:9,14
75:6

**space** 11:6

**speak** 60:18,21

**SPEAKER**
36:14

**specific** 52:10,
11

**specifically**
15:5 35:13 39:5

**spent** 32:5,8,
10

**spoke** 35:9,13,
18 42:1 50:5,
19,22 61:3

**spread** 15:3

**Springfield**
42:15

**Square** 5:8

**Stamp** 24:17
26:24 43:5

**stamped** 10:5
17:10 25:1 52:8

**stand** 46:3

**standing** 78:6

**state** 6:4,6,9,
12,17,20 7:2,7,
10 8:11,15
36:22 45:5,17,
21 46:17,23
54:22

**stated** 19:4,18
62:22 71:23
77:21 78:11,14

**statement**
49:24 56:7
57:12 60:7,9
62:24 63:2

**States** 5:12

**steps** 9:25
61:7,12 78:18

**stolen** 42:11

**stop** 19:13
78:4,5 80:7

**store** 77:24

**stored** 14:9

**streets** 32:16

**style** 29:3,9,22
30:1

**successful**
32:15

**Sunday** 56:25
57:9

**supervisor**
47:4,8,10,14,19

**supervisors**
48:25

**supplement**
71:21

**supplemented**
12:2

**support** 16:13

**surrounding**
47:22

**suspect** 17:2

**suspects** 49:8
51:1

**swear** 5:22,23

**sworn** 5:19

—————

**T**

—————

**taking** 44:16
49:3

**talking** 59:24
75:12 77:8

**talks** 77:15
78:1

**temple** 15:9

**ten** 22:8 77:22

**Tennessee**
33:4,16,23
34:7,10 38:16
39:3,6 44:3,4

54:1 78:9

**testified** 31:6,
11,14 59:12

**testifying**
70:20,23,24

**testimony**
5:24 31:9

**testing** 22:13,
21 37:23 38:2
50:14 52:1

**thing** 29:13
73:1,2,4,6

**thought** 12:3,
4,13 51:5 57:13
58:15,20

**threatening**
64:2 66:19,22
67:23 68:6
69:18 70:2,7,16
74:22 75:3,17

**threats** 64:6,
11,25 66:6

**thrown** 42:15

**tied** 15:10

**time** 5:7 6:18
10:11 16:25
18:19 35:22
46:11,14 65:9,
12 79:2,15,24
80:2,22

**times** 55:3
78:11

**Tina** 18:2 22:25
23:14,22

**Tinker** 77:8,14,
15,16,17,21,23,
24

**tiny** 30:25
34:19 36:15
53:3,16,18

**tobacco** 17:6

**today** 5:5,6
45:8,14,25

**Todd** 5:12 7:3
8:17,19 9:8,9
36:24 37:10,21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

54:6,18,23,25

told 72:14,17, 23 76:9,12 78:1

Tom 36:20 78:1,11,14,15, 19

totally 80:14

Town 30:25 34:19 53:3,17, 18

trailer 30:25 31:4 52:3 53:4, 17 55:13 57:12 67:15 77:22,25 78:3,5,7

transcript 80:11

transferred 7:5

transported 51:25

traveled 39:2,5

trial 31:6,17

trooper 47:3 57:7 63:22 64:16 69:23

truck 78:4,5

true 24:1 26:11 32:5,8,12 39:2 48:3 50:5,25 51:4 54:25 64:5 67:22 76:4

truth 5:25

turn 10:24 15:19 19:7 24:16 29:19 30:8 33:9 38:6 39:10 40:4 50:13 53:6 55:22 56:22 58:18 59:6 76:21 79:9

turned 69:12

type 69:9

typed 69:2,6, 14

**U**

Uh-huh 20:5 21:14 28:21

ultimate 43:22

ultimately 24:6,13 31:24 37:6 43:14,23 45:2 75:17

understand 13:16,25 29:12 79:19

understanding 32:20

understood 7:13,17,21,25 8:3,6

UNIDENTIFIE D 36:14

Uniform 10:1 11:16,20 55:23 57:17 58:2,19 59:7

uninvited 76:7

unit 57:7,8 68:11 75:15

United 5:12

upwards 16:6

**V**

Vernon 55:20 58:17 60:9 69:12,13

victim 53:13,14 57:9 58:8 73:16 74:3

victim's 57:10 74:4

video 80:19

violent 32:16 44:20

Virginia 63:16 79:1

voices 44:11, 12,14

**W**

waist 15:14

wait 27:3 67:16

walk 17:17

Wall 35:14,18, 21 36:1,21 41:5,7 42:18 43:1

wanted 56:7 60:18 66:5 75:10 78:2,12, 13 80:12

warrant 17:9, 23 19:20,23 20:13,22 21:2 22:10 25:1,8, 14,17 26:24 27:13,24 41:10, 11,24 78:8

water 46:3

Wayne 16:24 17:2,23 18:8, 12,15,22 19:17, 21 23:23 24:13, 20 25:9 30:17, 21,25 31:6,24 32:9 39:1,7 41:17 42:2 43:15,23 44:23 45:6 55:17 75:25 76:12

Wayne's 18:2 22:25 23:15,18 41:10

Western 5:13

white 11:6

wife 18:2 22:25 23:15,18

Williams 46:18,24 48:8, 11,20 49:3 50:23 52:7 53:1,3,14 56:12,19 57:19 58:4,12 59:2

60:7 64:3,6 65:1 66:3,6 67:15 71:9,24 73:10,11,14,15, 21 75:8 78:12, 14,15

Williams' 47:22 49:11,14 54:4,16,21 56:9,18 60:15 61:14,24 62:3, 22 63:1,16 64:22 65:5 71:8,18 76:6 78:10,19,23 79:1

wise 53:21

within-stated 21:3

witnesses 49:6,17

women 35:4 37:10 45:19,23

word 43:8

work 8:10,14 12:4 32:18

worked 6:20 18:9 37:15 44:6 55:6

working 33:16 36:22

would've 15:8 63:3,6,12 64:20 65:24

write 59:12 60:1 69:7,10

writing 21:15

written 63:4,7 66:22

wrong 73:1,23

wrote 59:2,8, 15 60:3 65:23 66:18 68:17,18, 21,24

Wynn 20:13

**Y**

years 62:21 80:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com