LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



## KENTUCKIANA
#### COURT REPORTERS

**CASE NO. 1:20-CV-000210-GNS**

**BRENDA GRAHAM, AS THE ADMINISTRATOR OF**

**THE ESTATE OF NORMAN GRAHAM**

**V.**

**TODD COUNTY, ET AL.**

**DEPONENT:**

**BRAD STEVENSON**

**DATE:**

**April 25, 2024**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1        IN THE UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF KENTUCKY

3               AT BOWLING GREEN

4          CASE NO. 1:20-CV-000210-GNS

5

6

7

8

9        BRENDA GRAHAM, AS THE ADMINISTRATOR OF

10          THE ESTATE OF NORMAN GRAHAM,

11                 Plaintiff

12

13                    V.

14

15             TODD COUNTY, ET AL.,

16                 Defendants

17

18

19

20

21

22

23    DEPONENT:  BRAD STEVENSON

24    DATE:      APRIL 25, 2024

25    REPORTER:  SEAN FRANKS

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
 1              APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, BRENDA GRAHAM, as the

 4   Administrator of the Estate of Norman Graham:

 5   Amy Robinson Staples, Esquire

 6   Lovey & Lovey

 7   311 North Aberdeen Street

 8   Third Floor

 9   Chicago, Illinois 60607

10   Telephone No.: (312) 243-5900

11   E-mail: amy@lovey.com

12

13   ON BEHALF OF THE DEFENDANT TODD COUNTY, ET AL:

14   Jessica Shoulders, Esquire

15   English, Lucas, Priest & Owsley, LLP

16   1101 College Street

17   Bowling Green, Kentucky 42101

18   Telephone No.: (270) 781-6500

19   E-mail: jshoulders@elpolaw.com

20

21

22

23

24

25
```

Page 3

```
 1          APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT SMITH AND MILLER, KENTUCKY

 4   STATE POLICE:

 5   Amber Arnett, Esquire

 6   Kentucky State Police Legal Services Branch

 7   919 Versailles Road

 8   Frankfort, Kentucky 40601

 9   Telephone No.: (502) 782-2163

10   E-mail: alea.arnett@ky.gov

11

12   Also Present: Madelyn Hamblin, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                  INDEX

 2                                          Page

 3   PROCEEDINGS                              6

 4   DIRECT EXAMINATION BY MS. STAPLES        7

 5

 6                EXHIBITS

 7   Exhibit                                 Page

 8   1 - Janice Kay Williams' Investigative

 9       File from the Kentucky State Police,

10       Bate Stamp KSP 55-303                50

11   2 - Investigative File Disclosed         68

12   3 - Photograph of Books Given by

13       Bobby Miller in Investigation        70

14   4 - Photograph of Victim, Bate Stamp 4171   82

15   5 - Photograph of Victim, Bate Stamp

16       KSP000024                            82

17   6 - Report from Comprehensive Care Center   96

18   7 - Pennyroyal Center Document           96

19

20

21

22

23

24

25
```

Page 5

```
 1                STIPULATION

 2

 3   The deposition of BRAD STEVENSON was taken at

 4   KENTUCKIANA COURT REPORTERS, 537 EAST TENTH AVENUE,

 5   BOWLING GREEN, KENTUCKY 42101 on THURSDAY the 25TH day

 6   of APRIL 2024 at 9:04 a.m. (CT); said deposition was

 7   taken pursuant to the KENTUCKY Rules of Civil Procedure.

 8

 9   It is agreed that SEAN FRANKS, being a Notary Public and

10   Court Reporter, may swear the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. My name is Madelyn Hamblin. I'm the videographer today. Sean Franks is the court reporter. Today is the 25th day of April 2021. The time is 9:04 a.m. Central Time.

We're at the offices of Kentuckiana Court Reporters, the Bowling Green location, to take the deposition, as Brad Stevenson in the matter of Brenda Graham, as the administrator of the Estate of Norman Graham v. Todd County, et al., pending in the United States District Court, Western District of Kentucky at Bowling Green, case number 1:20-CV-000210-GNS. Will counsel please identify themselves for the record?

MS. STAPLES: Amy Robinson Staples for the plaintiff.

MS. SHOULDERS: Jessica Shoulders for the defendant, Todd County, Kentucky.

MS. ARNETT: Amber Arnett, appearing by Zoom from Frankfort, Kentucky, and I represent the Kentucky State Police defendants, Robert Miller and Leonard Scott Smith.

THE VIDEOGRAPHER: Thank you very much.

Page 7

Mr. Stevenson, will you raise your right hand for the court reporter?

THE REPORTER: Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: You may begin.

DIRECT EXAMINATION

BY MS. STAPLES:

Q. Good morning, sir.

A. Morning.

Q. We just went on the record, but again, I'm Amy Staples, and I am the attorney who represents the late Norman Graham in this action. So I currently represent his wife, who's the administrator of his estate.

A. Okay.

Q. And a review of the record indicates that you investigated Mr. Graham's case for -- well, strike that. A review of the record reveals that you investigated the homicide of Janice Kay Williams for quite a few years. So that's why you're here today --

A. Okay.

Q. And that's what I'll be talking with you about. Before we get into it, though, let me go over some of the rules. I would ask that you answer all the

Page 8

questions verbally as opposed to just nodding your head. That way, we'll make sure that we have a clear record of what your answers really are.

If I ask a question that is confusing -- and I will do so -- please don't hesitate to ask me to rephrase that or to clarify, and I'll do my best to rephrase that in a better way; is that fair?

A. Sure.

Q. You are entitled to take as many breaks as you need or desire while we're here today. Don't hesitate to ask for a break if wanted. I would just ask that if there's a question pending of you that you answer that question before we go off the record, okay?

A. Sure. Yes.

Q. While I am asking questions, it's quite possible and likely that the other attorneys, both here in the room and on the computer, may voice some objections. If you hear them speak after I ask a question, I would ask that you hold off on answering. Allow them to voice their objection, and then thereafter you'll be able to proceed with your answer since there's not a judge here to rule in the immediate time as to whether or not the objection is proper, okay?

A. Yes.

Q. Do you have any questions about that?

Page 9

A. No.

Q. All right, sir. What is your current occupation?

A. Currently I'm working for the Green River Educational Cooperative.

Q. And what is that?

A. It is a educational cooperative in Kentucky.

THE VIDEOGRAPHER: Counsel, I'm going to step in real quick.

Mr. Stevenson, I'm sorry. Do you have --

THE WITNESS: Can you hear me now?

THE VIDEOGRAPHER: Yep.

THE WITNESS: Okay.

The --

THE VIDEOGRAPHER: --

THE WITNESS: Okay.

It's an educational cooperative here in Bowling Green. Sports, teachers, staff of -- of schools, school districts. And, like, my current role is school safety, where I assist school districts with providing them with the best -- with the best information regarding school safety and professional development.

BY MS. STAPLES:

Q. And how long have you been employed with the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRAD STEVENSON, taken on April 25, 2024

10..13

Page 10

1   Green River Educational Cooperative?
2       A.   Since 2021?  Yeah.
3       Q.   Is it accurate to state that you were
4   currently -- I'm sorry -- you were previously a law
5   enforcement officer?
6       A.   Yes.
7       Q.   Please walk me through your law enforcement
8   career beginning with the first department for which you
9   worked?
10      A.   First department I worked for was the
11  Cynthiana Police -- Cynthiana Police Department.
12  And then I worked there for a little over two years, and
13  then worked for the Kentucky State Police.
14      Q.   How long did you work for the Kentucky State
15  Police?
16      A.   Until 2014.  November 1st was my official
17  retire date.
18      Q.   And when did you begin working with the
19  Kentucky State Police?
20      A.   In January of 1998.
21      Q.   Were you stationed or assigned to various
22  posts --
23      A.   Yes.
24      Q.   -- during your employment with the Kentucky
25  State Police?  Where were you first stationed?

Page 11

1       A.   In Madisonville Post.
2       Q.   How long were you there?
3       A.   Until 2005, I believe.  I'm not 100 percent
4   sure.  That may be 2006.  I'm not sure.
5       Q.   Okay.
6       A.   I transferred to the Bowling Green Post.
7       Q.   So you transferred to Bowling Green in 2005 or
8   2006 --
9       A.   Uh-huh.
10      Q.   -- is that accurate?
11      A.   I -- yes.
12      Q.   And did you remain in Bowling Green until your
13  retirement?
14      A.   Yes.
15      Q.   While employed with the Kentucky State Police,
16  did you hold various titles or positions?
17      A.   I'd say trooper detective, and then retiring
18  as master trooper detective.  Sure, I had -- by
19  definition, those would have been at the -- at the time,
20  but yeah.
21      Q.   What is a master trooper detective?
22      A.   Well, retired as detective, and -- but master
23  trooper was a status that you obtain by completing X
24  amount of training and I believe education.  And so
25  those were all compiled to where you would receive that

Page 12

1   -- I'm not sure that it was a direct title at the time,
2   but that's -- that's what you receive after -- after
3   completing X amount of years and -- and then based on
4   review.
5       Q.   Okay.  What was your badge number while
6   employed at KSP?
7       A.   680.
8       Q.   680?.
9       A.   6-8-0, yes.
10      Q.   Okay.
11      A.   Yeah.
12      Q.   While you were employed with the Kentucky
13  State Police did you hold any positions in which you
14  supervised others?
15      A.   I don't recall where I was a supervisor.
16      Q.   While employed at KSP as a detective, did you
17  handle homicide investigations?
18      A.   Yes.
19      Q.   At some point in your career with the Kentucky
20  State Police did you also handle cold case homicides?
21      A.   Yes.
22      Q.   And how did that come about?
23      A.   That's a good question.  I -- I don't recall.
24  I guess through -- I don't recall how -- how that
25  came -- just by working on investigations.

Page 13

1       Q.   All right.  I'll ask you some more specific
2   questions --
3       A.   Sure.
4       Q.   -- about that in just a bit.
5       A.   Okay.
6       Q.   In what county and state do you currently
7   reside, sir?
8       A.   Warren County, Kentucky.
9       Q.   Where are you from originally?
10      A.   Hopkinsville.  I was -- well, I was born in
11  Springfield, Tennessee.
12      Q.   Is that Montgomery County?
13      A.   No, Robertson County.
14      Q.   Robertson?
15      A.   Uh-huh.
16      Q.   Close to Montgomery County, Tennessee?
17      A.   Yes.
18      Q.   Okay.  Where were you living in June of 1980?
19  I guess first I should ask you, were you living in June
20  of 1980?
21      A.   Yes.  Yes, Hopkinsville.
22      Q.   And did you go to high school in Hopkinsville?
23      A.   Yes.
24      Q.   Have you ever lived in Todd County, Kentucky?
25      A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRAD STEVENSON, taken on April 25, 2024

14..17

Page 14

1  Q.  How long did you live in Todd County?
2  A.  Three years.
3  Q.  Can you recall when that was?
4  A.  1998 to 2001.
5  Q.  So it's like --
6  A.  But --
7  Q.  I'm sorry, go ahead.
8  A.  -- I just -- I don't recall the exact dates.
9  Q.  I understand. No problem.
10  A.  Uh-huh.
11  Q.  And I should have told you that from the
12  beginning.  You know, we're going to be talking about
13  tasks that you did and events that occurred several
14  years ago, so I don't expect you to remember everything
15  from then.
16  A.  Okay.
17  Q.  I have a hard time remembering things from
18  last week, quite frankly.  So it's absolutely fine and
19  proper to tell me if you don't remember something.
20  So is it safe to state that you're familiar with the
21  Todd County, Kentucky area?
22  A.  Yes.
23  Q.  Sir, have you ever given a deposition before?
24  A.  Yes.  And I don't recall how long ago,
25  but I -- I do -- yes.

Page 15

1  Q.  Have you given multiple depositions
2  previously, or just one that you can recall?
3  A.  I just recall one.
4  Q.  Was that deposition related to your role as a
5  law enforcement officer?
6  A.  Yes.
7  Q.  Were you a named defendant in that case?
8  A.  No.  I don't recall.  I -- I don't believe so,
9  no.
10  Q.  What do you recall about that case and/or that
11  deposition?
12  A.  Very little.  I -- I just -- I do know I had
13  to go -- it -- but it was -- I was not named --
14  Q.  Okay.
15  A.  -- no.
16  Q.  Can you recall, like, the circumstances behind
17  the suit that led to you being deposed?
18  A.  I believe it was for a traffic accident --
19  Q.  Okay.
20  A.  -- that occurred.
21  Q.  Now, you testified earlier that you
22  investigated homicides in your role as a detective with
23  the Kentucky State Police, correct?
24  A.  Yes.
25  Q.  Did you investigate any homicides while you

Page 16

1  were with the Cynthiana Police Department?
2  A.  No.
3  Q.  I can't imagine there are a lot of homicides
4  in Cynthiana.
5  A.  No.
6  Q.  How many homicides would you estimate that you
7  investigated while you were employed with the Kentucky
8  State Police?
9  A.  I don't -- I really couldn't give you a
10  number.  I mean, it's -- that's -- maybe the case
11  officer directly or as a -- as an assist on the case.
12  I really don't know.  It would be -- it's numerous.
13  Q.  Numerous?
14  A.  Yes.
15  Q.  And that was the next question I was going to
16  ask you.  Were there times where you were the lead
17  investigator or case officer on those homicide
18  investigations?
19  A.  Yes.
20  Q.  And then there were other times that you were
21  just an assisting --
22  A.  Yes.
23  Q.  -- officer on the --
24  A.  Yes.
25  Q.  -- investigations, correct?  Do you have any

Page 17

1  idea of what the split is between cases that you were
2  lead investigator on versus assisting?
3  A.  No.
4  Q.  In other words --
5  A.  Yeah.
6  Q.  -- were there multiple cases that -- multiple
7  homicide cases that you investigated as a lead officer?
8  A.  I would say yes.
9  Q.  Okay.  Now, have you received training
10  throughout your career specific to handling homicide
11  investigations?
12  A.  Yes.
13  Q.  Generally, what type of training did you
14  receive in regard to handling homicide investigations?
15  A.  They would've been from, I suppose, start to
16  finish of investigating a homicide.  Of course, there
17  were other trainings, too, that I would've had also.
18  Q.  Was that training given to you by the Kentucky
19  State Police or did you also receive training from other
20  outside sources?
21  A.  Other outside sources.
22  Q.  Did you receive any training at the Kentucky
23  State Police specific to investigating homicides?
24  A.  Yes.
25  Q.  Sitting here today, can you tell me what any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 7 of 50 PageID
#: 3720
The Deposition of BRAD STEELMAN, taken on April 25, 2024

18..21

Page 18

1    of the training was that you specifically received from
2    KSP regarding homicides?
3        A.   I -- again, it would've been how to perform an
4    investigation.  I don't remember exact specifics on
5    that, no.
6        Q.   Do you recall if any of the training that you
7    received specific to homicides directed you to be
8    thorough when investigating the cases?
9        A.   I believe that would be without -- say with
10   any -- any training that you would have.  That's
11   obviously the goal.
12       Q.   Is it safe to say that you would expect other
13   law enforcement officers who are handling homicide
14   investigations to have that same goal in being thorough
15   in their investigations?
16           MS. ARNETT:  Object to form.
17   BY MS. STAPLES:
18       Q.   You may answer.
19       A.   Okay.  I suppose based on their training and
20   experience.
21       Q.   Well, would you expect other law enforcement
22   officers to receive that type of training?
23       A.   I think that goes -- I think that would
24   be -- that they would receive that type of training.
25       Q.   Would you agree that it's important for law

Page 19

1    enforcement officers to document the investigative steps
2    they take in homicide investigations in written reports?
3        A.   I think that goes along with the training that
4    you would receive.
5        Q.   So is it your answer that you were trained to
6    document investigative steps that you take in homicide
7    investigations in written reports?
8        A.   We would've received that training.
9        Q.   I'm sorry?
10       A.   Yes.
11       Q.   And you would expect other law enforcement
12   officers who handle homicide investigations to have
13   received that type of training regarding documenting the
14   steps they take in written reports; is that right?
15       A.   I really can't speak for other law enforcement
16   -- or officers.
17       Q.   Well, the training that you were in, were you
18   the only person in that training or were there
19   other --
20       A.   There would've been others.
21       Q.   -- officers with you?
22       A.   There would've been others.  Sure.
23       Q.   I mean, would you be surprised if there were
24   law enforcement officers at the Kentucky State Police
25   who weren't trained to document the investigative steps

Page 20

1    and written reports?
2        A.   I -- I wouldn't expect that.  I mean, I'm
3    trying to answer your question the best I know how.  I
4    really don't -- I'm not sure.  I think their -- their
5    training they would receive would -- that would -- that
6    would lend them to conduct those correctly, I mean --
7        Q.   And I want to make sure that I understand your
8    answer.  You said you wouldn't expect that --
9        A.   No, you would expect by the training they
10   receive --
11       Q.   Okay.  That they would have been trained to
12   document investigative steps in a written report?
13       A.   If they received it during training.
14       Q.   Okay.  Would you personally, as a career law
15   enforcement officer, expect officers who are handling
16   investiga-- homicides to have received training
17   directing them to document the steps they take in a
18   written report?
19       A.   If they received that training, yes.
20       Q.   Yeah, I -- okay.
21       A.   I mean, I --
22       Q.   I'm asking you, would you expect them to have
23   received that training?
24       A.   You would think, yes, based on training that
25   they would have received that.

Page 21

1        Q.   Okay.  Would you agree that it's important for
2    written reports to be accurate?
3        A.   Sure.
4        Q.   Would you agree that it's important that all
5    interviews or interrogations of suspects be documented
6    in an investigative file?
7        A.   We were taught that.
8        Q.   And what was your general practice for
9    documenting interrogations?
10       A.   Those were submitted into the case report and
11   into evidence.
12       Q.   Can you explain what you mean by "they were
13   submitted into evidence"?
14       A.   Documented through the case file and submitted
15   into -- into evidence based on the -- exact
16   procedure.  I don't remember exactly how it would go,
17   but they -- they were submitted to the case file.
18       Q.   Okay.  Let -- and let me ask a couple --
19       A.   Yeah.
20       Q.   -- specific questions that may help a little
21   bit.  And I'm asking you about your personal general
22   practice --
23       A.   Uh-huh.
24       Q.   -- of how you documented --
25       A.   Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    Q.   -- interrogations.  Did you draft written
2   reports about the interrogation?
3    A.   I submitted it based on the information that I
4   had.
5    Q.   What does that mean?
6    A.   So that -- it was noted in the case file
7   what -- an overview, and then that was submitted,
8   so --
9    Q.   Okay.  So let me make sure I'm understanding
10  your answer.  You would document in a written report
11  that you had interrogated a suspect; is that correct?
12   A.   That I would've met with them, and --
13  and -- and, yes.
14   Q.   Okay.
15   A.   So don't -- but I wouldn't call it
16  interrogation.
17   Q.   Okay.  That you had interviewed a suspect?
18   A.   Interviewed, yes.
19   Q.   And then --
20   A.   Based on that, that information was -- I
21  forget how we -- or how I specifically did it, but then
22  that was -- as a referral to that, information was
23  placed in the case file.
24   Q.   Did -- was it your practice to audio and/or
25  video record interviews with suspects?

Page 23

1    A.   Yes, as I recall.
2    Q.   And would you include those recordings in the
3   case file as well?
4    A.   Yes.
5    Q.   So you would note in a written report that you
6   had conducted the interview, and you would also include
7   the audio or video recording in the investigative file
8   as well?
9    A.   If it was done.
10   Q.   Did you receive training while employed at the
11  Kentucky State Police to audio or video record
12  interviews with suspects?
13   A.   I don't recall.
14   Q.   Did you receive training while employed with
15  the Kentucky State Police that interviews you had
16  conducted with suspects should be noted in a written
17  report?
18   A.   I don't recall specifically.
19   Q.   Sir, as a career law enforcement officer, are
20  you familiar with the concept of tunnel visual -- tunnel
21  vision in regard to criminal investigations?
22      MS. ARNETT:  Object to form.
23      THE WITNESS:  I don't recall.
24  BY MS. STAPLES:
25   Q.   So sitting here today, you can't tell me if

Page 24

1   you --
2    A.   Explain.
3    Q.   -- are familiar with the concept?
4    A.   Explain.
5    Q.   Sure.  So I believe one of the definitions of
6   tunnel visions in regard to criminal investigations
7   would be the tendency of investigators to focus on a
8   particular theory of the case or a particular suspect,
9   while on the other hand dismissing evidence that
10  contradicts that theory.  Are you familiar with that
11  concept?
12   A.   No, I don't -- I -- I don't really -- I
13  don't -- I don't recall.  No, the only thing I -- that
14  I -- example I would -- no, I really don't have, like,
15  tunnel vision.  I -- I don't really -- I don't recall
16  that, no.  Just being a -- something I would -- would
17  pop out in my mind --
18   Q.   Okay.  And when --
19   A.   -- for me.
20   Q.   -- you say that "No," you don't have tunnel
21  vision, I'm just asking you specifically if you -- if
22  you're familiar with that concept of tunnel vision?
23   A.   No.
24   Q.   Okay.  Is it safe to say, then, that you don't
25  recall receiving any training about the potential

Page 25

1   hazards of tunnel vision in criminal investigations?
2    A.   I don't recall.
3    Q.   And let me ask you -- ask it this way: Would
4   you agree that when you're investigating a homicide,
5   it's important to follow all potentially credible leads
6   as to suspects?  And let me preface this.  I said "you."
7   I mean investigators in general.  Would you agree that
8   when investigators in general are investigating criminal
9   homicides, it's important to look into all credible
10  leads regarding potential suspects?
11   A.   I would say yes, if -- if known, known
12  opportunities, yes.
13   Q.   And as a career law enforcement officer, would
14  you agree that by failing to conduct a thorough
15  investigation into all potentially known suspects that
16  investigators risk arresting an innocent individual for
17  the crime?
18      MS. ARNETT:  Object to form.
19      THE WITNESS:  There's always a possibility.
20  BY MS. STAPLES:
21   Q.   While you were employed with the Kentucky
22  State Police did you receive any training regarding the
23  risks associated with failing to conduct a thorough
24  investigation into other known suspects?
25   A.   I don't recall specifically.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRAD STEVENSON, taken on April 25, 2024

26..29

---

Page 26

1    Q.   As a career law enforcement officer would you
2    agree that it's improper for officers to fabricate or
3    falsify witness statements?
4    A.   I think we would all say agree on that.
5    Q.   You would hope so, right?
6    A.   We would hope so.
7    Q.   Would you agree that it's improper for
8    investigators to manipulate witness statements to fit an
9    existing theory of the case?
10   A.   I think we would all agree with that.
11   Q.   While you were employed with the Kentucky
12   State Police did you receive any training specific to
13   the impropriety of fabricating statements?
14   A.   I don't recall.
15   Q.   Would you agree that it's improper for law
16   enforcement officers to manipulate physical evidence in
17   criminal investigations?
18   A.   Well, I think we all agree with that.
19   Q.   While you were employed with the Kentucky
20   State Police did you receive any training specific to
21   the importance of maintaining the integrity of physical
22   evidence?
23   A.   Yes.
24   Q.   What training did you receive on that topic?
25   A.   I don't remember the specific name, but it

---

Page 27

1    would've been through the investigations on evidence
2    collections, since we were more or less tasked
3    with -- if you're the lead or if you're an assist, you
4    would be collecting evidence.  So that -- those -- those
5    processes -- we were trained on those.
6    Q.   Did that training include specifically the
7    impropriety of manipulating the physical evidence?
8    A.   I don't recall a specific term there, but
9    certainly would've been to collect it in the -- the
10   proper manners that -- based on that training and the
11   experience of the time.
12   Q.   As a career law enforcement officer are you
13   familiar with the term "exculpatory evidence"?
14   A.   Not exactly.  The -- I've -- I've heard that
15   term but, by definition, I don't recall exactly.
16   Q.   Are you familiar with the concept that
17   officers are to disclose any evidence that could impeach
18   a witness and/or point to favorable evidence to the
19   accused?
20   A.   Yes.
21   Q.   And would you agree that it's improper for
22   investigators to withhold evidence that may be favorable
23   to the accused and/or impeached witnesses?
24   A.   I think we all agree on that.
25   Q.   While employed with the Kentucky State Police

---

Page 28

1    did you receive any training regarding the importance of
2    -- strike that.  While employed with the Kentucky State
3    Police did you receive any training regarding the duty
4    to disclose evidence that was favorable to the accused?
5    A.   I suppose that would've been through our
6    investigative training.
7    Q.   And when you say you suppose, does that mean
8    you don't recall --
9    A.   I don't recall.
10   Q.   -- receiving that training specifically?
11   A.   I don't recall specifically.
12   Q.   Okay.  Would you agree as a career law
13   enforcement officer that innocent people shouldn't be
14   charms -- charged for crimes they didn't commit?
15   A.   Yes.
16   Q.   As a career law enforcement officer would you
17   agree that it's improper for an officer to give false
18   testimony?
19   A.   Yes.  Oh, wait.  Hold on.
20   Q.   No, no, no, you're good.
21   A.   Go ahead and ask the --
22   Q.   Well --
23   A.   -- the -- sorry.
24   Q.   Yeah.  And more specifically, would you agree
25   that it's improper for a law enforcement officer to give

---

Page 29

1    false testimony in hopes of securing an indictment?
2    A.   Not sure why you would do that.
3    Q.   Do you believe it would be improper for a law
4    enforcement officer to give false testimony in hopes of
5    securing an indictment?
6    A.   Yes.
7    Q.   While you were employed with the Kentucky
8    State Police did you receive any training regarding the
9    impropriety of giving false testimony in any judicial
10   procedure?
11   A.   I don't recall specifically, but that -- I --
12   I -- I think that's part of -- I'm sure there were
13   trainings.  I don't recall specifically.
14   Q.   I think you said you had retired from the
15   Kentucky State Police in 2014; is that right?
16   A.   November 1st was the date.
17   Q.   Okay.  So -- and I didn't provide you with any
18   documents before you came here today --
19   A.   No.
20   Q.   -- is that correct?
21   A.   That's correct.
22   Q.   Did you make any steps to review the file in
23   this case before coming here today?
24   A.   I don't have any.
25   Q.   Okay.

