ENTERED
OCT - 5 2017
TODD CO CIRCUIT/DISTRICT CT.
BY: _____ D.CLERK

COMMONWEALTH OF KENTUCKY
TODD CIRCUIT COURT
INDICTMENT NO. 07-CR-00001

COMMONWEALTH OF KENTUCKY      PLAINTIFF

VS.    <u>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING CR 60.02 MOTION</u>

NORMAN GRAHAM      DEFENDANT

\* \* \* \* \*

The Defendant ("Graham") filed a "Motion for a New Trial Pursuant to CR 60.02 (b) and (f)" for his conviction of the rape and brutal stabbing murder of Janice Kay Williams ("Kay"). This murder took place during the late evening hours of June 29 or the early morning hours of June 30, 1980. Primarily, Graham offers the testimony of two witnesses who say they saw an alternate perpetrator on the night of this murder. This evidence is further supported by indirect admissions. The alternate perpetrator allegedly admitted to the murder, and his father allegedly admitted to the destruction of evidence.

Due to the extraordinary nature of the offered new evidence, the Court permitted depositions in preparation for an evidentiary hearing. The Court conducted an evidentiary hearing on two days, April 24 and June 12, 2017. Counsel filed contemporaneous post-hearing memoranda. The Court will first address the law applicable to the Motion.

Mark Cowherd, Clerk of the Circuit & District Courts Todd County, KY certify this to be a true copy of the original record of this office
WITNESS my hand and seal of office this 23rd day of OCT. , 2017
Signed, _____
Mark Cowherd, Clerk
Circuit & District Courts
Todd County, KY

1

## THE APPLICABLE LAW

Graham's counsel argues "actual innocence." This doctrinal phrase applies to a due process claim. The premise is the conviction and incarceration of an innocent person offends due process. The doctrine usually applies to excuse a procedural default such as exceeding the time limit for a post-judgment motion. It is also known as the "miscarriage of justice" exception. <u>Bowling v. Commonwealth</u>, 163 S.W.3d 361, 372 (Ky. 2005).

Graham has not established actual innocence. The DNA evidence implicating Graham and his faulty alibi prevent such a finding on this record, despite the newly discovered evidence. Fortunately for Graham, he is not required to show actual innocence to prevail on this Motion.

CR 60.02 includes a one-year limitation for newly discovered evidence claims. In <u>Bedingfield v. Commonwealth</u>, 260 S.W.3d 805 (Ky. 2008), the Kentucky Supreme Court recognized an inconsistency in the absence of a time limitation for motions for new trial pursuant to RCr 10.06 as applied to RCr 10.02. The <u>Bedingfield</u> court reasoned the "catch-all" of CR 60.02(f) may be utilized even when CR 60.02(b) is time-barred.

"CR 60.02 … authorizes relief from a final judgment based upon newly discovered evidence only if: (1) the evidence was discovered after entry of judgment; (2) the moving party was diligent in

2

GRAHAM 000129

discovering the new evidence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the newly discovered evidence is material; and (5) the evidence, if introduced, would probably result in a different outcome." Hopkins v. Ratliff, 957 S.W.2d 300, 301-302 (Ky. App. 1997).

After a review of the evidence, the Court finds only two of these factors require detailed analysis. Graham clearly discovered the new evidence after the trial. The evidence is material and is not merely cumulative or impeaching in nature.

The Court's task then is twofold. After identifying and evaluating the recently disclosed evidence, the first inquiry is whether Graham exercised "due diligence" to discover this evidence. If so, the second inquiry is whether this evidence is "of such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted." Commonwealth v. Harris, 250 S.W.3d 637, 640-641 (Ky. 2008).

## THE RECENTLY DISCOVERED EVIDENCE

The offered evidence is primarily the testimony of two women who say as teenagers they saw an alternate perpetrator, Roy Wayne Dean ("Dean"), on the night of Kay's murder. Their collective observations of Dean on that night are consistent with Dean's commission of the murder of which Graham stands convicted. Their

3

GRAHAM 000130

testimony also adds admissions by Dean and his father consistent with Dean's participation in the murder. But this new evidence is not flawless.

Regina Renee Dean ("Renee"), age 13 at the time, lived with her brother, the claimed alternate perpetrator (Dean-then age 18), in a house next to the trailers in the Tiny Town Trailer Park near Guthrie. On the night of the murder, Renee remembers staying at the trailer of her Uncle Junior (paternal uncle) in Tiny Town with her first-cousins Barbara and Connie. They were playing hide-and-seek. They had a curfew of 10 p.m., but the curfew was not strictly enforced.

