UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:20-CV-00210-GNS-HBB

BRENDA GRAHAM,
as Administrator of the Estate of Norman Graham                              PLAINTIFF

v.

TODD COUNTY et al.                                                           DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Leave to File Excess Pages (DN 131); Defendant Todd County's Motion to Exclude Plaintiff's Expert (DN 116), Motion for Summary Judgment (DN 117), and Motion for Leave to File Excess Pages (DN 141); and Defendant KSP Troopers' Motion for Leave to File Excess Pages (DN 118), Motion to Join DN 116 (DN 120), and Motion for Summary Judgment (DN 122). These motions are ripe for adjudication.

## I.      STATEMENT OF FACTS AND CLAIMS

In the early morning of June 30, 1980, Norman Graham ("Graham") found the body of his girlfriend, Janice Kay Williams ("Williams"), in his home in Todd County, Kentucky. (KSP File 6-7, DN 122-3). She had been raped and stabbed twenty-seven times. (KSP File 6). Her hands were tied behind her, and she was nude—her red jumpsuit appeared to have been cut or torn off her. (KSP File 6). Todd County Sheriff Laurin Morris ("Sheriff Morris") was the first law enforcement officer at the scene; when he arrived, he noticed dew on Graham's car and that its engine was not very warm. (1981 Trial Tr. vol. 1, 59:20-60:1, 72:11-22, DN 130-2). Sheriff Morris called the Kentucky State Police ("KSP") and turned the investigation over to KSP

1

Detective Vernon Albro ("Detective Albro"), though Sheriff Morris continued to assist.  (KSP File 1; 1981 Trial Tr. vols. 1-2, 84:25-85:4, DN 117-3).

Graham told the investigators that he had just arrived home after a night out and had last had sex with Williams on the morning of June 29.  (Graham Statement 1-3, 5, DN 117-5). Williams was living with Graham, but their relationship was not exclusive.  (KSP File 7-8). Williams had social interactions with several men that were interested in her shortly before she was murdered.  (KSP File 7-8, 19).  For example, on June 29 Williams met a soldier and placed an envelope with his contact information in her purse, and though her purse was found at the crime scene that envelope was never located.  (KSP File 19, 1981 Trial Tr. vols. 1-2, 210:19-211:19). Additionally, Williams' mother and neighbor received anonymous threats referencing Williams. (KSP File 19-20).

Investigators collected vaginal smears and analyzed the jumpsuit Williams had been wearing for traces of semen.  (KSP File 48).  No semen was initially found on the jumpsuit, but—after Graham had provided semen samples—forensic examiners reexamined the jumpsuit and located semen.  (KSP File 48, 58, 72).

The Commonwealth indicted and tried Graham in 1981, but dismissed the charges after a hung jury in November 1981.  (KSP File 67, 78).  In 2003, the Commonwealth reexamined the biological evidence using DNA testing.  (KSP File 162).  A DNA sample from Roy Wayne Dean ("Dean"), who had been convicted of two similar murders nearby, did not  match the semen on the jumpsuit but a sample from Graham did.  (KSP File 162).  Graham was reindicted in 2007, and in 2008 he was convicted and sentenced to forty years' imprisonment.  (KSP File 192, 196, 201). Graham appealed and pursued post-conviction relief.  *Commonwealth v. Graham*, 586 S.W.3d 754, 757 (Ky. App. 2019).  In 2017, after two new witnesses came forward and provided testimony

2

implicating Dean, the state trial court granted Graham's motion for a new trial. *Id.* at 757, 759. This decision was affirmed on appeal, and the Commonwealth dismissed the charges against Graham. *Id.* at 757; (Order Dismissing Indictment, DN 130-21).

Graham then initiated this civil rights action, asserting claims under Section 1983 and state law against Todd County, the Morris Estate, and various KSP officers, including Trooper Robert Miller ("Miller"), Trooper Leonard Scott Smith ("Smith"), the Albro Estate, and the Estate of Detective Steven Silfies ("Detective Silfies"). (2d Am. Comp., DN 29). The Court dismissed the claims against the Estates of Morris, Silfies, and Albro. (Mem. Op. & Order, DN 46; Mem. Op. & Order, DN 92). Thus, the remaining defendants are Todd County and KSP Troopers Miller and Smith (jointly, "KSP Troopers"). Graham died in 2023, and his wife and administrator of his estate, Brenda Graham ("Plaintiff"), was substituted as Graham's personal representative in this action. (Order, DN 69).

## II.      JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction. *See* 28 U.S.C. § 1331. In addition, the Court has supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(a).

## III.      DISCUSSION

### A.      Motions for Summary Judgment

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party

satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the nonmoving party must present facts proving that a genuine factual dispute exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### 1. *KSP Troopers*

Plaintiff voluntarily dismisses her claims for supervisory liability, negligent supervision, and intentional infliction of emotional distress. (Pl.'s Resp. Defs.' Mot. Summ. J. 19 n.8, DN 128 [hereinafter Pl.'s Resp. KSP Troopers' Mot. Summ. J.]). The remaining claims against the KSP Troopers are for Fourteenth Amendment due process violations, fabrication of evidence, malicious prosecution, failure to intervene, and conspiracy. (*See* 2d Am. Compl.).

The KSP Troopers have invoked federal qualified immunity, stating that "[t]here is no evidence that the KSP Defendants violated any of the Plaintiff's rights." (KSP Troopers' Mot. Summ. J. 22). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). The Sixth Circuit has explained:

4

> The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question.   Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct.

*Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citation omitted).

"[T]o overcome a qualified immunity defense, an individual must show that his or her *own* rights were violated, and that the violation was committed *personally* by the defendant." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Next, a plaintiff must show that her right was clearly established at the time the action occurred:  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Harlow*, 457 U.S. at 818.  Although the Supreme Court "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (alteration in original) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  Thus, Plaintiff must "identify a case that found a constitutional violation based on sufficiently similar facts which, due to these factual similarities, gave the officers 'fair notice' that their [actions] [were] unconstitutional."  *Paul v. Whitley Cnty. Det. Ctr.*, 712 F. Supp. 3d 907, 920-21 (E.D. Ky. 2024) (internal quotation marks omitted) (quoting *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022)).

### a.    Due Process

The KSP Troopers argue that Plaintiff's due process claims are barred because the underlying criminal proceeding ultimately terminated in Graham's favor.  (Defs.' Mot. Summ. J. 23-25, DN 122 [hereinafter KSP Troopers' Mot. Summ. J.]).  To succeed on a *Brady* claim, a plaintiff must demonstrate prejudice that resulted from the nondisclosure of exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  The KSP Troopers assert that Plaintiff has not done so, citing *Anderson v. Knox County*, No. 6:17-133-KKC, 2018 WL 7500205 (E.D. Ky. Oct. 3, 2018), which states that if "the underlying criminal proceeding terminated in [the plaintiff's] favor, he has not been injured by the act of wrongful suppression of exculpatory evidence."  *Id.* at *6-7 (alteration in original) (citation omitted).  *Anderson*, however, is readily distinguishable because that plaintiff was acquitted at trial, and therefore suffered no deprivation of liberty, unlike Graham, who was convicted and incarcerated.  *Id.* at *1.  The fact that Graham's conviction was later overturned does not prohibit him from bringing a *Brady* claim—plaintiffs must overturn their convictions before they can bring civil *Brady* claims under Section 1983.  *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 592 (6th Cir. 2025) (Murphy, J., concurring) ("[T]he so-called '*Heck* bar' applies to civil *Brady* claims, meaning that [Section] 1983 plaintiffs must overturn their convictions before they may pursue their claims."  (citing *Hobbs v. Faulkner*, No. 19-3303, 2020 WL 12933850, at *2 (6th Cir. June 9, 2020); *Ruiz v. Hofbauer*, 325 F. App'x 427, 431 (6th Cir. 2009))).  Accordingly, the KSP Troopers' argument has no merit, and Plaintiff's *Brady* claim is not barred by virtue of the hung jury at his first trial.