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 10 of 50
PageID #: 3723
The Deposition of BRENT EVANS, taken on April 25, 2024

30..33

Page 30

1    A.    No.
2    Q.    Have you seen a copy of the civil complaint
3    that was filed in this lawsuit by Norman Graham against
4    Todd County and the other named defendants?
5    A.    No.
6    Q.    Prior to being served with the subpoena for
7    today's deposition, were you aware that Mr. Graham had
8    filed a civil suit based on his wrongful conviction?
9    A.    Only through the newspaper.
10   Q.    So you had read some news stories about that?
11   A.    I didn't really read them --
12   Q.    Okay.
13   A.    -- so just -- I just heard -- saw the
14   headlines and -- and knew that that was happening.  So
15   I've received very little information, I -- as I
16   mentioned, about this.
17   Q.    Would it also be true that you had seen
18   headlines regarding Mr. Graham's exoneration of the
19   charges?
20   A.    I don't recall specifically.  I did -- I did
21   hear about it, sure.
22   Q.    Okay.  Other than me communicating with you
23   about moving the deposition from Hopkinsville to Bowling
24   Green, you and I have not had any conversations about
25   this case --

Page 31

1    A.    I don't recall.
2    Q.    -- previously; is that right?  Have you spoken
3    to any other of the civil attorneys in this case
4    regarding the lawsuit?
5    A.    I don't know who they are --
6    Q.    Okay.
7    A.    -- so, yeah.
8    Q.    Have you spoken with Ms. Arnett that there --
9    that's there on the computer?
10   A.    No.
11   Q.    Okay.  Have you spoken with Ms. Shoulders
12   that's here at the table --
13   A.    No.
14   Q.    -- with me?  Okay.  Do you recall having any
15   conversation with any attorneys whatsoever about the
16   civil suits in this case?
17   A.    No.
18   Q.    Have you spoken with anyone, whether it's an
19   attorney or a law enforcement officer or just a lay
20   witness about the civil suit in this case?
21   A.    What do you mean specifically?
22   Q.    Has anyone --
23   A.    From this -- no.
24   Q.    Nothing -- no one has talked with you about
25   the fact that Mr. Graham had filed a civil suit

Page 32

1    and --
2    A.    No.
3    Q.    -- no one's discussed with you any of these
4    specific testimony that's come out during depositions or
5    anything like that; is that right?
6    A.    No, that's right.
7    Q.    All right.  I believe I know the answer to
8    this, but just bear with me so I can make sure we can
9    get it on the record.
10   A.    Sure.
11   Q.    Have you had the opportunity to review any
12   transcripts or videos from depositions that have been
13   taken previously in this civil litigation?
14   A.    No.
15   Q.    Sir, do you know former Kentucky State Police
16   Detective and defendant in this litigation, Leonard
17   Scott Smith?
18   A.    Yes.
19   Q.    How do you know Mr. Smith?
20   A.    From working with him, while at Post 2.
21   Q.    And what is Post 2?
22   A.    It's Madisonville Post.
23   Q.    Okay.  How long did you work with Mr. Smith at
24   the Madisonville Post?
25   A.    I'm not sure.  A couple years.

Page 33

1    Q.    Did you and Mr. Smith work together on the
2    homicide investigation regarding Janice Kay Williams?
3    A.    No.
4    Q.    If Mr. Smith had testified in -- at an
5    evidentiary hearing in this case that was held in Todd
6    Circuit Court some years ago, that while you were the
7    lead investigator in the Williams' homicide
8    investigation, he had reviewed some of the physical
9    evidence for you in that investigation, do you have any
10   reason to refute that?
11   A.    I don't.  I don't recall that, but
12   I don't -- no.  It -- it's possible.
13         MS. ARNETT:  Object to form.
14   BY MS. STAPLES:
15   Q.    Have you and Mr. Smith ever socialized outside
16   of work?
17   A.    I don't recall.
18   Q.    Do you consider him a friend?
19   A.    I would say yes.
20   Q.    When's the last time that you saw Mr. Smith?
21   A.    The -- maybe in the trial for this particular
22   case.  I don't recall the last time.
23   Q.    And just so we can make sure the record's
24   clear, there were two different trials in this case.  One
25   in 1981 and one in --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    A.    Oh.
2    Q.    -- 2008.  Which trial are you referring to?
3    A.    It'd be 2008, since I was 11 in 1981.
4    Q.    Have you spoken with Mr. Smith since the trial
5    in 2008?
6    A.    I don't recall.
7    Q.    Okay.  So it's been several years since you've
8    seen him in person and maybe communicated with him
9    altogether?
10   A.    Yes.
11   Q.    Okay.
12   A.    It may have been a decade ago, over a decade
13   ago.
14   Q.    So is it safe to assume that you and Mr. Smith
15   have not had any conversations about Mr. Graham's civil
16   suit in this case?
17   A.    Yes.
18   Q.    Do you know former Kentucky State Police
19   Detective and defendant in this litigation, Robert
20   Miller?
21   A.    Yes.
22   Q.    How do you know Mr. Miller?
23   A.    From working years ago with State Police.
24   Q.    And when you say "from working years ago with
25   State Police," do you mean from you working years ago

Page 35

1    with the State Police or Mr. Miller working years ago
2    for the State Police?
3    A.    No.  While I was employed with the State
4    Police.
5    Q.    While you were employed --
6    A.    Yeah, while working --
7    Q.    -- that's how you got to know Mr. Miller?
8    A.    Yes.
9    Q.    Was Mr. Miller still working at the Kentucky
10   State Police at the time that you were employed there?
11   A.    No.
12   Q.    Okay.  Have you and Mr. Miller ever socialized
13   outside of work?
14   A.    No.
15   Q.    Do you consider him a friend?
16   A.    Yes.
17   Q.    When's the last time that you spoke with
18   Mr. Miller?
19   A.    I don't recall.  That's -- I -- I don't
20   recall.  That's over -- over a decade ago, I'd say.
21   Q.    Can you recall the last time that you saw
22   Mr. Miller?
23   A.    No.
24   Q.    Okay.  The record reveals that you and
25   Mr. Miller met about the Williams' homicide

Page 36

1    investigation and we'll go through those details
2    in just --
3    A.    Okay.
4    Q.    -- a little bit.  But have you and Mr. Miller
5    had any conversations about Mr. Graham's civil suit --
6    A.    No.
7    Q.    -- in this case?
8          Have you and Mr. Miller had any discussions
9    about the deposition that he had previously given in
10   this suit?
11   A.    No.
12   Q.    Have you had any conversations with any of
13   Mr. Miller's family members --
14   A.    No.
15   Q.    -- about the deposition that he's given in
16   this case?
17   A.    No.
18   Q.    Earlier you testified that while you were
19   employed with the Kentucky State Police you worked on
20   some cold case investigations; is that correct?
21   A.    Yes.
22   Q.    How would you define a cold case?
23   A.    I suppose it's a case that would have -- it's
24   hard to ex- -- I suppose a -- case that had not
25   received or not leads or potential leads that had -- or

Page 37

1    opportunities that would've been exhausted with a case.
2    I'm not sure exactly how to give you the exact
3    definition for that.
4    Q.    Was there a cold case unit to which you were
5    assigned at the Kentucky State Police or were you just
6    assigned cases that had not yet been exhausted in your
7    general role as a detective?
8    A.    There were the cases in the case file that we
9    would've had to -- to review.
10   Q.    Yeah.  Sorry, I -- I wasn't clear on -- on my
11   question.
12         What I'm trying to determine is, were you
13   assigned to a specific unit that only handled cold cases
14   or was your handling of cold cases just part of your job
15   as a detective at the post?  Does that make sense?
16   A.    Uh-huh.  I -- I don't specifically recall an
17   exact unit per se.  I don't recall -- I mean, I know we
18   worked on them.  I do know that.  I did have opportunity
19   to work on some of those.
20   Q.    Was there a time in your career when your only
21   investigations were investigations that were considered
22   cold cases?
23   A.    There was an opportunity, I believe, where I
24   did review some of those at the post.  I -- I --
25   specifically, I can't -- I -- mean, there was a time

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 12 of 50
The Deposition of BRENT EDWARDS, taken on April 25, 2024
PageID #: 3725

38..41

Page 38

1    where I did work on cases.
2        Q.    Okay.  So it's -- it sounds as though you're
3    saying that you -- there was a time where you handled
4    multiple cold case investigations, is that correct?
5        A.    I did work -- I did work on some, yes.
6        Q.    Okay.  Do you recall if all of the cold case
7    investigations that you worked on were homicides or were
8    there other types of cold case investigations that you
9    also worked on?
10       A.    There could have been others.  I'm not sure. I
11   mean, that's -- I don't recall specifically.
12       Q.    Were you the lead investigator on any of the
13   cold case homicide investigations on which you worked?
14       A.    I guess would be lead as far as having them
15   and -- well, there was a lead on them because if they
16   were cold cases, I would've been -- I would've reviewed
17   them to see what could have transpired from them.
18       Q.    Oh, okay.  And what I meant, were you the lead
19   case officer on any of the cold case homicides that you
20   reviewed?
21       A.    Just if they were placed in my file.
22       Q.    I'm sorry?
23       A.    If they were -- had been placed in my file, I
24   -- I assume that's how they would've done that.
25       Q.    What do you mean by that?

Page 39

1        A.    Been assigned to me.
2        Q.    Okay.  So is it accurate to say that the way
3    that you would become involved in a cold case
4    investigation is if someone assigned that cold case
5    investigation to you?
6        A.    I -- to the best of my recollection, I'm not
7    sure exactly how that would've transpired.
8        Q.    Well, how did you generally receive your cases
9    as a detective at the Kentucky State Police?
10       A.    Through a supervisor.
11       Q.    Okay.  And the supervisor would determine
12   which investigations were assigned to you; is that
13   right?
14       A.    I think that's right.
15       Q.    Would the supervisor determine whether or not
16   you were going to be the lead case officer on the
17   investigation or just an assisting officer on the
18   investigation?
19       A.    I suppose I would determine that.
20       Q.    Okay.
21       A.    And then -- or -- or if the actions were taken
22   by multiple officers.
23       Q.    Okay.  And we know by the record in this case
24   that you were the lead case officer in the Janice
25   Williams' homicide investigation.

Page 40

1        A.    Yes.  Assigned to my case file if -- if
2    I -- if I recall.
3        Q.    Okay.  Can you recall other cases that were
4    assigned to you as the lead case officer that were cold
5    case homicides?
6        A.    Specifically, no.
7        Q.    Okay.  So thinking back to when you were
8    handling cold case investigations at Kentucky State
9    Police what was your general practice of investigative
10   steps that you would take when you were first assigned
11   the case?
12       A.    To read it.
13       Q.    And when you say "to read it," what are you
14   referring to reading?
15       A.    Reading the entire case file.
16       Q.    Is there any significance to your statement
17   that you would read the entire case file?
18       A.    What -- what items were -- were there with the
19   -- that were associated with the case, yes.
20       Q.    And it was important to you personally that
21   you reviewed the file in its entirety; is that correct?
22       A.    Yes.
23       Q.    Okay.  Would that include reviewing any
24   previous witness statements that had been given in the
25   case?

Page 41

1        A.    Yes.
2        Q.    Would that include looking and/or reviewing
3    the physical evidence in the case?
4        A.    Yes.
5        Q.    Were you trained to review results from
6    previous forensic testing that had been conducted on
7    evidence in the case?
8        A.    I was not a forensic analyst.  Would've
9    referred any of that information to those doctors
10   associated with that.
11       Q.    Of course.
12       A.    Yeah.
13       Q.    However, if forensic testing had been done
14   previously in the case --
15       A.    Uh-huh.
16       Q.    -- and there were results within the file of
17   the testing that was done, was it your practice to read
18   over the reports?
19       A.    Yes.
20       Q.    Was it your practice to review statements that
21   were taking -- taken from potential suspects in the
22   case?
23       A.    Yes.
24       Q.    Were you trained to re-interview witnesses in
25   attempt to gather further information from him or her in



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 13 of 50
The Deposition of BRENT EVANS, taken on April 25, 2024
PageID #: 3726
42..45

Page 42

1  cold case investigations?
2      A.   To re-interview?
3      Q.   Yes, sir.
4      A.   No.  I specifically received -- I don't
5  remember -- I don't recall receiving specific training
6  to re-interview.
7      Q.   Was it your practice to re-interview witnesses
8  in cold cases?
9      A.   If the potential was there -- talking about
10 suspects or witnesses?
11     Q.   Witnesses.
12     A.   Witnesses.  If -- yeah.  If -- if it was
13 determined that that needed to be done, but I -- I -- so
14 specific to re-interview, I'm not sure that -- I was
15 trained to -- to interview --
16     Q.   Yeah.
17     A.   -- individuals.
18     Q.   Was there ever a time in your cold cases where
19 you would go back and speak with witnesses that had
20 already been interviewed in the original investigation?
21     A.   Yes.
22     Q.   In what circumstances generally would you do
23 that?
24     A.   In order to try to gather information based on
25 my training experience at the time.

Page 43

1      Q.   Is it safe to say that when you reviewed the
2  investigative file that you did so in an effort to
3  determine whether there was further steps that could be
4  taken or further information that could be obtained in
5  the investigation?
6      A.   Yes.  Based on my training and experience.
7      Q.   Based on your training and experience -- well,
8  strike that.  Were you trained to speak with the former
9  investigators on the case?
10     A.   I don't recall any training.  And what do you
11 mean specifically about that -- that question?
12     Q.   Well, did you receive any training from the
13 Kentucky State Police in regard to cold case
14 investigations that directed you to have conversations
15 with any of the original investigators on the case?
16     A.   I don't recall.
17     Q.   Did you receive any training from the Kentucky
18 State Police directing you to keep an open mind when you
19 were reviewing and investigating cold cases?
20     A.   It could have been outside sources besides the
21 Kentucky State Police where I may have -- may not have
22 received training to look at other possibilities.
23     Q.   Was it your practice to look at other
24 possibilities in a cold case investigation?  To look at
25 other potential suspects in a cold case investigation?

Page 44

1      A.   I'm trying to -- I think that goes with any
2  investigation.
3      Q.   In other words, were you trained to conduct
4  your own investigation of the cases and not solely rely
5  on the investigative steps that had been taken by the
6  previous investigators on the case?
7      A.   I received training on how to investigate
8  criminal acts.  That's -- that's -- I think that's what
9  I would've been -- my investigative training experience
10 at the time.
11     Q.   Was it your general practice to conduct your
12 own investigation on the cold cases to which you were
13 assigned versus simply reading through it and relying on
14 the investigation that the previous investigators had
15 conducted?
16     A.   I suppose in consultation with my supervisors
17 to -- to look at those -- to look at all aspects of the
18 case, based on my training and experience at the time.
19     Q.   So just to make sure I'm clear, is your answer
20 yes, that it was your general practice to conduct your
21 own independent investigation on cold cases if you deem
22 them to be necessary?
23     A.   In any case.
24     Q.   Okay.  But I'm asking --
25     A.   Yeah.

Page 45

1      Q.   -- you specifically about cold cases at the
2  present moment.
3      A.   Yes.
4      Q.   And why was that your practice?  Why was it
5  important to you to conduct your own independent
6  investigation versus simply relying on the investigation
7  that had been done previously?
8      A.   I suppose based on my training and experience
9  at the time.
10     Q.   And what do you mean by that, sir?
11     A.   Through -- I guess throughout your career,
12 you -- you learn and obtain new information that may
13 assist you through your investigations, and that's based
14 on your training and experience.  So rather than just
15 sticking to one -- one specific training, you might view
16 it through other lenses.
17     Q.   Okay.  And taking the training part out of it,
18 as a -- as an investigator looking at cold cases, why
19 was it personally important to you to conduct your own
20 independent investigation versus simply relying on the
21 investigation that had been done previously in the case?
22         MS. ARNETT:  Object to form.
23         THE WITNESS:  I -- I -- I -- I would, again, refer
24 to your [sic] experience at the time with training
25 and consultation with supervision.  So yeah, I --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 14 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024
                                                                    PageID #: 3727
                                                                    46..49

Page 46

1    I'm -- I'm not sure --
2    BY MS. STAPLES:
3        Q.   What was your goal in conducting your own
4    independent investigation?  What was the purpose of
5    doing that?
6        A.   To come to some reasonable conclusion to that
7    event.
8        Q.   And how would you have come to a reasonable
9    conclusion?
10       A.   I'm not sure how it would end.
11       Q.   I'm sorry?
12       A.   I'm not sure how would -- how that
13   would -- how that would -- how that would end.  I'm not
14   sure.
15       Q.   Sir, was it important for you when you were
16   conducting cold case investigations to determine whether
17   there was new or additional information that had not
18   been gathered previously in the case?
19       A.   I think every effort would've been made.
20       Q.   So is that a yes?
21       A.   Based on training and experience at the time,
22   yes.
23       Q.   Okay.  I -- I don't -- maybe I'm not answering
24   the question -- asking the question correctly,
25   but I -- I'm -- what I'm trying to determine is why

Page 47

1    it -- okay. Strike that.  It seems like to me, you could
2    do two different things in a cold case investigation.
3    And I want you to correct me if I'm wrong.
4        A.   Okay.
5        Q.   Once you're assigned a cold case
6    investigation, you can sit at your desk.  You can go
7    through and you can look at all the witness statements
8    and all the suspect interrogations and all the physical
9    evidence that had been obtained originally.  And you can
10   say, oh, "Looks like everything was done here. Looks
11   like it's all good.  No need to do any further
12   investigation."
13            Or you could look at that file.  You could
14   look at what was done previously.  And you could say,
15   oh, "I think there may be some additional investigative
16   tasks that I could do to try to come to a conclusion in
17   this case."  So what was your general standard of
18   practice?  Were you one to sit at your desk and say,
19   oh, "Everything's been done"?  Or was it your general
20   practice to look at the case and say, oh, "I think maybe
21   we can do a few more things here to try to come to a
22   result in the case"?
23            MS. ARNETT:  Object to form.
24            THE WITNESS:  I think if there's -- if there's
25   a possibility of -- with reviewing those cases, I

Page 48

1    would, again, based on my training and experience at
2    the time, would -- would go with the -- if there's
3    possibilities, you can also take a look at those.
4    BY MS. STAPLES:
5        Q.   Okay.  And I believe that when I asked you
6    earlier about what training you had received specific to
7    cold case investigations --
8        A.   Uh-huh.
9        Q.   -- you couldn't recall, but please correct me
10   if I'm wrong about that.  What training did you receive
11   specific to cold case investigations?
12       A.   There could have been outside sources on -- as
13   -- not -- I don't recall specifically, but there could
14   have been outside sources.
15       Q.   So when you say based on your training, you
16   made that decision.  You don't know what training that
17   you're referring to?
18       A.   I don't recall.
19       Q.   I mean, sir, I -- we're getting ready to go
20   through it here in just a second.  But in the Norman
21   Graham / Janice Kay Williams' investigation, I mean, you
22   conducted numerous investigative steps.  And what I'm
23   trying to determine is is that something that you
24   typically did when investigating cold cases or was this
25   just a special case?

Page 49

1        A.   They were -- the cases were conducted, again,
2    based on my training and experience.  If there were
3    opportunities to review them and -- and look at them,
4    that's -- that's what I did.  I'm not -- I'm trying to
5    answer best I can.
6        Q.   Okay.
7            MS. STAPLES:  Let's go off the record for just
8    a moment, please.
9            THE VIDEOGRAPHER:  Yeah, of course.  Stand by.
10   We are now off the record.  The time is 10:02 a.m.
11            (OFF THE RECORD)
12            THE VIDEOGRAPHER:  We're now going back on the
13   record to continue the deposition of Brad Stevenson.
14   The time is 10:08.
15            Counsel, you may proceed.
16   BY MS. STAPLES:
17       Q.   All right, sir.  Sitting here today, can you
18   recall when you first became involved in the Janice Kay
19   Williams' homicide investigation?
20       A.   I don't recall that specific day.
21       Q.   Okay.
22       A.   But, again, as mentioned earlier, read -- read
23   through the case.  I guess at some point that's how this
24   took off.
25       Q.   Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 15 of 50
The Deposition of BRENT EVANS, taken on April 25, 2024
PageID #: 3728

50..53

Page 50

1        MS. STAPLES:  I am going to hand you what I
2   have marked as Plaintiff's Exhibit 1.
3        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
4   BY MS. STAPLES:
5        Q.    This is part of the Williams' Investigative
6   File that was disclosed to us by counsel for Kentucky
7   State Police.  It is Bates stamped KSP 55 through 303.
8   Do you see those numbers at the top, the Bates stamps?
9        A.    Yes.
10       Q.    Okay.  Obviously, I'm not going to ask you to
11  sit here and look at every piece of paper --
12       A.    Thank you.
13       Q.    -- in that file that I just gave to you.
14       A.    It might be a long time.
15       Q.    But do you recognize the front page of that
16  exhibit?
17       A.    It's -- it would have been a case -- looks
18  like the case form we used for many years.
19       Q.    Okay.  And when you say "the case form that we
20  used," you're referring to the Kentucky --
21       A.    Yes.
22       Q.    State Police --
23       A.    Uh-huh.
24       Q.    -- is that correct?
25       A.    Yeah.

Page 51

1        Q.    And would you agree that this is a form
2   specific to the Janice Kay Williams' murder?
3        A.    Yes.  According to what I'm seeing, yes.
4        Q.    Okay.  And you see that under --
5        A.    Uh-huh.
6        Q.    -- the victim --
7        A.    Yes.
8        Q.    -- data; is that correct?
9        A.    Uh-huh.
10       Q.    Okay.  And would this have been part of the
11  file that you reviewed --
12       A.    Yes.
13       Q.    -- when you were assigned the Janice Kay
14  Williams' investigation?
15       A.    Yes.
16       Q.    Okay.  If you will go ahead and turn to what's
17  Bates stamped KSP 158, so about a hundred pages into --
18       A.    Uh-huh.
19       Q.    -- that exhibit.
20       A.    Okay.
21       Q.    Now, sir, you're obviously welcome to look
22  through this entire record, but I will tell you that
23  based on my multiple multiple reviews of this file, this
24  document that you're looking at at KSP 158 is the first
25  time that I see your name in the file.