Renee and Barbara were out after dark. Recollections of seeing a light on a pole illuminating Dean and the distinct memory of lightning bugs when considered with all other evidence offered supports the conclusion the observations were after dark. The Court takes judicial notice of official data of the United States Naval Observatory establishing sunset in Guthrie on June 29, 1980, at 8:11 p.m. local time with end of twilight at 8:42 p.m. An almost full (98%) but waning moon rose at 9:21 p.m.

While hiding near a bush, Renee heard a scream. A few minutes later she saw Dean at the door of the victim's trailer. This was her testimony at the recent hearing. Renee has also suggested she saw Dean coming out of the trailer or coming from the direction of the trailer. Dean was wearing a white T-shirt with blood on it.

4

Dean had what looked like a duffel bag in his hand. Renee asked Dean what he was doing. He just said "Shhh" and ran away. Renee remembers later Dean came home and took a shower. Renee also saw a scratch or cut on one of Dean's hands. Dean said the cut and blood were from a dog bite. Dean was not at the house the next day when police investigated the nearby murder of Kay. Curiously, the parents had taken Dean to stay with other relatives by then.

A couple of weeks later, Renee remembered Dean threatening to throw her into a creek. Renee could not swim. When Renee resisted and apparently threatened to tell their parents, Dean said: "If you tell Mom, I'll do you like I did that woman in the trailer." The disturbing nature of the relationship between Renee and Dean must be addressed more fully later when evaluating the timeliness of the disclosure of this evidence.

Barbara Dean Keeton ("Barbara") was one of the cousins with whom Renee was playing hide-and-seek that night. She was 14 years old at the time. She remembers sneaking a cigarette during or after a hide-and-seek game. She was smoking the cigarette on the trailer hitch of her home when she saw Dean running without a shirt on. Dean was wearing jeans and probably without shoes. Barbara distinctly remembers Dean carrying a black combat boot with the tongue all the way out, suggesting the absence of the laces.

When they made eye contact, they looked at each like "deer caught in headlights." Barbara asked Dean something about the

GRAHAM 000132

boot. Dean ran away in the direction of the dumpsters in the trailer park. Barbara has said Dean threw the boot in the dumpster. The police did not find a boot there.

Connie Powell, Barbara's sister, adds a little to this testimony. Although she was inside and not playing hide and seek at the time, she also claims to have heard a scream. Curiously, Barbara said that screams were not that unusual in the area, but this scream was different and got their attention.

Barbara and Renee add further information about Dean having seen Kay before her death and making crude comments in her presence. Kay's sister, Judy Blick, discounts this testimony because Kay would not have associated with teenagers like these girls at the time, and Kay never expressed any concern about or knowledge of Dean. Judy Blick also testified she never heard any scream that night, and she was next door to the murder scene.

More disturbing additional evidence is that of Danny Moles, a long-time friend of Graham's but also a cousin to the Deans, who spoke with Dean's father. Moles testified Dean Sr. admitted Dean came to him for assistance in destroying the bloody clothes Dean wore on the night of the murder. Unfortunately, Dean Sr. died just days prior to the second day of the hearing in this matter. He had been subpoenaed to testify. His statement may be admissible evidence as a statement against penal interest. KRE 804(b)(3).

Lisa Potter ("Potter") was instrumental in gathering this new

6

GRAHAM 000133

evidence. Potter is a fervent private citizen advocate for Graham. The Commonwealth implies that Potter may have pressured or even "bribed" the witnesses to come forward and give false evidence. Renee told police during an interview on March 1, 2017, Potter was trying to give her money to provide testimony, but she did not take any. Renee thought Potter was crazy for offering her money.

The Court has concerns about some of Potter's actions. She repeatedly met with Renee, eventually showing her photographs of the bodies of Kay and Dean's two known murder victims. This grotesque and unnecessary display was obviously designed to elicit a response. Potter's actions may end up discrediting Renee's testimony. As for the bribery allegation, the evidence of any actual payment is not impressive. Potter did buy some groceries (worth $38 according to Potter) for Renee. Still, the Court should consider all the circumstances in assessing the offered evidence.

Several inconsistencies present themselves as the Commonwealth has pointed out. For example, the Court wonders why the difference in shirt or shirtless, duffle bag or boot? Perhaps the answer develops from the evidence when considered together. Renee saw Dean just after the event. Barbara may have seen Dean as he was frantically running away trying to shed evidence. Dean may have taken the bloody shirt off by then. Dean's father saw Dean last when the evidence was destroyed. Then Dean's father removes Dean from the scene. The evidence in the neighborhood may have been

GRAHAM 000134

gathered and destroyed.