Plaintiff asserts that Miller withheld exculpatory evidence consisting of an anonymous letter received by the victim's mother before the murder, information from an "intercept device" placed on the phone of a neighbor of the victim's mother, and evidence related to other murders

committed in the vicinity after the murder for which Graham was convicted.[1]  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 6-7, 12, 22, 30).  Plaintiff's citations to this supposedly exculpatory evidence, however, all refer to entries in the KSP file and Plaintiff concedes that there is no evidence that the KSP failed to turn over its entire file to the prosecution, with the exception of the photos due to the age of the file.[2]  (Summ. J. Hr'g Audio Recording 10:25:30-10:27:00 AM, Mar. 25, 2026).

Plaintiff's concession is fatal to her claims against Miller for withholding exculpatory evidence.  Although there is no question that law enforcement officers have a duty not to withhold exculpatory evidence from the prosecution under *Brady v. Maryland*, "[t]hat duty is discharged once an officer delivers such evidence to the prosecutor's office." *Army v. Collins*, 488 F. App'x 957, 961-62 (6th Cir. 2012) (citation omitted); *Virgil v. City of Newport*, 545 F. Supp. 3d 444, 459-60 (E.D. Ky. 2021).  In this instance, all of the information Plaintiff accuses Miller of withholding

---

[1] In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment . . . ." *Id.* at 87.  "[A] criminal defendant is equally deprived of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  A plaintiff may bring both malicious prosecution and due process claims based on *Brady*, contrary to Todd County's contention. *See Sykes v. Anderson*, 625 F.3d 294, 303 (6th Cir. 2010).

[2] Although Plaintiff complains that Miller withheld some evidence in his personal files when he retired which were later turned over to KSP Detective Stevenson in 2001, she concedes that there is no proof that any of the information Miller later provided to Stevenson was exculpatory.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 14-15; Summ. J. Hr'g Audio Recording 10:31:37-10:31:54 AM).

is referenced in the KSP file.[3]  For this reason, Miller is entitled to summary judgment on Plaintiff's

claim that he withheld evidence in violation of *Brady*.[4]

Because Plaintiff provides no evidence that Smith withheld exculpatory evidence, he is

also entitled to summary judgment.  (*See* Pl.'s Resp. KSP Troopers' Mot. Summ. J. 30).

### b.        Fabrication of Evidence

The KSP Troopers assert that Plaintiff's fabrication claim does not state a Fourth

Amendment injury separate from malicious prosecution.  (KSP Troopers' Mot. Summ. J. 18).

Plaintiff, however, raises her fabrication claim under both the Fourth and the Fourteenth

Amendments.  (2d Am. Compl. 21).  Courts have recognized fabrication-of-evidence claims under

both amendments.  *Clark v. Abdallah*, 131 F.4th 432, 447 (6th Cir. 2025) (citing *Hoskins v. York*,

No. 23-5325, 2024 WL 2894648, at *2 (6th Cir. June 10, 2024)).  The Sixth Circuit has explained

the difference between the protections provided by the amendments:

> The Fourth Amendment's protection against unreasonable seizures prohibits the government from arresting and detaining individuals without probable cause that they committed an offense.  The Fourth Amendment is violated when probable cause rests on fabricated evidence presented to a grand jury or to a judge determining probable cause.  When individuals present claims that they were unlawfully detained based on fabricated evidence, we tend to consider them under the rubric of malicious prosecution.  Because Fourth Amendment claims turn crucially on the lack of probable cause, a law-enforcement defendant may defeat

---

[3] Plaintiff faults Miller for documenting in April 1982 his review in "the late fall of 1980" of a murder case at Fort Campbell, which Miller believed was not similar to the Williams murder. (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 12; KSP File 85).  Although Miller obviously prepared his summary at a later date, the KSP file references this same conclusion contemporaneously with the date of the review.  (KSP File 35).  Additionally, the commonwealth attorney's January 19, 1982, letter to Miller, which references "developments" in the case that they discussed, does not provide any proof that Miller violated Graham's *Brady* rights; even if those developments included exculpatory evidence, that evidence was clearly disclosed to the prosecution.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 11; KSP File 80).

[4] Moreover, Plaintiff has not met her burden to overcome the KSP Troopers' assertion of qualified immunity in opposition to her *Brady* claim.  Plaintiff does not argue nor cite any cases illustrating that Graham had a clearly established right to this type of exculpatory information at the time his right was supposedly violated.  (*See* Pl.'s Resp. KSP Troopers' Mot. Summ. J. 36-37).

> liability by showing that, notwithstanding the fabricated evidence, probable cause supported detention.
>
> The Fourteenth Amendment, by contrast, prohibits the government from depriving a person of liberty without due process of law. The due-process right is infringed when the prosecution presents "evidence [that] is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." Because the core of the right at issue here is not the deprivation of liberty but the right to a fair trial, "a stand-alone fabrication-of-evidence claim can survive without regard to probable cause."

*Id.* (alteration in original) (internal citations omitted) (citation omitted). Thus, Plaintiff's malicious prosecution claim does not prohibit her from also bringing a Fourteenth Amendment fabrication-of-evidence claim.

To succeed on a fabrication-of-evidence claim, a plaintiff must show that "a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (alterations in original) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). "A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Jacobs v. Alam*, 915 F.3d 1028, 1042 (6th Cir. 2019) (quoting *Stemler*, 126 F.3d at 872).

"[W]hether evidence is 'fabricated' will often turn on circumstantial evidence . . . ." *Ferris v. City of Cadillac*, 726 F. App'x 473, 479 (6th Cir. 2018). "[D]irect observation of the allegedly fabricating act" is not necessary to survive summary judgment. *Thomsen v. Sullivan Cnty.*, No. 2:22-CV-5, 2024 WL 4438466, at *4 (E.D. Tenn. Oct. 7, 2024). For example, in a drug possession case where pills were found in a plaintiff's wallet, the plaintiff's testimony that he did not have pills in his wallet before law enforcement officers exercised control over the wallet created a genuine dispute of material fact. *Id.* ("Under this version of events, . . . 'it is impossible' for a pill to have been located inside Plaintiff's wallet unless . . . [the officers]—the only other individuals

9

who had custody of the wallet on the date in question—planted it there." (citation omitted)). Additionally, when an officer delivers evidence, this can "create[] the means and opportunity to" fabricate evidence. *Ricks v. Pauch*, No. 20-1778, 2021 WL 4775145, at *6 (6th Cir. Oct. 13, 2021) (internal quotation marks omitted) (finding claim survived summary judgment when the delivered evidence differed from the evidence collected from the crime scene).