Page 52

1        A.    I believe that's correct.  Yes.
2        Q.    So according to this document -- well, strike
3   that.
4             What is this document that you're looking at
5   at 158?
6        A.    It's -- I don't remember the specific -- it's
7   a continuation page, supplementary report.
8        Q.    Okay.
9        A.    Yeah.
10       Q.    And who's the officer making the request on
11  this --
12       A.    That would be me.
13       Q.    And actually, usually that says, "Officer
14  making report" --
15       A.    Uh-huh.
16       Q.    -- I think.
17       A.    Yeah.
18       Q.    That's weird, isn't it?
19       A.    Yeah.
20       Q.    First time I've noticed that.
21       A.    And the other one before.
22       Q.    Okay.  And what is the date of this report,
23  sir?
24       A.    May the 11th.  Okay.  May 15th, 2001.
25       Q.    Okay.  So yeah.  So it's dated May 15th, '01,

Page 53

1   but I see where you're getting the May 11th, 2001.
2        A.    Uh-huh.
3        Q.    Is that in regard to your notation where you
4   had spoken with Bobby Miller?
5        A.    Yes.
6        Q.    Okay.  So would -- do you agree with me that
7   in at least or by at least May 11th of 2001, you had
8   been assigned to the Janice Kay Williams' homicide
9   investigation?
10       A.    Yes.
11       Q.    Okay.  Did you know Ms. Williams prior to her
12  murder?
13       A.    No.
14       Q.    Prior to working on the Williams' homicide
15  investigation, did you know my client Norman Graham?
16       A.    No.
17       Q.    Had you had any previous interactions with him
18  whatsoever?
19       A.    No.
20       Q.    You testified earlier that typically your cold
21  case investigations were assigned to you by a
22  supervisor; is that right?
23       A.    Again, just off my knowledge today, yes.
24       Q.    Yeah.
25       A.    Uh-huh.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 16 of 50
The Deposition of BRIAN EVANS, taken on April 25, 2024
PageID #: 3729

54..57

Page 54

1    Q.   Do you have any reason to suspect that the
2  process was different than that as to how you became
3  involved in the Williams' homicide investigation?
4    A.   I don't recall.  No.
5    Q.   So sitting here today, it's your assumption
6  that you were assigned the case by a supervisor?
7    A.   It would've been, yes.
8    Q.   Do you have any idea -- well, strike that.
9  Were you working at the Madisonville post in May of
10  2001?
11    A.   Yes.
12    Q.   Do you know who your supervisor was at that
13  time?
14    A.   Caroline Boyd (phonetic), I believe was my
15  sergeant at the time.
16    Q.   Did you say Caroline?
17    A.   Caroline Boyd.
18    Q.   And I'm assuming that's a female?
19    A.   Uh-huh.
20    Q.   And was -- well, we'll strike that.  Oh, I'll
21  ask you some more questions about that in a minute.  So
22  it's likely that Sergeant Boyd assigned you the Janice
23  Kay Williams' homicide investigation; is that right?
24    A.   I can only assume that's how -- that's how
25  this happened.

Page 55

1    Q.   Okay.  Did you discuss the work that you
2  conducted on the Williams' investigation with Sergeant
3  Boyd?
4    A.   We would have at some point, yes.
5    Q.   Did she give you guidance on the
6  investigation?
7    A.   I don't recall speci- -- I -- I mean, we
8  would've discussed it.  I don't recall specific
9  conversations about it.
10    Q.   Did Sergeant Boyd review the reports that you
11  submitted --
12    A.   Yes.
13    Q.   -- in the file --
14    A.   Yes.
15    Q.   -- or in the investigation?
16    A.   Yes.
17    Q.   And how specifically would you submit your
18  reports in 2001 in KSP?  In other words, was there a
19  computer program in which you typed out your reports and
20  then they automatically went into the file and up the
21  chain?  Did you print out your reports and physically
22  hand them to the supervisor?  How did that work?
23    A.   I don't recall.  It would've been -- they
24  would've been submitted to them for review.
25    Q.   But what you can't recall is whether that was

Page 56

1  through electronically or --
2    A.   At that time --
3    Q.   -- physically?
4    A.   -- there was some transition to computer, so
5  yeah, I -- I -- but it would've been submitted to them,
6  yes.
7    Q.   Okay.  Did Sergeant Boyd remain your direct
8  supervisor while you were stationed at the Madisonville
9  Post?
10    A.   No.
11    Q.   Who became your direct supervisor after
12  Sergeant Boyd?
13    A.   I don't recall.
14    Q.   And do you recall how long Sergeant Boyd
15  remained your direct supervisor?
16    A.   I don't recall.
17    Q.   Let me ask it this way: According to my review
18  of this Exhibit 1, the last report that I could find
19  bearing your name was from March 16th of 2006.
20    A.   Okay.
21    Q.   That's KSP 230, if you want to turn there.
22    A.   Okay.
23    Q.   And actually, let's do look at KSP 230 because
24  that might answer our -- are you there, sir?
25    A.   230?  Yes.

Page 57

1    Q.   Okay.  And do you recognize this document?
2    A.   Yes.  It's -- it's a supplementary form.
3    Q.   And who's the reporting officer?
4    A.   Me.
5    Q.   What is this report dated?
6    A.   3-16-2006.
7    Q.   And you note in this report that there's been
8  no new leads or information at this time; is that right?
9    A.   Uh-huh.  The case is open.
10    Q.   Now it says -- there's a reviewed by.
11    A.   Uh-huh.
12    Q.   Do you have any idea whose signature or
13  initials?  I can't tell which --
14    A.   I --
15    Q.   -- that is?
16    A.   I can't tell.
17    Q.   Okay.  All right.  I was hoping that might
18  give us --
19    A.   Yeah.
20    Q.   -- an indication as to whether that was
21  Sergeant Boyd or not, but I -- I don't know.  While
22  we're there, do you recall working on the case any later
23  than March of 2006?
24    A.   No.
25    Q.   Would that have been in line with when you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRIAN EVANS, taken on April 25, 2024

58..61

Page 58

1  transferred to the Bowling Green Post?
2      A.  I suppose it would be.
3      Q.  And would that make sense?  Well, strike that.
4  When you transferred to the Bowling Green Post, did you
5  take the Janice Kay Williams' homicide investigative
6  file --
7      A.  No.
8      Q.  -- or case with you?
9      A.  No.
10     Q.  It's not one on which you continued to work
11  once you left Madisonville and then went to Bowling
12  Green; is that correct?
13     A.  Correct.
14     Q.  Okay.  Is it your recollection that the reason
15  why your work on the Williams' investigative case ended
16  was because of that transfer?
17     A.  Yes.
18     Q.  Okay.  So if you began working on the
19  Williams' investigative case -- I mean, the Williams'
20  homicide investigation as early as May of 2001 and you
21  ended as late as March of 2006, is it safe to estimate
22  that you worked on the case for about five years?
23     A.  Yes.
24     Q.  Okay.
25     A.  Had it in my case file.

Page 59

1      Q.  I -- and are you making -- well, why --
2      A.  I had --
3      Q.  -- the distinction?
4      A.  I had -- I had the case.
5      Q.  You weren't working day in and day out for
6  five years on the case in other words?
7      A.  Right.  Right.
8      Q.  Okay.  All right, sir.  Upon receiving the
9  assignment of the Williams' murder, I believe you
10  testified earlier it was your standard practice that you
11  would review the entirety of the case file; is that
12  right?  Did you do that here?
13     A.  To review the case?
14     Q.  Uh-huh.
15     A.  Yes.
16     Q.  Did you learn upon your review of the
17  Williams' homicide file that Norman Graham had been
18  tried in 1981 for Ms. Williams' murder?
19     A.  I had -- yeah.  I mean, I -- I'd heard that.
20  Yeah.
21     Q.  And did you see documentation of that within
22  the investigative file as well?
23     A.  It should have been noted in there.
24     Q.  Yeah.  So if he had been tried in 1981 and you
25  were assigned the case in 2001, he had been tried 20

Page 60

1  years prior to your assignment on the case, correct?
2      A.  Correct.
3      Q.  Okay.  And through your review of the file,
4  did you learn that Mr. Graham had not been re-indicted
5  or re-tried during that 20 years?
6      A.  I suppose I would've known that.
7      Q.  Okay.  During your review of the case file,
8  did you learn that no other individual had been charged
9  within that --
10     A.  Right.
11     Q.  -- 20 years prior?
12     A.  Correct.
13     Q.  So once you were assigned to the Williams'
14  homicide investigation, what steps did you take to --
15  specifically to familiarize yourself with the case?
16     A.  Would've reviewed the case with -- in its
17  entirety at -- at that point.
18     Q.  Okay.
19     A.  Yeah.
20     Q.  And would that include reviewing the police
21  reports from the initial investigation?
22     A.  Yes.
23     Q.  Would that include reviewing the 1981 trial
24  proceedings?
25     A.  I don't recall.

Page 61

1      Q.  Was it your typical practice to review
2  previous trial proceedings in your cold case
3  investigations?
4      A.  I don't recall.
5      Q.  And maybe I should preface that:  Was it
6  typical in the cold cases that you handled for someone
7  to have already been tried in the case?  In other words
8  here --
9      A.  Right.
10     Q.  -- Mr. Graham was tried --
11     A.  Right.  Yes.
12     Q.  -- but it was a hung jury, right?
13     A.  Right.
14     Q.  Was it typical for you to have a case where
15  someone had already been tried and wasn't convicted in
16  the cold case?
17     A.  Right.
18         MS. ARNETT:  Object to form.
19  BY MS. STAPLES:
20     Q.  And when you say "right," do you mean yes,
21  that was -- that was typical?
22     A.  I don't recall any that I worked on.
23     Q.  Okay.  Other than -- other than this case?
24     A.  Yeah.  Yeah.
25     Q.  Okay.  In addition to reviewing the case file

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  in its entirety, did you speak with any of the original
2  investigators from 1980 on this case?
3      A.   I don't recall, other than if Mr. Miller had
4  asked -- I -- others, I don't recall.
5      Q.   Yeah.  And I'll -- I'm going to -- we'll get
6  to you --
7      A.   Okay.
8      Q.   -- speaking with Mr. Miller.  Do you recall
9  having any specific conversations with former Todd
10 County Sheriff, Laurin Morris?
11     A.   No.  Don't recall.
12     Q.   Do you know -- do you -- strike that.  Are you
13 familiar with Sheriff Morris?
14     A.   No.
15     Q.   Okay.  And he's no longer with us, but would
16 you have been familiar with him in 2001?
17     A.   I don't recall being with him.
18     Q.   Okay.  And to be honest sitting here, I can't
19 recall when he passed away.
20     A.   Okay.  Okay.
21     Q.   So he may have already passed away --
22     A.   Got it, right.
23     Q.   -- by that time as well.
24     A.   Yeah.
25     Q.   Do you recall having any conversations with

Page 63

1  former KSP Detective Vernon Albro?
2      A.   No.
3      Q.   If you turn your attention to the file before
4  you, pages KSP 150 through 156 --
5      A.   Okay.
6      Q.   -- you see those documents, sir?
7      A.   Uh-huh.
8      I believe these are multiple reports that were
9  drafted by Detective J.W. Sowell, the first one being in
10 March of 1984 and the last being in October of 1999.  Do
11 you see that on KSP 156?
12     A.   Yes.
13     Q.   Did you speak with Detective J.W. Sowell about
14 the work he or she had done from 1994 until 1999?
15     A.   I don't recall.
16     Q.   Do you know who J.W. Sowell is?
17     A.   Yes, I -- I -- I'm familiar with him.
18     Q.   Was he someone that you worked with at the
19 Madisonville Post?
20     A.   Briefly.
21     Q.   But sitting here today, you don't have any
22 recollection of speaking with Detective Sowell about his
23 work on the Williams' homicide investigation?
24     A.   No.
25     Q.   If you flip to KSP 157 --

Page 64

1      A.   Uh-huh.
2      Q.   -- would you agree that's a Uniform Offense
3  Report --
4      A.   Yes.
5      Q.   -- dated February 26th of 2000?
6      A.   Yes.
7      Q.   And I believe that the officer making that
8  report is a Detective Bryant Bond?
9      A.   Uh-huh.
10     Q.   Do you know Detective Bond?
11     A.   I worked with him briefly.
12     Q.   Okay.  Did you speak with Detective Bond about
13 the work that he had done in the Williams' homicide
14 investigation?
15     A.   I don't recall.
16     Q.   I think I asked you earlier about what your
17 goal was when you were reviewing the case, and I believe
18 you said to see if there were other tasks that should be
19 performed; is that right?
20     A.   Possibility, yeah.
21     Q.   Okay.  What was your goal in re-investigating
22 Ms. Williams' murder?
23     A.   I don't recall specifically, other than if you
24 want to look at the fact that she had been murdered and
25 that she needed a -- if there was an opportunity to try

Page 65

1  and figure out who committed it, that you were trying to
2  -- to figure that out.
3      Q.   So one of your goals was to try to find the
4  perpetrator of Ms. Williams' murder?
5      A.   Yes.
6      Q.   All right, sir.  If you'll turn back to KSP
7  158 --
8      A.   Okay.
9      Q.   -- I believe you testified just a few minutes
10 ago that you recognized this document as being a
11 supplementary report that you had drafted; is that
12 right?
13     A.   Uh-huh.
14     Q.   Okay.  Sitting here today, do you have any
15 reason to believe that you drafted a report in this case
16 any earlier than May 15th of 2001?
17     A.   I don't recall.
18     Q.   Sitting here today, do you have any
19 recollection of taking any investigative steps in this
20 case prior to May 11th of 2001 when you spoke with Bobby
21 Miller?
22     A.   I don't recall.
23     Q.   If you had taken any investigative steps in
24 this case prior to May of -- May 11th of 2001, would it
25 have been your general practice to document those

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 19 of 50
PageID #: 3762
The Deposition of BRIAN EVANS, taken on April 25, 2024

66..69

Page 66

1  investigative steps in a report like this?
2      A.   Yes.  I'm --
3      Q.   And would it have been your general practice
4  to submit those reports to the case file?
5      A.   Yes.
6      Q.   Okay.  You don't have any reports or notes or
7  anything from this case in your personal possession,
8  custody, or control; is --
9      A.   No.
10     Q.   -- that right?  You don't have a box sitting
11 in your basement dedicated to the Williams'
12 investigative file where you kept any reports or
13 anything?
14     A.   No.
15     Q.   Is that right?
16     A.   No.
17     Q.   Okay.  So going through this May 15th, 2001,
18 report, you indicate that on May 11th, you spoke with
19 Bobby Miller, who was the chief of Police of the Elkton
20 Police Department in reference to this case.
21          And you also note that Chief Miller is a
22 retired Kentucky State Police detective who had worked
23 on this case.  Just for sake of clarification for the
24 record, do you know Chief Miller, Chief Bobby Miller to
25 be the same individual as Chief Robert Miller?

Page 67

1      A.   I believe that would be, yes.  Yes.
2      Q.   Okay.
3      A.   Yes.  Yes.
4      Q.   I know, silly question.
5      A.   Yeah, yeah.  Sure.
6      Q.   But I just want to make sure we're talking
7  about the same people -- or same person --
8      A.   Right.
9      Q.   -- I should say.  Okay.  So please tell me how
10 and why you came to speak with Chief Miller in May of
11 2001 in reference to this case?
12     A.   I don't recall specifics about that other than
13 asking about the case.  I mean, I -- but I don't recall
14 specifically.
15     Q.   Do you know if you reached out to Mr. Miller
16 or if Mr. Miller reached out to you about the case?
17     A.   I don't recall.  I don't recall specifically
18 how that would've gone.
19          THE WITNESS:  (Sound effect) I don't know what
20     that is.
21          MS. STAPLES:  I think somebody hung up in the
22 --
23          THE WITNESS:  Yeah.
24          MS. STAPLES:  -- in the lights.
25          THE WITNESS:  They hit the wire.

Page 68

1          UNIDENTIFIED SPEAKER:  The lights don't work
2  anymore, so --
3          THE WITNESS:  I think somebody got hung up in
4  the wire.
5          MS. STAPLES:  Okay.  Sorry.  Amber, apparently
6  a truck right outside the window hung up in the
7  traffic lights --
8          THE WITNESS:  Something happened.
9          MS. STAPLES:  -- right outside the window and
10 made a really loud noise.  And you could see the
11 lights, like, shaking like crazy.  Now they're
12 blinking.  So sorry.  We were like little squirrels,
13 but it -- it sounded kind of loud.
14          THE WITNESS:  Yeah.
15 BY MS. STAPLES:
16     Q.   All right.  Now according to this report,
17 Chief Miller gave you a box containing the murder case
18 in 2-84-840; do you see this -- or see that?  I'm sorry.
19     A.   Yes.
20     Q.   Sitting here today, do you recall what murder
21 case 2-84-840 is?
22     A.   I don't specifically know that case number.
23     Q.   Okay.
24          MS. STAPLES:  Let me hand you what we've marked
25 as Plaintiff's Exhibit 2.

Page 69

1          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
2  BY MS. STAPLES:
3      Q.   This is the investigative file that's been
4  disclosed in case number 2-84-840.  It's Bates stamped
5  Graham 283 through 451.  And I think it's labeled, like,
6  the Church investigative File.
7          I got to find my copy.  I'm sorry.
8      A.   Okay.
9      Q.   All right, sir.  If you turn to the second
10 page of that file -- and for some reason, I'm not -- oh,
11 there's -- I was trying to look for the Bates stamp and
12 I couldn't see it.  It's -- it's at the very bottom
13 right corner.  It's Bates Graham 284; do you see that?
14     A.   I'm sorry.  What?
15     Q.   Graham 284.  It's the second page.
16     A.   Okay.  Right - right here.
17     Q.   You're - you're near.
18     A.   Okay.
19     Q.   Do you recognize this document, sir?
20     A.   No.
21     Q.   Do you recognize this to be a Uniform Offense
22 Report?
23     A.   Yes.
24     Q.   Is it one that was used by the Kentucky State
25 Police?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB     Document 130-18     Filed 10/27/25     Page 20 of 50
PageID #: 3733
The Deposition of BRENDA EVANS, taken on April 25, 2024

70..73

Page 70

1    A.   Yes.
2    Q.   And would you agree that the case number is
3  listed 2-84-840?
4    A.   Okay.  Yes.
5    Q.   And do you see there in the middle of the page
6  where it lists the victim data?
7    A.   Yes.
8    Q.   And who is the victim that's named in this
9  case?
10    A.   Brenda Church.
11    Q.   Okay.  Now that you've seen that document,
12  does that refresh your recollection as to what case
13  2-84-840 is?
14    A.   Yes, the best of my knowledge today.
15    Q.   Okay.
16    MS. STAPLES:  Sir, I am going to hand you what
17  we'll mark as Plaintiff's Exhibit number 3.
18    (EXHIBIT 3 MARKED FOR IDENTIFICATION)
19  BY MS. STAPLES:
20    Q.   It's Bates stamped Graham 4177.  Take a second
21  to look at that, please.
22    Do you recognize that photo?
23    A.   No.
24    Q.   This was a photo that was disclosed to us in
25  this litigation.  And I wondered if it - if this was a

Page 71

1  photo depicting the box that Bobby Miller had brought to
2  you in regard to the Church -
3    A.   I don't -
4    Q.   -- investigation?
5    A.   I don't recall.
6    Q.   Okay.  When you met with Mr. Miller on
7  May 11th of 2001, did he inform you how he came to be in
8  possession of this Church investigative file?
9    A.   No, I don't recall.
10    Q.   And I ask because Mr. Miller, as you note in
11  your report, was no longer employed by the Kentucky
12  State Police, right?  He was then the Chief of Police
13  for the Elkton Police Department?
14    A.   Right.
15    Q.   So I wonder why it is that an employee of a
16  different police agency would have in his possession the
17  KSP investigative file in the Church murder?
18    A.   I don't recall.
19    Q.   When you were employed with the Kentucky State
20  Police, where did you store the investigative files on
21  which you were the lead case officer?
22    A.   They were - they were stored at the Post.
23    Q.   Did you ever take your - the case files on
24  which you were the lead case officer home with you?
25    A.   No.

Page 72

1    Q.   Do you know if it was common for investigators
2  with the Kentucky State Police to take investigative
3  files home with them?
4    A.   I don't recall.
5    Q.   Was there a practice or policy in place at the
6  Madisonville Post directing that investigative files
7  remain at the Post?
8    A.   They would've had to been checked out.  Like,
9  you couldn't - I - I think that's the policy on that.
10  I -- but I don't recall specifics.
11    Q.   The policy that dictated that investigative
12  files would need to be checked out before they left
13  Post, was that also true of physical evidence that was
14  stored at Post in cases?
15    A.   I would assu -- I - I don't recall specifics
16  about -- but any of that would've -- would've had to
17  have a timeline or stamp on it, I suppose.
18    Q.   And why is that?  Why would there have to be a
19  timeline or stamp if evidence was taken out of Post?
20    A.   I believe it would be to keep with the
21  integrity of the investigation.  I was -- suppose
22  that's -- that's how that would've been.
23    Q.   Yeah.  And to note, like, chain of custody.
24  Would that be --
25    A.   Right.

Page 73

1    Q.   -- an issue --
2    A.   Yes, that's --
3    Q.   -- as well?
4    A.   Yes.
5    Q.   So to maintain the integrity of the
6  investigation and to note chain of custody?
7    A.   Right.
8    Q.   Okay.  So what was your understanding of
9  Mr. Miller's purpose in bringing and giving you the box
10  containing murder case 2-84-840?
11    A.   I don't recall that specific event, but based
12  on the case report here, that's -- that's -- I can tell
13  you based on the case report that there would've been
14  some discussion, it -- it appears, that -- between
15  the -- the two cases.
16    Q.   Okay.  Yeah.  According to this case report
17  drafted by you, you say that, "Chief Miller gave this
18  unit case 2-84-840 to compare with case 2-80-543 to see
19  if there may be evidence in both for testing to
20  determine if the accused in case 2-84-840 could have
21  been involved in case 2-80-543;" is that right?
22    A.   Based on the case.
23    Q.   And according to this file, case 2-80-543 is
24  the case number for the Janice Kay Williams'
25  investigation; is that right?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 21 of 50
PageID #: 3734
The Deposition of BRENDA EVANS, taken on April 25, 2024

74..77

Page 74

1    A.   Correct.
2    Q.   Okay.  And you testified earlier that you were
3 trained for your reports to be accurate; is that right?
4    A.   Correct.
5    Q.   And you made efforts --
6    A.   Yes.
7    Q.   -- to ensure that your reports were accurate
8 when you drafted them; is that right?
9    A.   Sure.
10   Q.   So you have no reason to refute what you wrote
11 in May of 2001 regarding the purpose of Mr. Miller
12 bringing you this case file; is that right?
13   A.   Based on the case, I can -- that's what I can
14 tell you about today.
15   Q.   Sure.  So in May of -- in at least May of
16 2001, it appears that Mr. Miller had expressed to you
17 some belief that the accused in Brenda Church's murder
18 could have been involved in Ms. Williams' murder;
19 is that right?
20   A.   Based on case information.
21   Q.   Did Mr. Miller express to you how long he had
22 held that belief?
23   A.   I don't recall that conversation specifically.
24   Q.   If you look quickly at the next page KSP 159,
25 the paragraph under your numbered paragraphs there, do

Page 75

1 you see, "An attempt to compare" --
2    A.   Uh-huh.
3    Q.   Do you see where you drafted in this report
4 dated 7-12-01, that an -- an attempt to compare the
5 cases was done in 1985 by Detective Robert Miller and
6 Detective Albro?
7    A.   Yes.
8    Q.   Does that indicate to you that Mr. Miller may
9 have held this belief as far back as 1985, that the
10 accused in Brenda Church's murder was also responsible
11 for Ms. Williams' murder?
12   A.   According to the case.
13      MS. ARNETT:  Object to form.
14 BY MS. STAPLES:
15   Q.   Now did you ultimately review the
16 investigative file that Mr. Miller had brought to you
17 regarding the murder of Brenda Church?
18   A.   I don't recall specifics about that day or
19 re-reading of that.
20   Q.   Well, let me ask you some specifics to see if
21 it refreshes your recollection.  First, sitting here
22 today, do you recall who the accused in the Church
23 murder case is?
24   A.   I see the accused here.
25   Q.   Okay.  And who's that?

Page 76

1    A.   Roy Wayne Dean.
2    Q.   Prior -- well, strike that.  Do you know who
3 Roy Wayne Dean is, sir?
4    A.   I know him only by name in the investigation
5 and I did happen to speak with him.
6    Q.   Do you know him to be an individual who's been
7 convicted of multiple murders in the Todd County
8 Kentucky area?
9    A.   I know of maybe one that -- off the top of my
10 head.
11   Q.   Okay.  Is it your testimony that you don't --
12 you're not familiar with the fact that Mr. Dean is
13 accused of being a serial killer in the area?
14   A.   Specific serial killer?  No, I don't recall
15 that, but --
16   Q.   All right.  Well, I.
17   A.   -- I do -- go ahead.
18   Q.   Sure.  Yeah.  We'll ask you about some of the
19 other murders here in just a minute.  During -- well,
20 you say that you can't recall whether you actually
21 reviewed the Church investigative file; is that right?
22   A.   Right.
23   Q.   Okay.  So let's look at the top then of -- of
24 page KSP 159 of Plaintiff's Exhibit 1.
25      Again, this is a report that was drafted by

Page 77

1 you on July 12th of 2001; is that correct?
2    A.   Correct.
3    Q.   And what does that first sentence say there,
4 sir?
5    A.   Of number one?
6    Q.   The -- the -- yeah, the first sentence of the
7 page.
8    A.   Oh, "This case is currently being reviewed by
9 the unit in regards to comparison case.  It's accused
10 2-84-842 cases are similar based on character -- or
11 following characteristics."
12   Q.   Okay.  So does that sentence indicate to you
13 that you did in fact review the Church murder
14 investigation?
15      I mean, you state as much right there in that
16 sentence; is that correct?
17   A.   Right.
18   Q.   Okay.
19   A.   Based on the case.
20   Q.   Okay.  Now, during your review of the Church
21 murder file, did you learn that Roy Wayne Dean was
22 ultimately convicted of Ms. Church's murder?
23   A.   Yes.
24   Q.   During your review of the Church murder file,
25 were you able to determine who the lead investigator on



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 22 of 50
The Deposition of BRENT EVANS, taken on April 25, 2024
PageID #: 3735

78..81

Page 78

1  the Church murder was?
2      A.   I don't recall specifics, but it appears to be
3  noted here.
4      Q.   And who is noted there?
5      A.   R. Miller.  We -- yeah.
6      Q.   And would it -- and that would make sense as
7  to why you were talking with --
8      A.   Yes.  Yes.
9      Q.   -- Detective Miller or Chief Miller about the
10 Church murder investigation; is that right --
11     A.   Yes.
12     Q.   -- because he was the lead case officer on
13 that investigation, correct?
14     A.   Yeah.  Yeah.  According to the case report.
15     Q.   Okay.  You also note that he was the lead
16 investigator in the Church murder investigation in an
17 affidavit for search warrant that you did.  If you want
18 to look at that on page -- page P166.  We'll talk more
19 specifically about this just in just a minute, but would
20 you agree that this is an affidavit for a search warrant
21 that you drafted in July of 2001?
22     A.   Drafted by the courts, I suppose.
23     Q.   Well, you supplied -- you were the affiant
24 who --
25     A.   Right.