The Commonwealth could just as reasonably argue the various inconsistencies mean the witnesses did not see what they say they saw, and they are making it up to shift blame to a different murderer they hate who is already in prison for life. Dean denies any involvement in this murder. Despite guilty pleas, Dean has also denied involvement in one of the murders for which he is serving a life sentence.

Another consideration is the age of the observations. Thirty-seven years have now passed. What is offered are the memories of teenagers with decades of intervening experiences to cloud the details and to impact the trustworthiness of their recollections.

## DUE DILIGENCE IN DISCOVERY

At first blush, one asks the obvious question: Why was this evidence not discovered until well after the prior trials and the prior post-conviction motions? First, witnesses suggest the initial investigative police canvass of the neighborhood was not thorough. Barbara and Renee do not recall anyone speaking directly to them at the time or ever seeking information from them later. Both Renee and Barbara moved away within a couple of months of these events and did not follow the trials of Graham.

On the other hand, Barbara mentioned in a police interview on March 1, 2017, a prior occasion when she and Renee spoke to police

8

for a half a day, and she wanted to know where that evidence was. There is no record of any such interview. Barbara later testified in court no such interview took place. This just adds to the credibility deficits specific to Barbara's testimony.

The keys to the late disclosure are Dean's mother, Patsy, and the incarceration of Dean. Both Barbara and Renee explain Dean's mother was very protective of Dean. All the witnesses who spoke about the late Mrs. Dean agree. Renee could not tell her mother anything bad about Dean. Her mother would punish her instead. Renee would not come forward until after her mother died in June 2014.

Dean is a proven murderer and psychopath. His mental illness and criminal conduct were documented as early as 1980. Barbara and Renee were and are afraid of him. Barbara claims Dean raped her at age ten, taking her virginity by force. Renee says Dean molested her for years. Dean broke Renee's arm and chased her in a field with a car. When Potter contacted Renee in 2016, Renee would not say anything for fear Dean would someday get out. Only when Potter showed Renee documentation of Dean's serve out status for his life sentences (decided in June 2015) would Renee tell what she knew.

The Court agrees due diligence would require efforts to find witnesses about Dean when he was offered as an alternate perpetrator in the 2008 trial, when a new trial was requested just after that trial, and when an RCr 11.42 motion complained of the

GRAHAM 000136

insufficient efforts by counsel to research Dean as an alternate perpetrator.

Graham's counsel points out Detective Smith with the Kentucky State Police also did not discover the existence of these witnesses when the case was reopened in 2004. He would have had the same reason (to discover the truth) to search for these witnesses. Yet these former teenage witnesses did not cross his radar screen either.

The Court agrees Detective Smith is a trained and experienced investigator. His participation in the investigation of the 2008 trial and the proceedings since prove Smith's skill and excellent work ethic. Smith impressed the Court as a credit to his profession.

The controlling factor is the fear of the witnesses in coming forward. In a similar case, the Court of Appeals of Indiana addressed newly discovered evidence of a witness who saw a murderer fleeing the scene. She did not come forward earlier due to fear of the perpetrator who had beaten and raped her in the past. The Court held due diligence did not require the earlier discovery of such evidence. Rhymer v. State, 627 N.E.2d 822 (Ind. App. 1994). See also, McCallum v. State, 559 So.2d 233 (Fla. App. 1990).

In the circumstances presented, the Court finds Graham acted with the requisite due diligence in securing this new evidence. Because of the well-justified fear of the witnesses in coming

GRAHAM 000137

forward, the evidence was not available to Graham for his prior trials or his prior post-conviction motions. Graham provided the evidence with sufficient promptness once discovered.

While addressing this issue of due diligence, the Court was apparently more concerned than either of the parties about one procedural aspect of this issue. Graham's counsel filed the present motion on September 7, 2016. At that time, the Court was already working on a prior motion in this case also seeking CR 60.02 relief. A claim of actual innocence was mentioned in two paragraphs of this prior Motion, but no new offered evidence to support this claim was filed with the prior motion.

Because of the strong public policy favoring finality of judgments, serial CR 60.02 motions are discouraged. Why Graham's counsel filed two motions rather than one remains a mystery. Still, counsel for both sides have all but ignored this issue. Graham filed an appeal of the prior CR 60.02 decision entered on September 22, 2016. In doing so, counsel did not heed the suggestion of this Court of a motion to reconsider so that the motions may be considered as one coordinated CR 60.02 effort. The Court of Appeals abated the first CR 60.02 appeal (2016-CA-001624) awaiting a decision on the second motion.