The KSP Troopers contend that Plaintiff provides no evidence supporting her fabrication claim, other than mentioning Williams' jumpsuit. (KSP Troopers' Mot. Summ. J. 17). Plaintiff maintains the KSP Troopers' mere assertion that there is no evidence of her claim is insufficient to shift the burden of proof to her. (Pl.'s Reply KSP Troopers' Mot. Summ. J. 33). To the contrary, in contesting Defendants' motion for summary judgment it is incumbent upon Plaintiff to point the court to evidence in the record which would support a jury verdict in her favor. Fed. R. Civ. P. 56(c)(1); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *Bickley v. Norfolk & W. Ry. Co.*, 187 F.3d 634, 1999 WL 427026, at *1 (6th Cir. 1999). The KSP Troopers' burden "may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993) (citation omitted); Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). "The Court's task is not to determine which parties' story is more credible at this stage. Instead, the Court's task is to determine whether Plaintiff provides enough evidence to overcome Defendants' argument there is 'no evidence' of fabrication." *Black v. W. Va. State Police*, 696 F. Supp. 3d 236, 249 (S.D.W. Va. 2023) (internal citation omitted).

10

With respect to alleged fabrication of semen on the jumpsuit by Miller, Plaintiff has failed to meet her burden. Indeed, in opposing Defendants' proposition that there is no evidence that Miller or Sheriff Morris planted semen on the jumpsuit the victim was wearing at the time of the murder, Plaintiff first cites to her own Second Amended Complaint. (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 22, 33 (citing 2d Am. Compl. ¶¶ 45-59)). Of course, allegations in Plaintiff's complaint are not evidence and are clearly insufficient to carry her burden. *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (allegations in an unverified complaint are not admissible evidence). Plaintiff also cites to her own "Statement of Facts" in her response opposing the motion. (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 22, 33). While Plaintiff claims that Sheriff Morris and Miller obtained semen samples from Graham, the record reflects that this evidence was gathered by the pathologist, Dr. Frank Pritzer ("Dr. Pritzer"). (1981 Trial Tr. vol. 1, 83:1-16; 111:12-19). Sheriff Morris accompanied Graham to Dr. Pritzer's office, but Miller is not mentioned.[5] *Id.* The only *evidence* Plaintiff cites implicating Miller is that he transported the jumpsuit to the State Crime Lab ("SCL") on April 1, 1981. (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 10, 22). While the KSP file indeed reflects that Miller took the jumpsuit to the SCL on that date, the semen sample had been sent by Detective Albro to the SCL by certified mail on December 22, 1980, received by the SCL on January 9, 1981, tested four days later, and returned on April 2, 1981. (KSP File 62-63, 71). No evidence has been provided to show how Miller could have planted semen on the jumpsuit when Graham's semen sample had been sent to SCL months before Miller took the jumpsuit to the SCL. Indeed, though Plaintiff notes that finding semen on the jumpsuit upon re-examination is "curious," she has cited no proof that the semen was not simply missed upon initial examination

---

[5] Sheriff Morris testified that a "state police officer" accompanied him and Graham to the pathologist's office but could not remember who the officer was. (1981 Trial Tr. vol. 1, 83:4-6). Plaintiff provides no proof that the other officer was Miller.

or that it was so obvious upon re-examination that it could not have been missed. There also is no proof cited by Plaintiff that the specimen submitted by Graham had been altered or tampered with when received by the SCL. (KSP File 63-64). Further, Plaintiff provides no explanation, much less proof, to support her implicit contention that Miller or any other law enforcement officers could have foreseen in 1981 that advances in forensic science would occur **over twenty years in the future** to enable a laboratory match between Graham's DNA and the semen which was supposedly planted on the jumpsuit. Based upon this record it appears a jury could only link Miller to the supposed fabrication of semen on the jumpsuit (or indeed that fabrication actually occurred) through sheer speculation, which is not permitted. *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1061 (6th Cir. 2024).

The same can be said for Plaintiff's claim that Miller fabricated a signed statement from Graham's ex-wife, Sandra Graham ("Sandra"). (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 9, 33). The KSP file shows that on the day after the murder, Detective Albro interviewed Sandra who said that she had eaten with Graham at around 11:00 PM, about four hours before the murder. (KSP File 7). According to Detective Albro's report, Sandra said she and Graham then returned Graham to his car at the Red Carpet Inn in Clarksville, where she left him after locking his car doors.[6] (KSP File 7-8). On December 5, 1980, Sandra signed a written statement witnessed by Miller and KSP Trooper A. Bell ("Bell") consistent with what Detective Albro had documented on July 1. (S. Graham Statement 1, DN 128-10). Part of the written statement indicating that Sandra left

---

[6] Graham told Detective Albro that he was with Sandra until about 10:00 PM, but was too drunk to drive home and passed out in his car until 4:00 AM. (KSP File 7). Employees at the Red Carpet Inn said that the only car in the parking lot when the bar closed at 3:00 AM belonged to one of their friends. (KSP File 8).

Graham in his car at 2:30 AM was crossed out and instead of the time, the words "unknown time" were penciled in and initialed by Sandra and Bell.  (S. Graham Statement 1).

To support her claim that Miller fabricated Sandra's December 1980 statement, Plaintiff has produced an "affidavit"[7] from Sandra dated August 23, 2011, ("2011 Affidavit") over thirty years after her original statements.  (Burnette Aff., DN 128-11).  In her 2011 Affidavit, Sandra states that on July 1, 1980, she told "the detective" (apparently referencing Detective Albro) that she had been with Graham until 3:30 AM on the night of the murder.  (Burnette Aff. 1).  Sandra's 2011 Affidavit, however, makes no reference to her December 1980 signed statement indicating she did not know what time she left Graham at the Red Carpet Inn.[8]  (Burnette Aff. 1).  The 2011 Affidavit does not include any denial by Sandra that she signed the 1980 statement or claim that her signature was forged.

Sandra's 2011 Affidavit is clearly insufficient to support a jury verdict against Miller for fabricating Sandra's December 1980 statement.  First, Sandra's 2011 Affidavit is inadmissible hearsay.  Fed. R. Evid. 803.  Sandra is deceased and she apparently did not testify in this case, so Plaintiff has not shown that any explanation is forthcoming from Sandra regarding the circumstances of her statement to Detective Albro and her written statement to Bell and Miller in 1980.  (Summ. J. Hr'g Audio Recording 10:10:01-10:10:11 AM).  Without some admissible evidence that Sandra denied signing her December 1980 statement or otherwise accused Bell and Miller with some impropriety, Plaintiff has not sustained her burden of showing some evidence

---

[7] Sandra's affidavit is neither notarized nor attested.  At the time she signed this document, her name was Sandra Burnette.

[8] Plaintiff's counsel indicated at oral argument that Sandra had testified in connection with Graham's second trial or a post-conviction hearing, but none of that testimony has been cited to the Court.

13

that Miller fabricated Sandra's 1980 statement. Accordingly, Miller is entitled to summary judgment on this claim.

Because Plaintiff provides no evidence that Smith fabricated evidence, he is also entitled to summary judgment. (*See* Pl.'s Resp. KSP Troopers' Mot. Summ. J. 33).

### c.    Malicious Prosecution

Plaintiff brings both federal and state malicious prosecution claims against the KSP Troopers. The Court will first address her federal claim. "A malicious prosecution claim under the Fourth Amendment provides a cause of action for damages caused by 'wrongful investigation, prosecution, conviction, and incarceration.'" *Phat's Bar & Grill v. Louisville Jefferson Cnty. Metro Gov't*, 918 F. Supp. 2d 654, 660 (W.D. Ky. 2013) (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)). To assert a claim of malicious prosecution under Section 1983, a plaintiff must prove the following four elements:

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute." Second, because a [Section] 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, "as a consequence of a legal proceeding," the plaintiff suffered a "deprivation of liberty," as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Sykes*, 625 F.3d at 308-09 (alterations in original) (internal footnote omitted) (internal citations omitted) (citation omitted). The KSP Troopers do not contest the deprivation of liberty and favorable termination elements. (KSP Troopers' Mot. Summ. J. 9).