Page 79

1      Q.   -- supplied this information --
2      A.   Right, right.
3      Q.   -- in the affidavit, correct?
4      A.   Based on the case information.  Correct.
5      Q.   Okay.  Yeah.  And at the bottom of that
6  affidavit, you spoke that -- or you state, I'm sorry,
7  that you, "Spoke with Robert Miller, retired detective
8  with the Kentucky State Police who was the lead
9  investigator of the Brenda Church murder;" is that
10 right?
11     A.   Yes.
12     Q.   Okay.  So it appears that you knew at the time
13 that Mr. Miller was the lead case officer --
14     A.   Yes.
15     Q.   -- on the Brenda Church murder?  Prior to this
16 discussion with Mr. Miller about the Church murder and
17 Roy Wayne Dean, had you had any -- or were you with --
18 strike that, I'm sorry.
19          Were you familiar with even the name Roy Wayne
20 Dean prior to conducting this review of the Church
21 murder investigation?
22     A.   I don't recall.
23     Q.   Okay.  So to your knowledge, sitting here
24 today, you at least have no recollection of having any
25 previous encounters with Roy Wayne Dean; is that right?

Page 80

1      A.   Right.
2      Q.   Okay.  Now it appears that based on your
3  conversation with Robert Miller on May 11th, 2001, you
4  spoke with County Attorney Mac Johns in regard to
5  obtaining a search warrant for Roy Wayne Dean; is that
6  correct?  And that's back on KSP 158.
7      A.   According to the case.
8      Q.   Okay.  And it looks like you told Mr. Johns
9  that you would get back with him about that after you
10 reviewed the cases, right?
11     A.   Yes.
12     Q.   Okay.  So turning back now to KSP 150 -- oh,
13 no, no.  I'm sorry.  Stay on 158.  It looks like on May
14 15th of 2001, you spoke with Rhonda Wood-Willoby in
15 reference to photographs from the Williams' case.
16 Do you know who Rhonda Wood-Willoby is?
17     A.   Not right off.  Can I look at some
18 photo -- some photography or the -- I'm -- I'm not sure.
19     Q.   Okay.
20     A.   Yeah.  I don't --
21     Q.   You had also noted previous -- in the previous
22 notation that Chief Miller had also brought photos from
23 the Church file.  Oh, wait, strike that.  It looks like
24 Chief Miller gave you photos of the scene from case
25 280543, which is the Williams' file; is that correct?

Page 81

1      A.   According to the case.
2      Q.   Do you know why it is that Mr. Miller would've
3  had in his possession photos of the crime scene?
4      A.   No.
5      Q.   Do you agree that it's a bit odd that
6  Mr. Miller would've had those in his possession?
7      A.   I -- I don't --
8          MS. ARNETT:  Object to form.
9          THE WITNESS:  I don't know why.  I can't speak
10 for him.
11 BY MS. STAPLES:
12     Q.   Was it typical for you to receive photos or
13 case files from individuals who were no longer employed
14 with the Kentucky State Police?
15     A.   I don't recall.
16     Q.   You don't recall that --
17     A.   I don't recall it.  No, I don't --
18     Q.   -- happening in any other situation?
19     A.   -- recall.  I don't recall.  No.
20     Q.   Now ultimately, you did a review of the
21 Williams and Church case files, correct?
22     A.   Yes.
23     Q.   And that included a copy of -- a review of
24 photos that were in both of the files?
25     A.   Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 23 of 50
PageID #: 3736
The Deposition of BRENT EVANS, taken on April 25, 2024
82..85

Page 82

1    Q.   Okay.  I'm going to ask you some questions
2  about these photos.
3         MS. STAPLES:  For purposes of the record, we're
4    going to mark these Plaintiff's Exhibit 4 and 5.
5         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
6         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
7  BY MS. STAPLES:
8    Q.   Both of these photos are graphic. 4 is Bates
9  stamped Graham 4174, and 5 is KSP 24.
10        THE REPORTER:  Top one is 4?
11        MS. STAPLES:  Yes.
12 BY MS. STAPLES:
13   Q.   Sir, do you recognize the photo that we have
14 marked as Plaintiff's Exhibit number 4?
15   A.   They're homicide photo -- photographs.
16   Q.   Do you recognize this as being a photo taken
17 of Ms. Church's deceased body?
18   A.   Only -- you would have to -- I mean, to fully
19 understand that the -- the case is associated with this
20 case, yes.
21   Q.   I mean, you have no reason to refute that this
22 was a photo --
23   A.   No.
24   Q.   -- that was provided to you of -- from the
25 Church file; is that right?

Page 83

1    A.   No.
2    Q.   Okay.  Likewise, do you recognize what we have
3  marked as Plaintiff's Exhibit number 5?
4    A.   Right.
5    Q.   And what -- do you know what that is a photo
6  of?
7    A.   It must be of case -- of the Janice Williams'
8  case.
9    Q.   Okay.  And that is a file that you -- excuse
10 me.  Strike that.  That is a photo that you would have
11 reviewed from the Janice Kay Williams' investigative
12 file; is that correct?
13   A.   Correct.
14   Q.   Okay.  So turning back to your report,
15 KSP 159 --
16   A.   Uh-huh.
17   Q.   -- is it accurate to state that after you
18 reviewed the Church and the Williams' murder files,
19 you determined that there were some similarities in the
20 cases?
21   A.   Well, based on the case information, yes.
22   Q.   Okay.  And again, this is a report that was
23 drafted by you in July of 2001.  And it was your
24 practice to be accurate when documenting your reports;
25 is that right?

Page 84

1    A.   As to the best of my training and ability,
2  yeah.
3    Q.   Sitting here today, you have no reason to
4  refute the accuracy of the information that you provided
5  in this report?
6    A.   Based on my training and experience at the
7  time.
8    Q.   Okay.  So based on this report, what were the
9  multiple similarities that you determined between the
10 two cases?
11   A.   Overkill.  Is that -- you want that --
12   Q.   Yes, sir.
13   A.   Yeah.
14   Q.   And what do you mean by "overkill"?
15   A.   The -- the -- in the manner in which someone
16 was killed, would've been not necessarily one specific
17 blow, but multiple in a -- in -- in a chain of events.
18   Q.   Okay.  And what was the next similarity that
19 you noted?
20   A.   That the victims had been reported as raped,
21 based on the case file.  And then the victims had their
22 wrists bound together on the back.
23   Q.   And just stopping you there, are these two
24 pictures indicative of that fact; Exhibits 4 and 5?
25   A.   Based on what you can see --

Page 85

1    Q.   Uh-huh.
2    A.   -- and-- yes.
3    Q.   And what other similarities did you notice?
4    A.   Similar positions were left.
5    Q.   Similar positions, meaning the position in
6  which their bodies were left?
7    A.   Uh-huh.  And then it's known that the victim
8  knew the accused in 2-84-840.  It's not known the victim
9  knew the accused in 2-85-43 but could have lived with
10 decedent -- but the accused did have an address at the
11 time of -- in Guthrie on August 12th of 1980.
12   Q.   Okay.  So let's just -- let me ask you a few
13 questions about that.
14        I think we've already established that the
15 accused in case 284840 was Roy Wayne Dean; is that
16 right?
17   A.   Right.
18   Q.   And you state here that it was known that
19 Ms. Church knew Roy Wayne Dean, correct?
20   A.   Correct.
21   Q.   And that was from a review of your -- of the
22 case file in the Church murder, right?
23   A.   Yes.
24   Q.   In fact, do you recall that Roy Wayne Dean had
25 worked for Ms. Church's husband?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 86

1   A.   You -- not specifically.  Yeah.
2   Q.   No reason to refute that though?
3   A.   Right.  Right.
4   Q.   Okay.  Now you state at the time that it was
5   not known if Ms. Williams knew Roy Wayne Dean; is that
6   right?
7   A.   Correct.
8   Q.   But you had determined that Roy Wayne Dean had
9   an address of general delivery in Guthrie, Kentucky as
10  of August of 1980; is that right?
11  A.   Based on the investigation.
12  Q.   Okay.  And just for purposes of the record,
13  would you agree that Ms. Williams was murdered in June
14  of 1980?
15  A.   According to the case report, yes.
16  Q.   Okay.  Were you later able to obtain a more
17  specific address for Roy Wayne Dean?
18  A.   I don't recall.
19  Q.   Okay.  If you will flip over to the next page,
20  KSP 160 and take a second just to read to yourself, that
21  top paragraph beginning with, "On July 6th" --
22  A.   Okay.
23  Q.   Before I ask you specific questions about that
24  paragraph, can you tell me what this document is that
25  we're looking at right now?

Page 87

1   A.   It appears that Mr. -- by probation parole,
2   they determined that -- that he had had a address
3   February to June 1980 in Tiny Town Trailer Park --
4   Q.   Okay.
5   A.   -- or well, let's see.  June -- June through
6   August of 1980.  There's --
7   Q.   Okay.  Yeah.
8   A.   -- a couple of different dates there but, yes.
9   Q.   So before we get there, would you agree
10  that this is a supplement to a Uniform Offense Report?
11  A.   Yes.
12  Q.   And that it is drafted by you?
13  A.   Yes.
14  Q.   And dated July 12th of 2001?
15  A.   Yes.
16  Q.   Okay.  And on this report, you note that
17  probation and parole advised the Circuit Court clerk
18  that from June to August of 1980, Roy Wayne Dean had an
19  address in the Tiny Town Trailer Park; is that right?
20  A.   Right.
21  Q.   Okay.
22  A.   According to the investigation.
23  Q.   And was the fact that Roy Wayne Dean lived in
24  the Tiny Town Trailer Park in June of 1980 any -- of any
25  significance to you?

Page 88

1   A.   I don't recall specific -- specifics to that,
2   but --
3   Q.   Can you recall where Ms. Williams lived at the
4   time of her murder in June of 1980?
5   A.   The Tiny Town Trailer Park --
6   Q.   Okay.
7   A.   -- according to the report.
8   Q.   Okay.
9   A.   Yeah.
10  Q.   So was the fact that Ms. Williams was murdered
11  in the Tiny Town -- Tiny Town Trailer Park in June of
12  1980, where you discovered Roy Wayne Dean lived at the
13  same time, significant?
14  A.   Possibly.
15  Q.   Did you later learn that Ms. Williams did in
16  fact know Roy Wayne Dean?
17  A.   I don't recall.
18  Q.   Do you recall learning that Ms. Williams had
19  been harassed by Roy Wayne Dean prior to her death?
20  A.   I don't recall.
21  Q.   You don't recall learning that?
22  A.   No.
23  Q.   It's possible that you did.  Just don't recall
24  that sitting here, this -- all this time later?
25  A.   I don't recall.  Right.

Page 89

1   Q.   Okay.  Now after determining the multiple
2   similarities between the murder of Ms. Church and the
3   murder of Ms. Williams, did you take any steps to obtain
4   physical evidence from Roy Wayne -- Roy Wayne Dean?
5   A.   Yes.
6   Q.   Okay.  If you will please, turn your attention
7   to KSP 161.
8        And first, before you turn your attention to
9   that, what do you recall -- what steps do you recall
10  taking to obtain physical evidence from Mr. Dean?
11  A.   I don't specifically recall the steps.
12  Q.   Okay.
13  A.   I mean, I -- I just -- I -- I can tell you
14  based on the case report.
15  Q.   Yeah.  Okay.
16  A.   Yeah.
17  Q.   Well then now turn to --
18  A.   Okay.
19  Q.   -- KSP 161, please.
20  A.   Sure.
21  Q.   Do you recognize this document?
22  A.   Sure.
23  Q.   And what is this document?
24  A.   It's a Uniform Offense Report.
25  Q.   Okay.  And who is this -- who drafted this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 25 of 50
                              PageID #: 3738
The Deposition of BRENDA PENCE, taken on April 25, 2024
                                                                    90..93

Page 90

1 report?

2    A.    That'd be me.

3    Q.    Okay.  And when is this report dated?

4    A.    July 31st of '01.

5    Q.    Okay.  If you'll look particularly at

6 Paragraph 4 which is dated July 30th, 2001 -- do you see

7 where that is?

8    A.    Yes.

9    Q.    If you'll just read that report to yourself

10 quickly.  I'm going to get my glasses.

11    A.    The first one, July 30th?

12    Q.    July 30th.

13    A.    Okay.

14    Q.    Yes.  The first July 30th.  I'm sorry.

15    A.    Okay.

16    Q.    I'll be able to read better if I actually put

17 my glasses on.  Oh, yeah, that really helps.  Okay.

18          So did reading that report or that paragraph

19 refresh your recollection as to what steps that you took

20 to obtain physical evidence from Roy Wayne Dean?

21    A.    Noted in the case here.

22    Q.    Okay.  And what did you note in the case?

23    A.    That the search warrant was obtained.

24 Just -- I get -- let me see.  So you would -- I -- based

25 I guess -- I'm assuming this is based on that report --

Page 91

1 or the search warrant, items to be seized from -- to be

2 used in comparison with Case 2-85-43.

3    Q.    Okay.  So according to this report you

4 drafted, on July 30th of 2001, you spoke with Todd

5 County Attorney Mac Johns, correct?

6    A.    Yes.

7    Q.    That conversation was in reference to

8 obtaining a search warrant for Roy Wayne Dean, Jr.,

9 correct?

10    A.    Uh-huh.

11    Q.    And the purpose was to use that for testing in

12 comparison to evidence that had been collected in the

13 Williams' homicide?

14    A.    Yes.

15    Q.    Is that right?

16    A.    Yes.

17    Q.    So did you ultimately draft a search warrant

18 affidavit?

19    A.    Yes.

20    Q.    And if you'll turn with me to KSP 165 through

21 169, take just a second to look at those documents.

22    A.    Yep.

23    Q.    Okay.  Do you recognize these documents, sir?

24    A.    They would have been evidence examining -- or

25 the -- you're talking about more specific, the -- the

Page 92

1 search warrant affidavit, right?

2    A.    Uh-huh.

3    A.    Yeah.

4    Q.    And would you agree that the -- that you are

5 the individual who signed the search warrant as the

6 affiant?

7    A.    Yes.

8    Q.    Okay.  And therefore, you're the one who

9 supplied the information that is contained within the

10 body of the affidavit; is that right?

11    A.    Yes.

12    Q.    Okay.  And you noted in this search warrant

13 affidavit, that you had compared the facts of Ms.

14 Williams' murder to similar incidents, and determined

15 that on September 27th of 1984, Brenda Church was

16 murdered in Todd County, Kentucky; is that right?

17    A.    Yes.

18    Q.    Okay.  You discussed the fact that you had met

19 with Robert Miller who was the lead investigator in the

20 Brenda Church murder, right?

21    A.    Right.

22    Q.    And in the body of this affidavit, you talked

23 about the multiple similarities in the two cases; is

24 that right?

25    A.    Correct.

Page 93

1    Q.    And those were the similarities that we went

2 over earlier including being raped, being bound with her

3 hands behind their back --

4    A.    Uh-huh.

5    Q.    -- the overkill, those -- those similarities;

6 is that right?

7    A.    Yes.

8    Q.    Okay.  What did you state was the only

9 dissimilarity between the two cases?

10    A.    I'm not sure.  I don't -- if I'm seeing that.

11 I mean, dissimilarity that --

12    Q.    So if you look at the first -- that third

13 paragraph of the body of the affidavit on KSP 166 --

14    A.    Uh-huh.

15    Q.    -- do you see where you state that you

16 compared the two incidents and determine the only

17 dissimilarity was the weapon utilized?

18    A.    Okay.

19    Q.    Do you have any reason to question the --

20    A.    No.

21    Q.    -- accuracy of that today?

22    A.    No.  No.  It's -- no.  It's -- no, I don't

23 know.

24    Q.    Yeah.  Okay.

25    A.    Just don't recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRENT EASTON, taken on April 25, 2024

94..97

Page 94

1    Q.   And you even went as far as to say that
2  "Consequently, Affiant concluded there were more
3  similarities than dissimilarities existed between the
4  two cases"; is that right?
5    A.   Based on the case, yes.
6    Q.   Okay.  Did the judge ultimately grant your
7  request for a search warrant?
8    A.   Yes.
9    Q.   And was the search warrant executed?
10   A.   Yes.
11   Q.   What evidence specifically was obtained from
12 Mr. Dean in regard to the search warrant?
13   A.   Was it -- I'm just looking at this -- at the
14 evidence with DNA collected.  Blood -- blood collection.
15 Based on this.  I -- I don't recall exactly.
16   Q.   What about if you look at KSP 169?
17   A.   Blood, hair, saliva.  Okay.  I see there at
18 the bottom.
19   Q.   Okay.  Would you agree that this is a document
20 noting the execution of the search warrant?
21   A.   Yes.
22   Q.   Okay.  And would you agree that according to
23 this document, the search warrant was executed on July
24 31st of 2001?
25   A.   According to the report.

Page 95

1    Q.   And according to this report, you were the
2  officer who executed that search warrant?
3    A.   Yes.
4    Q.   Okay.  And according to this report, that's
5  where you were reading that blood, hair and saliva for
6  the suspect, sexual assault evidence or biological
7  reference collection kit was obtained; is that right?
8    Q.   Is there a reason why Roy Wayne Dean's -- why
9  a sperm sample was not obtained from him?
10   
11   A.   I don't recall.
12   Q.   Okay.  So is it safe to say that during your
13 investigation, you believed that Roy Wayne Dean could be
14 an alternate suspect in the Janice Kay Williams' murder?
15   A.   At -- at this point in time, that's --
16 according to the case report.
17   Q.   Okay.  During your review of the Church
18 investigative file, did you review any documents in
19 relation to Roy Wayne Dean's mental health?
20   A.   I don't recall.
21   Q.   Do you recall reviewing a psychological
22 examination report which documented that Dean was
23 diagnosed as schizophrenic?
24   A.   I don't recall.
25   Q.   All right.  Let me hand you a couple

Page 96

1  documents.  Okay.  The first document that I'm going to
2  hand you is a report from Comprehensive Care Center that
3  is Bates stamped Graham 2461 through 262.  We'll mark
4  that as Plaintiff's Exhibit number 6, please.  And the
5  second document that I'm going to hand you is a document
6  from Pennyroyal Center that is Bates stamped Graham
7  2459 -- 2459.  Sorry.  Take a second to review those.
8        (EXHIBIT 6 MARKED FOR IDENTIFICATION)
9        (EXHIBIT 7 MARKED FOR IDENTIFICATION)
10   A.   I don't recall seeing these.
11 BY MS. STAPLES:
12   Q.   So that was going to be my question.  Sitting
13 here today, you don't recall seeing these documents as
14 part of your review of the Brenda Church murder file?
15   A.   I -- I don't.
16   Q.   You're not saying specifically -- or you're
17 not saying that you did not review them or you just
18 don't have a recollection of review?
19   A.   I -- I don't have a recollection of this.
20   Q.   Okay.  Do you agree with me that according to
21 Plaintiff's Exhibit number 6, Comprehensive Care
22 employees were called to the emergency room of Jimmy
23 Stewart Hospital in August of 1980?
24     MS. ARNETT:  Object to form, foundation.
25     THE WITNESS:  Right here?

Page 97

1  BY MS. STAPLES:
2    Q.   I'm sorry.  It's in Exhibit number 6.
3    A.   I don't recall seeing the form -- I mean,
4  or these reports.
5    Q.   You don't -- you don't refute what this report
6  says?
7    A.   I -- I don't.
8    Q.   Okay.
9    A.   I don't have a recollection of it.
10   Q.   Without -- even without not specifically
11 remembering or recalling seeing these forms, do you have
12 any recollection of learning that just a couple months
13 after Ms. Williams was murdered, Mr. Dean was taken to
14 the emergency room after choking his mother and saying
15 that he was hearing voices?
16   A.   I don't recall that.
17   Q.   Even without recalling, looking at these
18 reports, do you have any recollection of learning that
19 Mr. Dean had been determined to be acutely psychotic in
20 August of 1980?
21   A.   I don't recall.
22   Q.   Do you recall learning that Mr. Dean had been
23 determined to have been acutely psychotic for several
24 weeks previous to August of 1980?
25   A.   I don't recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 27 of 50
PageID #: 3740
The Deposition of BRENT EVANS, taken on April 25, 2024
98..101

Page 98

1    Q.   Do you recall learning that Mr. Dean had been
2  diagnosed as being schizophrenic?
3    A.   I don't recall.
4    Q.   During your investigation into the Janice Kay
5  Williams' homicide, did you learn that Roy Wayne Dean
6  had admitted -- had admitted to killing something in
7  Tiny Town Trailer Park?
8    A.   I don't recall.
9    Q.   During your investigation, did you ever speak
10  with any of Roy Wayne Dean's family members?
11    A.   No.  I don't recall ever.
12    Q.   Did you ever speak with Roy Wayne Dean's
13  ex-wife?
14    A.   I don't recall.
15    Q.   During your investigation, did you ever learn
16  that multiple members of Roy Wayne Dean's family stated
17  that they had observed him running from the area of
18  Ms. Williams' trailer on the night of her murder?
19    A.   No, I don't recall.
20    Q.   Are you aware that DNA testing was done on
21  some of the physical evidence in the post litigation,
22  post-conviction litigation for Mr. Graham?
23    A.   I don't -- don't know about it.
24    Q.   You don't know about that?
25    A.   I don't know.  No, I don't.