Ultimately, this procedural faux pas, if it was one, should not prohibit determination of the serious issues presented. If it did, Graham might be denied relief due to ineffective

11

assistance of counsel. Considering the equitable nature of CR 60.02, the uncoordinated presentation of the CR 60.02 issues should not be the reason for denial of relief in the circumstances of this case.

### EFFECT OF NEW EVIDENCE ON TRIAL

The final determination is whether this new evidence is powerful enough to change the result of a trial. The Court notes the first trial in 1981 ended with a jury unable to reach a verdict probably due to the then circumstantial nature of the evidence against Graham. As the Court has previously discussed in its prior CR 60.02 Order, the advent of DNA analysis changed the strength of the evidence against Graham.

This decision requires a review of all the other evidence available for the 2008 trial. The closing argument of the Commonwealth in the 2008 trial is an excellent summary of this evidence.

With certainty, Graham was the source of semen found in or on Kay's body or clothing. They were dating and sexually intimate. Kay was killed in Graham's trailer. Graham admitted having sex with Kay early on the day of the murder. While some DNA expert evidence strongly questions Graham's timing of the semen deposit, other experts disagreed about what they saw when the semen was examined. The experts disputed the presence of "tails,"

GRAHAM 000139

determinative of the age of the semen. Thus, the DNA evidence does not absolutely foreclose Graham's having been the source of the semen prior to the timeframe of the murder.

Kay's sister, Regina Alexander, said Kay was almost obsessively clean, taking multiple baths a day. She testified Kay took a bath after 3 p.m. that day and changed clothes. This does not necessarily mean that all semen would have been removed from the vaginal cavity. Kay's sister also remembered Kay's comment about problems in the relationship and that it might end soon, although that detail may have been added when compared to an earlier interview of Ms. Alexander. Still, this evidence provides support for Graham's motive.

Apart from the DNA evidence, the biggest problem for Graham was his faulty alibi. Graham insisted he went out and got drunk that night. Indeed, Kay went out with friends unsuccessfully looking for Graham. Kay probably returned home after 10 p.m. Most of the scientific evidence suggests Kay was murdered before 12:30 a.m. Graham says he had passed out in a parking lot that night. Graham remembers no details after 9:30 p.m. until he woke up in the early morning hours.

The problem is no one saw Graham in the parking lot where he says he passed out. Equally important, no one saw Graham at his trailer before he says he got there early the next morning. Graham says he raced home when he woke up after 4 a.m. only to find Kay

13

tied up with black bootlaces and stabbed to death in his bed. He went next door to Kay's sister's place to report what he found.

Ralph Blick, the husband of Kay's sister next door, testified Graham looked like he had just showered. His hair was still wet. Graham testified to the contrary. Yet the bathtub indicated recent use with water visible.

Blick said Graham acted too calm. The sister also commented on the odd reaction of Graham. A neighbor, Joey Weatherford, saw Graham calmly walking from his trailer to the one next door. But Blick also is not a perfect witness, having been convicted of child molestation himself. Weatherford also was a sex offender.

At this point, the Court notes the bewildering array of suspects offered during the history of this case. The neighbor Weatherford was suspected but ruled out by DNA testing. Ralph Blick once claimed his wife, Judy, killed Kay. Linda Chapman, a supposed jealous girlfriend of Graham's, was claimed to be the murderer. Indeed, Chapman and Kay had a physical run-in not long before the murder. Even the soldiers Kay met when she was searching for Graham that night have been suggested. Although the semen DNA points only to Graham, other DNA tests of the bootlaces were inconclusive.

Much, perhaps too much, has been made of the evidence of dew on Graham's car when the police arrived at about 5:10 a.m. Also, observations were made of the engine of Graham's car being just

14

warm to the touch. A mechanic testified about the warmth of the engine. Expert testimony may not have been required as common experience includes the cooling of a car engine after the passage of time. The evidence of how much time may have passed was not very precise. Still, both these observations of dew and a barely warm engine support the conclusion Graham had been at the trailer longer than he claimed.

Graham said he was drunk to the point of passing out. Witnesses support he was out drinking that night. Yet it is expected he would know precisely where he passed out and what time he left that place. Maybe he committed the murder in a drunken rage and tried to cover it up. Maybe he panicked when he discovered the scene and tried to sober up, even taking a shower before facing the relatives next door. If so, this conduct is at least odd and again would be circumstantial evidence pointing to Graham's guilt.

Evidence of Graham's clothing should be evaluated. Graham had a single drop of blood near the zipper of the pants he wore when he reported finding Kay. Graham said it was from a small cut on Kay's foot from earlier that day. No such cut was noted in the autopsy. One wonders whether such a scratch would be noted given the extreme nature of the stab wounds being documented.