### i.    Decision to Prosecute

"[T]he term 'participated,'" as used in the first element of malicious prosecution, "should be construed within the context of tort causation principles." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Sykes*, 625 F.3d at 308 n.5). "To be liable for 'participating' in the

14

decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* "Because officers are responsible for *investigating* instead of *prosecuting* criminal activity, their investigative work 'must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake,' to satisfy the elements of a Fourth Amendment malicious prosecution claim." *Little v. City of Saginaw*, 731 F. Supp. 3d 814, 830-31 (E.D. Mich. 2024) (quoting *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015)), *aff'd*, No. 23-1535, 2025 WL 553008 (6th Cir. Feb. 19, 2025). "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge," and "(2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth." *Meeks v. City of Detroit*, 727 F. App'x 171, 178 (6th Cir. 2018).

Miller argues that he was not involved in Graham's prosecution. (KSP Troopers' Mot. Summ. J. 14-15). He was never the lead investigator—instead, he assisted Detective Albro. (KSP Troopers' Mot. Summ. J. 14). Miller did not testify in front of the grand jury or at trial, and he retired in 1988, years before Graham was retried. (KSP Troopers' Mot. Summ. J. 14-15; KSP Troopers' Reply Mot. Summ. J. 1).

Plaintiff has not presented evidence that Miller meaningfully participated in or personally influenced the decision to prosecute Graham. On December 1, 1980, Miller, along with Bell, Sheriff Morris, and KSP Detective Larry Bollinger, met with Commonwealth Attorney Jesse Riley ("Riley") and a county attorney to review the evidence in the case. (KSP File 29). Those officers met with Riley again two days later. (KSP File 33). Then on January 20, 1981, Miller and Sheriff Morris turned evidence over to Riley. (KSP File 66). Plaintiff argues that "it is 'reasonable to infer' [these meetings] involved statements about the fabricated evidence"; however, beyond

15

Miller's mere presence at these meetings, Plaintiff points to no proof that Miller actually impacted the decision to prosecute Graham.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 23 (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 821 (6th Cir. 2019))).  Absent such evidence, a jury would be left to speculate that Miller, one of the junior law enforcement officers in these meetings, "caused" the decision to seek an indictment.  Regardless, "truthful participation in the prosecution decision is not actionable."  *Johnson*, 790 F.3d at 655 (citation omitted); *Sykes*, 625 F.3d at 314 ("It is absolutely clear, however, that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." (citations omitted)).  Although Plaintiff argues that Miller's participation was blameworthy because he fabricated evidence and withheld exculpatory information, Plaintiff has not provided sufficient evidence to substantiate those allegations, as discussed above.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 21-24).

Smith also argues he was not involved in Graham's prosecution.  (KSP Troopers' Mot. Summ. J. 15).  Indeed, Smith may not be held liable for Graham's first prosecution because he was not involved with the case until the 2000s.  (Smith Dep. 41:16-42:19).  While Plaintiff asserts that Smith did not stop Detective Silfies from obtaining an indictment, this is irrelevant because that clearly would not have been *active* participation.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 24).  Although Smith served the arrest warrant on Graham and transported him to Kentucky, Plaintiff does not point to any evidence that Smith provided any false information.  *See Jones v. Naert*, 121 F.4th 558, 569 (6th Cir. 2024) (held that arresting officer did not influence the decision to prosecute because falsehoods were not material); *Miller v. Maddox*, 866 F.3d 386 (6th Cir. 2017); *Stacy v. Clarksville Police Dep't*, 771 F. Supp. 3d 1024, 1039 (M.D. Tenn. 2025).  Smith

16

also did not testify in front of the grand jury or at trial.  (Smith Dep. 65:13-16; 2008 Trial Tr. 78:8-106:5, Oct. 14, 2008, DN 117-2).

Plaintiff points to Smith's concession that, while he does not remember if he was "directly involved in the seeking the indictment," he was "involved in the discussions about the case, the information from within the case, and the results . . . from the lab."  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 24; Smith Dep. 64:22-65:4).  Plaintiff, however, makes no allegation that Smith participated by fabricating evidence, knowingly providing false information, or withholding evidence and has cited no facts demonstrating that Smith's participation was blameworthy.

### ii.      Probable Cause

Even if the KSP Troopers did participate in the decision to prosecute Graham, there was probable cause to support Graham's indictment.  The KSP Troopers argue there is a presumption of probable cause because Graham was indicted by a grand jury before each trial.  (KSP Troopers' Mot. Summ. J. 11-12); *Allen v. Rucker*, 304 F. Supp. 3d 638, 643 (E.D. Ky. 2018) (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)).  A plaintiff may rebut this presumption by showing that:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury) . . . .

*King*, 852 F.3d at 587-88.

Plaintiff briefly mentions the jumpsuit, referencing her fabrication claim.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 27).  Because Plaintiff points to no evidence that the KSP Troopers made

17

any false statement or fabricated evidence, Plaintiff has failed to rebut the presumption of probable cause.

Moreover, there was probable cause for both prosecutions. "An officer has probable cause when 'the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed.'" *Phat's Bar & Grill*, 918 F. Supp. 2d at 662 (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). Finding probable cause is not a "high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Courts must view "the totality of the circumstances at the time of the Plaintiffs' arrest and through the time that the criminal proceeding against them commenced . . . ." *Sykes*, 625 F.3d at 311. Thus, courts must consider "both the inculpatory and exculpatory evidence." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (citation omitted). Probable cause inquiries, however, do "not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands . . . ." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (citation omitted). "Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (citations omitted).

"'When no material dispute of fact exists, probable cause determinations are legal determinations that should be made' by the court. But, '[i]f disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts.'" *Alman v. Reed*, 703 F.3d 887, 896 (6th Cir. 2013) (alteration in original) (internal citation omitted) (quoting *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005)). In this instance, Plaintiff argues that there is a genuine dispute of material fact about whether probable cause existed and continued to exist throughout the investigations. (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 29). While Plaintiff certainly disputes the relevance of certain facts to the probable

18

cause analysis, she does not dispute the following facts, which will be construed in her favor. *See King*, 852 F.3d at 582 ("all reasonable inferences must be given to [the nonmovant] at the summary-judgment stage").

Williams was Graham's girlfriend, and she was found murdered in his trailer where they both lived. A medical examiner placed Williams' time of death between midnight and 5:00 AM on Monday June 30, 1980. (KSP File 70). Because a neighbor reported hearing screaming around 3:00 AM, investigators believed that to be Williams' time of death. (KSP File 4, 7). Graham asserted he was out drinking that night. (KSP File 7). His ex-wife, Sandra, confirmed his story, averring that Graham joined her at the Red Carpet Inn. (Sandra Statement 1). Later that evening the two went to get breakfast—they drove in Sandra's vehicle, leaving Graham's car in the Red Carpet Inn parking lot. (Sandra Statement 1). Sandra stated that they returned to the parking lot of the Red Carpet Inn at some unknown time. (Sandra Statement 1). Graham said he slept in his car until around 4:00 am, when he woke up, drove home, and discovered Williams' body in his trailer. (KSP File 7). Employees at the Red Carpet Inn, however, indicated the only car in the lot at 3:00 AM belonged to their friend. (KSP File 8).