Page 99

1    Q.   Does that mean you've never heard that Roy
2  Wayne Dean could not be excluded from segments of the
3  bootlaces that were used to bound Ms. Williams?
4        MS. ARNETT:  Object to form.
5        THE WITNESS:  I don't recall any tests
6    being -- you said post litigation?
7  BY MS. STAPLES:
8    Q.   Uh-huh.
9    A.   I don't recall any tests being -- no.
10    Q.   During your investigation, did you review any
11  other cases for which Roy Wayne Dean had been convicted
12  of murder?
13    A.   Don't recall.
14    Q.   Do you recall reviewing the Deeann Rapp
15  investigative file?
16    A.   No.
17    Q.   During your investigation, did you learn that
18  Deeann Rapp was murdered in August of 1984 -- '84?
19    A.   Okay.  I -- I don't recall your -- that
20  investigation.  I -- I mean, I -- I'm not saying I
21  didn't.
22    Q.   Okay.
23    A.   But I just don't recall.
24    Q.   Okay.  And Ms. Rapp's murder occurred in
25  Montgomery County, Tennessee.  Does that refresh any

Page 100

1  recollection that you may have?
2    A.   Then -- so then that would've been a multiple
3  piece then --
4    Q.   Yes, sir.
5    A.   Okay.  -- to that.  I don't recall reviewing
6  the case.
7    Q.   Okay.  Being familiar with the Todd County
8  area and also with the Tennessee area, do you know how
9  close in proximity you would estimate that Montgomery
10  County Tennessee is from Todd County?
11    A.   I believe they border.
12    Q.   So pretty close in proximity then, correct?
13    A.   Pretty close in proximity.
14    Q.   Okay.  During your investigation, do you
15  recall learning that Roy Wayne Dean had pled guilty to
16  killing Ms. Rapp in Montgomery County -- Montgomery
17  County, Tennessee?
18    A.   I don't recall that specifically.
19    Q.   Okay.  Do you have any recollection of
20  learning that during a psychological examination
21  conducted in Ms. -- in Roy Wayne Dean's criminal case
22  for the murder of Deeann Rapp, he admitted to hearing
23  voices that made him violent?
24    A.   I don't recall.
25    Q.   Okay.  Now eventually, you were informed that

Page 101

1  there were two different sources of DNA found on
2  Ms. Williams' vaginal smears that were taken during an
3  autopsy; is that correct?
4    A.   I'm not sure that -- that -- I'm not -- based
5  on the case, would that have been in the case?
6    Q.   Yeah.  So here, let me turn your attention
7  to -- back to Plaintiff's Exhibit 1, KSP 173.
8        THE VIDEOGRAPHER:  Are you there, sir?
9        THE WITNESS:  Okay.  173.
10  BY MS. STAPLES:
11    Q.   Yes, sir.  Do you recognize this document?
12    A.   Yeah.  It's a -- another continuation.
13    Q.   Okay.  And is this a continuation report that
14  was drafted by you?
15    A.   Uh-huh.
16    Q.   And what is the date of this report?
17    A.   Six of '02.
18    Q.   Okay.  And do you see there at the top of that
19  page, where Sandra Hill with the Kentucky State Police
20  Lab in Frankfort advised you that she'd been able to
21  determine there were two different sources of DNA found
22  in evidence from this case?
23    A.   According to the case.  I would have to refer
24  any of that information to her.
25    Q.   Well, but you are documenting what was told to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 28 of 50
The Deposition of BRUCE LYNN, taken on April 25, 2024
                                    PageID #: 3741
                                                                    102..105

Page 102

1  you by her?  Is that right, in this report?
2      A.   According to what she told me --
3      Q.   Yeah.
4      A.   -- based on information from -- she provided
5  to me.
6      Q.   And again, we've already talked about how you
7  made every effort to be accurate in what you reported in
8  your Uniform Offense Reports, correct?
9      A.   Yes.
10     Q.   Okay.
11     A.   But -- yeah, I -- I -- this is based on the
12  information she provided to me.  I --
13     Q.   Sure.  Yeah.  And that's -- so at some point
14  in the investigation, in fact, as of -- well, I'm not
15  sure the date, but by June 5th of 2002, you had received
16  information from the Kentucky State Police Lab analyst
17  that there were two different sources of DNA on
18  Ms. Williams, correct?
19     A.   According to her information, yes.
20     Q.   Okay.
21     A.   I don't recall that, no.
22     Q.   Let me go ahead and turn your attention to
23  another document within Plaintiff's Exhibit number 1.
24  Specifically, please turn to KSP 191 through 192.
25     A.   Okay.  All right.

Page 103

1      Q.   Okay.  Do you recognize this document on KSP
2  191, sir?
3      A.   It's been some time ago but this is another
4  search warrant.  Yeah.
5      Q.   And specifically, it's an affidavit in support
6  of a search warrant; is that correct?
7      A.   Yes.
8      Q.   And this is in regard to a request for a
9  search warrant for a Joe Weatherford; is that right?
10     A.   Correct.
11     Q.   Okay.  Who was Joe Weatherford?
12     A.   He was a neighbor.  Is that correct here?
13     Q.   Yeah.  I think if you turn to the second page
14  of your affidavit, KSP 192, you note that --
15     Q.   -- Joe Weatherford was a neighbor.  You note
16  that he had been convicted of rape previously.  Do you
17  see that?
18     A.   Yes.
19     Q.   Okay.  And I -- I'm sorry.  I don't know
20  that --
21     A.   Yeah.
22     Q.   -- I actually had you authenticate this
23  affidavit.  You -- you stated that it was an affidavit
24  for a search warrant.  Do you agree that you were the

Page 104

1  affiant in this -- on this affidavit as well?
2      A.   Yes.  Yes.
3      Q.   Okay.  So if you go down to the middle --
4  well, towards the end of Page 192, there's a paragraph
5  where you note, "There were two separate semen deposits
6  found on Williams' body"; you see that?
7      A.   Uh-huh.
8      Q.   And that "investigators determined that
9  Williams had intercourse with one man between the hours
10  of 8:00 a.m. and 10:00 a.m. on June 29th, and that she
11  was raped by a second man sometime after midnight on
12  June 30th."
13        You stated in here that Norman Graham states
14  he did have intercourse with Williams on the morning of
15  June 29th, 1980, and that police believe the second
16  semen -- the second sample found on Williams' body is
17  from the individual who raped and killed her; you see
18  that?
19     A.   Yes.
20     Q.   So does that -- does that refresh your
21  recollection as to the information that you had obtained
22  from KSP lab analyst, Sandra Hill, regarding the two
23  separate --
24     A.   I --
25     Q.   -- semen deposits?

Page 105

1      A.   -- suppose this -- I -- yeah, but I -- I don't
2  recall this, but I -- I suppose that's correct.
3      Q.   And again --
4      A.   Yeah.
5      Q.   -- like your Uniform Offense Reports, you made
6  efforts --
7      A.   Sure.
8      Q.   -- in your affidavits for search warrants to
9  be accurate; is that right?
10     A.   Yes.
11     Q.   In fact, you -- you swore in your affidavit
12  that what you had stated was truthful; is that right?
13     A.   Yes.  I -- I don't -- I don't recall this
14  specific information.
15     Q.   Yeah.  But sitting here today, you have no
16  reason to refute that you had obtained information from
17  the analyst saying there were two separate sources of
18  semen found on Ms. Williams' body, correct?
19     A.   Based on information provided to me at the
20  time.
21     Q.   Okay.  And when you reviewed the Williams'
22  investigative file in this case, you reviewed interviews
23  that Mr. Graham had given to the original investigators
24  in the case, correct?
25     A.   I suppose, yes.



Kentuckiana Reporters                    502.589.2273 Phone
P.O. Box 3983                            502.584.0119 Fax
Louisville, KY 40201                     schedule@kentuckianareporters.com
                                         www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 29 of 50
The Deposition of BRENT EVANS, taken on April 25, 2024
                                                                    106..109

Page 106

1    Q.   I mean -- well, you would've --
2    A.   Yeah.  Well, yeah.  Yes.
3    Q.   I mean, you would've had no reason to --
4    A.   Right.
5    Q.   -- ignore the statements that Mr. Graham
6    would've given in the case, right?
7    A.   Right.
8    Q.   And do you recall that Mr. Graham admitting
9    to -- admitted to having sex with his girlfriend on the
10   morning before her death?
11   A.   Yeah.  You had mentioned that -- I'm not sure
12   the time period.
13   Q.   Okay.  You have no reason to -- well, the
14   statement will speak for itself, but you have no reason
15   sitting here today to refute the fact that
16   Mr. Graham --
17   A.   Right.
18   Q.   -- had stated from -- that he had had sex with
19   his girlfriend that day?
20   A.   Right.
21   Q.   Okay.  All right.  So turning the page,
22   not -- not literally, figuratively, I want to ask you
23   about some information from the original investigation.
24   A.   Uh-huh.
25   Q.   During your conversation with Mr. Miller, did

Page 107

1    Mr. Miller discuss the information that he'd learned
2    about Ms. Williams sharing contact information with a
3    soldier on the day of her murder?
4    A.   I don't recall.
5    Q.   Do you recall learning that information when
6    reviewing the case file?
7    A.   It's possible; I don't recall.
8    Q.   Did Mr. Miller inform you that an envelope had
9    been found at the Williams' murder scene with the
10   soldier's contact information written on it?
11   A.   I don't recall.
12   Q.   In your review of the -- well, let me strike
13   that and back up just a little bit.
14        Did you review the physical evidence that was
15   gathered by the initial investigators, those from 1980,
16   1981 in this case?
17   A.   If I -- I -- yes, I suppose I would have.
18   Q.   Okay.  In your review of that physical
19   evidence, have you ever seen the envelope containing the
20   contact information that Ms. Williams had obtained that
21   day from the soldier?
22   A.   Don't recall.
23   Q.   Would you agree that the envelope should have
24   been stored with the physical evidence and/or kept in
25   the investigative file once it was collected?

Page 108

1    A.   I don't know to what degree that
2    would've -- I -- I -- I would have to lean on
3    investigative officers at the time to determine that.
4    Q.   What's the general practice for the handling
5    and storing of physical evidence that is obtained from a
6    crime scene?
7    A.   That it would've been submitted in to the
8    case.
9    Q.   And it would've been submitted to the case so
10   that it can be viewed at a later time, correct?
11   A.   Sure.
12   Q.   Okay.  So the envelope that was collected from
13   the murder scene should have been kept in the case file,
14   correct?
15   A.   Presumably.
16   Q.   Why do you say "presumably"?
17   A.   Well, I mean, I -- again, I'd lean on the
18   investigative officer at the time.  I -- I couldn't
19   determine that.  I mean --
20   Q.   Well, but it doesn't matter who the
21   investigating officer was or when it was obtained, does
22   it?  I mean, if any investigator on the case had
23   obtained any physical evidence whatsoever from the case,
24   isn't it true that that physical evidence should have
25   been maintained as part of the case file?

Page 109

1    A.   I think we could agree with that.
2    Q.   Yeah.  I mean --
3    A.   I -- I don't -- I'm not sure where that's
4    going, but anyway --
5    Q.   Well, I -- I mean --
6    A.   -- based on -- based on that --
7    Q.   I mean, it's not going --
8    A.   Yeah.
9    Q.   -- anywhere other --
10   A.   Yeah.
11   Q.   -- than to say --
12   A.   Yeah.  Based --
13   Q.   -- it --
14   A.   -- based on the determination of the time of
15   the investigator.  Sure.  Yeah.
16   Q.   And -- and it doesn't matter whether it's an
17   envelope or a cigarette butt or whatever, if you -- or a
18   weapon.  If an investigator collects evidence from a
19   scene --
20   A.   Sure.
21   Q.   -- that evidence should be maintained with the
22   case file and/or stored in a location that it can later
23   be observed --
24   A.   Sure.
25   Q.   -- with the case, right?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 30 of 50
                              PageID#: 3743
The Deposition of BRENDA WANZNE, taken on April 25, 2024

110..113

Page 110

1    A.   Right.
2    Q.   Okay.
3         MS. ARNETT:  Object.  Asked and answered.
4    BY MS. STAPLES:
5    Q.   Would you agree that an important step in a
6    homicide investigation would be to investigate the
7    individuals with whom the victim had been in contact on
8    the day of her murder, just generally speaking?
9    A.   Yes.
10   Q.   Would you agree that any investigation into
11   those individuals should be documented in a written
12   report within the case file?
13   A.   Yes.
14   Q.   Did you personally take any steps when you
15   were reinvestigating the Williams' homicide case to
16   determine the identity of this soldier that Ms. Williams
17   had given her address to on the day of her murder?
18   A.   I don't recall.
19   Q.   You don't recall doing that?
20   A.   I -- I don't.
21   Q.   Okay.  Did you interview Ms. Williams' friend,
22   Michelle Arms, who had been with her at the time that
23   Ms. Williams gave her address to that soldier?
24   A.   I don't recall.
25   Q.   Did you interview Ms. Williams' friend, Denise

Page 111

1    Gushea, who Ms. Williams had been with at the time that
2    she gave the soldier her address?
3    A.   I don't recall.
4    Q.   Would you agree that if you had interviewed
5    Michelle or Denise, you should have documented that in a
6    report in the case file?
7    A.   I don't recall doing that.
8    Q.   Right, but I'm -- but my -- my question is
9    that if you had done that, would you agree that you
10   should have documented that in the case file?
11   A.   That -- I -- I'm not sure what -- I don't
12   recall doing that but, no.
13   Q.   Okay.  I -- I understand that you don't recall
14   doing it.
15   A.   Uh-huh.
16   Q.   If you had interviewed a witness, whether it
17   was Michelle Arms or Denise Gushea during your
18   reinvestigation, was it your standard practice to
19   document the fact that you had interviewed someone in a
20   written report in the case file?
21   A.   Depending on the information you may have
22   obtained.  I -- yeah, I don't -- yeah.
23   Q.   So there were times that you interviewed
24   individuals that were witnesses in the case without
25   documenting it --

Page 112

1    A.   I don't recall doing that.
2    Q.   -- in the report because your standard
3    practice was to make that documentation?
4    A.   But I don't recall doing that, without --
5    without my standard practice being in place.
6    Q.   Okay.  Did Mr. Miller discuss with you the
7    letter that directed obscene threats towards
8    Ms. Williams that Ms. Williams' mother had given to him?
9    A.   I don't recall.
10        MS. ARNETT:  Object to form.
11   BY MS. STAPLES:
12   Q.   In your review of the physical evidence in
13   this case, have you ever seen the letter that
14   Ms. Williams had provided to the initial investigators
15   in which her daughter had been threatened?
16   A.   I don't recall.
17   Q.   You don't recall seeing such a letter?
18   A.   I don't.
19   Q.   Would you agree that once collected, that
20   letter should have been stored with the physical
21   evidence and/or kept in the Williams' investigative
22   file?
23   A.   I -- I -- I don't recall seeing anything like
24   that, so.
25   Q.   Yes, sir.

Page 113

1    A.   Right.
2    Q.   I agree.
3    A.   Right.
4    Q.   It's not there.
5    A.   Right.
6    Q.   My question to you is:  Would you agree that
7    when investigators were given that letter, they should
8    have placed that in the file?
9    A.   Based on the information at the time they were
10   provided, I suppose, yes.
11   Q.   Well, is there any --
12   A.   I --
13   Q.   Is there any situation that you could think of
14   sitting here today where an investigator obtains a
15   letter in which the victim was threatened, that they
16   would not put that letter in the file?
17        MS. ARNETT:  Object to form.
18        THE WITNESS:  I -- I -- I can't -- I don't
19        understand why the information wouldn't have been
20        provided.
21   BY MS. STAPLES:
22   Q.   Right.  I'm --
23   A.   Based on -- based on my training experience,
24   like --
25   Q.   Because you were trained that if you collected

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 31 of 50
The Deposition of BRENDARIANCE, taken on April 25, 2024
PageID #: 3744

114..117

Page 114

1   evidence from a case, that it was to be kept with the
2   case file or referred to in the case file with --
3       A.    Sure.
4       Q.    -- a location that you could go get that
5   letter --
6       A.    Sure.
7       Q.    -- whether that be like in the store room on
8   Post or whatever?
9       A.    Sure.
10      Q.    Okay.  And in this situation, would you agree
11  that whomever had written this letter threatening
12  Ms. Williams prior to her death would be someone that
13  you would want to investigate?  Like, you would want to
14  try to determine who the author of that letter was,
15  right --
16      A.    I believe so.
17      Q.    -- because it's possible that person had a
18  motive to kill --
19      A.    It's possible.
20      Q.    -- Ms. Williams, right?
21      A.    Possible.
22      Q.    And when you're investigating cases, you're
23  supposed to investigate all possible leads?
24      A.    Yes.
25      Q.    Did you ever conduct any interviews of

Page 115

1   Ms. Williams' sisters?
2       A.    I don't recall.
3       Q.    So is it safe to say that you don't have any
4   recollection of questioning any of Ms. Williams' sisters
5   about the letter that their mom had --
6       A.    I don't recall --
7       Q.    -- received?
8       A.    Yeah.  I don't.
9       Q.    When talking with Mr. Miller about the
10  Williams' homicide investigation, did Mr. Miller discuss
11  the information that he'd learned during the interview
12  of Ms. Williams' neighbor, Rita Kelly?
13      A.    I don't recall.
14      Q.    Let me turn your attention -- well, let me ask
15  you first: Do you remember who Rita Kelly is --
16      A.    No.
17      Q.    -- in regard to this case?
18      A.    No.
19      Q.    Okay.  Turn your attention quickly to KSP 73
20  in Plaintiff's Exhibit 1.
21      A.    I am getting there.
22      Q.    I know.  I'm sorry.
23      A.    Yeah.  Okay.
24      Q.    I would have it down for you, but because it
25  has to be scanned in for --

Page 116

1       A.    Sure.
2       Q.    -- deposition, I can't.  I'm sorry.
3       A.    Sure.  You're fine.
4       Q.    Okay.  So you're at KSP 73.  Do you recognize
5   this report --
6       A.    Uh-huh.
7       Q.    -- or this document?  I'm sorry.
8       A.    Uh-huh.
9       Q.    And what is this document?
10      A.    A Uniform Offense Report.
11      Q.    Okay.  And who is it drafted by?
12      A.    It looks like Detective V. Albro.
13      Q.    And what is the date of the report?
14      A.    12-11 of '80.
15      Q.    And would this have been one of the reports
16  that you would have reviewed when you were doing your
17  investigation into the Williams cold case?
18      A.    Yes.
19      Q.    Okay.  If you look specifically down there at
20  the very bottom of the page, do you see where it says
21  that at 1720 hours, 11-26-80, there was an interview
22  with Rita Gale Kelly?
23      A.    Yes.
24      Q.    And do you see where it states that Rita had
25  been receiving threatening phone calls?

Page 117

1       A.    Yes.
2       Q.    Do you see where it says the caller had
3   referred to Kay's body and said that was nothing
4   compared to what he would do to her?
5       A.    Yes.
6       Q.    Do you see where it says that Rita said that
7   on one occasion, the caller told her he was the one who
8   had killed Kay Williams?
9       A.    Yes.
10      Q.    Do you see where Rita stated she was still
11  getting those phone calls?
12      A.    Uh-huh.
13      Q.    And do you see where it said that a phone
14  intercept was going to be placed on her phone?
15      A.    Yes.
16      Q.    Do you recall reviewing this information
17  specific to Rita Kelly and the threatening phone calls
18  that she had received?
19      A.    I don't recall specifically -- yes.  This is
20  too long ago, many sunsets ago.
21      Q.    Did you ever have any conversations with Rita
22  Kelly about this information?
23      A.    I don't recall.
24      Q.    In your review of the file, have you seen
25  anything documenting the results of the phone intercept



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRIAN EVANS, taken on April 25, 2024

118..121

---

Page 118

1  that was going to be placed on her phone?
2     A.  I don't recall seeing it.
3     Q.  And would you agree that a report should have
4  been drafted, documenting the results of that phone
5  intercept by the investigators who obtained that
6  information?
7     A.  I suppose.
8     Q.  And if drafted, where should that report have
9  been filed --
10    A.  Presumably in the case report.
11    Q.  -- because that may have been important
12  information for you to know as --
13    A.  Uh-huh.
14    Q.  -- a investigator later on in the case?
15    A.  Sure.
16    Q.  And it's information that should have been
17  shared with the prosecutor and the defense and
18  Mr. criminal -- Mr. Graham's criminal trial, correct?
19      MS. ARNETT: Object to form.
20      THE WITNESS: Depending on the -- the -- the
21    date there, you -- would've been -- and the criminal
22    case was '80, '81? Yeah.
23  BY MS. STAPLES:
24    Q.  Yes.
25    A.  So yes, if it was determined.

---

Page 119

1    Q.  Yeah.  When speaking with Detective Miller
2  about the Williams' homicide, did he inform you of the
3  information that he'd learned from Ms. Kelly about Ms.
4  Kelly finding Roy Wayne Dean in her home in the middle
5  of the night prior to Ms. Williams' murder?
6    A.  I don't recall.
7    Q.  Sir, during the five years that you were the
8  lead case officer on the Janice Kay Williams cold case,
9  did you discover any new evidence whatsoever pointing to
10  Norman Graham as the perpetrator of Ms. Williams?
11    A.  I don't recall finding anything.
12    Q.  And if you had, you would have documented that
13  in your report?
14    A.  Right.  And all of my findings would've
15  been -- yeah, I don't recall finding anything.
16    Q.  You certainly never sought to have Mr. Graham
17  re-indicted for Ms. Williams' murder, did you?
18    A.  But the time based on my training and
19  experience, I don't know specifically how that turned
20  out to be but, no, at the time.
21    Q.  Well, and not just based on your training and
22  experience at the time but also based on the five years
23  of investigation that you had put into the case,
24  correct?
25    A.  Yeah.  If you're looking back at the time,

---

Page 120

1  I don't recall so --
2    Q.  Well, what I'm saying is --
3    A.  I didn't, so --
4    Q.  -- you did not seek to re-indict Mr. Graham,
5  not only based on the training and experience that you
6  had as a Kentucky state police officer, but also on the
7  five years that you had been hands-on in the case? Okay.
8      MS. ARNETT: Object to form.
9      THE WITNESS: I don't -- I don't recall doing
10    that.  No.
11  BY MS. STAPLES:
12    Q.  Yeah.  I mean -- well, I can tell you, you did
13  not seek for a re-indictment.
14    A.  Exactly.
15    Q.  Right?
16    A.  Exactly.
17    Q.  You agree with that?  Okay.  And if you had
18  believed that you had sufficient probable cause to seek
19  re-indictment of Mr. Graham, you would've done so at the
20  time, correct?
21    A.  Based on my training and experience at the
22  time, with -- with counsel, yes.
23    Q.  Well, and let's talk about that.  That's a
24  good point.  And you talk about "with counsel." I get -
25  - are you referring to talking with supervisors?  Are

---

Page 121

1  you talking about refer -- speaking with prosecutors?
2    A.  No, the supervision and at the -- at the point
3  during the -- the time, yes.
4    Q.  Okay.  Let me ask you about this: Turn your
5  attention please to Plaintiff's Exhibit 1, KSP 134.
6    A.  Okay.
7    Q.  Would you agree that this is a letter on the
8  letterhead of the Office of the Commonwealth Attorney?
9    A.  Yes.
10    Q.  And that it's dated January 19th of 1982?
11    A.  Yes.
12    Q.  And to whom is this letter address, sir?
13    A.  Bobby Miller.
14    Q.  And whom is this letter signed by?
15    A.  Jesse Riley.
16    Q.  And Jesse Riley was the Commonwealth's
17  attorney at the time; is that correct?
18    A.  Uh-huh.
19    Q.  Okay.  Is this a document that you would've
20  reviewed when you were reviewing the Williams' cold case
21  file?
22    A.  I suppose, in the case.
23    Q.  And do you see here where it says that
24  Mr. Riley said that he had talked with Ms. Merriweather,
25  who is Ms. Williams' mother, relative to the possible

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 33 of 50
The Deposition of BRIAN EVANS, taken on April 25, 2024
PageID#: 3746
122..125

Page 122

1  dismissal of the indictment against Norman Graham
2  without prejudice in view of the developments, which he
3  discussed with me on Monday; you see that?
4      A.  Uh-huh.
5      Q.  Did you talk with Mr. Miller about what the
6  developments were that he discussed with the prosecutor
7  that resulted in the prosecutor dismissing the charges
8  against Mr. Graham in 1982?
9      MS. ARNETT:  Object to form.
10     THE WITNESS:  I don't recall a specific
11  conversation.
12  BY MS. STAPLES:
13     Q.  In your review of the Williams' homicide
14  investigative file, did you ever see a report from
15  Detective Miller documenting this meeting that he had
16  had with Jesse Riley in which -- well, strike
17  that -- documenting this meeting that he had had with
18  Jesse Riley in January of 1982?
19     A.  I don't recall seeing anything.
20     Q.  Did you ever see any report in the file
21  documenting what these developments were that Mr. Miller
22  had discussed with the prosecutor in January of
23  1982?
24     A.  I don't recall seeing that.
25     Q.  Did you ever personally speak with

Page 123

1  Commonwealth's Attorney Jesse Riley about what the
2  developments were that Mr. Miller had shared with him
3  that led to him dismissing the case with prejudice?
4      A.  I don't recall specifically.
5      Q.  Or I'm --
6      A.  I did meet, but I don't recall specifically --
7      Q.  -- I'm sorry.  And I'm --
8      A.  -- of all the details.
9      Q.  I misspoke.  He dismissed the case without
10  prejudice.
11     A.  Right.
12     Q.  Okay.  So let's go back to that question.
13  You said you did meet with the prosecutor?
14     A.  I believe so, at some point.
15     Q.  Okay.
16     A.  But I don't recall our conversation exactly.
17  I mean that about -- no -- now what prosecutor?
18     Q.  With Prosecutor Jesse Riley, the one who
19  agreed -- who moved to dismiss the case against
20  Mr. Graham in 1982 without prejudice?
21     A.  I believe that did happen.  I don't recall the
22  conversation specifically about why it was dismissed
23  or --
24     Q.  Do you agree if you did have that discussion
25  with Mr. Riley that you should have documented that

Page 124

1  conversation in a report?
2      A.  I'm not sure what you mean here --
3      Q.  If you had a discussion with --
4      A.  -- complete discussion of the conversation?
5      Q.  No.  If you had a discussion with the
6  prosecutor as to what the developments were that caused
7  him to dismiss the case against Mr. Graham in 1982, do
8  you agree that you should have noted that you'd had that
9  discussion with the prosecutor?
10     A.  If there had been a conversation.  I -- I
11  don't -- I don't recall a specific conversations with
12  Mr. Riley, if there had been one.
13     Q.  If there had been one, then you agree that it
14  should have been documented?
15     A.  I -- I don't -- I don't recall hav-- -- I mean,
16  I just -- I don't know if -- unless it's here, I don't
17  recall.  It's been too long ago.
18     Q.  Yeah.  And nobody knows unless it's there --
19     A.  Right.
20     Q.  -- right?
21     A.  Right.
22     Q.  And that's one of the reasons why it's
23  important for investigators, whether it's investigators
24  from 1980 or investigators from 2024 --
25     A.  Sure.