Given the location of the multiple stab wounds with effusion of blood, Graham could not have been wearing these pants at the

GRAHAM 000142

time of the murder, if he committed the murder. On the other hand, if Graham wore these pants when he discovered the body, it would not be surprising with the scene as it was that Graham would get a single drop of blood on him. The drop was so small it could not be tested.

If Graham committed the murder and changed his clothes, where did the clothes he wore during the murder go? No blood-soaked clothes of Graham's were ever found or otherwise accounted for.

Another important point should be mentioned. Graham had a knife on his person when the police first spoke to him. This knife was consistent with the stab wounds. Yet this knife had not been cleaned according to experts and had no blood or fibers on it. A little pocketknife was also found on the scene, but it could not have been the cause of the wounds. Thus, the murder weapon was never found. As one can see, the evidence against Graham, like that against Dean, is far from perfect.

Essentially, the Court finds the new evidence fits Aristotle's saying: "The whole is greater than the sum of its parts." The Court observed the testimony of Renee carefully and found it essentially credible. It had a ring of sincerity, although it certainly was not unblemished. But it is not reasonable to expect perfect recollection with the long passage of time and the dynamics of the relationship between Dean and Renee. The Court does not find Barbara's testimony very credible because of too many

16

GRAHAM 000143

Case 1:20-cv-00210-GNS-HBB    Document 130-20    Filed 10/27/25    Page 17 of 20
PageID #: 3803

inconsistencies. Still, Barbara's testimony has at least some probative value when combined with that of Renee.

Starting with the combined testimony of two eye-witnesses to the presence of Dean (a multiple murderer in the making) on the night of the murder, one must add the indirect admission by Dean to Renee close in time to the murder. The admission by Dean's father to the destruction of incriminating evidence lends further weight.

If there is a next trial, the testimony of Dean's ex-wife and Graham's ex-wife might add to the newly discovered evidence, but it is not to be considered in the analysis for this Motion, because it is not recently discovered evidence. These ex-wives provided testimony after the 2008 trial in prior post-trial proceedings. Their evidence was either not discovered with due diligence or was not alone sufficient to change the result of the trial as determined by prior rulings of this Court.

While discussing the weight of the evidence, the Court should comment on the evidence offered about Dean's murders of others. While some similarities are presented, the evidence of these other crimes the Court has examined thus far is not sufficiently similar to be admitted in evidence as "signature" crimes. See Clark v. Commonwealth, 223 S.W.3d 90 (Ky. 2007). Even so, Graham's counsel claims Dean left no DNA at one of these scenes. This has some bearing on the emphasis of the Commonwealth about the exclusion of Dean from the samples taken from the murder scene here.

GRAHAM 000144

The foregoing analysis should not be taken as the opinion of the Court as to what the evidence proves or will prove. To properly analyze the evidence in the correct context of this Motion the Court has tried to draw inferences both ways. One reason for this approach is the fact criminal convictions are decided with application of a "beyond a reasonable doubt" standard. Graham is not required to prove actual innocence; only the result of a new trial would probably be different. When reasonable doubt is applied, the Court finds this probability.

The gravity of this decision is not lost on the Court. The finality of cases is an important public policy, and special care must be exercised in setting aside a conviction based on evidence offered decades later. Yet this important decision rests with this Court. An appellate court may not simply disagree with this decision. An abuse of discretion would have to be shown. <u>Harris</u>, <u>supra</u>, at 341.

This case presents a truly extraordinary situation. Two witnesses swear they saw an alternate perpetrator, Dean, who was known to live in the vicinity. They saw him near the crime scene on the night of the murder and describe his appearance and conduct in such a way as to strongly suggest his participation in the murder. Dean later committed at least two murders with at least some disturbing similarity to the murder in this case. Added to this are a reported admission of the murder by Dean and an

GRAHAM 000145

admission by Dean's father of destruction of incriminating evidence. When this evidence is compared to the evidence against Graham, a new trial is justified. THEREFORE,

THE COURT HEREBY GRANTS the Defendant's Motion for New Trial. The Judgment in this case is VACATED. The Court will schedule further proceedings after counsel have had an opportunity to review their respective calendars with that of the Court; AND

THE COURT FURTHER ORDERS the Defendant's bond and conditions pending his next court appearance will return to that bond posted prior to the trial in 2008, specifically $250,000 (10% deposit) with at least two personal sureties and a verified residential address.

So Ordered this 2nd day of October, 2017.

_____
SPECIAL JUDGE, TODD CIRCUIT COURT

GRAHAM 000146

GRAHAM 000147