When law enforcement officials arrived on the scene, they observed a heavy dew on Graham's car and that the engine was not warm, despite Graham's assertion that he had just driven around 20 miles home.[9] (KSP File 7, 179). There was no sign of a struggle in the trailer. (KSP File 7). The knife Graham turned over to police was large enough to have punctured Willliams'

---

[9] Plaintiff's assertion that "[Graham's] car may or may not have had dew on its windshield by the time the officers observed it at the scene" is insufficient to place this fact into controversy because Plaintiff does not support this assertion with any citation to the record. (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 29); Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). Regardless, the KSP report noted the absence of heavy dew on Graham's car when law enforcement first arrived at the scene. (KSP File 7, 178-79, 182).

heart, while the knife found at the scene was not. (KSP File 29). No blood was found on either knife, though. (KSP File 54). Additionally, there was water in the bathtub, and Williams' brother-in-law Ralph Blick reported that Graham's hair was wet. (KSP File 179, 2008 Trial Tr., 116:2-4, Oct. 14, 2008). A piece of red fabric, possibly from the jumpsuit Williams had been wearing, and pubic hair matching Graham's were found in the bathtub drain. (KSP File 7, 58).

Graham said he and Williams had consensual sex the morning of Sunday, June 29. (Graham Statement 5). Williams' mother stated that Williams took a bath at her home in the afternoon, then put on a red jumpsuit. (KSP File 25). An analysis of vaginal smears indicated that Williams had recent sexual activity, but Dr. Pritzer, the pathologist, did not identify any sperm. (KSP File 76).

Graham was not the only man Williams was dating. (KSP File 7, 31). One boyfriend admitted that he visited Williams' sister on Sunday, and that night his car was seen in the trailer park where Graham lived. (KSP File 8). Williams drove to a different boyfriend's house around 10 PM but left after she saw him with another girl. (KSP File 31). She also gave her phone number and address to a soldier she had just met the afternoon before she was murdered. (KSP File 21).

Williams' mother received a letter threatening Williams and her child before Williams was killed. (KSP File 19). Williams' neighbor also received threatening phone calls after the murder—the caller reportedly admitted to killing Williams and said that they would do something even worse to the neighbor. (KSP File 19-20).

Before Graham was tried, Miller compared this case to a similar case from Fort Campbell, in which a young woman had also been bound, stripped of her clothing, sexually assaulted, and murdered. (KSP File 85). There were, however, differences in many of the details; for example, there were signs of a struggle, unlike in the Williams case. (KSP File 85).

20

After Graham's first trial, two other women were murdered nearby, Dean was ultimately convicted in both cases. (Miller Dep. vol. I, 31:20-32:1, 45:2-15). Investigators compared these cases to the Williams case and learned that Dean lived just outside of the trailer park when Williams was murdered. (KSP File 91; Miller Dep. vol. I, 30:24-31:5). The SCL also determined that there were semen deposits from two different men on Williams' body. (KSP File 119, 138). Dean's DNA, however, did not match any of the evidence collected. (KSP File 119).[10] Witnesses implicating Dean did not come forward until after Graham had been convicted; in state court, Graham succeeded on his motion for a new trial based on the newly discovered evidence from the new witnesses. *Graham*, 586 S.W.3d at 771.[11]

The Court must now examine these uncontroverted facts to determine whether there was probable cause to prosecute Graham in 1981. "In considering a suspect's possible alibi in an assessment of probable cause, this Court has held that [a] suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making the determination whether probable cause to arrest exists." *Meakens v. Benz*, 515 F. App'x 414, 418 (6th Cir. 2013) (alteration in original) (internal quotation marks omitted) (citation omitted). "At the same time, the Court has found that an officer is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation, if the initially discovered facts provide probable cause." *Id.* (internal quotation marks omitted) (citation omitted).

---

[10] Graham was the only match in DNA testing. (KSP File 156).

[11] Two of Dean's family members testified that they heard a woman scream, then saw Dean running from the area behind Graham's trailer on the night Williams was murdered. *Graham*, 586 S.W.3d at 759.

Although Graham's alibi was partially corroborated by his ex-wife, their story conflicts with the reports of a neutral witness indicating Graham's car was not in the Red Carpet Inn parking lot at 3:00 AM and is further called into question by the dew observed on his vehicle when police arrived at Graham's trailer.  This is supportive of probable cause.  *See Smith v. City of Chicago*, 785 F. Supp. 3d 356, 417 (N.D. Ill. 2025) ("Smith's alibi witnesses . . . who were interviewed twice, could not account for Smith's whereabouts between around midnight and 3:00 a.m., suggesting at a minimum, Smith was lying to police."); *Jackson v. Pigeon*, No. C 01-2417 VRW, 2002 WL 500776, at *5 (N.D. Cal. Mar. 25, 2002) ("He had no evidence of a definitive alibi. Indeed, adding the alibi information available to Pigeon might suggest that Jackson's friends were lying about his alibi."); *Hyung Seok Koh v. Graf*, 307 F. Supp. 3d 827, 848 (N.D. Ill. 2018) ("apparent inconsistencies in the Kohs' stories" supported probable cause).

Turning to the evidence from the crime scene, the absence of any signs of forced entry or a struggle also support a finding of probable cause, as Williams was dating Graham and her body was found in his trailer where they lived together.  *See Goodman v. City of L.A. Police Dep't*, 708 F. App'x 888, 890 (9th Cir. 2017) ("The officers, however, knew that (1) Alan was found in a pile of blood; (2) that there was no sign of forced entry and Goodman was the only person with access to the home; and (3) that the autopsy report indicated homicide.  This is sufficient for a reasonable officer to believe probable cause existed."); *Smith*, 785 F. Supp. 3d at 417 (lack of forced entry contributed to finding of probable cause).[12]

---

[12] The probative value of the remaining evidence is minimal:  though Graham's knife could have caused Williams' wounds, there was no blood found on the knife.  Moreover, the KSP Troopers have not pointed to any accounts corroborating Blick's observation that Graham's hair was wet, and Plaintiff asserts that Blick himself later became a suspect.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 29; 2008 Trial Tr. 126-128, Oct. 14, 2008).  The fact that Graham's hair was found in his own bathtub did not incriminate him, and the presence of semen indicated that Williams may have been raped but did not implicate Graham in particular.  Because Dr. Pritzer testified that

Finally, the exculpatory evidence that Plaintiff points to is not "'conclusively established' evidence that defeats probable cause, or 'clearly exculpatory facts' . . . ." *Nelson v. Vill. of Lisle*, 437 F. App'x 490, 494 (7th Cir. 2011) (internal citations omitted). "The inference of the suspect's guilt does not need to be more probable than competing alternatives; a fair probability of guilt is enough." *Hyung Seok Koh*, 307 F. Supp. 3d at 861 (citation omitted). The evidence pointing to Dean was not discovered until Graham had already been convicted, so it does not affect the probable cause analysis.

In conclusion, the fact that Graham's girlfriend was found murdered in his home, Graham's alibi was contradicted by witnesses from the Red Carpet Inn, and heavy dew was noted on Graham's car after he had supposedly driven a substantial distance just before the police arrived, taken altogether, support a finding of probable cause as a matter of law with respect to the initial indictment. The second indictment also included evidence of Graham's DNA on the victim's jumpsuit, but even without that evidence, the prosecution could rely on the same facts as the first indictment. Having concluded those facts established probable cause without Graham's DNA evidence, the second indictment based on those same facts was also supported by probable cause. *See Clark*, 131 F.4th at 453; *King v. Harwood*, No. 3:15-CV-762-CHB, 2020 WL 1578615, at *21 (W.D. Ky. Apr. 1, 2020); *see also McCallum v. Geelhood*, 742 F. App'x 985, 991 (6th Cir. 2018). Accordingly, summary judgment on this claim will be granted for Smith and Miller.[13]

---

Graham had "a tremendous number of . . . mobile sperm," the lack of sperm initially identified in the vaginal smears would indicate that Graham was not the offender; however, "the existence of some contrary evidence does not defeat probable cause." *Hyung Seok Koh*, 307 F. Supp. 3d at 848 (citation omitted); (1981 Trial Tr. vol. 1, 111:12-19).