Page 125

1      Q.  -- to document information they learn during
2  an investigation --
3      A.  Sure.
4      Q.  -- is that right?  Now, are you aware -- well,
5  strike that.
6      I don't think that I've asked you this:  Are
7  you familiar with the late Detective Steven Silfies?
8      A.  Yes, worked with him.
9      Q.  You worked with him?
10     A.  Yes.
11     Q.  Did you work with him at the Madisonville
12  Post?
13     A.  I did.
14     Q.  Okay.  How long did you and Detective Silfies
15  work together?
16     A.  I'm not sure.  I mean, just a couple years.
17     Q.  Were you aware of the fact that after you
18  transferred posts that Detective Silfies became the lead
19  case officer in the Williams' homicide investigation?
20     A.  I wasn't sure who but -- who was assigned the
21  case, but it was determined that, yes.
22     Q.  You have no reason to refute that Detective
23  Silfies became the lead case officer at some point after
24  you?
25     A.  I don't -- I don't specifically know, but

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 34 of 50
                              PageID #: 3747
The Deposition of BRENT STEVENSON, taken on April 25, 2024
                                                                    126..129

Page 126

1  yeah.
2       Q.   Okay.
3       A.   Yeah.  No, I -- yeah.  I can't --
4       Q.   Were you aware of the fact that Detective
5  Silfies sought to re-indict Mr. Graham in Ms. Williams'
6  murder?
7       A.   I don't recall the conversations about that.
8       Q.   Well, and that was going to be my next
9  question.  Prior to Detective Silfies seeking re-
10 indictment against Mr. Graham, did Detective Silfies
11 reach out to you to ask you any questions about the five
12 years of investigation that you had put into the
13 Williams' homicide?
14      A.   I don't recall any.
15      Q.   You don't recall having any conversations
16 whatsoever with Detective Silfies about your work on the
17 Williams' homicide case; is that right?
18      A.   I -- I don't recall.  I mean, I'm -- it's been
19 a long time ago.
20      Q.   I understand.
21      A.   Yeah.
22      Q.   Do you recall having any specific
23 conversations with Detective Scott Smith about the five
24 years of work that you had put into the Williams'
25 homicide investigation?

Page 127

1       A.   I don't recall.
2            MS. ARNETT:  Object to form.
3  BY MS. STAPLES:
4       Q.   Okay.  I know that you said that you worked
5  with Detective Silfies for a couple years.  Did you
6  consider him a friend?
7       A.   Working -- yes.  I mean, we worked together.
8  Yes.
9       Q.   Did the two of you ever socialize outside of
10 work together?
11      A.   I don't recall any -- any socializing, no.
12      Q.   Did the two of you ever work on any joint
13 investigations together?
14      A.   I don't recall any -- any investigations.
15 You -- I mean, like -- no, I don't recall anything.
16 Maybe like a -- an accident or something like that
17 working -- but I don't recall
18      Q.   Like a traffic accident maybe?
19      A.   Something, yeah, maybe.  I don't recall.
20      Q.   Sitting here today, you don't have any
21 recollection of investigating a homicide with Detective
22 Silfies; is that right?
23      A.   Right.
24           MS. STAPLES:  Okay.  If we could take just like
25 a five-minute break, I may be done, but I'd like to

Page 128

1  look through --
2            THE WITNESS:  Sure.
3            MS. STAPLES:  -- my documents, please?
4            THE WITNESS:  And use the restroom.
5            MS. STAPLES:  Of course.
6            THE VIDEOGRAPHER:  All right.  We are now going
7  off the record.  The time is 11:54 a.m.
8            (OFF THE RECORD)
9            THE VIDEOGRAPHER:  We are now back on the
10 record to continue the deposition.  The time is
11 12:00 p.m.
12           Counsel, you can proceed.
13           MS. STAPLES:  Thank you.  Okay, sir, that is
14 all the questions that I have for you --
15           THE WITNESS:  Okay.
16           MS. STAPLES:  -- at the present time.  Amber
17 and Jessica may have some and then I may do some
18 follow-up afterwards.
19           THE WITNESS:  Sure.
20           MS. STAPLES:  But I appreciate you and your
21 time thus far.
22           MS. SHOULDERS:  I've actually got no questions.
23 Thank you.
24           THE WITNESS:  Okay.
25           MS. ARNETT:  I don't have any questions either.

Page 129

1            THE WITNESS:  Okay.
2            MS. ARNETT:  Thank you, Mr. Stevenson.
3            THE WITNESS:  Thank you.
4            MS. STAPLES:  You're done.
5            THE WITNESS:  All right.
6            THE REPORTER:  All right.  And before we go off
7  the record, how would you guys like your copy of the
8  transcript today?
9            MS. STAPLES:  E-Tran, please.
10           THE REPORTER:  Ms. Arnett, did you hear me?
11           MS. ARNETT:  Yes.  E-transcript.  No video.
12           THE REPORTER:  Okay.  And would either of you
13 like a copy of the video?
14           MS. ARNETT:  No.
15           MS. STAPLES:  Not -- not yet.
16           THE REPORTER:  All right.  Thank you very much.
17 That concludes the deposition and we are going off
18 record.  The time is 12:01 p.m.
19           (DEPOSITION CONCLUDED AT 12:01 P.M. CT)
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1              CERTIFICATE OF REPORTER

2

3    I do hereby certify that the witness in the foregoing

4    transcript was taken on the date, and at the time and

5    place set out on the Title page hereof, by me after

6    first being duly sworn to testify the truth, the whole

7    truth, and nothing but the truth; and that the said

8    matter was recorded by me digitally and then reduced to

9    typewritten form under my direction, and constitutes a

10   true record of the transcript as taken, all to the best

11   of my skill and ability. I certify that I am not a

12   relative or employee of either counsel and that I am in

13   no way interested financially, directly or indirectly,

14   in this action.

15

16

17

18

19

20

21

22   SEAN FRANKS,

23   COURT REPORTER / NOTARY

24   MY COMMISSION EXPIRES ON: 01/30/2028

25   SUBMITTED ON: 05/06/2024

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_**
**Stevenson**
50:2,3 56:18
76:24 101:7
102:23 115:20
121:5

**Exhibit 2_**
**Stevenson**
68:25 69:1

**Exhibit 3_**
**Stevenson**
70:17,18

**Exhibit 4_**
**Stevenson**
82:4,5,14

**Exhibit 5_**
**Stevenson**
82:6 83:3

**Exhibit 6_**
**Stevenson**
96:4,8,21 97:2

**Exhibit 7_**
**Stevenson**
96:9

___

**0**

**01** 52:25 90:4

**02** 101:17

___

**1**

**1** 50:2,3 56:18
76:24 101:7
102:23 115:20
121:5

**100** 11:3

**10:00** 104:10

**10:02** 49:10

**10:08** 49:14

**11** 34:3

**11-26-80**
116:21

**11:54** 128:7

**11th** 52:24
53:1,7 65:20,24
66:18 71:7 80:3

**12-11** 116:14

**12:00** 128:11

**12:01** 129:18,
19

**12th** 77:1 85:11
87:14

**134** 121:5

**150** 63:4 80:12

**156** 63:4,11

**157** 63:25

**158** 51:17,24
52:5 65:7 80:6,
13

**159** 74:24
76:24 83:15

**15th** 52:24,25
65:16 66:17
80:14

**160** 86:20

**161** 89:7,19

**165** 91:20

**166** 93:13

**169** 91:21
94:16

**16th** 56:19

**1720** 116:21

**173** 101:7,9

**191** 102:24
103:2

**192** 102:24
103:14 104:4

**1980** 13:18,20
62:2 85:11
86:10,14 87:3,
6,18,24 88:4,12
96:23 97:20,24
104:15 107:15
124:24

**1981** 33:25

**34:3** 59:18,24
60:23 107:16

**1982** 121:10
122:8,18,23
123:20 124:7

**1984** 63:10
92:15 99:18

**1985** 75:5,9

**1994** 63:14

**1998** 10:20
14:4

**1999** 63:10,14

**19th** 121:10

**1:20-CV-**
**000210-GNS**
6:14

**1st** 10:16 29:16

___

**2**

**2** 32:20,21
68:25 69:1

**2-80-543**
73:18,21,23

**2-84-840**
68:18,21 69:4
70:3,13 73:10,
18,20 85:8

**2-84-842** 77:10

**2-85-43** 85:9
91:2

**20** 59:25 60:5,
11

**2000** 64:5

**2001** 14:4
52:24 53:1,7
54:10 55:18
58:20 59:25
62:16 65:16,20,
24 66:17 67:11
71:7 74:11,16
77:1 78:21
80:3,14 83:23
87:14 90:6 91:4
94:24

**2002** 102:15

**2005** 11:3,7

**2006** 11:4,8
56:19 57:23
58:21

**2008** 34:2,3,5

**2014** 10:16
29:15

**2021** 6:6 10:2

**2024** 124:24

**230** 56:21,23,
25

**24** 82:9

**2459** 96:7

**2461** 96:3

**25th** 6:6

**262** 96:3

**26th** 64:5

**27th** 92:15

**280543** 80:25

**283** 69:5

**284** 69:13,15

**284840** 85:15

**29th** 104:10,15

___

**3**

**3** 70:17,18

**3-16-2006** 57:6

**303** 50:7

**30th** 90:6,11,
12,14 91:4
104:12

**31st** 90:4 94:24

___

**4**

**4** 82:4,5,8,10,14
84:24 90:6

**4174** 82:9

**4177** 70:20

**451** 69:5

___

**5**

**5** 82:4,6,9 83:3
84:24

**55** 50:7

**5th** 102:15

___

**6**

**6** 96:4,8,21 97:2

**6-8-0** 12:9

**680** 12:7,8

**6th** 86:21

___

**7**

**7** 96:9

**7-12-01** 75:4

**73** 115:19 116:4

___

**8**

**80** 116:14
118:22

**81** 118:22

**84** 99:18

**8:00** 104:10

___

**9**

**9:04** 6:6

___

**A**

**a.m.** 6:6 49:10
104:10 128:7

**ability** 84:1

**absolutely**
14:18

**accident** 15:18
127:16,18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 37 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024
PAGE ID #: 3750

132

**accuracy** 84:4
93:21

**accurate** 10:3
11:10 21:2 39:2
74:3,7 83:17,24
102:7 105:9

**accused**
27:19,23 28:4
73:20 74:17
75:10,22,24
76:13 77:9
85:8,9,10,15

**action** 7:14

**actions** 39:21

**acts** 44:8

**acutely** 97:19,
23

**addition** 61:25

**additional**
46:17 47:15

**address** 85:10
86:9,17 87:2,19
110:17,23
111:2 121:12

**administrator**
6:11 7:15

**admitted** 98:6
100:22 106:9

**admitting**
106:8

**advised** 87:17
101:20

**affiant** 78:23
92:6 94:2 104:1

**affidavit** 78:17,
20 79:3,6 91:18
92:1,10,13,22
93:13 103:5,14,
24 104:1
105:11

**affidavits**
105:8

**affirm** 7:3

**agency** 71:16

**agree** 18:25
21:1,4 25:4,7,

14 26:2,4,7,10,
15,18 27:21,24
28:12,17,24
51:1 53:6 64:2
70:2 78:20 81:5
86:13 87:9 92:4
94:19,22 96:20
103:25 107:23
109:1 110:5,10
111:4,9 112:19
113:2,6 114:10
118:3 120:17
121:7 123:24
124:8,13

**agreed** 123:19

**ahead** 14:7
28:21 51:16
76:17 102:22

**Albro** 63:1 75:6
116:12

**alternate**
95:14

**altogether**
34:9

**Amber** 6:21
68:5 128:16

**amount** 11:24
12:3

**Amy** 6:17 7:12

**analyst** 41:8
102:16 104:22
105:17

**and--** 85:2

**and/or** 15:10
22:24 27:18,23
41:2 107:24
109:22 112:21

**answering**
8:19 46:23

**answers** 8:3

**anymore** 68:2

**apparently**
68:5

**appearing**
6:21

**appears** 73:14
74:16 78:2

79:12 80:2 87:1

**April** 6:6

**area** 14:21
76:8,13 98:17
100:8

**Arms** 110:22
111:17

**Arnett** 6:21
18:16 23:22
25:18 31:8
33:13 45:22
47:23 61:18
75:13 81:8
96:24 99:4
110:3 112:10
113:17 118:19
120:8 122:9
127:2 128:25
129:2,10,11,14

**arresting**
25:16

**aspects** 44:17

**assault** 95:6

**assigned**
10:21 37:5,6,13
39:1,4,12 40:1,
4,10 44:13 47:5
51:13 53:8,21
54:6,22 59:25
60:13 125:20

**assignment**
59:9 60:1

**assist** 9:20
16:11 27:3
45:13

**assisting**
16:21 17:2
39:17

**assu--** 72:15

**assume** 34:14
38:24 54:24

**assuming**
54:18 90:25

**assumption**
54:5

**attempt** 41:25
75:1,4

**attention** 63:3
89:6,8 101:6
102:22 115:14,
19 121:5

**attorney** 7:13
31:19 80:4 91:5
121:8,17 123:1

**attorneys** 8:16
31:3,15

**audio** 22:24
23:7,11

**August** 85:11
86:10 87:6,18
96:23 97:20,24
99:18

**authenticate**
103:23

**author** 114:14

**automatically**
55:20

**autopsy** 101:3

**aware** 30:7
98:20 125:4,17
126:4

───────

**B**

**back** 40:7
42:19 49:12
65:6 75:9 80:6,
9,12 83:14
84:22 93:3
101:7 107:13
119:25 123:12
128:9

**badge** 12:5

**based** 12:3
18:19 20:24
21:15 22:3,20
27:10 30:8
42:24 43:6,7
44:18 45:8,13
46:21 48:1,15
49:2 51:23
73:11,13,22
74:13,20 77:10,
19 79:4 80:2
83:21 84:6,8,
21,25 86:11

89:14 90:24,25
94:5,15 101:4
102:4,11
105:19 109:6,
12,14 113:9,23
119:18,21,22
120:5,21

**basement**
66:11

**Bates** 50:7,8
51:17 69:4,11,
13 70:20 82:8
96:3,6

**bear** 32:8

**bearing** 56:19

**began** 58:18

**begin** 7:7
10:18

**beginning**
10:8 14:12
86:21

**belief** 74:17,22
75:9

**believed** 95:13
120:18

**biological** 95:6

**bit** 13:4 21:21
36:4 81:5
107:13

**blinking** 68:12

**blood** 94:14,17
95:5

**blow** 84:17

**Bobby** 53:4
65:20 66:19,24
71:1 121:13

**bodies** 85:6

**body** 82:17
92:10,22 93:13
104:6,16
105:18 117:3

**Bond** 64:8,10,
12

**bootlaces** 99:3

**border** 100:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 38 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024

133

born 13:10

bottom 69:12
79:5 94:18
116:20

bound 84:22
93:2 99:3

Bowling 6:9,14
9:17 11:6,7,12
30:23 58:1,4,11

box 66:10
68:17 71:1 73:9

Boyd 54:14,17,
22 55:3,10
56:7,12,14
57:21

Brad 6:10
49:13

break 8:11
127:25

breaks 8:9

Brenda 6:10
70:10 74:17
75:10,17 79:9,
15 92:15,20
96:14

briefly 63:20
64:11

bringing 73:9
74:12

brought 71:1
75:16 80:22

Bryant 64:8

butt 109:17

_____

C

call 22:15

called 96:22

caller 117:2,7

calls 116:25
117:11,17

Care 96:2,21

career 10:8
12:19 17:10
20:14 23:19

25:13 26:1
27:12 28:12,16
37:20 45:11

Caroline
54:14,16,17

case 6:14 7:18
12:20 15:7,10
16:10,11,17
21:10,14,17
22:6,23 23:3
24:8 26:9 29:23
30:25 31:3,16,
20 33:5,22,24
34:16 36:7,16,
20,22,23,24
37:1,4,8 38:4,6,
8,13,19 39:3,4,
16,23,24 40:1,
4,5,8,11,15,17,
19,25 41:3,7,
14,22 42:1
43:9,13,15,24,
25 44:6,18,23
45:21 46:16,18
47:2,5,17,20,22
48:7,11,25
49:23 50:17,18,
19 53:21 54:6
57:9,22 58:8,
15,19,22,25
59:4,6,11,13,25
60:1,7,15,16
61:2,7,14,16,
23,25 62:2
64:17 65:15,20,
24 66:4,7,20,23
67:11,13,16
68:17,21,22
69:4 70:2,9,12
71:21,23,24
73:10,12,13,16,
18,20,21,22,23,
24 74:12,13,20
75:12,23 77:8,
9,19 78:12,14
79:4,13 80:7,
15,24 81:1,13,
21 82:19,20
83:7,8,21 84:21
85:15,22 86:15
89:14 90:21,22
91:2 94:5 95:16
100:6,21 101:5,
22,23 105:22,
24 106:6 107:6,

16 108:8,9,13,
22,23,25
109:22,25
110:12,15
111:6,10,20,24
112:13 114:1,2
115:17 116:17
118:10,14,22
119:8,23 120:7
121:20,22
123:3,9,19
124:7 125:19,
21,23 126:17

cases 17:1,6,7
18:8 37:6,8,13,
14,22 38:1,16
39:8 40:3 42:8,
18 43:19 44:4,
12,21 45:1,18
47:25 48:24
49:1 61:6 72:14
73:15 75:5
77:10 80:10
83:20 84:10
92:23 93:9 94:4
99:11 114:22

caused 124:6

Center 96:2,6

Central 6:7

chain 55:21
72:23 73:6
84:17

character
77:10

characteristic
s 77:11

charged 28:14
60:8

charges 30:19
122:7

charms 28:14

checked 72:8,
12

chief 66:19,21,
24,25 67:10
68:17 71:12
73:17 78:9
80:22,24

choking 97:14

Church 69:6
70:10 71:2,8,17
75:17,22 76:21
77:13,20,24
78:1,10,16
79:9,15,16,20
80:23 81:21
82:25 83:18
85:19,22 89:2
92:15,20 95:17
96:14

Church's
74:17 75:10
77:22 82:17
85:25

cigarette
109:17

Circuit 33:6
87:17

circumstance
s 15:16 42:22

civil 30:2,8
31:3,16,20,25
32:13 34:15
36:5

clarification
66:23

clarify 8:6

clear 8:2 33:24
37:10 44:19

clerk 87:17

client 53:15

close 13:16
100:9,12,13

cold 12:20
36:20,22 37:4,
13,14,22 38:4,
6,8,13,16,19
39:3,4 40:4,8
42:1,8,18
43:13,19,24,25
44:12,21 45:1,
18 46:16 47:2,5
48:7,11,24
53:20 61:2,6,16
116:17 119:8
121:20

collect 27:9

collected
91:12 94:14
107:25 108:12
112:19 113:25

collecting 27:4

collection
94:14 95:7

collections
27:2

collects
109:18

commit 28:14

committed
65:1

common 72:1

Commonwealt
h 121:8

Commonwealt
h's 121:16
123:1

communicate
d 34:8

communicatin
g 30:22

compare
73:18 75:1,4

compared
92:13 93:16
117:4

comparison
77:9 91:2,12

compiled
11:25

complaint
30:2

complete
124:4

completing
11:23 12:3

Comprehensiv
e 96:2,21

computer 8:17
31:9 55:19 56:4



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB     Document 130-18     Filed 10/27/25     Page 39 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024
134

**concept** 23:20
24:3,11,22
27:16

**concluded**
94:2 129:19

**concludes**
129:17

**conclusion**
46:6,9 47:16

**conduct** 20:6
25:14,23 44:3,
11,20 45:5,19
114:25

**conducted**
23:6,16 41:6
44:15 48:22
49:1 55:2
100:21

**conducting**
46:3,16 79:20

**confusing** 8:4

**considered**
37:21

**consultation**
44:16 45:25

**contact** 107:2,
10,20 110:7

**contained**
92:9

**continuation**
52:7 101:12,13

**continue** 49:13
128:10

**continued**
58:10

**contradicts**
24:10

**control** 66:8

**conversation**
31:15 74:23
80:3 91:7
106:25 122:11
123:16,22
124:1,4,10

**conversations**
30:24 34:15

**convicted**
61:15 76:7
77:22 99:11
103:17

**conviction**
30:8

**cooperative**
9:5,7,17 10:1

**copy** 30:2 69:7
81:23 129:7,13

**corner** 69:13

**correct** 15:23
16:25 22:11
29:20,21 36:20
38:4 40:21 47:3
48:9 50:24 51:8
52:1 58:12,13
60:1,2,12 74:1,
4 77:1,2,16
78:13 79:3,4
80:6,25 81:21
83:12,13 85:19,
20 86:7 91:5,9
92:25 100:12
101:3 102:8,18
103:6,10,12
105:2,18,24
108:10,14
118:18 119:24
120:20 121:17

**correctly** 20:6
46:24

**counsel** 6:15
9:8 49:15 50:6
120:22,24
128:12

**county** 6:12,20
13:6,8,12,13,
16,24 14:1,21
30:4 62:10 76:7
80:4 91:5 92:16
99:25 100:7,10,
16,17

**couple** 21:18
32:25 87:8
95:25 97:12

36:5,12 43:14
55:9 62:9,25
117:21 124:11
126:7,15,23

**court** 6:5,8,13
7:2 33:6 87:17

**courts** 78:22

**crazy** 68:11

**credible** 25:5,9

**crime** 25:17
81:3 108:6

**crimes** 28:14

**criminal** 23:21
24:6 25:1,8
26:17 44:8
100:21 118:18,
21

**CT** 129:19

**current** 9:2,19

**custody** 66:8
72:23 73:6

**Cynthiana**
10:11 16:1,4

———————

**D**

**data** 51:8 70:6

**date** 10:17
29:16 52:22
101:16 102:15
116:13 118:21

**dated** 52:25
57:5 64:5 75:4
87:14 90:3,6
121:10

**dates** 14:8 87:8

**daughter**
112:15

**day** 6:6 49:20
59:5 75:18
106:19 107:3,
21 110:8,17

**Dean** 76:1,3,12
77:21 79:17,20,
25 80:5 85:15,
19,24 86:5,8,17
87:18,23 88:12,
16,19 89:4,10
90:20 91:8

94:12 95:13,22
97:13,19,22
98:1,5 99:2,11
100:15 119:4

**Dean's** 95:9,19
98:10,12,16
100:21

**death** 88:19
106:10 114:12

**decade** 34:12
35:20

**deceased**
82:17

**decedent**
85:10

**decision** 48:16

**dedicated**
66:11

**Deeann** 99:14,
18 100:22

**deem** 44:21

**defendant**
6:20 15:7 32:16
34:19

**defendants**
6:23 30:4

**defense**
118:17

**define** 36:22

**definition**
11:19 27:15
37:3

**definitions**
24:5

**degree** 108:1

**delivery** 86:9

**Denise** 110:25
111:5,17

**department**
10:8,10,11 16:1
66:20 71:13

**Depending**
111:21 118:20

**depicting** 71:1

**deposed** 15:17

**deposition**
6:10 14:23
15:4,11 30:7,23
36:9,15 49:13
116:2 128:10
129:17,19

**depositions**
15:1 32:4,12

**deposits**
104:5,25

**desire** 8:10

**desk** 47:6,18

**details** 36:1
123:8

**detective**
11:17,18,21,22
12:16 15:22
32:16 34:19
37:7,15 39:9
63:1,9,13,22
64:8,10,12
66:22 75:5,6
78:9 79:7
116:12 119:1
122:15 125:7,
14,18,22 126:4,
9,10,16,23
127:5,21

**determination**
109:14

**determine**
37:12 39:11,15,
19 43:3 46:16,
25 48:23 73:20
77:25 93:16
101:21 108:3,
19 110:16
114:14

**determined**
42:13 83:19
84:9 86:3 87:2
92:14 97:19,23
104:8 118:25
125:21

**determining**
89:1

**development**
9:23



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**developments** 122:2,6,21 123:2 124:6