[13] Moreover, because "it would have been reasonable—even if mistaken—for an officer to believe that there was probable cause[,]" the KSP Troopers would be entitled to qualified immunity for the malicious prosecution claim. *Hyung Seok Koh*, 307 F. Supp. 3d at 849.

### d.   State Malicious Prosecution

Next, the elements of a claim for malicious prosecution under Kentucky law are:

1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
2) the defendant acted without probable cause;
3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and
5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016).  The KSP Defendants do not dispute the last two elements.

"Kentucky's standard for determining probable cause is the same as the federal standard." *Palmer v. Carter*, No. 2013-CA-001123-MR, 2014 WL 4377874, at *2 (Ky. App. Sep. 5, 2014); *see Allen*, 304 F. Supp. 3d at 647-48 ("'[A] grand jury indictment raises a presumption of probable cause,' that must be rebutted by the plaintiff."  (alteration in original) (quoting *Davidson v. Castner-Knott Dry Goods Co.*, 202 S.W.3d 597, 607 (Ky. App. 2006))).  As discussed above, the KSP Troopers had probable cause as a matter of law to believe that Graham had murdered his girlfriend.  Accordingly, both troopers are entitled to summary judgment as to this claim.

### e.   Failure to Intervene and Conspiracy

The parties address Plaintiff's failure to intervene and conspiracy claims together.  To succeed on a claim for failure to intervene, a plaintiff must show that the defendant "observed or had reason to know" that constitutional harm was occurring and that the defendant "had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  Next, "[t]o prove conspiracy, plaintiffs must show (1) 'that there was a single plan,' (2) 'that the

24

alleged coconspirator shared in the general conspiratorial objective,' and (3) 'that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.'" *Rieves v. Town of Smyrna*, 67 F.4th 856, 862 (6th Cir. 2023) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).

For both claims, the KSP Troopers argue that no underlying constitutional violations occurred.[14]  (KSP Troopers' Mot. Summ. J. 18-20).  Plaintiff argues that Miller either conspired with or failed to stop Sheriff Morris from violating Graham's rights.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 35-36).  As discussed below, there is no evidence that Sheriff Morris conspired to or did violate Graham's rights.  These claims against Miller therefore fail.

The KSP Troopers also argue that these claims against Smith are supported by insufficient evidence.  (KSP Troopers' Mot. Summ. J. 19-20).  In response, Plaintiff alleges that "Smith did nothing to stop Detective Silfies from obtaining an indictment in 2007, even though he knew no new evidence existed establishing probable cause."  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 36).  Smith's concession that no new evidence was obtained from October 31, 2006—when Detective Silfies became the lead investigator—to January 2, 2007, hardly means there was no probable cause to prosecute Graham; sufficient evidence had been obtained previously.

Moreover, Plaintiff provides no specific allegation or facts showing that Smith knew evidence was fabricated.  Plaintiff does claim that Smith was "aware of" the investigation into the murder of Brenda Church, for which Dean was convicted, and that KSP Detective Brad Stevenson suspected Dean murdered Williams, but Plaintiff makes no allegation and provides no facts showing that Smith knew of any undisclosed exculpatory information.  (Pl.'s Resp. KSP Troopers'

---

[14] Plaintiff first argues the summary judgment burden not shifted to her on either claim.  (Pl.'s Resp. KSP Troopers' Mot. Summ. J. 35).  Once again, the KSP Troopers' contention that Plaintiff has not produced any evidence is sufficient to shift the burden of proof to Plaintiff.

25

Mot. Summ. J. 16).  There is no evidence tying Smith to any alleged constitutional violations, so Smith is also entitled to summary judgment on these claims.

### 2.   *Todd County*

The only remaining claim against Todd County is a *Monell* claim.  (Pl.'s Resp. Def.'s Mot. Summ. J. 17 n.7, DN 130 [hereinafter Pl.'s Resp. Todd Cnty.'s Mot. Summ. J.]).  "There are two elements to a *Monell* claim:  (1) the existence of an underlying constitutional violation; and (2) a practice or custom of the City that was the moving force behind that constitutional violation." *Brooks v. City of Cleveland*, 795 F. Supp. 3d 987, 1017 (N.D. Ohio 2025).

#### a.      Constitutional Violation

To impose *Monell* liability on Todd County, Plaintiff must prove that an underlying constitutional injury occurred.  *See Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *5 (6th Cir. May 13, 2024) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).  "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under [Section] 1983." *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 731 (6th Cir. 2022) (citation omitted).  Sheriff Morris is the only individual associated with Todd County named in the Second Amended Complaint.[15]

#### i.      Fourteenth Amendment Due Process Claim

As a preliminary matter, there appears to be some confusion among the parties as to what type of Fourteenth Amendment due process claim Plaintiff states in Count II of the Second Amended Complaint.  Todd County argues that, if the claim is based on procedural due process, then it fails because Plaintiff has not alleged that state remedies are inadequate, and if the claim

---

[15] The claims against the Morris Estate were dismissed because they either did not survive his death or were barred by statutes of limitation.  (Mem. Op. & Order, DN 46).

based on substantive due process, then malicious prosecution is the appropriate claim. (Def.'s Mem. Supp. Mot. Summ. J. 16, DN 117-1 [hereinafter Todd Cnty.'s Mem. Supp. Mot. Summ. J.). Plaintiff does not directly respond to these arguments but rather asserts that Todd County did not address her *Brady* claims. (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 25). From this response, the Court infers that Plaintiff intended Count II to cover the alleged *Brady* violations only, rather than some other unspecified due process violations.[16] Still, in its reply, Todd County repeats its initial due process argument, but addresses the *Brady* claims alongside the fabrication claim, contending that Plaintiff has not provided enough evidence to support her *Brady* claims. (Def.'s Reply Mot. Summ. J. 6-10, DN 141-1 [hereinafter Todd Cnty.'s Reply Mot. Summ. J.]).[17]

As Todd County argues, Plaintiff's own expert does not mention any facts showing that Sheriff Morris failed to disclose exculpatory evidence. (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 13; Craig Miller Report 12-16, DN 116-1). In her response, however, Plaintiff alleges that Sheriff Morris failed to disclose exculpatory information he learned during his interrogation of Graham with a hypnotist and an envelope Williams placed in her purse containing a man's contact information. (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 25).

Regarding the meeting with the hypnotist, Todd County argues that nothing in the record supports the contention that Sheriff Morris gained any exculpatory information from that meeting. (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 9). Indeed, Sheriff Morris testified that Graham said

---

[16] Count II also references fabricated evidence, but those claims are brought explicitly in Count III. (2d Am. Compl. ¶¶ 116-130).

[17] Contrary to Plaintiff's assertion, Todd County did not waive any further argument regarding Plaintiff's Fourteenth Amendment due process claim. (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 25). In its memorandum supporting its motion for summary judgment, Todd County argued that there was no evidence that Sheriff Morris failed to disclose exculpatory evidence and addressed Plaintiff's due process claim, even if it may have misunderstood Plaintiff's intended claim. (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 13, 16).

he could not be hypnotized and that Graham did not make a statement.  (2008 Trial Tr. 179:6-22, Oct. 14, 2008; 2008 Trial Tr. 136:11-137:24, Oct. 16, 2008, DN 117-6).  Plaintiff provides no evidence that any exculpatory information was revealed.  Even if it was, "[t]here is no *Brady* violation when the person on trial 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source.'"  *Clark*, 131 F.4th at 455 (second alteration in original) (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)).  "If the person on trial knows or should have known the crucial information, 'there is really nothing for the government to disclose.'"  *Id.* (quoting *Coe*, 161 F.3d at 344).  Plaintiff does not assert that Graham did not know what occurred during the meeting. Because presumably Graham would have been aware of any supposedly exculpatory information revealed, there can be no *Brady* violation.