**diagnosed** 95:23 98:2

**dictated** 72:11

**direct** 7:8 12:1 56:7,11,15

**directed** 18:7 43:14 112:7

**directing** 20:17 43:18 72:6

**directly** 16:11

**disclose** 27:17 28:4

**disclosed** 50:6 69:4 70:24

**discover** 119:9

**discovered** 88:12

**discuss** 55:1 107:1 112:6 115:10

**discussed** 32:3 55:8 92:18 122:3,6,22

**discussion** 73:14 79:16 123:24 124:3,4, 5,9

**discussions** 36:8

**dismiss** 123:19 124:7

**dismissal** 122:1

**dismissed** 123:9,22

**dismissing** 24:9 122:7 123:3

**dissimilarities** 94:3

**dissimilarity**

**distinction** 59:3

**District** 6:13

**districts** 9:19, 20

**DNA** 94:14 98:20 101:1,21 102:17

**doctors** 41:9

**document** 19:1,6,25 20:12,17 22:10 51:24 52:2,4 57:1 65:10,25 69:19 70:11 86:24 89:21,23 94:19,23 96:1,5 101:11 102:23 103:1 111:19 116:7,9 121:19 125:1

**documentatio n** 59:21 112:3

**documented** 21:5,14,24 95:22 110:11 111:5,10 119:12 123:25 124:14

**documenting** 19:13 21:9 83:24 101:25 111:25 117:25 118:4 122:15, 17,21

**documents** 29:18 63:6 91:21,23 95:18 96:1,13 128:3

**draft** 22:1 91:17

**drafted** 63:9 65:11,15 73:17 74:8 75:3 76:25 78:21,22 83:23 87:12 89:25 91:4 101:14 116:11 118:4,8

**duty** 28:3

### E

**E-TRAN** 129:9

**E-TRANSCRIPT** 129:11

**earlier** 15:21 36:18 48:6 49:22 53:20 59:10 64:16 65:16 74:2 93:2

**early** 58:20

**education** 11:24

**educational** 9:5,7,17 10:1

**effect** 67:19

**effort** 43:2 46:19 102:7

**efforts** 74:5 105:6

**electronically** 56:1

**Elkton** 66:19 71:13

**emergency** 96:22 97:14

**employed** 9:25 11:15 12:6,12, 16 16:7 23:10, 14 25:21 26:1, 19 27:25 28:2 29:7 35:3,5,10 36:19 71:11,19 81:13

**employee** 71:15

**employees** 96:22

**employment** 10:24

**encounters** 79:25

**end** 46:10,13 104:4

**ended** 58:15, 21

**enforcement** 10:5,7 15:5 18:13,21 19:1, 11,15,24 20:15 23:19 25:13 26:1,16 27:12 28:13,16,25 29:4 31:19

**ensure** 74:7

**entire** 40:15,17 51:22

**entirety** 40:21 59:11 60:17 62:1

**entitled** 8:9

**envelope** 107:8,19,23 108:12 109:17

**established** 85:14

**estate** 6:11 7:15

**estimate** 16:6 58:21 100:9

**et al** 6:12

**event** 46:7 73:11

**events** 14:13 84:17

**eventually** 100:25

**Everything's** 47:19

**evidence** 21:11,13,15 24:9 26:16,22 27:1,4,7,13,17, 18,22 28:4 33:9 41:3,7 47:9 72:13,19 73:19 89:4,10 90:20 91:12,24 94:11, 14 95:6 98:21

**101**:22 107:14, 19,24 108:5,23, 24 109:18,21 112:12,21 114:1 119:9

**evidentiary** 33:5

**ex-** 36:24

**ex-wife** 98:13

**exact** 14:8 18:4 21:15 37:2,17

**examination** 7:8 95:22 100:20

**examining** 91:24

**excluded** 99:2

**exculpatory** 27:13

**excuse** 83:9

**executed** 94:9, 23 95:2

**execution** 94:20

**exhausted** 37:1,6

**exhibit** 50:2,3, 16 51:19 56:18 68:25 69:1 70:17,18 76:24 82:4,5,6,14 83:3 96:4,8,9, 21 97:2 101:7 102:23 115:20 121:5

**Exhibits** 84:24

**existed** 94:3

**existing** 26:9

**exoneration** 30:18

**expect** 14:14 18:12,21 19:11 20:2,8,9,15,22

**experience** 18:20 27:11 42:25 43:6,7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 41 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024

136

44:9,18 45:8,
14,24 46:21
48:1 49:2 84:6
113:23 119:19,
22 120:5,21

**explain** 21:12
24:2,4

**express** 74:21

**expressed**
74:16

---

### F

**fabricate** 26:2

**fabricating**
26:13

**fact** 31:25
64:24 76:12
77:13 84:24
85:24 87:23
88:10,16 92:18
102:14 105:11
106:15 111:19
125:17 126:4

**facts** 92:13

**failing** 25:14,
23

**fair** 8:7

**false** 28:17
29:1,4,9

**falsify** 26:3

**familiar** 14:20
23:20 24:3,10,
22 27:13,16
62:13,16 63:17
76:12 79:19
100:7 125:7

**familiarize**
60:15

**family** 36:13
98:10,16

**favorable**
27:18,22 28:4

**February** 64:5
87:3

**female** 54:18

**figuratively**
106:22

**figure** 65:1,2

**file** 21:6,14,17
22:6,23 23:3,7
29:22 37:8
38:21,23 40:1,
15,17,21 41:16
43:2 47:13
50:6,13 51:11,
23,25 55:13,20
58:6,25 59:11,
17,22 60:3,7
61:25 63:3
66:4,12 69:3,6,
10 71:8,17
73:23 74:12
75:16 76:21
77:21,24 80:23,
25 82:25 83:9,
12 84:21 85:22
95:18 96:14
99:15 105:22
107:6,25
108:13,25
109:22 110:12
111:6,10,20
112:22 113:8,
16 114:2
117:24 121:21
122:14,20

**filed** 30:3,8
31:25 118:9

**files** 71:20,23
72:3,6,12
81:13,21,24
83:18

**find** 56:18 65:3
69:7

**finding** 119:4,
11,15

**findings**
119:14

**fine** 14:18
116:3

**finish** 17:16

**fit** 26:8

**five-minute**
127:25

**flip** 63:25 86:19

**focus** 24:7

**follow** 25:5

**follow-up**
128:18

**forensic** 41:6,
8,13

**forget** 22:21

**form** 18:16
23:22 25:18
33:13 45:22
47:23 50:18,19
51:1 57:2 61:18
75:13 81:8
96:24 97:3 99:4
112:10 113:17
118:19 120:8
122:9 127:2

**forms** 97:11

**found** 101:1,21
104:6,16
105:18 107:9

**foundation**
96:24

**Frankfort** 6:22
101:20

**frankly** 14:18

**Franks** 6:5

**friend** 33:18
35:15 110:21,
25 127:6

**front** 50:15

**fully** 82:18

---

### G

**Gale** 116:22

**gather** 41:25
42:24

**gathered**
46:18 107:15

**gave** 50:13
68:17 73:17
80:24 110:23
111:2

**general** 21:8,
21 25:7,8 37:7
40:9 44:11,20
47:17,19 65:25
66:3 86:9 108:4

**generally**
17:13 39:8
42:22 110:8

**girlfriend**
106:9,19

**give** 7:4 16:9
28:17,25 29:4
37:2 55:5 57:18

**giving** 29:9
73:9

**glasses** 90:10,
17

**goal** 18:11,14
46:3 64:17,21

**goals** 65:3

**good** 7:10
12:23 28:20
47:11 120:24

**Graham** 6:11,
12 7:14 30:3,7
31:25 48:21
53:15 59:17
60:4 61:10
69:5,13,15
70:20 82:9
96:3,6 98:22
104:13 105:23
106:5,8,16
119:10,16
120:4,19 122:1,
8 123:20 124:7
126:5,10

**Graham's** 7:18
30:18 34:15
36:5 118:18

**grant** 94:6

**graphic** 82:8

**Green** 6:9,14
9:4,18 10:1
11:6,7,12 30:24
58:1,4,12

**guess** 12:24
13:19 38:14

45:11 49:23
90:25

**guidance** 55:5

**guilty** 100:15

**Gushea** 111:1,
17

**Guthrie** 85:11
86:9

**guys** 129:7

---

### H

**hair** 94:17 95:5

**Hamblin** 6:4

**hand** 7:1 24:9
50:1 55:22
68:24 70:16
95:25 96:2,5

**handle** 12:17,
20 19:12

**handled** 37:13
38:3 61:6

**handling**
17:10,14 18:13
20:15 37:14
40:8 108:4

**hands** 93:3

**hands-on**
120:7

**happen** 76:5
123:21

**happened**
54:25 68:8

**happening**
30:14 81:18

**harassed**
88:19

**hard** 14:17
36:24

**hav-** 124:15

**hazards** 25:1

**head** 8:1 76:10

**headlines**
30:14,18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 42 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024

137

health 95:19

hear 8:18 9:11
30:21 129:10

heard 27:14
30:13 59:19
99:1

hearing 33:5
97:15 100:22

held 33:5 74:22
75:9

helps 90:17

hesitate 8:5,10

high 13:22

Hill 101:19
104:22

hit 67:25

hold 8:19 11:16
12:13 28:19

home 71:24
72:3 119:4

homicide 7:20
12:17 16:17
17:7,10,14,16
18:13 19:2,6,12
25:4 33:2,7
35:25 38:13
39:25 49:19
53:8,14 54:3,23
58:5,20 59:17
60:14 63:23
64:13 82:15
91:13 98:5
110:6,15
115:10 119:2
122:13 125:19
126:13,17,25
127:21

homicides
12:20 15:22,25
16:3,6 17:23
18:2,7 20:16
25:9 38:7,19
40:5

honest 62:18

hope 26:5,6

hopes 29:1,4

hoping 57:17

Hopkinsville
13:10,21,22
30:23

Hospital 96:23

hours 104:9
116:21

hundred 51:17

hung 61:12
67:21 68:3,6

husband 85:25

_____

I

idea 17:1 54:8
57:12

IDENTIFICATI
ON 50:3 69:1
70:18 82:5,6
96:8,9

identify 6:15

identity 110:16

ignore 106:5

imagine 16:3

impeach 27:17

impeached
27:23

importance
26:21 28:1

important
18:25 21:1,4
25:5,9 40:20
45:5,19 46:15
110:5 118:11
124:23

improper 26:2,
7,15 27:21
28:17,25 29:3

impropriety
26:13 27:7 29:9

incidents
92:14 93:16

include 23:2,6
27:6 40:23 41:2
60:20,23

included 81:23

including 93:2

independent
44:21 45:5,20
46:4

indication
57:20

indicative
84:24

indictment
29:1,5 122:1
126:10

individual
25:16 60:8
66:25 76:6 92:5
104:17

individuals
42:17 81:13
110:7,11
111:24

inform 71:7
107:8 119:2

information
9:22 22:3,20,22
30:15 41:9,25
42:24 43:4
45:12 46:17
57:8 74:20
79:1,4 83:21
84:4 92:9
101:24 102:4,
12,16,19
104:21 105:14,
16,19 106:23
107:1,2,5,10,20
111:21 113:9,
19 115:11
117:16,22
118:6,12,16
119:3 125:1

informed
100:25

initial 60:21
107:15 112:14

initials 57:13

innocent 25:16
28:13

integrity 26:21

72:21 73:5

interactions
53:17

intercept
117:14,25
118:5

intercourse
104:9,14

interrogated
22:11

interrogation
22:2,16

interrogations
21:5,9 22:1
47:8

interview 23:6
42:15 110:21,
25 115:11
116:21

interviewed
22:17,18 42:20
111:4,16,19,23

interviews
21:5 22:25
23:12,15
105:22 114:25

investiga-
20:16

investigate
15:25 44:7
110:6 114:13,
23

investigated
7:18,19 15:22
16:7 17:7

investigating
17:16,23 18:8
25:4,8 43:19
48:24 108:21
114:22 127:21

investigation
18:4 25:15,24
33:2,8,9 36:1
39:4,5,17,18,25
42:20 43:5,24,
25 44:2,4,12,
14,21 45:6,20,
21 46:4 47:2,6,

12 48:21 49:19
51:14 53:9,15
54:3,23 55:2,6,
15 58:20 60:14,
21 63:23 64:14
71:4 72:21
73:6,25 76:4
77:14 78:10,13,
16 79:21 86:11
87:22 95:13
98:4,9,15
99:10,17,20
100:14 102:14
106:23 110:6,
10 115:10
116:17 119:23
125:2,19
126:12,25

investigations
12:17,25 16:18,
25 17:11,14
18:14,15 19:2,
7,12 23:21 24:6
25:1 26:17 27:1
36:20 37:21
38:4,7,8,13
39:12 40:8 42:1
43:14 45:13
46:16 48:7,11
53:21 61:3
127:13,14

investigative
19:1,6,25 20:12
21:6 23:7 28:6
40:9 43:2 44:5,
9 47:15 48:22
50:5 58:5,15,19
59:22 65:19,23
66:1,12 69:3,6
71:8,17,20
72:2,6,11 75:16
76:21 83:11
95:18 99:15
105:22 107:25
108:3,18
112:21 122:14

investigator
16:17 17:2 33:7
38:12 45:18
77:25 78:16
79:9 92:19
108:22 109:15,
18 113:14
118:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**investigators** 24:7 25:7,8,16 26:8 27:22 43:9,15 44:6,14 62:2 72:1 104:8 105:23 107:15 112:14 113:7 118:5 124:23, 24

**involved** 39:3 49:18 54:3 73:21 74:18

**issue** 73:1

**items** 40:18 91:1

_____

## J

**J.W.** 63:9,13,16

**Janice** 7:20 33:2 39:24 48:21 49:18 51:2,13 53:8 54:22 58:5 73:24 83:7,11 95:14 98:4 119:8

**January** 10:20 121:10 122:18, 22

**Jesse** 121:15, 16 122:16,18 123:1,18

**Jessica** 6:19 128:17

**Jimmy** 96:22

**job** 37:14

**Joe** 103:9,11, 16

**Johns** 80:4,8 91:5

**joint** 127:12

**Jr** 91:8

**judge** 8:22 94:6

**judicial** 29:9

**July** 77:1 78:21 83:23 86:21 87:14 90:4,6, 11,12,14 91:4 94:23

**June** 13:18,19 86:13 87:3,5, 18,24 88:4,11 102:15 104:10, 12,15

**jury** 61:12

_____

## K

**Kay** 7:20 33:2 48:21 49:18 51:2,13 53:8 54:23 58:5 73:24 83:11 95:14 98:4 117:8 119:8

**Kay's** 117:3

**Kelly** 115:12,15 116:22 117:17, 22 119:3,4

**Kentuckiana** 6:8

**Kentucky** 6:13,20,22,23 9:7 10:13,14, 19,24 11:15 12:12,19 13:8, 24 14:21 15:23 16:7 17:18,22 19:24 23:11,15 25:21 26:11,19 27:25 28:2 29:7,15 32:15 34:18 35:9 36:19 37:5 39:9 40:8 43:13,17, 21 50:6,20 66:22 69:24 71:11,19 72:2 76:8 79:8 81:14 86:9 92:16 101:19 102:16 120:6

**kill** 114:18

**killed** 84:16 104:17 117:8

**killer** 76:13,14

**killing** 98:6 100:16

**kind** 68:13

**kit** 95:7

**knew** 30:14 79:12 85:8,9,19 86:5

**knowledge** 53:23 70:14 79:23

**KSP** 12:6,16 18:2 50:7 51:17,24 55:18 56:21,23 63:1, 4,11,25 65:6 71:17 74:24 76:24 80:6,12 82:9 83:15 86:20 89:7,19 91:20 93:13 94:16 101:7 102:24 103:1, 14 104:22 115:19 116:4 121:5

_____

## L

**lab** 101:20 102:16 104:22

**labeled** 69:5

**late** 7:13 58:21 125:7

**Laurin** 62:10

**law** 10:4,7 15:5 18:13,21,25 19:11,15,24 20:14 23:19 25:13 26:1,15 27:12 28:12,16, 25 29:3 31:19

**lawsuit** 30:3 31:4

**lay** 31:19

**lead** 16:16 17:2,7 27:3 33:7 38:12,14,

15,18 39:16,24 40:4 71:21,24 77:25 78:12,15 79:8,13 92:19 119:8 125:18, 23

**leads** 25:5,10 36:25 57:8 114:23

**lean** 108:2,17

**learn** 45:12 59:16 60:4,8 77:21 88:15 98:5,15 99:17 125:1

**learned** 107:1 115:11 119:3

**learning** 88:18, 21 97:12,18,22 98:1 100:15,20 107:5

**led** 15:17 123:3

**left** 58:11 72:12 85:4,6

**lend** 20:6

**lenses** 45:16

**Leonard** 6:24 32:16

**letter** 112:7,13, 17,20 113:7,15, 16 114:5,11,14 115:5 121:7,12, 14

**letterhead** 121:8

**lights** 67:24 68:1,7,11

**Likewise** 83:2

**listed** 70:3

**lists** 70:6

**literally** 106:22

**litigation** 32:13,16 34:19 70:25 98:21,22 99:6

**live** 14:1

**lived** 13:24 85:9 87:23 88:3,12

**living** 13:18,19

**location** 6:9 109:22 114:4

**long** 9:25 10:14 11:2 14:1,24 32:23 50:14 56:14 74:21 117:20 124:17 125:14 126:19

**longer** 62:15 71:11 81:13

**lot** 16:3

**loud** 68:10,13

_____

## M

**Mac** 80:4 91:5

**made** 46:19 48:16 68:10 74:5 100:23 102:7 105:5

**Madelyn** 6:4

**Madisonville** 11:1 32:22,24 54:9 56:8 58:11 63:19 72:6 125:11

**maintain** 73:5

**maintained** 108:25 109:21

**maintaining** 26:21

**make** 8:2 20:7 22:9 29:22 32:8 33:23 37:15 44:19 58:3 67:6 78:6 112:3

**making** 52:10, 14 59:1 64:7

**man** 104:9,11

**manipulate** 26:8,16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 44 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024

139

manipulating 27:7

manner 84:15

manners 27:10

March 56:19 57:23 58:21 63:10

mark 70:17 82:4 96:3

marked 50:2,3 68:24 69:1 70:18 82:5,6,14 83:3 96:8,9

master 11:18, 21,22

matter 6:10 108:20 109:16

meaning 85:5

meant 38:18

meet 123:6,13

meeting 122:15,17

members 36:13 98:10,16

mental 95:19

mentioned 30:16 49:22 106:11

Merriweather 121:24

met 22:12 35:25 71:6 92:18

Michelle 110:22 111:5, 17

middle 70:5 104:3 119:4

midnight 104:11

Miller 6:23 34:20,22 35:1, 7,9,12,18,22,25 36:4,8 53:4

62:3,8 65:21 66:19,21,24,25 67:10,15,16 68:17 71:1,6,10 73:17 74:11,16, 21 75:5,8,16 78:5,9 79:7,13, 16 80:3,22,24 81:2,6 92:19 106:25 107:1,8 112:6 115:9,10 119:1 121:13 122:5,15,21 123:2

Miller's 36:13 73:9

mind 24:17 43:18

minute 54:21 76:19 78:19

minutes 65:9

misspoke 123:9

mom 115:5

moment 45:2 49:8

Monday 122:3

Montgomery 13:12,16 99:25 100:9,16

months 97:12

morning 7:10, 11 104:14 106:10

Morris 62:10, 13

mother 97:14 112:8 121:25

motive 114:18

moved 123:19

moving 30:23

multiple 15:1 17:6 38:4 39:22 51:23 63:8 76:7 84:9,17 89:1 92:23 98:16 100:2

murder 51:2 53:12 59:9,18 64:22 65:4 68:17,20 71:17 73:10 74:17,18 75:10,11,17,23 77:13,21,22,24 78:1,10,16 79:9,15,16,21 83:18 85:22 88:4 89:2,3 92:14,20 95:14 96:14 98:18 99:12,24 100:22 107:3,9 108:13 110:8, 17 119:5,17 126:6

murdered 64:24 86:13 88:10 92:16 97:13 99:18

murders 76:7, 19

_____

**N**

named 15:7,13 30:4 70:8

necessarily 84:16

needed 42:13 64:25

neighbor 103:12,16 115:12

news 30:10

newspaper 30:9

night 98:18 119:5

nodding 8:1

noise 68:10

Norman 6:11 7:14 30:3 48:20 53:15 59:17 104:13 119:10 122:1

notation 53:3 80:22

note 23:5 57:7 66:21 71:10 72:23 73:6 78:15 87:16 90:22 103:14, 16 104:5

noted 22:6 23:16 59:23 78:3,4 80:21 84:19 90:21 92:12 124:8

notes 66:6

notice 85:3

noticed 52:20

noting 94:20

November 10:16 29:16

number 6:14 12:5 16:10 68:22 69:4 70:2,17 73:24 77:5 82:14 83:3 96:4,21 97:2 102:23

numbered 74:25

numbers 50:8

numerous 16:12,13 48:22

_____

**O**

Object 18:16 23:22 25:18 33:13 45:22 47:23 61:18 75:13 81:8 96:24 99:4 110:3 112:10 113:17 118:19 120:8 122:9 127:2

objection 8:20,23

objections 8:18

obscene 112:7

observed 98:17 109:23

obtain 11:23 45:12 86:16 89:3,10 90:20

obtained 43:4 47:9 90:23 94:11 95:7,10 104:21 105:16 107:20 108:5, 21,23 111:22 118:5

obtaining 80:5 91:8

obtains 113:14

occasion 117:7

occupation 9:3

occurred 14:13 15:20 99:24

October 63:10

odd 81:5

Offense 64:2 69:21 87:10 89:24 102:8 105:5 116:10

Office 121:8

officer 10:5 15:5 16:11,17, 23 17:7 20:15 23:19 25:13 26:1 27:12 28:13,16,17,25 29:4 31:19 38:19 39:16,17, 24 40:4 52:10, 13 57:3 64:7 71:21,24 78:12 79:13 95:2 108:18,21 119:8 120:6 125:19,23

officers 18:13, 22 19:1,12,16, 21,24 20:15



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 45 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024
PAGEID #: 3758

140

26:2,16 27:17
39:22 108:3

**offices** 6:8

**official** 10:16

**one's** 32:3

**open** 43:18
57:9

**opportunities**
25:12 37:1 49:3

**opportunity**
32:11 37:18,23
64:25

**opposed** 8:1

**order** 42:24

**original** 42:20
43:15 62:1
105:23 106:23

**originally** 13:9
47:9

**overkill** 84:11,
14 93:5

**overview** 22:7

─────────

**P**

─────────

**p.m.** 128:11
129:18,19

**P166** 78:18

**pages** 51:17
63:4

**paper** 50:11

**paragraph**
74:25 86:21,24
90:6,18 93:13
104:4

**paragraphs**
74:25

**Park** 87:3,19,
24 88:5,11 98:7

**parole** 87:1,17

**part** 29:12
37:14 45:17
50:5 51:10
96:14 108:25

**passed** 62:19,
21

**pending** 6:12
8:12

**Pennyroyal**
96:6

**people** 28:13
67:7

**percent** 11:3

**perform** 18:3

**performed**
64:19

**period** 106:12

**perpetrator**
65:4 119:10

**person** 19:18
34:8 67:7
114:17

**personal**
21:21 66:7

**personally**
20:14 40:20
45:19 110:14
122:25

**phone** 116:25
117:11,13,14,
17,25 118:1,4

**phonetic** 54:14

**photo** 70:22,24
71:1 80:18
82:13,15,16,22
83:5,10

**photographs**
80:15 82:15

**photography**
80:18

**photos** 80:22,
24 81:3,12,24
82:2,8

**physical**
26:16,21 27:7
33:8 41:3 47:8
72:13 89:4,10
90:20 98:21
107:14,18,24
108:5,23,24

112:12,20

**physically**
55:21 56:3

**pictures** 84:24

**piece** 50:11
100:3

**place** 72:5
112:5

**plaintiff** 6:18

**Plaintiff's** 50:2
68:25 70:17
76:24 82:4,14
83:3 96:4,21
101:7 102:23
115:20 121:5

**pled** 100:15

**point** 12:19
27:18 49:23
55:4 60:17
95:15 102:13
120:24 121:2
123:14 125:23

**pointing** 119:9

**police** 6:23
10:11,13,15,19,
25 11:15 12:13,
20 15:23 16:1,8
17:19,23 19:24
23:11,15 25:22
26:12,20 27:25
28:3 29:8,15
32:15 34:18,23,
25 35:1,2,4,10
36:19 37:5 39:9
40:9 43:13,18,
21 50:7,22
60:20 66:19,20,
22 69:25 71:12,
13,16,20 72:2
79:8 81:14
101:19 102:16
104:15 120:6