Next, regarding the envelope, Todd County argues that:  (1) there is no evidence that the envelope was still in Williams' purse when Sheriff Morris arrived at the crime scene; and (2) the KSP, not Sheriff Morris, searched the purse.  (Todd Cnty.'s Reply Mot. Summ. J. 9-10).  Williams' friend testified that, on the day before the murder, Williams gave her address and phone number to a soldier—believed to be named Rick, but who is otherwise unidentified—and wrote his name and address on a brown envelope, which she placed in her purse.  (KSP File 21).  Sheriff Morris was the first law enforcement officer to arrive at the crime scene.  (1981 Trial Tr. vol. 1, 59:20-60:1, 69:9-12).  Detective Albro later reported to the scene and searched Williams' purse, but did not mention any envelope.  (1981 Trial Tr. vols. 1-2, 210:19-211:9).  From these facts, Plaintiff proposes it is possible to infer that Sheriff Morris took the envelope out of Williams' purse when he first arrived at the crime scene.

28

"At this stage of the case, the Court must indulge reasonable inferences in the plaintiff's favor. But inferences, whether drawn by the Court or the jury, must consist of reasonable extrapolations from the evidence actually in the record." *Williams v. Kuryakyn Holdings, LLC*, No. 18-13606, 2021 WL 1313358, at *8 (E.D. Mich. Apr. 7, 2021). Plaintiff's claim would require a jury to infer Williams brought the envelope to Graham's trailer and Sheriff Morris—rather than Williams, her killer, or another first responder, such as Detective Albro—removed the envelope. This conjecture would also presuppose that Sheriff Morris, freshly arriving at the scene, would have immediately understood the significance of a name and address written on an envelope in Williams' purse and undertaken to remove or destroy it. These inferences, based only on the above facts, are not reasonable. *See Kubala v. Smith*, 984 F.3d 1132, 1141 (6th Cir. 2021) (rejecting plaintiff's theory as requiring "too many inferences"). Plaintiff's claim that Sheriff Morris took the envelope is "[m]ere speculation," which "will not suffice to defeat a motion for summary judgment."[18] *Wheeler v. Graves Cnty.*, No. 5:17-CV-38-TBR, 2019 WL 1320506, at *3 (W.D. Ky. Mar. 22, 2019); *Walden*, 119 F.4th at 1061 ("[The plaintiff's claim] rests not on 'significant probative evidence,' but on '[c]onjecture' and 'speculation,' which do not create a triable factual

---

[18] Even if Sheriff Morris did remove the envelope, that evidence was not material to Graham's guilt or punishment. "A finding of a *Brady* violation requires that suppressed, favorable evidence must be material, i.e., that 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Hughbanks v. Hudson*, 2 F.4th 527, 539 (6th Cir. 2021) (citation omitted). According to Williams' friend, the only information on the envelope was the soldier's address and phone number, which may have given defense counsel a better chance of identifying the soldier but does not tie the soldier to the murder. The identity of the soldier certainly does not create "a compelling alternative narrative." *Id.* at 542. Because the envelope is not material to Graham's guilt, Sheriff Morris would not have violated Graham's *Brady* rights even if he did fail to disclose it. *Compare id.* at 541 ("Given the relatively weak exculpatory nature of the undisclosed evidence . . . , we cannot conclude that the State's failure to disclose the evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (citations omitted)), *with Bies v. Sheldon*, 775 F.3d 386, 399-401 (6th Cir. 2014) ("Considering the quality and quantity of the evidence that the State failed to disclose in this case, the potential for that evidence to have affected the outcome of [the plaintiff's] trial is inescapable.").

matter." (internal citations omitted)). There is simply not sufficient evidence here to allow the jury to do more than speculate wildly about what could have happened to the envelope Williams put in her purse the day before she was killed. This claim must be dismissed.

### ii.      Fabrication of Evidence

Todd County asserts that there is no evidence supporting Plaintiff's claim that Sheriff Morris fabricated evidence by planting Graham's semen on the jumpsuit. (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 17). Plaintiff responds that she has offered sufficient circumstantial evidence. (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 25-27).

As Todd County argues, the semen samples were provided to KSP, which sent them to the SCL, and Miller transported the jumpsuit alone—although some evidence was stored at the Todd County Sheriff's Office, there is proof cited that Sheriff Morris accessed the samples or the jumpsuit. (KSP File 62-63, 70-71); *cf. Stillwagon v. City of Del.*, 274 F. Supp. 3d 714, 780 (S.D. Ohio 2017) (officers were entitled to summary judgment on a spoilation of evidence claim because there was no evidence that they accessed the evidence), *aff'd in part, appeal dismissed in part*, 747 F. App'x 361 (6th Cir. 2018). Because there is no evidence indicating that Sheriff Morris had the means or the opportunity to plant Graham's semen on Williams' jumpsuit, or that Graham's semen sample had been altered or tampered with, Plaintiff's claim that Sheriff Morris planted evidence on the jumpsuit in anticipation of DNA testing far in the future is implausible. *See Ricks*, 2021 WL 4775145, at *6; *see Davis v. Gallagher*, 951 F.3d 743, 745 (6th Cir. 2020) (reversing grant of summary judgment where "nothing in the record leads us to the conclusion that [the plaintiff's] claim that [the defendant] planted the drugs is demonstrably false or totally implausible"). Thus, no reasonable jury could find that Sheriff Morris fabricated this evidence.

30

### iii.   Malicious Prosecution

Todd County does not challenge the last two elements of the malicious prosecution claim, deprivation of liberty and favorable termination.  (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 14-15; Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 20).  It focuses instead on the first two elements, participating in the decision to prosecute and lack of probable cause.

Todd County argues that there was probable cause for Graham's prosecution, as evidenced by the grand jury indictment. (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 15).  In response, Plaintiff contends that the grand jury indictment was tainted.[19]  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 23).  She asserts that Sheriff Morris fabricated evidence and made false statements used to obtain the indictment.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 24).  There is insufficient evidence to show that Sheriff Morris fabricated evidence, however, and Plaintiff does not identify any allegedly false statements made by Sheriff Morris; accordingly, Plaintiff has failed to rebut the presumption of probable cause provided by the grand juries' indictments of Graham.  Moreover, as discussed above, there was probable cause to indict Graham as a matter of law.

Plaintiff is therefore unable to prove that Sheriff Morris maliciously prosecuted Graham, and it is unnecessary for the Court to consider the parties' arguments regarding the first element, whether Sheriff Morris participated in the decision to prosecute Graham.

---

[19] Plaintiff also claims that Todd County has waived any further argument on this point.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 23 n.8).  It has not.  Todd County explained why it is entitled to summary judgment:  Graham's indictment was fair on its face. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citation omitted).  Todd County also addressed Plaintiff's argument that the indictment was tainted.  (Todd Cnty.'s Reply Mot. Summ. J. 5).  The Court was not forced to "search the record and construct arguments" for Todd County. *See Ricks v. Pauch*, No. 17-12784, 2020 WL 1640166, at *25 (E.D. Mich. Apr. 2, 2020) (citation omitted).