**policy** 72:5,9,
11

**pop** 24:17

**position** 85:5

**positions**
11:16 12:13

85:4,5

**possession**
66:7 71:8,16
81:3,6

**possibilities**
43:22,24 48:3

**possibility**
25:19 47:25
64:20

**Possibly** 88:14

**post** 11:1,6
32:20,21,22,24
37:15,24 54:9
56:9 58:1,4
63:19 71:22
72:6,7,13,14,19
98:21 99:6
114:8 125:12

**post-
conviction**
98:22

**posts** 10:22
125:18

**potential** 24:25
25:10 36:25
41:21 42:9
43:25

**potentially**
25:5,15

**practice** 21:8,
22 22:24 40:9
41:17,20 42:7
43:23 44:11,20
45:4 47:18,20
59:10 61:1
65:25 66:3 72:5
83:24 108:4
111:18 112:3,5

**preface** 25:6
61:5

**prejudice**
122:2 123:3,10,
20

**present** 45:2
128:16

**pretty** 100:12,
13

**previous**
40:24 41:6
44:6,14 53:17
61:2 79:25
80:21 97:24

**previously**
10:4 15:2 31:2
32:13 36:9
41:14 45:7,21
46:18 47:14
103:17

**print** 55:21

**prior** 30:6
53:11,14 60:1,
11 65:20,24
76:2 79:15,20
88:19 114:12
119:5 126:9

**probable**
120:18

**probation**
87:1,17

**problem** 14:9

**procedure**
21:16 29:10

**proceed** 8:21
49:15 128:12

**proceedings**
6:1 60:24 61:2

**process** 54:2

**processes**
27:5

**professional**
9:22

**program** 55:19

**proper** 8:23
14:19 27:10

**prosecutor**
118:17 122:6,7,
22 123:13,17,
18 124:6,9

**prosecutors**
121:1

**provide** 29:17

**provided**
82:24 84:4



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

102:4,12
105:19 112:14
113:10,20

**providing** 9:21

**proximity**
100:9,12,13

**psychological**
95:21 100:20

**psychotic**
97:19,23

**purpose** 46:4
73:9 74:11
91:11

**purposes** 82:3
86:12

**put** 90:16
113:16 119:23
126:12,24

---

**Q**

**question** 8:4,
12,13,19 12:23
16:15 20:3
37:11 43:11
46:24 67:4
93:19 96:12
111:8 113:6
123:12 126:9

**questioning**
115:4

**questions** 8:1,
15,25 13:2
21:20 54:21
82:1 85:13
86:23 126:11
128:14,22,25

**quick** 9:9

**quickly** 74:24
90:10 115:19

---

**R**

**raise** 7:1

**rape** 103:17

**raped** 84:20
93:2 104:11,17

**Rapp** 99:14,18
100:16,22

**Rapp's** 99:24

**re-** 126:9

**re-indict** 120:4
126:5

**re-indicted**
60:4 119:17

**re-indictment**
120:13,19

**re-interview**
41:24 42:2,6,7,
14

**re-investigating**
64:21

**re-reading**
75:19

**re-tried** 60:5

**reach** 126:11

**reached** 67:15,
16

**read** 30:10,11
40:12,13,17
41:17 49:22
86:20 90:9,16

**reading** 40:14,
15 44:13 90:18
95:5

**ready** 48:19

**real** 9:9

**reason** 33:10
54:1 58:14
65:15 69:10
74:10 82:21
84:3 86:2 93:19
95:9 105:16
106:3,13,14
125:22

**reasonable**
46:6,8

**reasons**
124:22

**recall** 12:15,23,
24 14:3,8,24
15:2,3,8,10,16

18:6 23:1,13,
18,23 24:13,15,
25 25:2,25
26:14 27:8,15
28:8,9,11
29:11,13 30:20
31:1,14 33:11,
17,22 34:6
35:19,20,21
37:16,17 38:6,
11 40:2,3 42:5
43:10,16 48:9,
13,18 49:18,20
54:4 55:7,8,23,
25 56:13,14,16
57:22 60:25
61:4,22 62:3,4,
8,11,17,19,25
63:15 64:15,23
65:17,22 67:12,
13,17 68:20
71:5,9,18 72:4,
10,15 73:11
74:23 75:18,22
76:14,20 78:2
79:22 81:15,16,
17,19 85:24
86:18 88:1,3,
17,18,20,21,23,
25 89:9,11
93:25 94:15
95:11,20,21,24
96:10,13 97:3,
16,21,22,25
98:1,3,8,11,14,
19 99:5,9,13,
14,19,23 100:5,
15,18,24
102:21 105:2,
13 106:8 107:4,
5,7,11,22
110:18,19,24
111:3,7,12,13
112:1,4,9,16,
17,23 115:2,6,
13 117:16,19,
23 118:2 119:6,
11,15 120:1,9
122:10,19,24
123:4,6,16,21
124:11,15,17
126:7,14,15,18,
22 127:1,11,14,
15,17,19

**recalling**

97:11,17

**receive** 11:25
12:2 17:14,19,
22 18:22,24
19:4 20:5,10
23:10,14 25:22
26:12,20,24
28:1,3 29:8
39:8 43:12,17
48:10 81:12

**received** 17:9
18:1,7 19:8,13
20:13,16,19,23,
25 30:15 36:25
42:4 43:22 44:7
48:6 102:15
115:7 117:18

**receiving**
24:25 28:10
42:5 59:8
116:25

**recognize**
50:15 57:1
69:19,21 70:22
82:13,16 83:2
89:21 91:23
101:11 103:1
116:4

**recognized**
65:10

**recollection**
39:6 58:14
63:22 65:19
70:12 75:21
79:24 90:19
96:18,19 97:9,
12,18 100:1,19
104:21 115:4
127:21

**record** 6:3,16
7:12,17,19 8:2,
13 22:25 23:11
32:9 35:24
39:23 49:7,10,
11,13 51:22
66:24 82:3
86:12 128:7,8,
10 129:7,18

**record's** 33:23

**recording** 23:7

**recordings**
23:2

**refer** 45:23
101:23 121:1

**reference**
66:20 67:11
80:15 91:7 95:7

**referral** 22:22

**referred** 41:9
114:2 117:3

**referring** 34:2
40:14 48:17
50:20 120:25

**refresh** 70:12
90:19 99:25
104:20

**refreshes**
75:21

**refute** 33:10
74:10 82:21
84:4 86:2 97:5
105:16 106:15
125:22

**regard** 17:14
23:21 24:6
43:13 53:3 71:2
80:4 94:12
103:8 115:17

**reinvestigating**
110:15

**reinvestigation**
111:18

**related** 15:4

**relation** 95:19

**relative** 121:25

**rely** 44:4

**relying** 44:13
45:6,20

**remain** 11:12
56:7 72:7

**remained**
56:15

**remember**
14:14,19 18:4
21:16 26:25
42:5 52:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 47 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024

142

115:15

remembering
14:17 97:11

rephrase 8:6,7

report 20:12,18
21:10 22:10
23:5,17 52:7,
14,22 56:18
57:5,7 64:3,8
65:11,15 66:1,
18 68:16 69:22
71:11 73:12,13,
16 75:3 76:25
78:14 83:14,22
84:5,8 86:15
87:10,16 88:7
89:14,24 90:1,
3,9,18,25 91:3
94:25 95:1,4,
16,22 96:2 97:5
101:13,16
102:1 110:12
111:6,20 112:2
116:5,10,13
118:3,8,10
119:13 122:14,
20 124:1

reported 84:20
102:7

reporter 6:5
7:2,3,7 82:10
129:6,10,12,16

Reporters 6:9

reporting 57:3

reports 19:2,7,
14 20:1 21:2
22:2 41:18
55:10,18,19,21
60:21 63:8
66:4,6,12 74:3,
7 83:24 97:4,18
102:8 105:5
116:15

represent 6:22
7:14

represents
7:13

request 52:10
94:7 103:8

reside 13:7

responsible
75:10

restroom
128:4

result 47:22

resulted 122:7

results 41:5,16
117:25 118:4

retire 10:17

retired 11:22
29:14 66:22
79:7

retirement
11:13

retiring 11:17

reveals 7:19
35:24

review 7:17,19
12:4 29:22
32:11 37:9,24
41:5,20 49:3
55:10,24 56:17
59:11,13,16
60:3,7 61:1
75:15 77:13,20,
24 79:20 81:20,
23 85:21 95:17,
18 96:7,14,17,
18 99:10
107:12,14,18
112:12 117:24
122:13

reviewed 33:8
38:16,20 40:21
43:1 51:11
57:10 60:16
76:21 77:8
80:10 83:11,18
105:21,22
116:16 121:20

reviewing
40:23 41:2
43:19 47:25
60:20,23 61:25
64:17 95:21
99:14 100:5
107:6 117:16
121:20

reviews 51:23

Rhonda 80:14,
16

Riley 121:15,
16,24 122:16,
18 123:1,18,25
124:12

risk 25:16

risks 25:23

Rita 115:12,15
116:22,24
117:6,10,17,21

River 9:4 10:1

Robert 6:23
34:19 66:25
75:5 79:7 80:3
92:19

Robertson
13:13,14

Robinson 6:17

role 9:19 15:4,
22 37:7

room 8:17
96:22 97:14
114:7

Roy 76:1,3
77:21 79:17,19,
25 80:5 85:15,
19,24 86:5,8,17
87:18,23 88:12,
16,19 89:4
90:20 91:8
95:9,13,19
98:5,10,12,16
99:1,11 100:15,
21 119:4

rule 8:22

rules 7:25

running 98:17

──────────

S

safe 14:20
18:12 24:24
34:14 43:1
58:21 95:12
115:3

safety 9:20,22

sake 66:23

saliva 94:17
95:5

sample 95:10
104:16

Sandra 101:19
104:22

scanned
115:25

scene 80:24
81:3 107:9
108:6,13
109:19

schizophrenic
95:23 98:2

school 9:19,
20,22 13:22

schools 9:18

Scott 6:24
32:17 126:23

Sean 6:5

search 78:17,
20 80:5 90:23
91:1,8,17 92:1,
5,12 94:7,9,12,
20,23 95:2
103:4,6,9,25
105:8

securing 29:1,
5

seek 120:4,13,
18

seeking 126:9

segments 99:2

seized 91:1

semen 104:5,
16,25 105:18

sense 37:15
58:3 78:6

sentence 77:3,
6,12,16

separate
104:5,23
105:17

September
92:15

sergeant
54:15,22 55:2,
10 56:7,12,14
57:21

serial 76:13,14

served 30:6

sex 106:9,18

sexual 95:6

shaking 68:11

shared 118:17
123:2

sharing 107:2

she'd 101:20

Sheriff 62:10,
13

Shoulders
6:19 31:11
128:22

sic 45:24

signature
57:12

signed 92:5
121:14

significance
40:16 87:25

significant
88:13

Silfies 125:7,
14,18,23 126:5,
9,10,16 127:5,
22

silly 67:4

similar 77:10
85:4,5 92:14

similarities
83:19 84:9 85:3
89:2 92:23
93:1,5 94:3

similarity
84:18

simply 44:13
45:6,20



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

sir 7:10 9:2
13:7 14:23
23:19 32:15
42:3 45:10
46:15 48:19
49:17 51:21
52:23 56:24
59:8 63:6 65:6
69:9,19 70:16
76:3 77:4 82:13
84:12 91:23
100:4 101:8,11
103:2 112:25
119:7 121:12
128:13

sisters 115:1,4

sit 47:6,18
50:11

sitting 17:25
23:25 49:17
54:5 62:18
63:21 65:14,18
66:10 68:20
75:21 79:23
84:3 88:24
96:12 105:15
106:15 113:14
127:20

situation 81:18
113:13 114:10

smears 101:2

Smith 6:24
32:17,19,23
33:1,4,15,20
34:4,14 126:23

socialize
127:9

socialized
33:15 35:12

socializing
127:11

soldier 107:3,
21 110:16,23
111:2

soldier's
107:10

solely 44:4

solemnly 7:3

sought 119:16
126:5

sound 67:19

sounded 68:13

sounds 38:2

sources 17:20,
21 43:20 48:12,
14 101:1,21
102:17 105:17

Sowell 63:9,
13,16,22

speak 8:18
19:15 42:19
43:8 62:1 63:13
64:12 67:10
76:5 81:9 98:9,
12 106:14
122:25

SPEAKER
68:1

speaking 62:8
63:22 110:8
119:1 121:1

speci- 55:7

special 48:25

specific 13:1
17:10,23 18:7
21:20 26:12,20,
25 27:8 32:4
37:13 42:5,14
45:15 48:6,11
49:20 51:2 52:6
55:8 62:9 73:11
76:14 84:16
86:17,23 88:1
91:25 105:14
117:17 122:10
124:11 126:22

specifically
18:1 22:21
23:18 24:21
25:25 27:6
28:10,11,24
29:11,13 30:20
31:21 37:16,25
38:11 40:6 42:4
43:11 45:1
48:13 55:17
60:15 64:23

67:14,17 68:22
74:23 78:19
86:1 89:11
94:11 96:16
97:10 100:18
102:24 103:5
116:19 117:19
119:19 123:4,6,
22 125:25

specifics 18:4
67:12 72:10,15
75:18,20 78:2
88:1

sperm 95:10

split 17:1

spoke 35:17
65:20 66:18
79:6,7 80:4,14
91:4

spoken 31:2,8,
11,18 34:4 53:4

Sports 9:18

Springfield
13:11

squirrels
68:12

staff 9:18

stamp 69:11
72:17,19

stamped 50:7
51:17 69:4
70:20 82:9
96:3,6

stamps 50:8

Stand 49:9

standard
47:17 59:10
111:18 112:2,5

Staples 6:17
7:9,13 9:24
18:17 23:24
25:20 33:14
46:2 48:4 49:7,
16 50:1,4 61:19
67:21,24 68:5,
9,15,24 69:2
70:16,19 75:14
81:11 82:3,7,

11,12 96:11
97:1 99:7
101:10 110:4
112:11 113:21
118:23 120:11
122:12 127:3,
24 128:3,5,13,
16,20 129:4,9,
15

start 17:15

state 6:23 10:3,
13,14,19,25
11:15 12:13,20
13:6 14:20
15:23 16:8
17:19,23 19:24
23:11,15 25:22
26:12,20 27:25
28:2 29:8,15
32:15 34:18,23,
25 35:1,2,3,10
36:19 37:5 39:9
40:8 43:13,18,
21 50:7,22
66:22 69:24
71:12,19 72:2
77:15 79:6,8
81:14 83:17
85:18 86:4
93:8,15 101:19
102:16 120:6

stated 98:16
103:24 104:13
105:12 106:18
117:10

statement
40:16 106:14

statements
26:3,8,13 40:24
41:20 47:7
106:5

states 6:13
104:13 116:24

stationed
10:21,25 56:8

status 11:23

Stay 80:13

step 9:8 110:5

steps 19:1,6,
14,25 20:12,17

29:22 40:10
43:3 44:5 48:22
60:14 65:19,23
66:1 89:3,9,11
90:19 110:14

Steven 125:7

Stevenson
6:10 7:1 9:10
49:13 129:2

Stewart 96:23

sticking 45:15

stopping
84:23

store 71:20
114:7

stored 71:22
72:14 107:24
109:22 112:20

stories 30:10

storing 108:5

strike 7:18
28:2 43:8 47:1
52:2 54:8,20
58:3 62:12 76:2
79:18 80:23
83:10 107:12
122:16 125:5

submit 55:17
66:4

submitted
21:10,13,14,17
22:3,7 55:11,24
56:5 108:7,9

subpoena
30:6

sufficient
120:18

suit 15:17 30:8
31:20,25 34:16
36:5,10

suits 31:16

sunsets
117:20

supervised
12:14



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-00210-GNS-HBB    Document 130-18    Filed 10/27/25    Page 49 of 50
The Deposition of BRAD STEVENSON, taken on April 25, 2024

144

**supervision**
45:25 121:2

**supervisor**
12:15 39:10,11,
15 53:22 54:6,
12 55:22 56:8,
11,15

**supervisors**
44:16 120:25

**supplement**
87:10

**supplementary** 52:7 57:2
65:11

**supplied** 78:23
79:1 92:9

**support** 103:5

**suppose** 17:15
18:19 28:5,7
36:23,24 39:19
44:16 45:8 58:2
60:6 72:17,21
78:22 105:1,2,
25 107:17
113:10 118:7
121:22

**supposed**
114:23

**surprised**
19:23

**suspect** 22:11,
17 24:8 47:8
54:1 95:6,14

**suspects** 21:5
22:25 23:12,16
25:6,10,15,24
41:21 42:10
43:25

**swear** 7:3

**swore** 105:11

---
**T**
---

**table** 31:12

**taking** 41:21
45:17 65:19
89:10

**talk** 78:18
120:23,24
122:5

**talked** 31:24
92:22 102:6
121:24

**talking** 7:23
14:12 42:9 67:6
78:7 91:25
115:9 120:25
121:1

**tasked** 27:2

**tasks** 14:13
47:16 64:18

**taught** 21:7

**teachers** 9:18

**tendency** 24:7

**Tennessee**
13:11,16 99:25
100:8,10,17

**term** 27:8,13,
15

**testified** 15:21
33:4 36:18
53:20 59:10
65:9 74:2

**testimony** 7:4
28:18 29:1,4,9
32:4 76:11

**testing** 41:6,
13,17 73:19
91:11 98:20

**tests** 99:5,9

**That'd** 90:2

**theory** 24:8,10
26:9

**thing** 24:13

**things** 14:17
47:2,21

**thinking** 40:7

**threatened**
112:15 113:15

**threatening**
114:11 116:25
117:17

**threats** 112:7

**time** 6:6,7 8:22
11:19 12:1
14:17 27:11
33:20,22 35:10,
17,21 37:20,25
38:3 42:18,25
44:10,18 45:9,
24 46:21 48:2
49:10,14 50:14
51:25 52:20
54:13,15 56:2
57:8 62:23
79:12 84:7
85:11 86:4
88:4,13,24
95:15 103:3
105:20 106:12
108:3,10,18
109:14 110:22
111:1 113:9
119:18,20,22,
25 120:20,22
121:3,17
126:19 128:7,
10,16,21
129:18

**timeline** 72:17,
19

**times** 16:16,20
111:23

**Tiny** 87:3,19,24
88:5,11 98:7

**title** 12:1

**titles** 11:16

**today** 6:5 7:21
8:10 17:25
23:25 29:18,23
49:17 53:23
54:5 63:21
65:14,18 68:20
70:14 74:14
75:22 79:24
84:3 93:21
96:13 105:15
106:15 113:14
127:20 129:8

**today's** 30:7

**Todd** 6:12,20
13:24 14:1,21
30:4 33:5 62:9

76:7 91:4 92:16
100:7,10

**told** 14:11 80:8
101:25 102:2
117:7

**top** 50:8 76:9,
23 82:10 86:21
101:18

**topic** 26:24

**Town** 87:3,19,
24 88:5,11 98:7

**traffic** 15:18
68:7 127:18

**trailer** 87:3,19,
24 88:5,11
98:7,18

**trained** 19:5,25
20:11 27:5
41:5,24 42:15
43:8 44:3 74:3
113:25

**training** 11:24
17:9,13,18,19,
22 18:1,6,10,
19,22,24 19:3,
8,13,17,18
20:5,9,13,16,
19,23,24 23:10,
14 24:25 25:22
26:12,20,24
27:6,10 28:1,3,
6,10 29:8 42:5,
25 43:6,7,10,
12,17,22 44:7,
9,18 45:8,14,
15,17,24 46:21
48:1,6,10,15,16
49:2 84:1,6
113:23 119:18,
21 120:5,21

**trainings**
17:17 29:13

**transcript**
129:8

**transcripts**
32:12

**transfer** 58:16

**transferred**
11:6,7 58:1,4

125:18

**transition** 56:4

**transpired**
38:17 39:7

**trial** 33:21 34:2,
4 60:23 61:2
118:18

**trials** 33:24

**trooper** 11:17,
18,21,23

**truck** 68:6

**true** 30:17
72:13 108:24

**truth** 7:5

**truthful** 105:12

**tunnel** 23:20
24:6,15,20,22
25:1

**turn** 51:16
56:21 63:3 65:6
69:9 89:6,8,17
91:20 101:6
102:22,24
103:13 115:14,
19 121:4

**turned** 119:19

**turning** 80:12
83:14 106:21

**type** 17:13
18:22,24 19:13

**typed** 55:19

**types** 38:8

**typical** 61:1,6,
14,21 81:12

**typically** 48:24
53:20

---
**U**
---

**Uh-huh** 11:9
13:15 14:10
21:23,25 37:16
41:15 48:8
50:23 51:5,9,18
52:15 53:2,25
54:19 57:9,11



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

59:14 63:7
64:1,9 65:13
75:2 83:16
85:1,7 91:10
92:2 93:4,14
99:8 101:15
104:7 106:24
111:15 116:6,8
117:12 118:13
121:18 122:4

**ultimately**
75:15 77:22
81:20 91:17
94:6

**understand**
14:9 20:7 82:19
111:13 113:19
126:20

**understanding**
22:9 73:8

**UNIDENTIFIE
D** 68:1

**Uniform** 64:2
69:21 87:10
89:24 102:8
105:5 116:10

**unit** 37:4,13,17
73:18 77:9

**United** 6:12

**utilized** 93:17

———

**V**

**vaginal** 101:2

**verbally** 8:1

**Vernon** 63:1

**versus** 17:2
44:13 45:6,20

**victim** 51:6
70:6,8 85:7,8
110:7 113:15

**victims** 84:20,
21

**video** 22:25
23:7,11 129:11,
13

**videos** 32:12

**view** 45:15
122:2

**viewed** 108:10

**violent** 100:23

**vision** 23:21
24:15,21,22
25:1

**visions** 24:6

**visual** 23:20

**voice** 8:17,20

**voices** 97:15
100:23

———

**W**

**wait** 28:19
80:23

**walk** 10:7

**wanted** 8:11

**warrant** 78:17,
20 80:5 90:23
91:1,8,17 92:1,
5,12 94:7,9,12,
20,23 95:2
103:4,6,9,25

**warrants**
105:8

**Warren** 13:8

**Wayne** 76:1,3
77:21 79:17,19,
25 80:5 85:15,
19,24 86:5,8,17
87:18,23 88:12,
16,19 89:4
90:20 91:8
95:9,13,19
98:5,10,12,16
99:2,11 100:15,
21 119:4

**weapon** 93:17
109:18

**Weatherford**
103:9,11,16

**week** 14:18

**weeks** 97:24

**weird** 52:18

**Western** 6:13

**whatsoever**
31:15 53:18
108:23 119:9
126:16

**When's** 33:20
35:17

**whomever**
114:11

**wife** 7:15

**Williams** 7:20
33:2 53:11
81:21 86:5,13
88:3,10,15,18
89:3 97:13 99:3
102:18 104:9,
14 107:2,20
110:16,23
111:1 112:8,14
114:12,20
116:17 117:8
119:8,10

**Williams'** 33:7
35:25 39:25
48:21 49:19
50:5 51:2,14
53:8,14 54:3,23
55:2 58:5,15,19
59:9,17,18
60:13 63:23
64:13,22 65:4
66:11 73:24
74:18 75:11
80:15,25 83:7,
11,18 91:13
92:14 95:14
98:5,18 101:2
104:6,16
105:18,21
107:9 110:15,
21,25 112:8,21
115:1,4,10,12
119:2,5,17
121:20,25
122:13 125:19
126:5,13,17,24

**window** 68:6,9

**wire** 67:25 68:4

**withhold** 27:22

**witnesses**
27:23 41:24
42:7,10,11,12,
19 111:24

**wondered**
70:25

**Wood-willoby**
80:14,16

**words** 17:4
44:3 55:18 59:6
61:7

**work** 10:14
32:23 33:1,16
35:13 37:19
38:1,5 55:1,22
58:10,15 63:14,
23 64:13 68:1
125:11,15
126:16,24
127:10,12

**worked** 10:9,
10,12,13 36:19
37:18 38:7,9,13
58:22 61:22
63:18 64:11
66:22 85:25
125:8,9 127:4,7

**working** 9:4
10:18 12:25
32:20 34:23,24,
25 35:1,6,9
53:14 54:9
57:22 58:18
59:5 127:7,17

**would've**
17:15,17 18:3
19:8,20,22
22:12 27:1,9
28:5 37:1,9
38:16,24 39:7
41:8 44:9 46:19
54:7 55:8,23,24
56:5 60:6,16
67:18 72:8,16,
22 73:13 81:2,6
84:16 100:2
106:1,3,6
108:2,7,9
118:21 119:14
120:19 121:19

**wrists** 84:22

**written** 19:2,7,
14 20:1,12,18
21:2 22:1,10
23:5,16 107:10
110:11 111:20
114:11

**wrong** 47:3
48:10

**wrongful** 30:8

**wrote** 74:10

———

**Y**

**years** 7:20
10:12 12:3
14:2,14 32:25
33:6 34:7,23,
24,25 35:1
50:18 58:22
59:6 60:1,5,11
119:7,22 120:7
125:16 126:12,
24 127:5

———

**Z**

**Zoom** 6:21



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com