### iv.    Supervisory Liability

Plaintiff is no longer pursuing this claim.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 17 n.7). This claim is dismissed.

### v.    Failure to Intervene and Conspiracy

Todd County argues that there is no evidence in the record to support these claims.[20] (Todd Cnty.'s Mem. Supp. Mot. Summ. J. 17-18).  Plaintiff responds that there are sufficient facts for a jury to find that Sheriff Morris failed to intervene and conspired to violate Graham's rights.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28-29).  Plaintiff alleges that Sheriff Morris and Miller failed to disclose exculpatory evidence, fabricated evidence, and met with a prosecutor to discuss an indictment when they knew probable cause did not exist.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28).  Plaintiff also claims that Sheriff Morris did not stop Detective Silfies from obtaining an indictment to prosecute Graham a second time.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28-29).

Plaintiff does not specify what information was withheld and has not pointed to evidence indicating that Sheriff Morris knew about Miller's alleged failure to disclose exculpatory evidence, which claims have been rejected above.  (*See* Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28).

Regarding her fabrication allegation, Plaintiff alleges that Sheriff Morris either failed to intervene or conspired with Miller to plant Graham's semen on a jumpsuit.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28).  First, there is no evidence that Miller planted Graham's semen, as discussed above.  Second, Sheriff Morris was with the forensic examiner when he obtained semen samples from Graham, but Plaintiff cites no evidence that Sheriff Morris had access to the semen samples and the jumpsuit or that Sheriff Morris knew about Miller's alleged fabrication.  (*See* Pl.'s

---

[20] Plaintiff also argues that this "cursory" argument fails to shift the summary judgment burden. (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28).  As previously explained, this kind of argument is sufficient to require Plaintiff to point to evidence in the record.

Resp. Todd Cnty.'s Mot. Summ. J. 28).  Plaintiff does assert that Sheriff Morris and Miller jointly investigated Williams' murder, "[b]ut that alone is not enough to show a conspiracy to violate Plaintiff's constitutional rights."  *Allen v. Linn Cnty. Bd. of Comm'rs*, No. 2:23-CV-02453-HLT-BGS, 2024 WL 3066168, at *12 (D. Kan. June 20, 2024) (citation omitted); (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28-29).

Next, Plaintiff has not provided any evidence that Sheriff Morris knew probable cause was lacking when he met with other investigators and the prosecution regarding the first indictment. (*See* Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28-29).  Plaintiff argues that Sheriff Morris knew "the [second] indictment was based on the evidence [he] and Miller fabricated on the jumpsuit." (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 28-29).  Again, there was probable cause for the second indictment and Plaintiff has provided no evidence of fabrication, so her claim that Sheriff Morris knew an indictment would violate Graham's rights or that he conspired with Detective Silfies to violate Graham's rights fails.

Because no jury could find that Sheriff Morris violated Graham's constitutional rights, Todd County is entitled to summary judgment on Plaintiff's *Monell* claim.

### b.      Policy or Custom

Even if Plaintiff had established a constitutional violation, she has not proven the second prong of *Monell*.  "Respondeat superior or vicarious liability will not attach under [Section] 1983." *City of Canton v. Harris*, 489 U.S. 378, 386 (1989) (citing *Monell*, 436 U.S. at 694-95).  Rather, for a municipality to be liable for the actions of its employees under *Monell*, a causal link must connect the alleged constitutional deprivation to a policy or custom of the municipality.  *See Deaton v. Montgomery Cnty.*, 989 F.2d 885, 889 (6th Cir. 1993).  "The official policy requirement was intended to distinguish acts of the municipality from acts of employees of the municipality,

and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) (internal quotation marks omitted). To establish municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

Here, Plaintiff alleges that Todd County had no written policies or procedures during Graham's investigation and prosecution. (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 30).

> The absence of a governing policy can be actionable "where the need to act is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need" in failing to institute a policy controlling the situation.

*Mills v. Owsley Cnty.*, 483 F. Supp. 3d 435, 474-75 (E.D. Ky. 2020) (quoting *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)). There are two ways that a plaintiff may demonstrate a county's need to act: First, a plaintiff may "show[] that the municipality possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof), such as where there have been recurring constitutional violations." *Heyerman*, 680 F.3d at 648. Second, a plaintiff may "show that the need to act should have been 'plainly obvious to the [county's] policymakers, who, nevertheless, are "deliberately indifferent" to the need,'" but this only applies "in a narrow range of circumstances where a violation of federal rights may be a highly predictable consequence of [the county's failure to act]." *Id.* at 648-49 (citation omitted). For example, when armed police officers will be required to arrest fleeing felons, "the need to train the officers in the constitutional limitations on the use of deadly force is "'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.'" *Id.* at 649 (quoting

34

*City of Canton*, 489 U.S. at 390 n.10).  In contrast, where "Plaintiffs have produced no evidence that the absence of a policy requiring officers to carry tasers and batons, or other non-deadly options, would predictably lead to the harm that occurred in this case," a deadly police shooting, no constitutional violation occurred.  *Mills*, 483 F. Supp. 3d at 475.

Accordingly, Plaintiff argues that Todd County's deliberate choice not to have any evidentiary policies amounts to an official policy, and that Graham would not have been wrongfully incarcerated if Todd County had maintained evidentiary policies and procedures.  (Pl.'s Resp. Todd Cnty.'s Mot. Summ. J. 29-32).  It is not necessary to have a policy prohibiting officers from fabricating evidence; planting evidence is obviously wrong.  *Cf. Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 774 (E.D. Tenn. 2010) ("Refraining from raping women in police custody is so obvious that even if [the] [county] were silent about such conduct, it would not give rise to a constitutional violation.  The court finds that [the] [county's] training procedures were sufficient as a matter of law, and that no specific training was necessary to inform officers not to rape or sexually assault women in their custody.").  Just as with fabrication of evidence, Sheriff Morris's supposed destruction of the envelope from Williams' purse would have been patently improper.  Accordingly, Todd County is entitled to summary judgment on Plaintiff's *Monell* claim.

B.    **Motion to Exclude Expert**

Todd County moves to exclude the testimony and opinions of Plaintiff's police practices expert, Craig R. Miller, and the KSP Troopers move to join this motion (Def. Todd Cnty.'s Mot. Exclude Pl.'s Expert, DN 116; Defs.' Mot. Join, DN 120). Because Todd County and the KSP Troopers are awarded summary judgment, these motions will be denied as moot.

35

C.      **Motions to Exceed Page Length**

Plaintiff, Todd County, and the KSP Troopers each move for leave to file a motion, response, or reply that exceeds the page limitation set by LR 7.1(d).  (Pl.'s Mot. Leave File Excess Pages, DN 131; Def.'s Mot. Leave File Excess Pages, DN 141; Defs.' Mot. Leave to File Excess Pages, DN 118).  The motions are reasonable and unopposed, and are therefore granted.

## IV.      CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Defendants' motions (DN 116, 117, 118, 120, 122) are **ADMINISTRATIVELY REINSTATED** to the Court's docket.

2.      Defendants' Motions for Summary Judgment (DN 117, 122) are **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

3.      Defendant's Motion to Exclude Plaintiff's Expert (DN 116) and Defendants' Motion to Join (DN 120) are **DENIED AS MOOT**.

4.      Defendants' Motions for Leave to File Excess Pages (DN 118, 141) and Plaintiff's Motion for Leave to File Excess Pages (DN 131) are **GRANTED**.

5.      The Clerk shall strike this matter from the active docket.

**Greg N. Stivers, Judge**
**United States District Court**
March 31, 2026

cc:      counsel of record